**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

STATE OF CALIFORNIA,

*Petitioner*,

v.

PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, PAUL ROBERTI, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, UNITED STATES DEPARTMENT OF TRANSPORTATION, AND SEAN DUFFY, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF TRANSPORTATION,

*Respondents*,

# PETITION FOR REVIEW

ROB BONTA
*Attorney General of California*
ANNADEL A. ALMENDRAS
DEBORAH M. SMITH
*Senior Assistant Attorneys General*
MYUNG J. PARK
VANESSA MORRISON
*Supervising Deputy Attorneys General*

MATTHEW BULLOCK
MICHAEL S. DORSI
MITCHELL RISHE
RAFAEL J. HURTADO
REBECCA HUNTER
*Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3802
Fax: (415) 703-1107
Michael.Dorsi@doj.ca.gov
Mitchell.Rishe@doj.ca.gov
*Attorneys for Petitioner*

July 20, 2026

**PETITION FOR REVIEW**

Pursuant to 49 U.S.C. Section 60119(a)(1), Federal Rule of Appellate Procedure 15, and Ninth Circuit Rule 15-1, the State of California, by and through Attorney General Rob Bonta and Office of the State Fire Marshal ("OSFM"), a unit of the California Department of Forestry and Fire Protection, petitions this Court for review of an order (or orders) issued by the Pipeline and Hazardous Materials Safety Administration ("PHMSA"), an agency within the United States Department of Transportation.

This Petition challenges as unlawful PHMSA's June 25, 2026 order granting a "Special Permit" (the "Special Permit"), designated Docket Number PHMSA-2026-0464, to Sable Offshore Corp. The Special Permit was accompanied by other documents entitled Analysis and Findings, Jurisdictional Determination, and Finding of No Significant Impact, (collectively, the "Related Documents"). The Related Documents were all prepared in support of the Special Permit and all issued the same date (June 25, 2026).

The Special Permit waives compliance with the requirements of 49 Code of Federal Regulations (CFR) § 195.452(h)(4)(iii)(H), which requires hazardous liquid pipeline operators to remediate certain longitudinal seam weld corrosion within 180 days of discovery, for the Las Flores Pipelines—a pair of onshore pipelines designated CA-324 and CA-325 that, in sequence, originate at Las Flores

Canyon in Santa Barbara County, California, and terminate at the Pentland Station terminal, in Kern County, California. The Special Permit is attached to this Petition as Exhibit 1.

To the extent that any or all of the Related Documents constitute separate orders or actions by PHMSA, Petitioner challenges them as well. For example, Petitioner also challenges the Jurisdictional Determination to the extent that it constitutes a separate order or action and supersedes PHMSA's December 17, 2025 order purporting to assume exclusive federal jurisdiction over the Las Flores Pipelines ("Federalization Order"). The Related Documents are attached to this Petition as Exhibits 2-4, respectively.

Pursuant to 49 U.S.C. Section 60119(a), orders issued by PHMSA under the Pipeline Safety Act may be challenged by filing a Petition for Review directly in the federal court of appeals where the petitioner resides, and the petition must be filed within 89 days of the issuance of PHMSA's order. Accordingly, Petitioner has timely and properly sought review of PHMSA's orders directly in this Court.

Respectfully submitted this 20th day of July, 2026.

ROB BONTA
*Attorney General of California*

/s/ *Michael S. Dorsi*
MICHAEL S. DORSI
*Deputy Attorney General*
Office of the Attorney General
455 Golden Gate Ave, Suite 11000
San Francisco, CA 94102
Tel: (415) 510-3802
Email: michael.dorsi@doj.ca.gov
*Attorney for Petitioner State of California*

## STATEMENT OF RELATED CASES

The following related cases are pending: *State of California v. Pipeline and Hazardous Materials Safety Administration, et al.*, Ninth Circuit Court of Appeals Case No. 26-508; and *Environmental Defense Center, et al. v. Pipeline and Hazardous Materials Safety Administration, et al.*, Ninth Circuit Court of Appeals Case No. 25-8059.

# EXHIBIT 1

Exhibit 1
to Petition for Review
filed July 20, 2026

# U.S. DEPARTMENT OF TRANSPORTATION
# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
# SPECIAL PERMIT

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | PHMSA-2026-0464 |
| **Requested By:** | Sable Offshore Corp. |
| **Operator ID #:** | 40881 |
| **Original Date Requested:** | January 22, 2026 |
| **Original Issuance Date:** | June 25, 2026 |
| **Effective Dates:** | June 25, 2026, to June 25, 2036 |
| **Code Section(s):** | 49 CFR § 195.452(h)(4)(iii)(H) |

**Grant of Special Permit:**

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA), Office of Pipeline Safety (OPS)[1] grants this special permit to Sable Offshore Corp. (Sable). This special permit applies to two segments of the Santa Ynez Pipeline System (SYPS), an interstate hazardous liquid pipeline facility that transports crude oil produced on the Outer Continental Shelf (OCS) through an onshore processing facility located in Santa Barbara County, California, to a terminal located in Kern County, California. The two segments that are subject to the special permit are known as Lines CA-324 and CA-325 (CA-325A and CA-325B). The regulation waived is 49 Code of Federal Regulations (CFR) § 195.452(h)(4)(iii)(H), which requires hazardous liquid pipeline operators to remediate certain longitudinal seam weld corrosion within 180 days of discovery.

### I. Purpose and Need:

Lines CA-324 and CA-325 were originally installed with polyurethane foam and an overlying polyethylene wrap tape to provide thermal insulation. The use of these materials is known to cause shielding, a condition that interferes with the proper functioning of cathodic protection and increases the risk of corrosion in pipeline systems. Sable requested a special permit authorizing an alternative approach for managing the increased corrosion risk on Lines CA-324 and CA-325

[1] Throughout this special permit, the usage of "PHMSA" or "PHMSA OPS" means the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration Office of Pipeline Safety.

to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the U.S. District Court for the Central District of California. The Consent Decree includes provisions to address a rupture that occurred on the SYPS in Santa Barbara County, California, in May 2015.

As relevant here, the Consent Decree required the prior operator of the SYPS to obtain a waiver before restarting Lines CA-324 and CA-325 to ensure that effective measures were in place to mitigate the risk of corrosion. The Consent Decree also incorporated the outstanding requirements from a corrective action order that PHMSA issued following the rupture (CPF No. 5-2015-5011H). The CAO required the restart plan for Lines CA-324 and CA-325 to include a long-term plan for managing corrosion under insulation (CUI). The Consent Decree provided multiple options for satisfying this requirement. One of the options was obtaining a special permit that requires: 1) accelerated reassessments; 2) use of appropriate, complementary assessment tools for all threats, including stress corrosion cracking; 3) coordination of data from the appropriate alternating in-line inspection (ILI) technologies; 4) more stringent repair criteria targeted at CUI; and 5) advanced data analysis techniques to account for the potential growth of CUI, including interaction criteria for anomaly assessment.[2]

The conditions in this special permit address the requirements in the Consent Decree. Specifically, the conditions require substantially more frequent integrity assessments as compared to the pipeline safety regulations at 49 CFR Part 195. Each integrity assessment must use threat-appropriate tools (including for wall loss anomalies from external and internal-based corrosion and for detecting crack anomalies from conditions such as stress corrosion cracking), The conditions also establish more stringent anomaly repair criteria as compared to Part 195; require enhanced data integration from integrity assessments to continuously gauge assessment performance through comparison with in-the-field and other comparative benchmarks; and require the performance of a corrosion growth rate analysis to better inform the analysis of integrity assessment data. PHMSA notes that it previously issued an emergency special permit to Sable for Lines CA-324 and CA-325 imposing substantially similar conditions on December 23, 2025 (Docket no. PHMSA-2025-1502),[3] and that the California Office of State Fire Marshal (OSFM) issued waivers to Sable containing essentially the same conditions on December 17, 2024.[4]

PHMSA further notes that the jurisdictional status of Lines CA-324 and CA-325 has changed since the District Court entered the Consent Decree. At that time, CA-324 and CA-325 were

---

[2] *See also* PHMSA ADB-2016-04, 81 Fed. Reg. 40398, 40400 (June 21, 2016).

[3] The emergency special permit included several conditions which Sable indicated it had completed prior to the effective date of the emergency special permit but that it had not provided to PHMSA for review. Sable provided additional records to PHMSA following the issuance of the emergency special permit, rendering those conditions no longer necessary for inclusion in this special permit. In addition, on February 13, 2026, Sable requested that its application be considered in accordance with the Notice of Limited Enforcement Discretion and Statement of Policy issued by PHMSA on January 12, 2026. As part of that request, Sable agreed to follow the terms and conditions in the emergency special permit until PHMSA issued its decision on this application.

[4] OSFM submitted a comment on the docket for this special permit request stating that the proposed special permit conditions removed the state waiver requirement that Sable account for tool tolerance in its evaluation of corrosion anomalies needing remediation prior to restart of the SYPS. As discussed in the SPAF, that requirement was not clearly stated in the state waiver itself, and PHMSA determined that the margin of error afforded by that tool tolerance allowance was not necessary for the conditions to be consistent with pipeline safety.

considered part of an intrastate hazardous liquid pipeline facility subject to regulation by OSFM.[5] However, as discussed more fully in the Jurisdictional Determination, PHMSA has since determined that Lines CA-324 and CA-325 are part of an interstate hazardous liquid pipeline facility. Accordingly, PHMSA has the sole and exclusive authority to issue the special permit for Lines CA-324 and CA-325 that Sable has requested in this proceeding.[6]

## II. Special Permit Segments

This permit pertains to the specified special permit segments defined in this section.

**Special Permit Segments:**

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

## III. Conditions

PHMSA grants this special permit subject to Sable implementing each of the following conditions. These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with requirements in 49 CFR § 195.452(h)(4)(iii)(H).

**General Conditions:**

**1)** The special permit segments may only be used to transport crude oil.

**2)** Prior to transporting crude oil in the special permit segments, Sable must develop and implement procedures for the conditions and requirements described in the special permit.

**3)** Sable shall not exceed maximum operating pressure (MOP) limits for the special permit segments, as follows:

   **a)** The MOP of Line CA-324 cannot exceed 1,003 pounds per square inch gauge (psig).

   **b)** The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) cannot exceed 1,000 psig.

---

[5] *See* 49 U.S.C. §§ 60101(a)(10) (defining "intrastate hazardous liquid pipeline facility"); 60105 (establishing requirements for State pipeline safety program certifications).

[6] 49 U.S.C. §§ 60104(c), 60118(c).

**c)** The MOP of Line CA-325B cannot exceed 1,292 psig between Sisquoc and Check Valve 37, and 1,170 psig between Check Valve 37 and Pentland Station.

**4)** Sable shall not exceed maximum operating temperature limits for crude oil transported in the special permit segments, as follows:

**a)** The maximum operating temperature of the crude oil transported in Line CA-324 must not exceed 140 degrees Fahrenheit (°F) for more than 12 consecutive hours.

**b)** The maximum operating temperature of the crude oil transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 °F for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

**c)** The maximum operating temperature of the crude oil transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 °F for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

**5)** This special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this special permit.

**6)** This special permit does not relieve Sable from any applicable requirements contained in the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

**7)** ILIs performed pursuant to this special permit must include

**a)** Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

**i.** Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

**ii.** General corrosion means uniform or gradually varying loss of wall thickness over an area.

**b)** Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

**c)** Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

**8)** Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24-inch pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All test specimens must be from the predominant existing 24-inch pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344 inches that was manufactured by Nippon Steel Corp. in the 1980s. At least three separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ),[7] and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e., three samples for pipe body,

[7] The HAZ, as used in this special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

three samples for HAZ, and three samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[8]

**9)** Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30-inch pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All test specimens must be from both of the two following predominant existing 30-inch pipe specifications:

**a)** API 5L X70 pipe with a nominal thickness of 0.281 inches that was manufactured by the various pipe mills in the 1980s.

**b)** API 5L X65 pipe with a nominal thickness of 0.344 inches that was manufactured by the various pipe mills in the 1980s.

At least three separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, HAZ, and the double submerged arc weld (DSAW) long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e., three samples for pipe body, three samples for HAZ, and three samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[9]

**10)** All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-324 and CA-325A/B.[10] Upon restart Sable must utilize ultrasonic thickness wall measurement (UTWM) and ultrasonic shear wave crack detection (USCD) ILI tools within 7 days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must use the UTWM and USCD ILI results to identify, to evaluate, and to remediate any immediate and 180-day repair conditions listed in this special permit.

**11)** Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with section 1.2 and exclusions in accordance with section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within 1 inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

**12)** Sable must use cleaning pigs at regular intervals not to exceed a biweekly basis to

[8] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable has submitted fracture toughness results to PHMSA, and PHMSA will review the results and confirm the completion of required testing.

[9] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable has submitted fracture toughness results to PHMSA, and PHMSA will review the results and confirm the completion of required testing.

[10] Sable indicated in its application that it has already completed the repairs required in this sentence. Sable must submit all relevant records to PHMSA.

maintain adequate cleanliness on the internal pipe wall of the special permit segments.

**13)** Pressure testing:[11]

**a)** Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100 percent specified minimum yield strength for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

**i.** All metal loss anomalies that have an ILI reported depth of 40 percent and greater wall loss.

**ii.** All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

**b)** Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

**c)** Prior to placing Line 325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of CA-325A at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

**i.** All metal loss anomalies that have an ILI reported depth of 40 percent and greater wall loss.

**ii.** All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

**d)** Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

**e)** Prior to placing Line 325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of CA-325B at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:

**i.** All metal loss anomalies that have an ILI reported depth of 40 percent and greater wall loss.

**ii.** All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

[11] Sable completed all of the testing required in this Condition, but the condition is included for completeness.

**f)** Sable must obtain approval for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

**g)** Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 CFR Part 195 subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

**h)** Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to PHMSA.[12]

**i)** Section(s) of the special permit segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this special permit if failure(s) raise the concern that the special permit segments cannot be safely operated.

**14)** ILI assessment and frequency:

**a)** Prior to performing ILIs of the special permit segment, Sable shall provide PHMSA with a written notification describing its assessment plan with the following information:

**i.** Dates for integrity assessment.

**ii.** ILI tool(s) selected, in accordance with API Standard 1163, section 5, and NACE SP0102[13] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications.

**iii.** ILI tool vendor(s).

**iv.** Required tool specifications, including operational specifications and tool validation methodology.

**v.** Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications.

**vi.** Criteria used to identify locations for excavation and field verification.

**vii.** Non-destructive examination.

**b)** Within 7 days prior to any anticipated ILI tool run, Sable must use extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

**c)** Metal loss tool(s):

**i.** Initial ILI tool runs – Each year, during the first 2 years of operating the

---

[12] All submissions to PHMSA required by this special permit shall be submitted through email to the OPS Western Region Director, Dustin Hubbard, email address, Dustin.Hubbard@dot.gov, or his designee.

[13] Industry standards referenced in this special permit must utilize the editions that are incorporated by reference in 49 CFR § 195.3 unless another edition is explicitly specified in this special permit.

special permit segments, Sable shall conduct at least two ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every 6 months not to exceed 9 months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

**ii.** Subsequent ILI tool runs – After the first 2 years of operating the special permit segments, Sable shall conduct at least one UTWM each calendar year, not to exceed 15 months, or the ILI assessment must be assessed at more frequent intervals if the remaining failure pressure ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the special permit segment within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an IMU.

**d)** Crack detection tools – Sable shall conduct at least one USCD tool each calendar year, not to exceed 15 months,[14] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

**i.** These crack tool runs must use an IMU and must be able to detect and size axial and circumferential cracks.

**ii.** USCD performance specification requirements:

**1.** The USCD tools must have a probability of detection that is greater than or equal to 90 percent for axial and circumferential cracks.

**2.** The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks located in the base material.

**3.** The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks located in the weld.

**4.** The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

**e)** Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

**f)** Where any ILI tool fails to record data for 5 percent or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed outside the range of the tool velocity listed in the

---

[14] Sable may petition PHMSA to revise the reassessment interval for crack detection tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to PHMSA approval.

tool specification for 2 percent or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the special permit segment in which the ILI tool velocity was outside of the specified tool velocity range.

**g)** Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10 percent or greater, based on raw data, prior to adding in any correction for tool tolerance.

**h)** Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition, and includes that tolerance in determining the size of each indication reported to Sable.

**i)** Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[15] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10 percent accuracy for 80 percent of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

**j)** Prior to the ILI final report being received, Sable must perform at least four separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

**15)** Discovery of condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

**16)** Immediate repair conditions:[16]

**a)** A crack or crack-like anomaly that meets any of the following criteria:

**i.** Crack or crack-like anomaly that is equal to or greater than 50 percent of pipe wall thickness.

**ii.** Crack or crack-like anomaly that has a predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

**b)** Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

**c)** Any external cluster corrosion or external general corrosion located where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the

[15] A minimum of four independent direct examination excavations must be used for unity plots.

[16] The criteria specified in this special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR § 195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

MOP.[17]

**17)** 180-day repair conditions:[18]

**a)** A crack or crack-like anomaly that has a predicted failure pressure of less than 1.5 times the MOP.

**b)** Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

**c)** All internal or external metal loss anomalies that have an ILI reported depth of 40 percent or greater wall loss, including tool sizing tolerance for depth.[19]

**d)** For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within 1 inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

**18)** Corrosion growth rate analysis (CGRA):

**a)** Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILIs (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the special permit segments is maintained.[20] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

**b)** The CGRA procedure must include ILI data matching methods[21] to analyze data from successive ILIs, methodologies for growth rate calculations and errors from comparing ILI data.

**c)** Sable must identify the projected date when remaining metal loss indications will reach a depth of 70 percent or greater wall loss.

**d)** When determining the projected date when remaining metal loss indications will reach a depth of 70 percent or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates.[22]

**e)** All metal loss indications that are projected to reach a depth of 70 percent or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

---

[17] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[18] The criteria specified in this special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR § 195.452(h)(4)(iii), except for those associated with 49 CFR § 195.452(h)(4)(iii)(H). All immediate repair conditions must be remediated with a permanent repair method.

[19] For example, if the ILI tool reports a 31 percent metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41 percent metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 CFR § 195.452 until the indication is remediated or until otherwise authorized by the PHMSA.

[20] At a minimum, Sable must include signal matching between ILI data sets.

[21] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[22] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

**19)** Pressure reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for 2 months prior to the date of inspection, until the anomaly is repaired.

**20)** In field direct examination of pipe:

**a)** Direct examinations[23] of pipe must include appropriate non-destructive examination methods for cracking, such as magnetic particle inspection, shear wave technology, or phased array ultrasonic testing (PAUT).[24] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

**b)** Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40 percent in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions apply if Sable chooses repair method 5 for metal loss anomalies:

**i.** Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

**ii.** Sable must increase the metal loss anomaly's depth by 20 percent when it inputs it into the formula for calculating the number of wraps needed for repair method 5.

**iii.** After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15 percent of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

**c)** Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

**d)** Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy.

**e)** Sable must recoat in accordance with its coating repair procedure.

**f)** All external polyurethane foam and the polyethylene tape wrap on buried pipe exposed during the field evaluation must not be replaced with new insulation or

---

[23] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[24] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

polyethylene tape wrap.

**21)** Integrity management:

**a)** A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

**i.** Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 CFR § 192.712(d)(1).

**ii.** Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 CFR § 192.712(d)(2).

**b)** Sable must analyze a sample of additional indications of varying amounts of metal loss between 10 percent and 40 percent for validation. The sample size shall be at least ten, unless fewer than ten indications are reported within that range, in which case Sable would examine the number of indications called.

**c)** When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

**d)** Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

**e)** Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the special permit segments. The review must be conducted within 6 months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

**f)** Within 1 year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.[25]

**22)** Data requirements for predicted failure analysis:

**a)** Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results, including—but not limited to—tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

---

[25] Sable completed the evaluation required in this condition, but the condition is included for completeness.

**b)** The analyses performed in accordance with this special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records.

**23)** Recordkeeping:

**a)** Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this special permit shall be kept for the life of the special permit segments and must be submitted to the PHMSA in the manner requested (electronic, hardcopy, or other format) within 30 days.

**b)** Sable must maintain the following records:

**i.** Technical approach used for the analysis.

**ii.** All data used and analyzed.

**iii.** Pipe and longitudinal weld seam properties.

**iv.** Procedures used to implement special permit conditions.

**v.** Evaluation methodology used.

**vi.** Models used.

**vii.** Direct in situ examination data.

**viii.** All ILI tool assessments information evaluated.

**ix.** Pressure test data and results.

**x.** All in-the-ditch assessments performed on the special permit segments.

**xi.** All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results.

**xii.** All finite element analysis results.

**xiii.** The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology.

**xiv.** The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods.

**xv.** Safety factors used for fatigue life and/or predicted failure pressure calculations.

**xvi.** Reassessment time interval and safety factors.

**xvii.** The date of the review.

**xviii.** Confirmation of the results by qualified technical subject matter expert(s).

**xix.** Approval by responsible Sable management personnel.

**xx.** Records of additional preventive and mitigative measures performed.

**xxi.** Reports required by this special permit.

**24)** Reporting:

**a)** Any release on the special permit segments shall be reported to PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the

time of discovery.[26]

**b)** An email notification shall be made to PHMSA at least 3 days prior to a special permit segment being exposed for non-emergency purposes of field evaluation and repair. The email notification shall include, if applicable:

- **i.** Tool type and run date.
- **ii.** Unique identifier (e.g., dig number, joint number, flaw ID, condition type).
- **iii.** Dig sheets.
- **iv.** Field contact information for Sable.
- **v.** Time and location of the field evaluation and repair.

**c)** Sable shall provide a summary of conditions report within 210 days of the last date of an ILI run to PHMSA and include:

- **i.** Tool type.
- **ii.** Run date.
- **iii.** Summary of conditions report.[27]
- **iv.** Final vendor report and pipe tally.

**d)** Sable shall provide a report to PHMSA by June 15 of every year for the duration of this special permit. At a minimum, the annual report shall contain the following, if applicable:

- **i.** A closure report for the previous calendar year (CY), which contains:
  - **1.** Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs.
  - **2.** Identify features that remain to be assessed.
  - **3.** Unity plots for previous ILI runs.
- **ii.** Fracture mechanics and pressure cycling analyses in accordance with condition 21(a).
- **iii.** The third-party ILI expert reviews in accordance with condition 21(e).
- **iv.** AC and DC interference surveys that are due in accordance with condition 21(f).
- **v.** A copy of the CGRA for prior year, including:
  - **1.** Mean corrosion growth rate for the special permit segments.
  - **2.** Distribution graph of the corrosion growth rate for the special permit segments (e.g., occurrences (#) versus corrosion rate (mpy)).

---

[26] This requirement does not relieve Sable from spill reporting requirements that might exist under local, State, or Federal regulations.

[27] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA) to be included in the summary of conditions reports, closure report, and annual reports if information provided is not deemed sufficient.

**25)** Limitations:

**a)** PHMSA grants this special permit for a period of ten years from the date of issuance.

**b)** PHMSA may order the special permit segments to be shut down, if appropriate, pursuant to its authority under 49 U.S.C. § 60112.

**c)** PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this special permit. The terms and conditions of any compliance order shall take precedence over the terms of this special permit.

**d)** In the event of conflict between the conditions of this special permit and industry standards, the special permit conditions shall prevail.

**e)** If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the special permit, Sable must provide PHMSA with written notice of the change within 30 days of the consummation date.

Issued in Washington, D.C. on June 25, 2026.

Paul Roberti,

Administrator, Pipeline and Hazardous Materials Safety Administration

# EXHIBIT 2

Exhibit 2
to Petition for Review
filed July 20, 2026

# U.S. DEPARTMENT OF TRANSPORTATION
# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
## Special Permit Analysis and Findings
## Sable Special Permit

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | PHMSA-2026-0464 |
| **Requested By:** | Sable Offshore Corp. PPC |
| **Operator ID#:** | 40881 |
| **Original Date Requested:** | January 22, 2026 |
| **Original Issuance Date:** | June 25, 2026 |
| **Code Section(s):** | 49 CFR § 195.452(h)(4)(iii)(H) |

## Purpose:

The Pipeline and Hazardous Materials Safety Administration (PHMSA), Office of Pipeline Safety (OPS),[1] provides this information to describe the facts of the subject special permit application submitted by Sable Offshore Corp. PPC (Sable), to discuss significant public comments received with respect to the application, to present the engineering and safety analysis of the special permit application, and to make findings regarding whether the requested special permit should be granted and, if so, under what conditions.

## Pipeline System Affected:

On January 22, 2026, Sable applied for a special permit seeking to waive the applicability of the requirements in 49 CFR § 195.452(h)(4)(iii)(H) to approximately 124.42 miles of 24- and 30-inch diameter pipe in the Santa Ynez Pipeline System (SYPS). The pipe is part of two SYPS segments, known as Lines CA-324 and CA-325 (CA-325A and CA-325B), that continue the transportation of crude oil produced on the Outer Continental Shelf (OCS) from an onshore processing facility to a terminal in Kern County, California. Additional information about Sable's special permit application is provided below.

## Special Permit Request:

Sable, in its special permit application, requested a waiver of 49 CFR § 195.452(h)(4)(iii)(H) as applied to Lines CA-324 and CA-325. Without this special permit, 49 CFR § 195.452(h)(4)(iii)(H) would

[1] Throughout this special permit the usage of "PHMSA" or "PHMSA OPS" means the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration Office of Pipeline Safety.

require corrosion of or along a longitudinal seam weld to be scheduled for evaluation and remediation within 180 days of discovering the condition.[2]

Description and definition of the special permits segments and the pipeline specifications are detailed in Sable's application letter with attachments in Docket No. PHMSA-2026-0464, including a map of the special permit segments in Attachment A.

## Public Notice:

On February 24, 2026, PHMSA posted a notice of this special permit request in the Federal Register (91 FR 8949) with a closing date of March 26, 2026. On March 20, 2026, PHMSA posted a notice extending the comment period to April 3, 2026, to give the public additional time for review following the issuance of the Defense Production Act (DPA) Order by the Secretary of Energy on March 13, 2026. Sable's special permit application letter with attachments, the Federal Register notices, environmental assessment, and all other pertinent documents are available for review in Docket No. PHMSA-2026-0464 in the Federal Docket Management System (FDMS) located at www.regulations.gov.

PHMSA reviewed all public comments received for Docket Number PHMSA-2026-0464 through April 3, 2026. PHMSA received 58 public comments submitted by both identified and anonymous members of the public concerning this special permit request.[3] Significant comments are addressed below. Some comments, which specifically referenced possible environmental effects of the proposed special permit or the environmental assessment prepared by PHMSA, are addressed in the Finding of No Significant Impact (FONSI), also available on Docket Number PHMSA-2026-0464 at www.regulations.gov.

## Public Comments:

### Jurisdictional Comments

Several commenters questioned whether CA-324 and CA-325 are part of an interstate hazardous liquid pipeline facility subject to PHMSA's jurisdiction under the Pipeline Safety Act. One commenter argued that the system should be classified as an interstate pipeline because it connects offshore Federal waters to a system terminating at international ports, thereby falling under federal rather than strictly state oversight. PHMSA addresses these comments in a separate document, titled Jurisdictional Determination in Support of Special Permit, that is available for review in the docket.

### General Comments

Many commenters supported the issuance of the special permit, noting that the operation of the SYPS is essential for California's energy security, economic health, and national interests. Supportive commenters believed the SYPS is ready for a safe restart and referenced the numerous tests, repairs, and system enhancements completed in recent years as demonstrating that the pipeline meets safety

[2] OPS published a revision of Hazardous Liquid Integrity Management Frequently Asked Question 7.16 on September 12, 2025 clarifying that corrosion coincident with a longitudinal seam does not need to be mitigated per 49 CFR § 195.452(h)(4)(iii)(H).

[3] PHMSA received a total of 12,816 comments on the Sable Offshore Corp. Special Permit request (Docket ID: PHMSA-2026-0464). One comment from a non-profit included a form campaign with over 12,000 signatories. Aside from the form campaign comments, there were a total of 58 unique comments.

requirements. Supportive commenters explained that increasing domestic oil production will stabilize or lower gas prices, and that the operation of the SYPS is expected to support high wage jobs and generate state and local tax revenues to fund schools, infrastructure, and public services. Supporters pointed out that California imports a large percentage of its oil, that domestic production may protect the state from global supply disruptions, and that oil transported by pipeline has a lower carbon footprint than oil shipped by oceangoing tankers. Some commenters stated that the SYPS is critical infrastructure and argued that the Secretary of Energy's DPA Order demonstrates the strategic importance of the pipeline system for national energy reliability.

Thirty-one comments, submitted by anonymous and identified individuals as well as several organizations, opposed the issuance of the special permit. The opposing commenters stated that granting the special permit would prioritize corporate profit over the safety of the environment, wildlife, and local communities. Some commenters referenced the 2015 failure of Line CA-324 and resulting release of crude oil. Commenters pointed out that corrosion caused the 2015 spill, and stated that the special permit does not address the underlying cause of the incident – an inadequate coating and insulation system that shields the steel from effective cathodic protection – and would waive a regulatory provision involving corrosion repair deadlines.

In response to these comments, PHMSA notes that the special permit conditions address the risks of corrosion occurring underneath insulation on the SYPS. Corrosion-driven metal loss is detectable using ILI tools and can be remediated using more stringent repair criteria, including the use of corrosion growth rate assessments. PHMSA further notes that the special permit only waives the requirement that Sable remediate certain longitudinal seam weld corrosion within 180 days, and that the waiver is subject to additional and more stringent conditions, including anomaly detection and repair deadlines calibrated to address corrosion that could threaten the pipeline integrity. In addition, PHMSA notes that the pipe in segments CA-324 and CA 325 is not particularly susceptible to longitudinal seam weld corrosion, meaning that the waiver and conditions, in combination, enhance the safety of the pipeline. The limited effectiveness of cathodic protection beneath insulation does not mean that corrosion on the pipeline cannot be adequately addressed to maintain the safety of the pipeline, particularly in light of the additional and more stringent conditions included in the special permit.

**Comments Regarding the National Energy Emergency and the DPA Order**

PHMSA received several comments addressing the potential impact that the DPA order might have on issuing the special permit, including whether the special permit remains necessary. Sable submitted a comment asserting that the special permit is necessary to fulfill the DPA Order and to resume hydrocarbon transportation during a national energy emergency, while implementing safety measures that exceed standard Federal pipeline safety requirements. Sable's submission included an extensive expert declaration from Michael J. Rosenfeld, P.E., who explained that the use of state-of-the-art, multi-tool in-line inspections (ILIs) performed much more frequently than the industry standard—coupled with more stringent anomaly repair criteria—effectively mitigates risks related to cathodic protection shielding and elevated operating temperatures. Other commenters stated that issuing the special permit is consistent with the DPA, and that the Secretary of Energy directed Sable to re-start the pipeline on March 13, 2026, under the authority of the DPA, so issuing the special permit is justified. Other commenters disagreed and stated that the DPA has no bearing on the special permit. These commenters stated that the DPA Order itself is unlawful and does not supersede safety requirements

under the Pipeline Safety Act. In response to these comments, PHMSA notes that the Secretary of Energy issued the DPA Order separately from PHMSA's consideration of Sable's special permit request, and that PHMSA does not have authority to ignore, override, or otherwise nullify the DPA Order. PHMSA has determined that it remains appropriate to consider and to issue the special permit with conditions that are consistent with pipeline safety.

Opposing commenters stated that the operation of the SYPS is not needed to address a national energy emergency, pointing to data and economic models indicating that restarting the pipeline would have limited impact on statewide or national energy markets. They also claimed the local economic benefit would be negligible compared to the risk, stating the local economy relies on tourism, recreation, and fishing, which were negatively impacted following the 2015 spill. One commenter claimed that many workers are brought in from Gulf states and live on the offshore platforms, meaning the pipeline restart would result in no benefits to local jobs or businesses.

In response to these comments, PHMSA notes that Sable's application included multiple reports (Attachments C, D, E, and F) describing the economic and energy impact of the SYPS on Kern County and California. The possible negative impacts of a spill do not outweigh these benefits because PHMSA has determined that the special permit maintains pipeline safety, meaning there is no increased risk of spills occurring compared to operation of the SYPS absent the special permit. PHMSA also notes that while special permit applications must provide a description of impacts on affected stakeholders, the decision of whether to grant the application turns on whether the special permit would be consistent with pipeline safety. While PHMSA believes that operation of the SYPS will be economically beneficial, that determination is not necessary to issue this special permit. Instead, PHMSA issues this permit because it has determined that the pipeline's operation is consistent with pipeline safety.

Commenters also stated that PHMSA does not have the authority to issue the emergency special permit (ESP) or the special permit. Specifically, commenters stated that issuing the special permit per E.O. 14156 was improper because the E.O. does not supersede applicable law, statutory protections, or state governance. Commenters also stated that the ESP did not meet the definition of emergency, which should be reserved for incidents like hurricanes or spills. Another commenter stated that PHMSA's Notice of Limited Enforcement Discretion and Statement of Policy for Issuing Special Permits in Response to National Energy Emergency is an inappropriate application of PHMSA's enforcement responsibilities, and that PHMSA did not adequately justify how issuing the ESP and the special permit would meet the purpose and need and address the energy emergency.

In response to these comments, PHMSA notes that it is authorized to grant special permits on an emergency basis under 49 U.S.C. § 60118(c)(2) and 49 CFR 190.341(g), and that the ESP expired on its own terms in February 2026. PHMSA further notes that 49 CFR 190.341(g) defines emergency as an event that may be: local, regional, or national in scope and includes significant fuel supply disruptions and natural or manmade disasters such as hurricanes, floods, earthquakes, terrorist acts, biological outbreaks, releases of dangerous radiological, chemical, or biological materials, war-related activities, or other similar events. Only the President can declare a national energy emergency. PHMSA determined that granting the ESP was consistent with the requirements in the Pipeline Safety Act given

the national energy emergency declared by the President in E.O. 14156. PHMSA's decision to grant the ESP also implemented the directives in E.O. 14154 and avoided a potential gap in coverage under the waivers issued by OSFM. PHMSA's Notice of Limited Enforcement Discretion and Statement of Policy for Issuing Special Permits in Response to National Energy Emergency, which is separate from the permit itself, is an application of PHMSA's enforcement discretion. The Notice merely allows operators to request expedited consideration of requests for special permits which implicate the national energy emergency, and exercises PHMSA's discretion to forgo enforcement action while such requests are under PHMSA review. The Notice did not modify PHMSA's jurisdiction, rights of inspection or access, or investigatory authority, and did not prevent PHMSA from "pursuing an enforcement action if it determines that a significant safety issue warrants doing so" or if the request is ultimately denied. Even absent the issuance of the Notice, PHMSA would retain the discretion not to pursue enforcement actions as appropriate.

**Comments Regarding Proposed Special Permit Conditions**

An opposing comment highlighted that past ILIs on this system underestimated corrosion, meaning that ILI data should not continue to be relied upon to assess the pipeline segments. In response to this comment, PHMSA notes that the special permit conditions require ILI assessment of the pipeline segments to a much more exacting level than standard ILI tool runs. To ensure ILIs are an effective tool in assessing the integrity of the pipeline, the special permit conditions require accelerated reassessments, appropriate and complementary tool selection to address all threats, enhanced data analysis practices, more stringent repair criteria, and advanced corrosion growth data analysis techniques. In addition, PHMSA personnel have reviewed records related to actions that Sable has already taken to ensure the pipeline system will be operated safely, including safely completing hydrostatically pressure testing of Lines CA-324, CA-325A, and CA-325B in 2025 to 139-percent or greater of the pipelines' maximum operating pressure.

Other commenters stated that issuing the special permit for a pipeline with a history of incidents is inconsistent with pipeline safety. Commenters referenced previous instances of Sable's noncompliance. Commenters also stated that the terms of the special permit are misrepresented, and it is inaccurate to describe them as substantially the same as those in the State waivers. Other commenters noted that Sable has a positive safety reputation. Overall, PHMSA has determined that granting the special permit would be consistent with requirements under the Pipeline Safety Act and the policy priorities embodied in E.O. 14156 and E.O. 14154. The proposed non-emergency special permit requests to waive the same regulatory requirement as the ESP, and the conditions imposed are overwhelmingly aligned with the requirements from the prior state waivers. Any future non-compliance by Sable with the special permit conditions may be addressed by PHMSA's inspection program and enforcement actions as necessary.

Some commenters proposed changes to conditions, including limiting the term of the special permit to a fixed number of years, allowing PHMSA to revoke the special permit if Sable does not comply with all conditions, and allowing PHMSA to revoke, suspend, or modify the special permit under certain circumstances. In light of these comments, PHMSA is revising the conditions to grant the special permit for a period of ten years from the date of issuance, and removing the prior limitation in Condition 25(a). PHMSA reserves the right to include such a limitation in the future.

**Comments Regarding Sable as an Applicant**

Some opposing commenters questioned whether Sable submitted its application to bypass California state law AB 864, which imposes additional requirements on state-regulated pipelines, including a requirement to analyze the need for additional leak detection systems, shutoff systems, and valves, and to retrofit existing pipelines according to that analysis. In response to these comments, PHMSA notes that the Consent Decree required completion of an analysis to determine the need for emergency flow restricting devices, and that, as a result, Sable installed 27 new safety valves along Lines CA-324, CA-325A and CA-325B, including a safety valve only 1.25 miles downstream of the start of CA-324. The special permit conditions also impose more stringent repair criteria on the pipeline segments. These actions demonstrate that Sable has and will improve the safety of the pipeline segments regardless of the applicability of AB 864.

Other negative commenters questioned the trustworthiness of Sable as an operator due to investigations and enforcement proceedings conducted by other governmental entities. They also stated that restart was rushed due to financial deadlines faced by the operator. PHMSA notes that Sable has provided the agency with extensive records regarding testing and anticipated operations, and that PHMSA performed an on-site inspection of its onshore processing facility as well as its control room. As an interstate pipeline, the SYPS will also be subjected to mandated reporting requirements and PHMSA's inspection program, including enforcement action as appropriate. PHMSA notes that the restart is occurring pursuant to a detailed plan and under the agency's oversight following years of improvements to the pipeline. Lastly, due to the issuance of the DPA Order, the restart of the pipeline has already safely occurred, and PHMSA's special permit does not displace or nullify the DPA Order's requirement that Sable operate the SYPS.

**Comments Regarding the Prior State Waivers**

OSFM submitted a comment recommending PHMSA deny the special permit request. OSFM stated that the prior state-issued waivers and the proposed special permit are different in that the state waivers required Sable to repair all anomalies, plus tool tolerances, before the pipeline segments were restarted. OSFM also stated that PHMSA previously reviewed and did not object to the state waivers in February 2025.

In response to these comments, PHMSA notes that the tool tolerance requirement described by OSFM represents an allowance of a 10% margin of error for ILI measurements of anomalies detected on CA-324 and CA-325. Notwithstanding OSFM's assertion, PHMSA finds the prior state waivers did not clearly require this allowance for tool tolerance for *pre-restart* ILI runs. The prior state waivers only discussed tool tolerance adjustment for *post-restart* ILI runs, a requirement that is also in the special permit conditions. Even if the state waivers had included the requirement to remediate anomalies accounting for tool tolerance prior to restart, PHMSA has determined that the extra margin of error created by the tool tolerance allowance was not necessary for the special permit to be consistent with pipeline safety, and PHMSA's prior no objection would not mean that an otherwise substantially identical waiver is not also consistent with pipeline safety. In addition, due to the DPA Order, the pipeline has already restarted operation, and the special permit conditions will require Sable to remediate the same anomalies, plus tool tolerances, following the performance of initial ILI runs once the SYPS reaches steady-state operation.

One commenter was neutral, acknowledging special permits can be beneficial to pipeline safety by allowing flexibility in pipeline safety regulations, but urged PHMSA to complete a thoughtful evaluation of the safety benefits and to give careful consideration to the public's comments. PHMSA appreciates the need to conduct a thoughtful review and has done so.

The finalized special permit conditions include minor adjustments for clarity after PHMSA review of Sable records. Condition 3(c) includes a specific MOP for two subsections of Line CA-325B. Condition 13(f) clarifies that Sable must obtain PHMSA approval rather than a specific identification number for applicable hydrostatic testing, and similar language which appeared at Condition 14(g) in the proposed conditions was removed.

## Analysis:

### Background

Special permits may be granted upon request if unique circumstances make the applicability of a regulation or standard unnecessary or inappropriate for an applicant's pipeline facility. Special permits will only be granted when pipe conditions, integrity management (IM), and the proposed special permit conditions will provide a level of safety greater than or equal to the code requirements. The operator's Federal pipeline safety regulation compliance and incident history are also evaluated prior to issuance of a special permit.

PHMSA reviewed this special permit request to understand the known type of integrity threats that are in the special permit segments. This integrity information informed the special permit conditions which ensure that the operator has an ongoing program to locate and remediate safety threats.

### Enforcement History

The special permit segments were previously considered intrastate at the time of entry of the Consent Decree and were regulated by OSFM pursuant to its state certification with PHMSA under 49 U.S.C. § 60105(a). As discussed in the Jurisdictional Determination, the special permit segments are now considered part of an interstate hazardous liquid pipeline facility. PHMSA reviewed OSFM's inspection history of the special permit segments in the time since Sable became the operator of Lines CA-324 and CA-325 in 2024.[4] OFSM conducted 16 inspections of Sable's SYPS in 2024 and 2025, with no concerning or unsatisfactory findings or enforcement actions resulting from the inspections. Therefore, Sable's inspection and enforcement history does not indicate that granting the special permit would be inconsistent with pipeline safety.

### Incident History

PHMSA typically reviews the previous 5 years of incident history to assess the quantity and severity[5] of reported incidents on proposed special permit segments. Lines CA-324 and CA-325 remained

[4] In October 2022, Pacific Pipeline Company (PPC), then a subsidiary of ExxonMobil, acquired CA-324 and CA-325 from Plains. In 2024 Sable acquired PPC and became the designated operator of CA-324 and CA-325.

[5] "Significant Incidents" are those including any of the following conditions: (1) Fatality or injury requiring in-patient hospitalization; (2) $50,000 or more in total costs, measured in 1984 dollars; (3) Highly volatile liquid releases of 5 barrels or more or other liquid releases of 50 barrels or more; and (4) Liquid releases resulting in an unintentional fire or explosion. Gas distribution incidents caused by a nearby fire or explosion that impacted the pipeline system are excluded from this definition.

"active" pursuant to PHMSA's Part 195 regulations but did not transport crude oil from May 19, 2015,[6] until March 14, 2026. Including the time since the restart of the SYPS, no incidents have occurred in the last five years. Even taking a longer view of the special permit segment's incident history to include the May 2015 spill, actions taken by Sable in implementing safety requirements reflected in the Consent Decree and prior state waivers, as well as adherence to the special permit conditions, ensure that issues reflected in the incident history of the pipeline have been and will be addressed. Therefore, the incident history does not indicate that the granting of the special permit would be inconsistent with pipeline safety.

## Findings:

Based on the information submitted by Sable and PHMSA's review of the documentation, PHMSA finds that granting this special permit with conditions that waives the requirements of 49 CFR § 195.452(h)(4)(iii)(H) for Sable's Lines CA-324 and CA-325 is in the public interest and is not inconsistent with pipeline safety. This special permit requires Sable to implement the special permit conditions that include applying IM practices to the special permit segments**.**

**Completed in Washington D.C. on**:  June 25, 2026

[6] In May 2015 Lines CA-324 and CA-325 were owned and operated by Plains Pipeline, L.P., and known as Lines 901 and 903, respectively.

# EXHIBIT 3

Exhibit 3
to Petition for Review
filed July 20, 2026

# U.S. DEPARTMENT OF TRANSPORTATION
# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
## Jurisdictional Determination in Support of Special Permit

### Special Permit Information:

| | |
|---|---|
| **Docket Number:** | PHMSA-2026-0464 |
| **Requested By:** | Sable Offshore Corp. PPC |
| **Operator ID#:** | 40881 |
| **Original Date Requested:** | January 22, 2026 |
| **Original Issuance Date:** | June 25, 2026 |
| **Code Section(s):** | 49 CFR § 195.452(h)(4)(iii)(H) |

The Pipeline and Hazardous Materials Safety Administration (PHMSA) is authorized under the Pipeline Safety Act[1] to issue special permits waiving compliance with the requirements in 49 CFR Part 195.[2] A special permit may be issued on either an emergency or non-emergency basis. An emergency special permit may be issued for a period of up to 60 days "without prior notice and comment if [PHMSA] determines that (i) it is in the public interest to grant the waiver; (ii) the waiver is not inconsistent with pipeline safety; and (iii) the waiver is necessary to address an actual or impending emergency involving pipeline transportation, including an emergency caused by a natural or manmade disaster."[3] A non-emergency special permit may be issued after providing notice and the opportunity for a hearing "on terms [PHMSA] considers appropriate if [PHMSA] determines that the waiver is not inconsistent with pipeline safety."[4]

---

[1] The Pipeline Safety Act refers generally to the series of laws enacted by Congress to regulate the safety of gas and hazardous liquid pipeline facilities. *See e.g.*, Natural Gas Pipeline Safety Act of 1968, Pub. L. No. 90-481, 82 Stat. 720; Pipeline Safety Act of 1979, Pub. L. No. 96-129, 93 Stat. 989; Pipeline Safety Reauthorization Act of 1988, Pub. L. 100-561, 102 Stat. 2805; Pipeline Safety Act of 1992, Pub. L. No. 102-508, 106 Stat. 3289; Accountable Pipeline Safety and Partnership Act of 1996, Pub. L. No. 104-304, 110 Stat. 3794; Pipeline Safety Improvement Act of 2002, Pub. L. No. 107-355, 116 Stat. 2985; Pipeline Inspection, Protection, Enforcement, and Safety Act of 2006, Pub. L. No. 109-468, 120 Stat. 3490; Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011, Pub. L. 112-90 (2012), 125 Stat. 1904; Protecting our Infrastructure of Pipelines and Enhancing Safety Act of 2016, Pub. L. No. 114-183, 130 Stat. 514; Protecting Our Infrastructure of Pipelines and Enhancing Safety Act of 2020, Consolidated Appropriations Act, 2021, Division R, Pub. L. 116-260 (2020), 134 Stat. 2210. These laws are currently codified at 49 U.S.C. § 60101 *et seq.*

[2] 49 U.S.C. § 60118(c); 49 CFR 190.341.

[3] 49 U.S.C. § 60118(c)(2); 49 CFR 190.341(g)-(i).

[4] 49 U.S.C. § 60118(c)(1); 49 CFR 190.341(a)-(f).

On December 23, 2025, PHMSA issued an emergency special permit to Sable Offshore Corp. PPC (Sable). The emergency special permit waived the applicability of certain requirements in 49 CFR Part 195 to two onshore pipeline segments, previously known as Lines 901 and 903 and currently known as CA-324 and CA-325, in the Santa Ynez Pipeline System (SYPS). In issuing the emergency special permit, PHMSA found that CA-324 and CA-325 are part of an interstate hazardous liquid pipeline facility subject to its jurisdiction under the Pipeline Safety Act.[5]

The emergency special permit expired on February 21, 2026, and Sable is now asking PHMSA to issue a non-emergency special permit for CA-324 and CA-325. As in the prior proceeding, Sable contends that CA-324 and CA-325 are part of an interstate hazardous liquid pipeline facility. Commenters in this proceeding have questioned that contention and urged PHMSA to conclude that CA-324 and CA-325 are part of an intrastate hazardous liquid pipeline facility.[6] Intrastate hazardous liquid pipeline facilities in California are subject to the jurisdiction of a State authority, the California Office of the State Fire Marshall (OSFM).[7]

As explained in more detail below, PHMSA finds that the SYPS is an interstate hazardous liquid pipeline facility. The SYPS transports crude oil from offshore production platforms on the Outer Continental Shelf (OCS) through state waters to an onshore processing facility in Santa Barbara County, California, and onto a terminal in Kern County, California. By moving crude oil from a place outside of California to a place inside of California, the SYPS is "used to transport hazardous liquid in interstate or foreign commerce."[8] Accordingly, the SYPS is an interstate hazardous liquid pipeline facility subject to PHMSA's jurisdiction under the Pipeline Safety Act. This jurisdictional determination confirms and supersedes the jurisdictional determination issued on December 17, 2025. PHMSA concludes that CA-324 and CA-325 are used or intended to be used to transport hazardous liquid in interstate commerce.

**Background**

From 1921 until 1960, the Interstate Commerce Commission (ICC) had the authority under the Transportation of Explosives Act (TOEA) to regulate the safety of pipelines transporting flammable liquids (including crude oil) by "common carriers engaged in interstate or foreign commerce."[9] But the ICC did not use that authority during this four-decade period, having concluded after studying the safety record of the oil pipeline industry in the 1930s and early 1940s that there was no "pressing" need to do so.[10]

---

[5] 49 U.S.C. § 60101(a)(7) (defining "interstate hazardous liquid pipeline facility").

[6] 49 U.S.C. § 60101(a)(10) (defining "intrastate hazardous liquid pipeline facility").

[7] 49 U.S.C. § 60105 (authorizing State authorities to regulate intrastate pipeline facilities by submitting an annual certification to PHMSA and meeting other program requirements); *see City & Cnty. of San Francisco v. U.S. Dep't of Transp.*, 796 F.3d 993, 996-997 (9th Cir. 2015); *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 878–79 (9th Cir. 2006).

[8] 49 U.S.C. § 60101(a)(7).

[9] Act of March 4, 1909, as amended by 41 Stat. 1445 (Mar. 4, 1921) and previously codified at 18 U.S.C. §§ 831-835.

[10] H. Rept. 588 to Accompany H.R. 5041, July 2, 1965, at p. 2-3.

In 1960, Congress inadvertently repealed the ICC's authority to regulate the safety of common carrier oil pipelines.[11] According to the legislative history, the repeal occurred when Congress added the phrase "other than pipelines" to the definition of "carrier" in the TOEA.[12] Congress corrected that error five years later, restoring the ICC's safety authority under the TOEA for common carrier oil pipelines.[13] The oil pipeline industry supported the 1965 amendment, primarily on preemption grounds.[14] Citing growing interest in the adoption of state and local safety regulations, the industry argued that, as with other modes of transportation, common carrier pipelines engaged in interstate or foreign commerce should be subject to uniform Federal safety regulations.[15]

From 1965 to 1979, the ICC and its successor agency, the Department of Transportation (DOT),[16] regulated the safety of certain common carrier oil pipelines under the TOEA.[17] Specifically, DOT prescribed safety regulations in 49 CFR Part 195 for common carrier pipelines transporting flammable liquids, including petroleum and petroleum products, "in interstate and foreign commerce."[18] DOT also applied its safety regulations to pipelines on the OCS transporting petroleum and petroleum products in interstate or foreign commerce.[19] In regulating OCS pipelines, DOT relied on the authority in the TOEA and an amendment that Congress enacted in the Deepwater Port Act (DWPA) of 1974.[20]

In 1979, a decade after authorizing DOT to regulate the safety of gas pipeline facilities in the Natural Gas Pipeline Safety Act (NGPSA),[21] Congress authorized DOT to regulate the safety of

---

[11] Pub. L. 86-10, 74 Stat. 808 (Sept. 6, 1960).

[12] H. Rept. 588 to Accompany H.R. 5041, July 2, 1965, at p. 3.

[13] Pub. L. 89-95, 74 Stat. 808 (Jul. 27, 1965); H. Rept. 588 to Accompany H.R. 5041, July 2, 1965, at p. 3.

[14] H. Rept. 588 to Accompany H.R. 5041, July 2, 1965, at p. 3-4.

[15] *Id.*

[16] Pub. L. 89-670, 81 Stat. 931 (Oct. 15, 1966).

[17] *See e.g.*, 30 Fed. Reg. 13,266 (ICC initiates rulemaking proceeding under TOEA to establish pipeline safety standards); 32 Fed. Reg. 1,098 (ICC proposes pipeline safety reporting requirements under TOEA); 32 Fed. Reg. 9,228 (DOT adopts pipeline safety reporting requirements originally proposed by ICC); 34 Fed. Reg. 15,473 (DOT adopts pipeline safety standards originally proposed by ICC).

[18] 34 Fed. Reg. at 15,476 (codifying scope provision in 49 CFR § 195.1(a)).

[19] 41 Fed. Reg. 34,035 (final rule codifying new safety standards in 49 CFR Part 195 for offshore pipeline facilities).

[20] Pu. L. 93–627, originally codified at 33 U.S.C. §§ 1507(a) ("For the purpose of chapter 39 of title 18, United States Code (18 U.S.C. 831-837), and part I of the Interstate Commerce Act (49 U.S.C. 1-27), a deep water port and storage facilities serviced directly by such deep water port shall be subject to regulation as a common carrier in accordance with the Interstate Commerce Act, as amended."), 1520(a) ("The Secretary [of Transportation], in cooperation with the Secretary of the Interior, shall establish and enforce such standards and regulations as may be necessary to assure the safe construction and operation of oil pipelines on the Outer Continental Shelf.").

[21] Pub. L. 90-481, 82 Stat. 720, originally codified at 49 U.S.C. §§ 1671–1684.

hazardous liquid pipeline facilities in the Hazardous Liquid Pipeline Safety Act (HLPSA).[22] Like the NGPSA, the HLPSA provided DOT with exclusive authority to regulate interstate pipeline facilities[23] and allowed State authorities that satisfied certain requirements to regulate intrastate pipeline facilities.[24] But unlike the NGPSA,[25] the HLPSA defined transportation in terms of the movement by pipeline of hazardous liquids, or storage incidental thereto, "in or affecting interstate or foreign commerce," subject to certain exceptions.[26] The HLPSA defined interstate pipeline facilities as those "used in the transportation of hazardous liquids in interstate or foreign commerce,"[27] and defined interstate or foreign commerce "as commerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof."[28] The HLPSA defined "intrastate pipeline facility" by exclusion, *i.e.*, as a pipeline facility that did not meet the definition of interstate pipeline facility.[29]

In 1981, DOT made certain conforming changes to the pipeline safety regulations in 49 CFR Part 195 to align with the HLPSA.[30] In particular, DOT limited the applicability of Part 195 to interstate hazardous liquid pipeline facilities, which DOT defined as (1) hazardous liquid pipeline facilities subject to the economic regulatory jurisdiction of the Federal Energy Commission (FERC) under the Interstate Commerce Act (ICA) over common carriers engaged in the transportation of oil by pipeline and (2) hazardous liquid pipeline facilities originating on the OCS not subject to FERC jurisdiction under the ICA.[31] DOT did not apply Part 195 to

---

[22] Pub. L. 96-129, title II, 93 Stat. 1003, originally codified at 49 U.S.C. §§ 2001-2014; H. Rep. No. 96-182, 267 (May 15, 1979).

[23] Sec. 203(d), originally codified at 49 U.S.C. § 2002(d).

[24] Sec. 205(a), originally codified at 49 U.S.C. § 2004.

[25] Section 2(3) of the NGPSA, originally codified at 49 U.S.C. § 1671(3) and currently codified as amended at 49 U.S.C. § 60101(a)(21), defined transportation as "the gathering, transmission or distribution of gas by pipeline or its storage in or affecting interstate or foreign commerce," subject to an exception for rural gas gathering lines.

[26] Sec. 202(3), originally codified at 49 U.S.C. § 2001(3). As explained below, the "affects interstate commerce" language extends to the full reach of Congress's Commerce Clause power and vests DOT with authority to regulate purely intrastate pipelines that "affect" interstate commerce. *See* 49 U.S.C. § 60102(a)(2). That authority is displaced only if a State authority obtains a certification to regulate intrastate pipelines. 49 U.S.C. § 60105(a). In all events, DOT has exclusive authority to regulate "interstate" hazardous liquid pipeline facilities, meaning pipelines used to transport hazardous liquid "in interstate commerce." *Id.* §§ 60101(7), 60104(c).

[27] Sec. 202(5), originally codified at 49 U.S.C. § 2001(5). Section 2(8) of the NGPSA, originally codified at 49 U.S.C. § 1671(8) and currently codified as amended at 49 U.S.C. § 60101(a)(6), defined an interstate gas pipeline facility based on the jurisdictional status of the facility under the Natural Gas Act of 1938, 15 U.S.C. 717 *et seq.*

[28] Sec. 202(7), originally codified at 49 U.S.C. § 2001(7).

[29] Sec. 202(6), originally codified at 49 U.S.C. § 2001(6).

[30] 46 Fed. Reg. 38,357.

[31] 46 Fed. Reg. 38,357-38,358 (discussing scope and applicability of Part 195); *id.* at 38,361 (codifying scope provision for Part 195 at 49 CFR § 195.1(a)). As explained in *W. Ref. Sw., Inc. v. FERC*, "Congress passed the [ICA] in 1887 to regulate railroads, and simultaneously created the [ICC] to administer the statute. Ch. 104, 24 Stat. 379 (1887). The Hepburn Act of 1906, Pub.L. No. 59–337, § 1, 34 Stat. 584, specifically extended the [ICA] to 'common carriers engaged in ... [t]he transportation of oil ... by pipeline.' 49 U.S.C. app. § 1(1)(b) (1988). In 1977, Congress transferred the [ICC's] authority over oil pipelines to the newly-created [FERC]. Department of Energy Reorganization Act, Pub.L. No. 95–91, § 402(b), 91 Stat. 565 (codified at 49 U.S.C. § 60502). The next year,

intrastate pipeline facilities at that time, primarily so State authorities could make the changes needed to fully participate in the Federal pipeline safety program.[32]

In 1985, DOT applied Part 195 to intrastate hazardous liquid pipeline facilities.[33] DOT defined intrastate hazardous liquid pipeline facilities consistent with the HLPSA and adopted a statement of policy for determining the jurisdictional status of hazardous liquid pipeline facilities.[34] The statement of policy generally codified the approach that DOT adopted in 1981 in applying Part 195 to interstate hazardous liquid pipeline facilities. Specifically, the statement of policy indicated that:

> In delineating which liquid pipeline facilities are interstate pipeline facilities within the meaning of the HLPSA, DOT will generally rely on the FERC filings; that is, if there is a tariff or concurrence filed with FERC governing the transportation of hazardous liquids over a pipeline facility or if there has been an exemption from the obligation to file tariffs obtained from FERC, then DOT will, as a general rule, consider the facility to be an interstate pipeline facility within the meaning of the HLPSA. The types of situations in which DOT will ignore the existence or non-existence of a filing with FERC will be limited to those cases in which it appears obvious that a complaint filed with FERC would be successful or in which blind reliance on a FERC filing would result in a situation clearly not intended by the HLPSA such as a pipeline facility not being subject to either State or Federal safety regulation.[35]

To demonstrate the application of these principles, the statement of policy included seven examples of hypothetical hazardous liquid pipeline systems that DOT would consider as either

---

Congress repealed much of the [ICA], but provided that transportation of oil by pipeline companies would be subject to '[t]he laws ... as they existed on October 1, 1977.' Act of Oct. 17, 1978, Pub.L. No. 95–473, § 4c, 92 Stat. 1337, 1470." 636 F.3d 719, 723–24 (5th Cir. 2011). For that reason, "[t]he 1977 version of the [ICA] remains the governing organic statute for FERC's oil pipeline authority, even though the Act is no longer part of the U.S. Code." *Petro Star Inc. v. FERC*, 166 F.4th 161, 166 (D.C. Cir. 2026). Moreover, as explained in *Re Bonito Pipe Line Co.*, FERC has concluded that the language of the ICA prohibits it from exercising jurisdiction over "pipelines transporting oil solely on or across the OCS." 61 FERC ¶ 61,050, 61,221 (1992). The ICA states that it only "appl[ies] to common carriers engaged in . . . [t]he transportation of oil . . . by pipeline . . .from one State or Territory of the United States . . . to any other State or Territory of the United States . . . or from one place in a Territory to another place in the same Territory, or from any place in the United States through a foreign country to any other place in the United States, or from or to any place in the United States to or from a foreign country, but only insofar as such transportation takes place within the United States." 61 FERC ¶ 61,221 (quoting section 1(1) of the ICA). Because "the OCS is not a State or Territory of the United States," FERC has found that it "does not come within the ICA's jurisdictional language." *Id.*

[32] 46 Fed. Reg. 38,359-38,360.

[33] 50 Fed. Reg. 15,895. As explained above, *see supra* note 26, DOT has jurisdiction to regulate intrastate hazardous liquid pipeline facilities under the "affects interstate commerce" language in the definition of transporting hazardous liquid. 49 U.S.C. §§ 60101(a)(22); 60102(a)(2).

[34] 50 Fed. Reg. 15,897-15,898.

[35] 50 Fed. Reg. 15,899-15,900 (codifying 49 CFR Part 195, Appendix A).

interstate or intrastate hazardous liquid pipeline facilities. One of those examples included a pipeline originating on the OCS and transporting hazardous liquid into the interior of an adjoining coastal State. The statement of policy indicated that DOT would consider such a pipeline to be an interstate hazardous liquid pipeline facility, even though the operator had no obligation under the ICA to file a FERC tariff for that system.

DOT has not made any significant changes to the regulations or policy statement in Part 195 that apply in determining interstate or intrastate status of hazardous liquid pipeline facilities since issuing the 1985 final rule. Aside from recodifying the Pipeline Safety Laws in 1994,[36] Congress has not made any substantive changes to the governing statutory provisions either.

**Facts**

The SYPS transports crude oil from the OCS to a terminal in Kern County, California. The SYPS originates at three offshore production platforms, named Heritage, Harmony, and Hondo, located on the OCS approximately 5 to 9 miles from the coastline of California. After passing through a separator, the offshore facilities produce crude oil as part of an emulsion that also contains water and other impurities. The crude oil emulsion moves through the SYPS to an onshore processing facility in Santa Barbara County, California.[37] The onshore processing facility is known as the Las Flores Canyon Facility (LFC Facility).

At the LFC Facility, the crude oil is metered and heated to reduce its viscosity for subsequent movement through the SYPS.[38] A "free water knock out" or "F.W.K.O" process is also performed to remove water and other corrosive constituents.[39] The crude oil is then sweetened by removing hydrogen sulfide and stabilized to reduce vapor pressure to levels suitable for subsequent storage and movement by pipeline.[40]

Following heating, dewatering, sweetening, and stabilization, the crude oil is either sent to a pump station for continued movement in the SYPS or to one of several aboveground tanks. The tanks are directly connected to the SYPS and receive crude oil for temporary storage and

---

[36] Pub. L. 103–272, §§ 1(e), 4(s), July 5, 1994, 108 Stat. 1301.

[37] The offshore platforms also produce raw natural gas. After passing through a separator at the offshore platforms, the raw natural gas is transported in a separate pipeline system to the LFC Facility for processing. The jurisdictional status of this gas pipeline system is not at issue in this proceeding.

[38] Portions of the SYPS downstream from the LFC Facility are insulated to maintain the heated temperature of the crude oil. For additional information on the impact of temperature, viscosity, and pour point on the operation of a crude oil pipeline, *see* Overview of the Design, Construction, and Operation of Interstate Liquid Petroleum Pipelines, Argonne National Laboratory, ANL/EVS/TM/08-1, p. 21-23 (Nov. 2007) (ANL/EVS/TM/08-1).

[39] The presence of water and other impurities in crude oil pipelines can cause internal corrosion. *See e.g., In the Matter of Plains Pipeline, LP*, 2015 WL 9287190, at *2 (PHMSA Nov. 12, 2015); *In the Matter of Kinder Morgan CO2 Company*, L.P., 2010 WL 6539184, at *6 (PHMSA Oct. 12, 2010).

[40] For additional information on the impact of vapor pressure on the operation of a crude oil pipeline, *see* ANL/EVS/TM/08-1 at p. 23.

reinjection back into the pipeline.[41] In addition to the processing facilities and tanks, the LFC Facility contains other equipment used in the operation of the SYPS, including pumps; valves and appurtenances; rectifiers; corrosion inhibitor injection points; and equipment necessary for performing in-line inspections and hydrostatic pressure testing.[42]

After leaving the LFC Facility, the SYPS transports the crude oil through two onshore pipeline segments, previously known as Line 901 and Line 903 and currently called CA-324 and CA-325, respectively, to a terminal. The terminal, known as Pentland Station, is the location designated as the delivery point in a current purchase agreement for the OCS-produced crude oil transported in the SYPS. The crude oil is delivered from Pentland Station in another pipeline system to refineries in California.

**Procedural History**

*May 2016 Letter from PHMSA to OSFM*

On May 18, 2016, PHMSA sent a letter to OSFM addressing the jurisdictional status of the onshore portions of the SYPS. The letter explained that Line 901 ruptured on May 19, 2015, resulting in the release of approximately 2,934 barrels of crude oil. The letter further explained that PHMSA issued a corrective action order (CAO) to the operator of Line 901, Plains Pipeline, LP (Plains), following the rupture, and that the CAO and subsequent amendments required Plains to shut down Line 901 and Line 903.[43]

The letter then explained that Plains operated Lines 901 and 903 as interstate crude oil pipelines subject to the jurisdiction of FERC under the ICA prior to the rupture, and that PHMSA had treated Line 901 and Line 903 as interstate hazardous liquid pipeline facilities on that basis. The letter noted that Plains had canceled the FERC tariffs for Lines 901 and 903 on February 12, 2016, and April 29, 2016, respectively, and that the cancelation made both lines intrastate hazardous pipeline facilities subject to OSFM's jurisdiction. The letter noted that PHMSA was reserving its right to investigate and to initiate enforcement actions for events that occurred prior to the tariff cancelation, and that PHMSA's understanding of the jurisdictional status of Lines 901 and 903 was "subject to change based on any future events or newly-discovered facts."

*November 2025 Letter from Sable to PHMSA*

On November 26, 2025, Sable sent a letter to PHMSA regarding the jurisdictional status of Lines 901 and 903, now called CA-324 and CA-325, respectively. The letter explained that Sable recently determined that Lines 901 and 903 should be reclassified as interstate hazardous liquid

---

[41] For additional information on the use of tanks in operating a crude oil pipeline, *see* ANL/EVS/TM/08-1 at p. 5-6.

[42] For additional information on the use of these and other components in operation of a crude oil pipeline, *see* ANL/EVS/TM/08-1 at p. 8-11, 29-38, 81-87. The LFC Facility also contains a power plant, a helipad, natural gas processing facilities, and equipment for biologically treating outfall water.

[43] Plains Pipeline, L.P., C.P.F. No. 5-2015-5011H, available at https://primis.phmsa.dot.gov/enforcement-data/case/520155011H.

facilities under the Pipeline Safety Act. The letter noted that Sable had acquired the SYPS from another operator in 2024, and that Sable intended to operate SYPS as part of a single pipeline system transporting crude oil from the OCS through the LFC Facility to Pentland Station.

The letter noted that the SYPS had operated differently prior to October 2022, with ExxonMobil owning and operating the offshore production platforms, the offshore-to-onshore oil emulsion pipeline, and the LFC Facility, and Plains owning and operating Lines 901 and 903. The letter further noted that PHMSA treated Lines 901 and 903 as interstate hazardous liquid pipeline facilities before Plains canceled the FERC ICA tariffs for the lines in early 2016. The letter then acknowledged PHMSA's conclusion in the May 2016 letter to OSFM that the cancelation of the ICA tariffs made the Lines 901 and 903 intrastate hazardous liquid pipeline facilities, "subject to change based on any future events or newly-discovered facts."

Pointing to the latter reservation, the letter explained that "intervening events" had impacted the jurisdictional status of Lines 901 and 903. The letter stated that, unlike the "arrangement considered by PHMSA in 2016 where different, unrelated entities operated portions" of the SYPS, Sable intended to operate the entire SYPS as a part of a single pipeline system transporting crude oil from the OCS through the LFC Facility to Pentland Station. The letter stated that Sable's intent to use the facilities in this manner made the SYPS an interstate hazardous liquid pipeline facility. The letter further explained that Lines 901 and 903 did not need a FERC tariff to attain that status, noting that the policy statement in Appendix A to Part 195 recognizes that the pipelines that originate on the OCS and transport crude oil to an adjoining coastal State can be classified as interstate hazardous liquid pipeline facilities even without a FERC tariff.

*December 2025 Letter from PHMSA to Sable*

On December 17, 2025, PHMSA responded to Sable's letter. In its letter, PHMSA began by acknowledging that Lines 901 and 903 had historically been treated as interstate hazardous liquid pipeline facilities but explained that both lines became intrastate hazardous liquid pipeline facilities when Plains canceled the ICA tariffs in 2016. The letter further acknowledged that Sable had acquired the SYPS in 2024 and intended to operate the entire SYPS as a single pipeline system transporting crude oil from the OCS through the LFC Facility to Pentland Station. The letter then explained that PHMSA had initiated a three-day, onsite jurisdictional audit of the SYPS after receiving Sable's letter, and that the audit included a review of written procedures and records and physical inspections of the offshore and onshore facilities. The letter noted that OSFM representatives had participated in the audit.

After providing that background information, the letter explained that determining the jurisdictional status of a hazardous liquid pipeline facility is a factual inquiry, and that Appendix A to Part 195 includes a statement of policy and interpretation to assist in making those determinations. The letter noted that Appendix A sets forth a general policy of deferring to the filing of an ICA FERC tariff in determining whether a hazardous liquid pipeline facility is interstate or intrastate. If the operator has a FERC tariff on file, PHMSA will generally consider

the hazardous liquid pipeline facility to be interstate. If the operator does not have a FERC tariff on file, PHMSA will generally consider the hazardous liquid pipeline facility to be intrastate. But the letter noted that Appendix A identifies several scenarios where a hazardous liquid pipeline facility will be treated as interstate without a FERC tariff. One of those scenarios is a pipeline that originates on the OCS and transports crude oil to an adjoining coastal State.

Citing the scenario in Appendix A for OCS pipelines and the results of its multi-day jurisdictional audit, letter stated that PHMSA agreed with Sable's determination that the entire SYPS is an interstate hazardous liquid pipeline facility under the Pipeline Safety Act. Because Lines 901 and 903 had previously been classified as intrastate hazardous liquid pipeline facilities, the letter stated that PHMSA would notify OSFM of the change in jurisdictional status.

**Analysis**

*Interstate Hazardous Liquid Pipeline Facilities*

Congress defined an "interstate hazardous liquid pipeline facility" in the Pipeline Safety Act as "a hazardous liquid pipeline facility used to transport hazardous liquid in interstate or foreign commerce."[44] Congress further defined "interstate or foreign commerce," in relevant part, as "commerce between—(i) a place in a State and a place outside that State; or (ii) places in the same State through a place outside the State."[45]

The key phrase in the definition of "interstate hazardous liquid pipeline facility"—"in interstate or foreign commerce"—has been used in Federal legislation for more than a century, including in the TOEA.[46] While construed more narrowly than the broader phrase "affecting interstate or foreign commerce,"[47] the U.S. Supreme Court has articulated certain basic principles that apply in determining whether something is "in interstate or foreign commerce."[48] Specifically, the Supreme Court has said that "[t]he question whether commerce is interstate or intrastate must be

---

[44] 49 U.S.C. § 60101(a)(7); *see also* 49 CFR § 195.2 (defining "interstate pipeline" as "a pipeline or that part of a pipeline that is used in the transportation of hazardous liquids or carbon dioxide in interstate or foreign commerce").

[45] 49 U.S.C. § 60101(a)(8)(B). Transportation is a particular type of commerce. Black's Law Dictionary 244 (5th ed. 1979) (defining commerce as "[i]ntercourse by way of trade and traffic between different peoples or states and the citizens or inhabitants thereof, including not only the purchase, sale, and exchange of commodities, but also the instrumentalities and agencies by which it is promoted and the means and appliances by which it is carried on, and transportation of persons as well as of goods, both by land and sea"); *id.* at 1344 (defining "transport" as "[t]o carry or convey from one place to another" and "transportation" as "[t]he movement of goods or persons from one place to another, by a carrier").

[46] Act of March 4, 1909, as amended by 41 Stat. 1445 (Mar. 4, 1921) and previously codified at 18 U.S.C. § 831-835; *see also* Federal Arbitration Act of 1925, codified at 9 U.S.C. § 1.

[47] *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 114-118 (2001); *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022); *Flowers Foods, Inc. v. Brock*, 146 S. Ct. 1358, 1365 (2026).

[48] *Kelley v. Rhoads*, 188 U.S. 1, 5-10 (1903); *Illinois Cent. R. Co. v. De Fuentes*, 236 U.S. 157, 163 (1915); *Champlain Realty Co. v. Town of Brattleboro*, 260 U.S. 366, 376 (1922); *Atlantic Coast Line R. Co. v. Standard Oil Co. of Kentucky*, 275 U.S. 257, 268-269 (1927); *U.S. v. Erie R. Co.*, 280 U.S. 98, 101-102 (1929); *Maryland v. Louisiana*, 451 U.S. 725, 753-756 (1981); *Flowers Foods Inc.,* 146 S. Ct. at 1364-1365.

determined by the essential character of the commerce," and that "the determination of the character of the commerce is a matter of weighing the whole group of facts in respect to it."[49] The Supreme Court has also said that once something "actually starts in the course of transportation" and "becomes a part of interstate commerce[,] . . . generally . . . this interstate character . . . continues, at least, until . . . the point where the parties originally intended that the movement should finally end."[50] Finally, the Supreme Court has said that an interruption on the way to an intended destination, such as a stop at a warehouse or processing facility, does not change the essential character of an interstate movement.[51] An interruption, for example, "to promote . . . safe or convenient transit" does not break the continuity of an interstate journey.[52]

Several Supreme Court cases addressing the effect of interruptions on the flow of interstate commerce are instructive. In *Kelley v. Rhoads*, for example, the Court held that a shepherd driving of a flock of sheep from Utah to Nebraska was engaged in interstate commerce throughout his journey and not subject to local taxation in Wyoming, even though he allowed his sheep to stop at various points along the way to graze.[53] The Court observed that the sheep were being driven through Wyoming for the purpose of shipment to another state, not for the purpose of grazing, that "they required sustenance on the journey, and could obtain it only by grazing," and "that they could hardly have been driven more rapidly without a loss of flesh during the transit."[54] Similarly, in *Flowers Foods*, a company transported baked goods across state lines to a warehouse in Colorado. A separate delivery driver then picked up the good from the warehouse and delivered them to stores in Colorado. The Court held that the delivery driver was engaged "in interstate commerce" because he performed "an intrastate leg of an interstate journey."[55] The Court rejected the argument that the interruption at the warehouse terminated the flow of interstate commerce. In *Maryland v. Louisiana*, the Court held that gas transported by pipeline from federal waters in the Gulf of America through an onshore processing facility in Louisiana and then onto consumers in over 30 states remained in interstate commerce throughout the journey.[56] The Court rejected an argument that the interruption at the processing facility terminated the flow of interstate commerce. The Court held that "[g]as crossing a state line at

---

[49] *Atlantic Coast Line R. Co.*, 275 U.S. at 268-269; *see also U.S. v. Erie R. Co.*, 280 U.S. at 101-102; *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. & Teamsters Joint Council No. 7 v. I.C.C.*, 921 F.2d 904, 907 (9th Cir. 1990) ("The characterization of transportation between two points within the same state as a continuation of an interstate shipment or as a distinct intrastate shipment depends upon the 'essential character' of the shipment.").

[50] *Illinois Cent. R. Co.*, 236 U.S. at 163; *see also Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 916 (9th Cir. 2020).

[51] *Flowers Foods*, 146 S. Ct. at 1364-1365; *Maryland v. Louisiana*, 451 U.S. at 754-756.

[52] *Champlain Realty Co.*, 260 U.S. at 376.

[53] *Kelley*, 188 U.S. 1.

[54] 188 U.S. at 8.

[55] *Flowers Foods*, 146 S. Ct. at 1363.

[56] *Maryland v. Louisiana*, 451 U.S. at 753-756.

any stage of its movement to the ultimate consumer is in interstate commerce during the entire journey."[57]

The pre-enactment history of the Pipeline Safety Act supports the conclusion that Congress intended to incorporate these basic principles in defining an "interstate hazardous liquid pipeline facility." As previously noted, Congress originally used the phrase "in interstate or foreign commerce" in the TOEA, the statute that the ICC and DOT used to regulate the safety of common carrier pipelines before the HLPSA. DOT clearly recognized the significance of that statutory language in determining the extent of its jurisdiction over oil pipelines under the TOEA,[58] and Congress retained the same language in defining an "interstate hazardous liquid pipeline facility" in the HLPSA.[59] As the Supreme Court has long held, "[w]here Congress employs a term of art 'obviously transplanted from another legal source,' it 'brings the old soil with it.'"[60] And as the Supreme Court recently reiterated in addressing analogous statutory language in the Federal Arbitration Act (FAA) of 1925, "we can hardly blind ourselves to what this Court's cases said, both before and around the time of the FAA's adoption, about what it means to be 'engaged in commerce between the States.'"[61]

The contemporaneous, post-enactment history confirms that Congress incorporated the traditional understanding of "in interstate or foreign commerce" into the Pipeline Safety Act as well.[62] As already noted, DOT issued a final rule in July 1981 amending Part 195 to conform to the new terminology in the HLPSA.[63] In so doing, DOT decided to "[r]estrict[] the application of Part 195" to interstate hazardous liquid pipeline facilities, *i.e.*, "to pipelines used for moving petroleum, petroleum products, or anhydrous ammonia *in interstate or foreign commerce*."[64] DOT also acknowledged in the July 1981 final rule that the HLSPA's "in interstate or foreign commerce" standard dated back to the TOEA and was comparable to the standard that FERC used in regulating pipelines under the ICA.[65] Lastly, DOT acknowledged that hazardous liquid pipeline facilities originating on the OCS, while not subject to FERC jurisdiction under the ICA, qualified as "interstate hazardous liquid pipeline facilities" for purposes of the DWPA and HLPSA.[66]

---

[57] 451 U.S. at 755-756.

[58] Interpretation Response #PI-72-055, available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-72-055.

[59] Sec. 202(5), originally codified at 49 U.S.C. § 2001(5).

[60] *George v. McDonough*, 596 U.S. 740, 746 (2022) (quoting *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019))

[61] *Flowers Foods, Inc.*, 146 S. Ct. at 1365.

[62] 46 Fed. Reg. at 38,357, 38,357-38,373; *Flowers Foods, Inc.*, 146 S. Ct. at 1365.

[63] 46 Fed. Reg. at 38,357.

[64] *Id.* (emphasis added).

[65] 46 Fed. Reg. at 38,359.

[66] *Id.*

*Intrastate Hazardous Liquid Pipeline Facilities*

Congress intended to go beyond the pre-HLPSA understanding of "interstate or foreign commerce" in regulating intrastate hazardous liquid pipeline facilities under the Pipeline Safety Act. The Pipeline Safety Act defines "transporting hazardous liquid" as "the movement of hazardous liquid by pipeline, or the storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline, *in or affecting* interstate or foreign commerce."[67] By adding the phrase "or affecting" to the definition of "transporting hazardous liquid," Congress invoked the full reach of its authority under the Commerce Clause.[68] And by excluding interstate hazardous liquid pipeline facilities from the definition of "intrastate hazardous liquid pipeline facility,"[69] Congress used that authority to assert jurisdiction over purely the local commerce that had not been previously subject to regulation under the TOEA and DWPA.[70] In other words, Congress defined "transporting hazardous liquid" and "intrastate hazardous liquid pipeline facility" to expressly authorize the regulation of movements of hazardous liquid by pipeline "affecting interstate or foreign commerce."

The contemporaneous, post-enactment history confirms that conclusion. In the April 1985 final rule that originally extended the applicability of Part 195 to intrastate hazardous liquid pipeline facilities,[71] DOT specifically noted that the HLPSA "requires the Secretary of Transportation to establish minimum Federal safety standards for the transportation of hazardous liquids by pipeline *in or affecting interstate or foreign commerce*," and that "[o]nce the Federal standards are established, . . . the HLPSA provides for state adoption and enforcement of the Federal standards with respect to *'intrastate pipelines,' or pipelines to which the HLPSA applies which are not used in interstate or foreign commerce*."[72]

DOT reiterated that principle in adopting the statement of agency policy and interpretation in Appendix A as part of the April 1985 final rule:

> In 1979, Congress enacted comprehensive safety legislation governing the transportation of hazardous liquids by pipeline, the Hazardous Liquids Pipeline

---

[67] 49 U.S.C. § 60101(a)(22)(A).

[68] *Circuit City*, 532 U.S. at 115–116, 118; *see also* Black's Law Dictionary 53 (5th ed. 1979) (defining "affecting commerce" as "[a]ny activity which touches or concerns business or industry, favorably or burdensomely; . . . in commerce, or burdening or obstructing commerce or the free flow of commerce").

[69] 49 U.S.C. § 60101(a)(10); *see also* 49 CFR § 195.2 (defining "intrastate pipeline" as "a pipeline or that part of a pipeline to which this part applies that is not an interstate pipeline").

[70] *Gonzales v. Raich*, 545 U.S. 1, 22 (2005); *see also* Black's Law Dictionary 244 (5th ed. 1979) (intrastate commerce is "[s]uch as is begun, carried on, and completed wholly within the limits of a single state").

[71] 50 Fed. Reg. at 15,895 ("The existing Federal safety standards for pipelines transporting hazardous liquids apply to pipelines operating in interstate or foreign commerce. This final rule extends the applicability of these standards to include pipelines transporting hazardous liquids that *affect interstate or foreign commerce, sometimes called intrastate pipelines*.") (emphasis added).

[72] 50 Fed. Reg. at 15,895 (emphasis added).

> Safety Act of 1979, 49 U.S.C. 2001 et seq. (HLPSA). The HLPSA expanded the existing statutory authority for safety regulation, which was limited to transportation by common carriers in interstate and foreign commerce, to transportation through facilities used in or affecting interstate or foreign commerce. . . . The HLPSA leaves to exclusive Federal regulation and enforcement the "interstate pipeline facilities," those used for the pipeline transportation of hazardous liquids in interstate or foreign commerce. For the remainder of the pipeline facilities, denominated "intrastate pipeline facilities," the HLPSA provides that the same Federal regulation and enforcement will apply unless a State certifies that it will assume those responsibilities.[73]

*Storage of Hazardous Liquid*

Congress defined "transporting hazardous liquid" in the Pipeline Safety Act to authorize the regulation of "the storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline."[74] Consistent with that authority, DOT issued a final rule in July 1981 applying Part 195 to "breakout tanks."[75] DOT defined a "breakout tank" as "a tank used to (a) relieve surges in a hazardous liquid pipeline system or (b) receive and store hazardous liquid transported by a pipeline for reinjection and continued transportation by pipeline."[76] In adopting that definition, DOT explained that "[s]ince its issuance in 1969, Part 195 has applied to storage called 'breakout tankage' by virtue of the inclusion of that term in the definition of 'pipeline system' or 'pipeline.'"[77] DOT further explained that it "believe[d] that it should try to make Part 195 more precise regarding the kinds of storage to which that Part applies and at the same time not extend its application to any storage not previously covered."[78]

To provide that precision, DOT defined a breakout tank to limit the "applicability of Part 195" to:

> two kinds of storage functions. First, tanks used to relieve surges in a hazardous liquid pipeline. This is sometimes called working tankage or a form of operating tankage. Second, tanks used to receive hazardous liquid from a pipeline and store it temporarily for reinjection into a pipeline for continued transportation. This type of storage aids in the dispatching of different types and grades of hazardous liquids through a pipeline system.[79]

---

[73] 50 Fed. Reg. at 15,899.

[74] 49 U.S.C. § 60101(a)(22)(A).

[75] 46 Fed. Reg. at 38,357.

[76] 46 Fed. Reg. at 38,362 (codified at 49 CFR § 195.2).

[77] 46 Fed. Reg. at 38,358.

[78] *Id.*

[79] *Id.*

The breakout tank definition adopted in the July 1981 final rule remains codified in Part 195.

*Exception for Onshore Production, Refining, or Manufacturing Facilities*

The Pipeline Safety Act contains an exception in the definition of "transporting hazardous liquid" for the movement of hazardous liquids "through onshore production, refining, or manufacturing facilities" and "storage or in-plant piping systems associated with onshore production, refining, or manufacturing facilities."[80] For purposes of that exception, a "hazardous liquid" includes, in relevant part, "petroleum or a petroleum product."[81]

When Congress originally enacted the exception for production, refining, or manufacturing facilities in the HLPSA, contemporaneous dictionaries provided definitions for the following key terms:

- Production was commonly understood as the "[p]rocess or act of producing" and "[t]hat which is produced or made; i.e. goods."[82]

- Manufacture was commonly understood as "[t]he process or operation of making goods or any material produced by hand, by machinery or by other agency; anything made from raw materials by the hand, by machinery, or by art. The production of articles for use from raw or prepared materials by giving such materials new forms, qualities, properties or combinations, whether by hand labor or machine."[83] Manufacture was also commonly understood as "something made from raw materials."[84]

- Refine was commonly understood as, among other things, "to reduce to a pure state."[85] A refinery was also commonly understood as "a building and equipment for refining or purifying metals, oil, or sugar."[86]

- Petroleum was commonly understood as "an oily flammable bituminous liquid that may vary from almost colorless to black, occurs in many places in the upper strata of the earth, is a complex mixture of hydrocarbons with small

---

[80] 49 U.S.C. § 60101(a)(22)(B)(ii)-(iii); *see also* 49 CFR 195.1(b)(8).

[81] 49 U.S.C. § 60101(a)(4)(A).

[82] Production, Black's Law Dictionary 1089 (5th ed. 1979).

[83] Manufacture, Black's Law Dictionary 870 (5th ed. 1979).

[84] Manufacture, Webster's New Collegiate Dictionary (1977).

[85] Refine, Webster's New Collegiate Dictionary (1977).

[86] Refinery, Webster's New Collegiate Dictionary (1977).

amounts of other substances, and is prepared for use as gasoline, naptha, or other products by various refining processes."[87]

- Product was commonly understood as "something produced."[88]

Taken together, these definitions suggest that the exception for "onshore production, refining, or manufacturing facilities" should be given a particular meaning when applied to the movement of petroleum and petroleum products.[89] Specifically, the exception should be applied with the understanding that petroleum is a raw material produced from the earth, and that petroleum products are manufactured from the process of refining that raw material.

The definitions in Part 195 support that understanding of the exception. The term "petroleum" is defined as "crude oil, condensate, natural gasoline, natural gas liquids, and liquefied petroleum gas," and the phrase "production facility" is defined as "piping or equipment used in the production, extraction, recovery, lifting, stabilization, separation or treating of petroleum or associated storage or measurement."[90] The Part 195 definition further states that "[t]o be a production facility . . ., piping or equipment must be used in the process of extracting petroleum from the ground and preparing it for transportation by pipeline."[91]

A "petroleum product," on the other hand, is defined as "flammable, toxic, or corrosive products obtained from distilling and processing of crude oil, unfinished oils, natural gas liquids, blend stocks and other miscellaneous hydrocarbon compounds."[92] Relying on the industry standard that formed the original basis for the Part 195 regulations, DOT has long recognized that the distilling and processing necessary to create a petroleum product from liquid petroleum "typically occurs at oil refineries . . . and gasoline plants."[93]

As important, DOT has further recognized that the exception for onshore production, refining, or manufacturing facilities "does not apply to any facilities that are used directly in the

[87] Petroleum, Webster's New Collegiate Dictionary (1977); *see also Wilshire Westwood Associates v. Atlantic Richfield Corp.*, 881 F.2d 801, 803 (1989) (quoting a similar definition from Webster's Third New International Dictionary Unabridged (1981) in interpreting the term "petroleum" for purposes of the Comprehensive Environmental Response, Compensation, and Liability Act).

[88] Product, Webster's New Collegiate Dictionary (1977).

[89] *Pulsifer v. United States*, 601 U.S. 124, 133 (2024) ("statutory construction" requires "reviewing text in context").

[90] 49 CFR § 195.2.

[91] *Id.*

[92] *Id.*; *see also* Notice of Interpretation and Partial Stay of Enforcement: Petroleum Products and Low-stress Pipelines, 61 Fed. Reg. 24, 244 (May 14, 1996); Interpretation Response #PI-24-0007 (Dec. 10, 2024), available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-24-0007.

[93] 61 Fed. Reg. at 24,245. Certain petroleum products are also extracted from natural gas that is delivered by pipeline to gas processing plants. *See Mobil Oil Corp. v. Fed. Energy Admin.*, 566 F.2d 87, 89 (Temp. Emer. Ct. App. 1977) (discussing similarities and differences in the extraction and recovery of natural gas liquids from gas processing plants and crude oil refineries).

transportation of hazardous liquids by pipeline."[94] DOT has applied that principle in exercising jurisdiction over midstream processing facilities that perform pipeline-transportation-related functions.[95] *In the Matter of ONEOK NGL Pipeline, L.P., et al.*, for example, PHMSA found that the exception for production, manufacturing, or refining facilities did not apply to a natural gas liquids (NGL) fractionation plant.[96] In reaching that conclusion, PHMSA was "guided by testimony presented by [the agency] that refining is a term commonly used in the industry to refer to the conversion of crude petroleum into new products, not the separation of a mixture," and "that common usage in the industry would never refer to an NGL fractionation facility as a refinery."[97]

*The Santa Ynez Pipeline System is an Interstate Hazardous Liquid Pipeline Facility*

The Pipeline Safety Act defines an "interstate hazardous liquid pipeline facility" as "a hazardous liquid pipeline facility used to transport hazardous liquid in interstate or foreign commerce."[98] In determining whether a hazardous liquid pipeline facility satisfies this definition, "the essential character of the commerce" must be considered in light of "the whole group of facts in respect to it."[99] Moreover, once the transportation of a hazardous liquid by pipeline in interstate or foreign commerce begins, it "generally . . . continues, at least, until . . . the point where the parties originally intended that the movement should finally end."[100] Finally, the continuity of a movement of a hazardous liquid in interstate or foreign commerce is not broken by an interruption "to promote the safe or convenient transit" by pipeline.[101]

Applying these basic principles to the facts at hand demonstrates that the SYPS is an interstate hazardous liquid pipeline facility. As previously discussed, the SYPS moves crude oil produced at offshore platforms on the OCS to the LFC Facility, where it is subject to certain processing, *i.e.*, heating, removal of water and other contaminants, sweetening, and stabilization, to facilitate further movement by pipeline.[102] After this processing is complete, the crude oil is either sent

---

[94] Interpretation Response #PI-17-0003, available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-17-0003; Interpretation Response #PI-96-015 (Jul. 22, 1996), available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-96-015 (the exception for manufacturing facilities does not apply to "facilities . . . operated primarily to further . . . transportation . . . by pipeline").

[95] *See* 85 Fed. Reg. 70,125 (Nov. 4, 2020) (draft guidance).

[96] *In the Matter of ONEOK NGL Pipeline, L.P., et al.*, 2016 WL 8315623 (PHMSA Oct. 12, 2016) appealed and resolved by consent agreement at 2018 WL 8058072 (PHMSA Oct. 23, 2018).

[97] 2016 WL 8315623, at *8.

[98] 49 U.S.C. § 60101(a)(7); *see also* 49 CFR § 195.2 (defining "interstate pipeline" as "a pipeline or that part of a pipeline that is used in the transportation of hazardous liquids or carbon dioxide in interstate or foreign commerce").

[99] *Atlantic Coast Line R. Co.*, 275 U.S. at 268-269; *see also U.S. v. Erie R. Co.*, 280 U.S. at 101-102.

[100] *Illinois Cent. R. Co.*, 236 U.S. at 163.

[101] *Champlain Realty Co.*, 260 U.S. at 376.

[102] Memorandum from Dustin Hubbard, Western Region Director, OPS to File, PHMSA-2026-0464, Document Review for Jurisdictional Determination in Support of Special Permit (June 25, 2026) (on file with PHMSA).

directly to a pump station for delivery to Pentland Station or to aboveground storage tanks at the LFC Facility. The tanks at the LFC Facility temporarily store the crude oil, which is later reinjected into the SYPS for shipment to Pentland Station, the location designated in a current purchase agreement as the delivery point for the OCS-produced crude oil transported through the SYPS. The crude oil is delivered from Pentland Station in another pipeline system to refineries in California.

The "essential character" of this commerce is interstate. First, the movement of a hazardous liquid by pipeline through the SYPS begins on the OCS. The offshore platforms produce an emulsion that contains crude oil, a hazardous liquid subject to regulation under the Pipeline Safety Act.[103] While the ICA prohibits FERC from exercising jurisdiction over "pipelines transporting oil solely on or across the OCS,"[104] the Pipeline Safety Act and DWPA clearly provide PHMSA with jurisdiction to regulate such pipelines.

Second, the movement of crude oil through the SYPS is also part of an interstate journey from the start. The Pipeline Safety Act defines "interstate or foreign commerce," in relevant part, as "commerce between . . . a place in a State and a place outside that State."[105] The SYPS transports crude oil from the OCS, "a place outside" of California, through state waters to inland points located within California. Once the crude oil produced at the offshore platforms enters the SYPS, it has begun an interstate journey.[106]

Third, the crude oil remains in interstate commerce at least until it reaches Pentland Station. A current purchase agreement identifies Pentland Station as the intended destination of the crude oil that begins its movement by pipeline on the OCS, and nothing breaks the interstate character of that movement during its transit through the SYPS. The heating, dewatering, sweetening, stabilization, and other processing functions performed at the LFC facility ensure that the crude oil can be safely transported by pipeline.[107] Such processing "to promote the safe or convenient transit" of crude oil by pipeline does not break the continuity of an interstate movement.[108] The aboveground storage tanks at the LFC Facility also provide storage incidental to pipeline

[103] 49 U.S.C. § 60101(a)(4)(A) (defining "hazardous liquid" to include "petroleum"); 49 CFR 195.2 (defining "hazardous liquid" to include "petroleum" and defining "petroleum" to include "crude oil"). The fact that the emulsion also contains water and other contaminants not subject to regulation as a hazardous liquid does not render the Pipeline Safety Act inapplicable to the offshore portions of the SYPS. PHMSA Letter of Interpretation, PI-20-0008 (June 15, 2020), available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-20-0008.

[104] *Re Bonito Pipe Line Co.*, 61 FERC ¶ 61,221.

[105] 49 U.S.C. § 60101(a)(8)(B).

[106] A different analysis would be required if the SYPS originated at offshore platforms located in California state waters. In that scenario, the movement of crude oil through the SYPS would not begin at a place outside of California, and that, in turn, would need to be considered in assessing the jurisdictional status of the pipeline under the Pipeline Safety Act. *See Southern Pacific Pipe Lines Inc. v. U.S. Dept. of Transp.*, 796 F.2d 539 (D.C. Cir. 1986).

[107] *See supra* notes 38-40.

[108] *Champlain Realty Co.*, 260 U.S. at 376.

transportation. The tanks, which qualify as PHMSA-regulated breakout tanks under Part 195, receive crude oil for reinjection and continued transportation in interstate commerce in the SYPS.[109]

In other words, Sable's onshore pipeline segments are just like the delivery driver and his truck in *Flowers Foods*. They are used to transport crude oil on an intrastate leg of an interstate journey. And just like the warehouse in *Flowers Foods* that repackaged the Butterscotch Krimpets from wholesale to retail packaging, and just like the onshore processing facility in *Maryland v. Louisiana*, the processing at the LFC Facility does not stop the flow of interstate commerce because the crude oil remains in interstate commerce until it reaches its final intended destination in Pentland.

Fourth, the exception for onshore production, refining, and manufacturing facilities does not apply to the LFC Facility. The crude oil that moves through the LFC facility is only subject to transportation-related processing[110] and remains a raw material until it reaches the California refineries downstream from the Pentland Station, where it is refined into petroleum products.[111] The fact that the transportation-related processing performed at the LFC Facility results in the removal of water, certain NGLs, and contaminants does not mean that the exception applies. Such phenomena are a regular feature of the transportation-related processing that occurs throughout the nation's hazardous liquid and natural gas pipeline network.[112]

---

[109] PHMSA Interpretation Response #PI-24-0009 (Jul. 28, 2025), available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-24-0009. Sable acknowledged in a letter submitted after the filing of the application for the non-emergency special permit that the tanks at the LFC Facility are breakout tanks under Part 195.

[110] Interpretation Response #PI-17-0003, available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-17-0003; Interpretation Response #PI-96-015 (Jul. 22, 1996), available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-96-015 (the exception for manufacturing facilities does not apply to "facilities . . . operated primarily to further . . . transportation . . . by pipeline").

[111] Nor would the applicability of the exception for onshore production, refining, and manufacturing facilities to certain movements of hazardous liquid through the LFC facility break the continuity of the interstate journey. The legislative history indicates that Congress added this exception to the HLPSA for policy reasons, *i.e.*, "because such lines present insufficient risk to life and property to require regulation." Senate Report No. 96-182 to Accompany S. 411, May 15, 1979, p. 18. The applicability of such a policy-based exception to a particular movement of hazardous liquid is not enough to change the "essential character" of the interstate commerce at issue in this case. *See Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. & Teamsters Joint Council No. 7 v. I.C.C.*, 921 F.2d 904, 910 (9th Cir. 1990) (holding "that goods shipped from a point in one state to a point in the same state may remain in interstate commerce even where an exempt movement of the goods precedes the single-state movement").

[112] *Oneok*, 2016 WL 8315623 at *7 ("Were the [Pipeline Safety Act] interpreted to exempt any facility used in removing unwanted substances, it would result in significant and unintended gaps in safety oversight. For example, every natural gas pipeline facility that removes unwanted moisture from its gas stream to aid in pipeline transportation could potentially fall under such concepts of refining and be excluded from the Act. PHMSA does not assume Congress intended to enact an exception so expansive that it would defeat much of the purpose of the legislation.").

Fifth, even if contrary to PHMSA's consistent interpretation going back many decades,[113] transportation-related processing facilities were outside the statutory definition of transporting hazardous liquid, PHMSA would still conclude that lines CA-324 and CA325 are used to transport hazardous liquid in interstate commerce under 49 U.S.C. § 60101(a)(7). Sable transports crude oil across state lines before it reaches the Las Flores Canyon facility and, after that crude oil exits the Las Flores Canyon facility, the crude oil continues its interstate journey through CA-324 and CA-325 until it reaches Pentland Station. Lines CA-324 and CA-325 are thus used to transport crude oil in interstate commerce because they perform an intrastate leg of an interstate journey. Based on our inspection and analysis, the processing that occurs at Las Flores does not change the essential character of the crude oil in any way that would terminate the flow of interstate commerce.

Finally, PHMSA's May 2016 letter to OSFM addressing the jurisdictional status of the SYPS does not change the essential character of the commerce today. PHMSA issued that letter shortly after Plains submitted filings with FERC canceling the ICA tariffs for CA-324 and CA-325. In those filings, Plains represented that the pipelines had been taken out of service and were no longer available to provide transportation in interstate commerce.[114] PHMSA had no reason to question the representations made in Plains' filings at that time, and there was no indication that Plains canceled the tariffs simply to avoid jurisdiction. To the contrary, PHMSA had mandated in the CAOs that CA-324 and CA-325 be shutdown following the May 2015 rupture, and the lines subsequently remained out of service for more than 10 years. The offshore platforms that produced crude oil for delivery into CA-324 and CA-325, then owned and operated by ExxonMobil, were also shut down at that time and remained in idle status for the next 10 years.[115]

PHMSA's conclusion in the May 2016 letter that Plains did not intend to use CA-324 and CA-325 in interstate commerce was reasonable under such circumstances. CA-324 and CA-325 were not operational and could not transport crude oil in interstate commerce, both because of the CAO and as a result of ExxonMobil's decision to idle the offshore platforms and eliminate the sole source of supply for the lines. And PHMSA relied, as it routinely does under Appendix A to Part 195, on the absence of a FERC tariff as a general proxy for jurisdiction under the HLPSA when there is no disputed issue as to jurisdiction.

But as PHMSA noted at the conclusion of the May 2016 letter, its views on the jurisdictional status of the SYPS were "subject to change based on any future events or newly-discovered

---

[113] *Id.*

[114] Plains Pipeline, L.P. Tariff Filing -- FERC Tariff No. 114.3.0, Document Accession No. 20160212-5032 (Feb. 12, 2016); Plains Pipeline, L.P. Tariff Filing -- FERC Tariff No. 114.4.0, Document Accession No. 20160429-5326 (Apr. 29, 2016), available at https://elibrary.ferc.gov/eLibrary/search

[115] U.S. Dep't of the Interior, Bur. of Safety and Envtl. Enf't, Finding of No Significant Impact: ExxonMobil/Sable Offshore Corp. Lease Extension of the Santa Ynez Unit at 2 (May 2025), https://www.boem.gov/sites/default/files/documents/environment/environmental-assessment/2025_0528_SableEA_FONSI_508c.pdf.

facts," a condition that is certainly met here. The SYPS is now under common ownership and control, production has resumed at the offshore platforms, and the pipeline is once again transporting crude oil from the OCS through the LFC Facility to Pentland Station. The movement of crude oil is consistent with the circumstances that existed prior to the May 2015 failure of Line 901, when PHMSA considered that pipeline and Line 903 to be part of an interstate hazardous liquid pipeline facility under the Pipeline Safety Act. For these reasons, the May 2016 letter does not undermine the determination that the SYPS is an interstate hazardous liquid pipeline facility.

**Conclusion**

As stated above, PHMSA finds that the SYPS is an interstate hazardous liquid pipeline facility subject to its jurisdiction under the Pipeline Safety Act.

# EXHIBIT 4

Exhibit 4
to Petition for Review
filed July 20, 2026

U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

**FINDING AFTER ENVIRONMENTAL REVIEW**

**RESPONSIBLE AGENCY**: U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration

**ACTION:** Finding of No Significant Impact

**DATE:** June 25, 2026

**PROJECT & PROPONENT:** Issuance of an Emergency Special Permit (ESP) and issuance of a subsequent non-emergency Special Permit (SP), Sable Offshore Corp., PHMSA-2025-1502 and PHMSA-2026-0464

**SUMMARY:**

Pursuant to the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.,* the Pipeline and Hazardous Materials Safety Administration (PHMSA) prepared an Environmental Assessment (EA) to assess the environmental impacts associated with the Emergency Special Permit (ESP) issued to Sable Offshore Corp. (Sable) on December 23, 2025, and the proposed non-emergency special permit currently under review by PHMSA. The ESP granted Sable's request to waive compliance with the requirements of 49 CFR 195.452(h)(4)(iii)(H) for two onshore segments of the Santa Ynez Pipeline System (SYPS). PHMSA's decision to grant the ESP avoided a potential lapse in oversight for waivers issued by the state of California. The proposed non-emergency special permit requests to waive the same regulatory requirement as the ESP.

**Purpose and Need:** The terms of a court-approved Consent Decree required the prior operator to obtain a waiver or completely replace the line pipe prior to restarting the two onshore segments. Sable originally obtained the required waivers from California's Office of the State Fire Marshall (OSFM) but subsequently asked PHMSA to issue the waivers on an emergency basis to address an actual or impending emergency involving pipeline transportation[1] pursuant to Executive Order (E.O.) 14156 *Declaring a National Energy Emergency*. PHMSA's decision to grant the ESP avoided a potential lapse in oversight once PHMSA determined that the two onshore pipeline segments were part of an interstate pipeline. PHMSA found that issuing the ESP

[1] 49 U.S.C. § 60118(c)(2); 49 CFR 190.341(g).

was necessary to replace those waivers, which no longer had any legal effect due to the preemption provision in 49 U.S.C. § 60104(c).

**Action Alternative:** PHMSA has selected the Action Alternative, which involves granting the non-emergency special permit following PHMSA's review. This Action Alternative requires Sable to adhere to stringent safety conditions that provide an equal or greater level of safety compared to regular compliance with Federal pipeline safety regulations. Key conditions include:

- Mandatory annual in-line inspections (ILI) for metal loss and crack detection.
- Stringent anomaly repair criteria, such as the immediate repair of cracks at 50% wall thickness, which exceeds the standard regulatory threshold.
- Enhanced monitoring and enhanced integrity management, including but not limited to fracture toughness testing and spike hydrotesting.

**Environmental Impacts:**

A Draft and Final environmental impact statement (EIS) (Initial EIS)[2] was prepared in 1984 which analyzed the construction, operation, and ongoing repair and maintenance of an approximately 1,200-mile pipeline to transport Outer Continental Shelf (OCS) and other locally produced crude oils from the Santa Barbara and Santa Maria Basins in California to McCamey, Texas. Lines CA-324 and CA-325 were analyzed in the Initial EIS as part of that project. In the EA, PHMSA uses the Initial EIS to characterize impacts associated with the construction of CA-324 and CA-325, as well as routine maintenance and repair activities as part of ongoing operation..

Based on the analysis in the current EA and supporting consultations, PHMSA has determined that the Action Alternative will not have a significant impact on the human or natural environment. This section describes the resource areas that were evaluated as part of the EA. Descriptions of how PHMSA complied with other relevant environmental laws and regulations, that were not included in the EA published on February 23, 2026, are also provided in the appropriate sections below. New analyses in the FONSI relate to the following statutory requirements: Section 4(f) of the U.S. Department of Transportation Act of 1966; Coastal Zone Management Act; Section 106 of the National Historic Preservation Act of 1966; and Section 7 of the Endangered Species Act.

- **Land Use, Agriculture & Recreation**: The Action Alternative involves localized inspections and repairs within the existing right of -way (ROW). No new land conversion or significant recreation impacts will occur. Potential impacts from integrity assessments

[2] The Draft EIS and Final EIS can be accessed at http://cosantabarbara.app.box.com/s/gc3vhh8ns8aiwketnq35vwbehnhre672 and https://cosantabarbara.app.box.com/s/lkl9oo9xdsaangevdp6pasfo0cmimvlt, respectively.

have been previously determined insignificant under the EA issued during promulgation of PHMSA's Integrity Management Rule.[3]

- Section 4(f) of the U.S. Department of Transportation Act of 1966: Section 4(f) properties were identified adjacent to the pipeline segments. PHMSA has determined that the Action Alternative does not constitute a use of any protected Section 4(f) properties. The special permit authorizes localized preventative maintenance activities within the existing pipeline ROW. Because no properties are being permanently incorporated or converted into a transportation use, there is no direct use of Section 4(f) properties. Temporary noise or visual disturbance associated with maintenance activities are consistent with existing pipeline operations and will not substantially impair the properties protected activities, features, or attributes.

- Coastal Zone Management Act: The Action Alternative does not implicate the Coastal Zone Management Act (CZMA) because it is not a federal license or permit (15 CFR 930.51), Outer Continental Shelf (OCS) OCS exploration, development or production activity (930.71), or a federal agency activity (930.31). First, the waiver in the special permit is not an "authorization that an applicant is required by law to obtain in order to conduct activities affecting any land or water use or natural resource of the coastal zone and that any Federal agency is empowered to issue to an applicant." 15 CFR 930.51(a). Sable was not required "by law" to acquire the special permit from PHMSA to operate the SYPS. While the Consent Decree required obtaining a waiver, Sable is not a party to the Consent Decree and therefore its obligation to obtain a waiver was contractual as opposed to a statutory or regulatory. The California Coastal Commission's published list of federal licenses and permits subject to consistency certification does not include any PHMSA activities.[4] Second, the special permit is not an OCS exploration, development, or production activity. Existing pipeline segments link the production facilities on the OCS to onshore portions of the SYPS. The special permit does not change that infrastructure in any way and only applies to onshore pipeline segments. Third, the special permit is not a federal agency activity within the meaning of the CZMA. Federal agency activities are "any functions performed by or on behalf of a Federal agency in the exercise of its statutory responsibilities. The term 'Federal agency activity' includes a range of activities where a Federal agency makes a proposal for action initiating an activity or series of activities when coastal effects are reasonably foreseeable, e.g., a Federal agency's proposal to physically alter coastal resources, a plan that is

[3] 49 CFR 195.452

[4] https://www.coastal.ca.gov/fedcd/listlic_2015.pdf.

used to direct future agency actions, a proposed rulemaking that alters uses of the coastal zone." 930.31(a). In general, this applies to activities in "which the federal agency itself is the principal actor," and not "federally approved activities of third parties." *Secretary of the Interior v. California*, 464 U.S. 312, 332 (1984); see also *Environmental Defense Center v. Bureau of Ocean Energy Management*, 36 F.4th 850, 886 (9th Cir. 2022) (contrasting when "the federal agency takes the action itself" and when the agency "instead is approving a proposed plan or is issuing a federal license or permit to an applicant"). Here, PHMSA is not the principal actor for the operation of the SYPS, it is only approving the action by Sable.

- **Cultural & Historic Resources**: Mitigation measures from the Initial EIS have already been implemented, and any subsequent excavations or ground-disturbing activities will occur in previously disturbed areas. Consultation with the State Historic Preservation Office (SHPO) or the Tribal Historic Preservation Office (THPO) is ongoing for unanticipated discoveries, but no adverse effects to historic properties are anticipated. Where a known site exists, further monitoring or treatment would be required. In the event that a new site is found, Sable would coordinate with PHMSA, SHPO, and THPO before work can occur.
    - <u>Section 106 of the National Historic Preservation Act of 1966</u>: PHMSA began consultation with California (CA) SHPO and the one federally recognized Tribe listed on the public-facing California Native American Heritage Commission (NAHC) database (Santa Ynez Chumash) on February 25, 2026. In accordance with 36 CFR 800.4(d)(1), PHMSA determined the Action Alternative will result in No Adverse Effect to Historic Properties with the condition that the existing mitigation measures from the Initial EIS and PHMSA's Unanticipated Discovery Protocol (UDP) are followed. On Friday, March 27, 2026, PHMSA received a response from CA SHPO, requesting additional information. PHMSA requested relevant information from the appropriate California Historic Information Systems (CHRIS) center and NAHC, responding to SHPO's questions and reevaluating their findings. On May 7, 2026, PHMSA sent a continuing consultation to SHPO and to the four federally recognized Tribes that were identified in the process (Morongo Band of Mission Indians, Tejon Indian Tribe, Table Mountain Rancheria, Tule River Indian Tribe). On May 7th, the Morongo Band of Mission Indians responded that they had no specific interest in the project area. The THPO for the Tejon Indian Tribe requested additional information, which was provided by PHMSA on May 11, 2026. No further response from SHPO, the Tule River Indian Tribe, the Santa Ynez Chumash, the Table Mountain Rancheria, or the Tejon Indian Tribe had been received as of June 9, 2026, 30 days from PHMSA's most recent response to the Tejon Indian Tribe, and 34 days

from the initiation of the second consultation period with SHPO and the Tribes. In accordance with 36 CFR 800.3(c)(4), PHMSA therefore will proceed with the finding that there will be No Adverse Effects to Historic Properties with the conditions that PHMSA's UDP is in force and any necessary treatment plans will be developed and followed for the special permit area in coordination with the SHPO and interested Tribes, as specified in the Initial EIS. Should SHPO or any of the Tribes reenter consultation, PHMSA will continue to consult in accordance with 36 CFR 800.3(c)(4).

- **Biological Resources**: Minimal disturbance which is limited to existing ROW. The Action Alternative could result in ground disturbance which may result in temporary and localized effects. However, PHMSA has determined these impacts would not be significant to Federal and state listed species or other biological resources, due to the limited scope of anticipated activities, implementation of mitigation measures, and because ground disturbance would occur in the previously disturbed ROW.
  - Section 7 of the Endangered Species Act: On February 20, 2026, PHMSA submitted a request to consult with the U.S. Fish and Wildlife Service (USFWS), pursuant to the emergency Endangered Species Act (ESA) Section 7 consultation procedures (50 CFR 402.05). PHMSA determined the action is an emergency based upon implementation of E.O. 14156 *Declaring a National Energy Emergency*. The USFWS provided PHMSA with a list of General Project Design Guidelines to help avoid or to minimize adverse effects to listed species and to designated critical habitat. PHMSA then submitted an informal consultation letter to USFWS on February 26, 2026, and found that the Action Alternative *may affect, but is not likely to adversely affect* listed species and designated critical habitat. PHMSA submitted an amended Section 7 consultation request on June 11, 2026, requesting concurrence only for the ILI runs required by the special permit conditions. Localized excavations and repairs will be addressed through site-specific consultation(s) after the exact locations requiring repairs, if any, are identified. PHMSA determined that ILI runs *may affect but is not likely to adversely affect* listed species and designated critical habitat. The USFWS concurred in writing with this determination on June 11, 2026.
  - The Action Alternative does not involve any offshore activities, underwater noise generation, or potential discharges into the marine environment, therefore, PHMSA has determined the action will have *no effec*t on species or critical habitats under the National Marine Fisheries Service (NMFS) jurisdiction.
- **Air Quality**: The Action Alternative will not result in a significant emissions increase compared to pipeline replacement. Localized work in the ROW is negligible compared to

pipeline replacement. The Action Alternative will not result in capacity expansion of the SYPS, meaning that no changes would occur to operational air quality.

- **Hydrological Resources**: The Action Alternative will not result in significant effects on hydrological resources. None of the special permit segments are offshore, and any inland water resources intersecting the ROW are not expected to be at greater risk of spills compared to operation of the SYPS without the special permit. Inspections and repairs are not expected to have significant effects on hydrological resources above those already required by the pipeline safety regulations. Largescale excavation due to pipe replacement could cause erosion, cause sedimentation in waterways, or other negative impacts to hydrological resources.
- **Hazardous Waste/Substance Discharge**: Neither alternative involves hazardous waste streams. Petroleum is excluded under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). Lines CA-324 and CA-325 do not transport hazardous waste or materials regulated by CERCLA.
- **Geology & Topography**: The Action Alternative will not result in significant effects on geology or topography because no large-scale excavations will occur aside from isolated excavation and repair and the pipeline alignment remains fixed.
- **Noise & Visual Environment**: The Action Alternative may result in limited, temporary noise from localized maintenance during specific excavation and repair. The Action Alternative will not result in any new permanent facilities. Pipeline replacement would result in much more extensive noise and visual impacts on the surrounding environment.
- **Socioeconomics**: The Action Alternative would not result in significant socioeconomic disruptions when compared to pipeline replacement.

**RESPONSE TO COMMENTS:**

PHMSA received a total of 12,816 comments on the Sable Offshore Corp. Special Permit request (Docket ID: PHMSA-2026-0464). Over 12,000 of those comments were from the public; seven comments were from industry, non-profits, or other private sector companies; two comments were from a state agency, and one comment was from Sable. One comment from a non-profit included a form campaign with over 12,000 signatories. Aside from the form campaign comments, there were a total of 58 unique comments. The public comment period occurred from February 24, 2026 to March 26, 2026 and was extended to April 3, 2026. A summary of substantive comments related to the environment, and PHMSA's responses, are below.

<u>Comment:</u> Several commenters expressed support for the issuance of the special permit. Commenters stated that resuming operations will generate revenue, will create jobs, and will reduce energy costs by promoting domestic energy, resulting in economic benefits. Other

commenters that supported the issuance of the special permit stated that frequent inspections and other conditions specified in the special permit mitigate the risk corrosion issues and other safety concerns. Commenters also stated that Sable has completed requirements to resume safe operation of the pipeline and that transport of crude oil via pipeline is safer than other modes of transportation.

Response: PHMSA acknowledges the commenters' statements that issuing the special permit will result in economic and safety benefits. PHMSA's environmental analysis is located in Section VII of the EA.

Comment: Three commenters neither opposed nor supported the issuance of the special permit. They stated that PHMSA must evaluate the benefits and impacts of issuing the special permit and that all comments should be considered.

Response: PHMSA conducts a comprehensive technical analysis of each special permit application to ensure that issuing the special permit would be consistent with pipeline safety (49 CFR 190.341). PHMSA reviewed Sable's special permit application and proposed conditions that will provide an equal or greater level of safety than the actions required by the pipeline safety regulations. PHMSA also analyzed the impacts of issuing the special permit in the EA. The EA was published in the Federal Register for review and comment from February 24, 2026 to April 3, 2026. PHMSA reviewed and considered all substantive comments received on the docket. PHMSA evaluates all benefits, impacts, and public comments per the National Environmental Policy Act (NEPA) and DOT Order 5610.1D.

Comment: Commenters proposed timeframes for inspections and other conditions. One commenter recommended regular inspections, and another commenter proposed an inspection frequency of once per day. Commenters also proposed an alert system so Sable can promptly respond to issues, in addition to providing full inspection transparency to inform the public of potential risks. Commenters proposed other conditions, including: limiting the term of the special permit to a fixed number of years; allowing PHMSA to revoke the special permit if Sable does not comply with all conditions; allowing PHMSA to revoke, suspend, or modify the special permit under certain circumstances; and maintaining the pipeline in its current, non-operational status.

Response: The proposed special permit conditions, which outline inspection and repair requirements under the special permit, are provided in the docket under PHMSA-2026-0464-0002. In addition, PHMSA addresses public notification and disclosure of risk through the NEPA and public comment processes. PHMSA utilizes risk-based framework to determine inspection frequency, and the SYPS, as an interstate hazardous liquids pipeline, is subject to numerous inspections and mandatory reporting requirements in accordance with 49 CFR Part 195.

PHMSA notes that, irrespective of the issuance of the special permit, the SYPS is currently operating in accordance with a Defense Production Act Order.

Moreover, the EA does not evaluate alternatives beyond PHMSA's mandate. The EA considers only reasonable alternatives, including those which are consistent with the legal framework currently applicable to the special permit segments (i.e., the requirements specified in the Consent Decree and Part 195), and which meet the purpose and need. The EA does not consider, nor does NEPA require, consideration of every theoretical alternative. The EA only analyzes reasonable, foreseeable impacts of specifically the Action Alternative (i.e., granting the special permit) and No Action Alternative. Alternatives that require speculation outside of the current legal framework (as may occur in the possibility of prospective termination or modification of the Consent Decree or amendment to Part 195), or which do not meet the purpose and need for the proposed action (such as permanent abandonment of the special permit segments without replacement) are not considered in the EA. The alternatives proposed by the commenters do not meet the purpose and need and are outside the scope of the EA.

Comment: Several comments expressed concern about the analysis in the EA and the NEPA process. Commenters stated that the EA did not analyze reasonably foreseeable environmental impacts, such as those that may occur from a spill. Other commenters stated that the resource analysis in the EA was inadequate, that the EA did not consider the negative impacts that may occur from issuing the special permit, especially those related to a spill, and that the analysis in the EA did not support PHMSA's findings and relied upon outdated sources. Other commenters requested a more detailed analysis on state-protected species. One commenter stated that PHMSA bypassed the required public notice and comment period before issuing the ESP, and other commenters stated that a more robust environmental analysis, such as the preparation of an EIS, is needed. A commenter stated that PHMSA should also hold a public meeting in Santa Barbara. Other commenters stated that it was unclear if PHMSA will consult with the National Marine Fisheries Service (NMFS).

Response: Section VII of the EA discusses potential impacts from issuing the special permit, including reasonably foreseeable impacts and impacts that may occur in the event of an incident. Through this analysis, PHMSA subject matter experts, including engineers, determined that granting the special permit would provide an equal or greater level of safety compared to the operation of the pipeline in compliance with the existing federal pipeline safety regulations. PHMSA determined that existing NEPA documentation described in Section IV of the EA accurately characterizes the impacts associated with the No Action Alternative, and impacts associated with routine maintenance and repair activities as part of the ongoing operation of the pipeline. Section 6 of DOT Order 5610.1D states that Operating Administrations (OAs), including PHMSA, must use available reliable data sources and not undertake new scientific or technical research to inform their analysis unless it is essential. The EA describes the relevance

of these existing environmental reviews, analyses, and data sources in the context of the special permit. The operator is required to coordinate with the state natural resources agencies if they anticipate any impacts to state-protected species as a result of the pipeline maintenance activities. The issuance of the special permit does not excuse Sable from compliance with any other applicable federal, state, or local environmental law or regulation, unless such a law or regulation is preempted by the Pipeline Safety Act in accordance with 49 U.S.C. 60104(c).

Per Section 10 of DOT Order 5610.1D, PHMSA may, but is not required to, release an EA for public comment. PHMSA released an EA for public comment, fulfilling the public comment and notification requirements for an EA per DOT Order 5610.1D. When the expected environmental impacts of a proposed emergency action are not considered significant, PHMSA prepares an EA to the extent practicable. PHMSA subject matter experts determined that expected environmental impacts of issuing the ESP and special permit would not be significant, therefore, an EA was prepared.

PHMSA has determined that consultation with NMFS is not required. The scope of the special permit is strictly limited to the onshore portion of the SYPS. Because the proposed action does not involve any offshore activities, underwater noise generation, or potential discharges into the marine environment, PHMSA has determined the action will have "no effect" on species or critical habitats under NMFS jurisdiction, therefore consultation is not required.

<u>Comment:</u> Many commenters referenced the pipeline's rupture and associated oil spill that occurred in 2015 due to corrosion and released 450,000 gallons of crude oil along 150 miles of coastline, killing birds and marine life. Commenters stated that Santa Barbara's economy relies on tourism, fisheries, recreation, and access to the coast, and that the Santa Barbara area has high marine biodiversity and waters that provide ecological, economic, and cultural significance, all of which would be negatively impacted in the event of a spill. Several commenters stated that the economic benefits of resuming pipeline operations are not as robust as the scale of potential risk.

<u>Response:</u> Section VII of the EA discusses potential impacts from issuing the special permit, including impacts that may occur in the event of an incident. Through this analysis, PHMSA determined that granting the special permit would provide an equal or greater level of safety compared to the operation of the pipeline in compliance with the existing federal pipeline safety regulations.

<u>Comment:</u> Several commenters referenced the operator's duty to install automatic shut-off valves (ASV) per PHMSA's 2022 Final Rule (87 FR 20940), which establishes that ASVs are the national standard for mitigating catastrophic ruptures, and per California law (AB 864), which requires ASV for pipelines near sensitive coastal areas.

Response: PHMSA requires interstate hazardous liquid pipeline operators to meet specific safety and operational standards under 49 CFR Part 195, including standards for valve placement and inspection. PHMSA's recent Pipeline Safety: Requirement of Valve Installation and Minimum Rupture Detection Standards Final Rule, which went into effect in 2022, amended the regulations regarding installation of rupture-mitigation valves (RMVs). An RMV is an ASV or remote-control valve (RCV). For an "entirely replaced onshore hazardous liquid or carbon dioxide pipeline segment" or an, "entirely replaced onshore gas transmission pipeline segment" replaced after April 10, 2023, operators must install RMVs or alternative equivalent technology whenever a valve must be installed in order to meet valve spacing requirements. Sable installed 27 new safety valves along lines CA-324 and CA-325 in response to an analysis on the need for emergency flow restricting devices (EFRDs). These safety valves limit the spill volume in the event of a rupture, reflecting best available technology to minimize spill volume. Sable also installed leak detection systems and an automatic shutoff system that shuts down pumps and closes valves in the event of a rupture. Section 2 of Sable's special permit application in Docket no. PHMSA-2026-0426 provides additional information on operating information, leak history, and testing and assessment results.

Comment: The California Attorney General's Office stated that PHMSA improperly invoked the ESA's emergency consultation procedures.

Response: PHMSA determined that granting the ESP was consistent with the requirements in the Pipeline Safety Act given the national energy emergency declared by the President in E.O. 14156. PHMSA's decision to grant the ESP also implements the directives in E.O. 14154, and PHMSA's decision to grant the ESP avoided a potential gap in coverage under the waivers issued by OSFM. Based on the emergency determination, PHMSA proceeded in accordance with 50 CFR 402.05 of the ESA. PHMSA also completed post-emergency informal consultation as part of the non-emergency special permit process, during which the Fish and Wildlife Service (FWS) concurred in PHMSA's judgment that the ILI requirements in the special permit conditions were not likely to affect endangered species, and that post-ILI repair and maintenance could be adequately mitigated using ongoing consultations once repair and maintenance excavation activities were identified.

Comment: The Environmental Defense Center and Center for Biological Diversity commented that the scope of the EA was too narrow, and that PHMSA should have analyzed the impacts resulting from the restart of the SYPS.

Response: In December, PHMSA conducted a review of Sable's restart plan and several related documents and procedures. Based on that review, on December 22, 2025, PHMSA issued a letter approving Sable's restart plan. However, Sable did not restart the pipeline at that time.

Subsequently, on March 13, 2026, the Secretary of Energy issued a Defense Production Act (DPA) Order requiring Sable to restart the pipeline. Sable restarted the pipeline on March 14, 2026. In light of the comments received about the scope of the EA, PHMSA has considered whether its approval of Sable's restart plan has a significant environmental impact. Because the pipeline will be operated in accordance with established pipeline safety standards (with the exception noted in this special permit, which itself has no significant environmental impact), PHMSA finds its approval of the restart plan also has no significant environmental impact. In addition, PHMSA notes that notwithstanding its approval of the restart plan, the pipeline must be operated pursuant to the DPA Order. Finally, as described in the EA, the No-Action Alternative of the special permit was for the segment pipe to be replaced, and the segments subsequently operated. And following the issuance of the DPA Order, failure to issue the special permit will not affect the operating status of the SYPS. At no point has the No Action Alternative been the non-operation of the SYPS.

**DETERMINATION**:

___ CE: No Extraordinary Circumstances Present

_X_ FONSI

___ EIS

In consideration of the factors detailed in the EA and summarized above, PHMSA finds that the Action Alternative would not result in significant impacts to the human environment. PHMSA therefore approves this FONSI pursuant to the National Environmental Policy Act (NEPA), as amended (42 United States Code (U.S.C.) § 4321 et seq.). No EIS is required for this proposal.

| PHMSA Review | Printed Name and Role of Reviewer | Sign and Date |
|---|---|---|
| EACD Environmental Protection Specialist | Dr. Amanda L. Murphy, FPO & Environmental Protection Specialist | |
| Agency Environmental Coordinator | Carolyn Nelson, P.E., Agency Environmental Coordinator | |

**CONTACT:** For further information on this FONSI, please contact Dr. Amanda Murphy, Federal Preservation Officer and Environmental Protection Specialist, at amanda.l.murphy@dot.gov.