No. 26-4629
Consolidated with Nos. 25-8059, 26-508, 26-6190
Judges Paez, Tallman, and Bennett, Circuit Judges

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

STATE OF CALIFORNIA,

*Petitioner*,

v.

PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, ET AL.,

*Respondents*

# PETITIONER'S EXCERPTS OF RECORD (CalER2)

ROB BONTA
*Attorney General of California*
ANNADEL A. ALMENDRAS
DEBORAH M. SMITH
*Senior Assistant Attorneys General*
MYUNG J. PARK
VANESSA C. MORRISON
*Supervising Deputy Attorneys General*

MATTHEW BULLOCK
MICHAEL S. DORSI
MITCHELL RISHE
RAFAEL J. HURTADO
REBECCA HUNTER
*Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3802
Fax: (415) 703-1107
Michael.Dorsi@doj.ca.gov
Mitchell.Rishe@doj.ca.gov
*Attorneys for Petitioner*

November 9, 2026

# U.S. DEPARTMENT OF TRANSPORTATION
# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
## Jurisdictional Determination in Support of Special Permit

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | PHMSA-2026-0464 |
| **Requested By:** | Sable Offshore Corp. PPC |
| **Operator ID#:** | 40881 |
| **Original Date Requested:** | January 22, 2026 |
| **Original Issuance Date:** | June 25, 2026 |
| **Code Section(s):** | 49 CFR § 195.452(h)(4)(iii)(H) |

The Pipeline and Hazardous Materials Safety Administration (PHMSA) is authorized under the Pipeline Safety Act[1] to issue special permits waiving compliance with the requirements in 49 CFR Part 195.[2] A special permit may be issued on either an emergency or non-emergency basis. An emergency special permit may be issued for a period of up to 60 days "without prior notice and comment if [PHMSA] determines that (i) it is in the public interest to grant the waiver; (ii) the waiver is not inconsistent with pipeline safety; and (iii) the waiver is necessary to address an actual or impending emergency involving pipeline transportation, including an emergency caused by a natural or manmade disaster."[3] A non-emergency special permit may be issued after providing notice and the opportunity for a hearing "on terms [PHMSA] considers appropriate if [PHMSA] determines that the waiver is not inconsistent with pipeline safety."[4]

---

[1] The Pipeline Safety Act refers generally to the series of laws enacted by Congress to regulate the safety of gas and hazardous liquid pipeline facilities. *See e.g.*, Natural Gas Pipeline Safety Act of 1968, Pub. L. No. 90-481, 82 Stat. 720; Pipeline Safety Act of 1979, Pub. L. No. 96-129, 93 Stat. 989; Pipeline Safety Reauthorization Act of 1988, Pub. L. 100-561, 102 Stat. 2805; Pipeline Safety Act of 1992, Pub. L. No. 102-508, 106 Stat. 3289; Accountable Pipeline Safety and Partnership Act of 1996, Pub. L. No. 104-304, 110 Stat. 3794; Pipeline Safety Improvement Act of 2002, Pub. L. No. 107-355, 116 Stat. 2985; Pipeline Inspection, Protection, Enforcement, and Safety Act of 2006, Pub. L. No. 109-468, 120 Stat. 3490; Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011, Pub. L. 112-90 (2012), 125 Stat. 1904; Protecting our Infrastructure of Pipelines and Enhancing Safety Act of 2016, Pub. L. No. 114-183, 130 Stat. 514; Protecting Our Infrastructure of Pipelines and Enhancing Safety Act of 2020, Consolidated Appropriations Act, 2021, Division R, Pub. L. 116-260 (2020), 134 Stat. 2210. These laws are currently codified at 49 U.S.C. § 60101 *et seq.*

[2] 49 U.S.C. § 60118(c); 49 CFR 190.341.

[3] 49 U.S.C. § 60118(c)(2); 49 CFR 190.341(g)-(i).

[4] 49 U.S.C. § 60118(c)(1); 49 CFR 190.341(a)-(f).

On December 23, 2025, PHMSA issued an emergency special permit to Sable Offshore Corp. PPC (Sable). The emergency special permit waived the applicability of certain requirements in 49 CFR Part 195 to two onshore pipeline segments, previously known as Lines 901 and 903 and currently known as CA-324 and CA-325, in the Santa Ynez Pipeline System (SYPS). In issuing the emergency special permit, PHMSA found that CA-324 and CA-325 are part of an interstate hazardous liquid pipeline facility subject to its jurisdiction under the Pipeline Safety Act.[5]

The emergency special permit expired on February 21, 2026, and Sable is now asking PHMSA to issue a non-emergency special permit for CA-324 and CA-325. As in the prior proceeding, Sable contends that CA-324 and CA-325 are part of an interstate hazardous liquid pipeline facility. Commenters in this proceeding have questioned that contention and urged PHMSA to conclude that CA-324 and CA-325 are part of an intrastate hazardous liquid pipeline facility.[6] Intrastate hazardous liquid pipeline facilities in California are subject to the jurisdiction of a State authority, the California Office of the State Fire Marshall (OSFM).[7]

As explained in more detail below, PHMSA finds that the SYPS is an interstate hazardous liquid pipeline facility. The SYPS transports crude oil from offshore production platforms on the Outer Continental Shelf (OCS) through state waters to an onshore processing facility in Santa Barbara County, California, and onto a terminal in Kern County, California. By moving crude oil from a place outside of California to a place inside of California, the SYPS is "used to transport hazardous liquid in interstate or foreign commerce."[8] Accordingly, the SYPS is an interstate hazardous liquid pipeline facility subject to PHMSA's jurisdiction under the Pipeline Safety Act. This jurisdictional determination confirms and supersedes the jurisdictional determination issued on December 17, 2025. PHMSA concludes that CA-324 and CA-325 are used or intended to be used to transport hazardous liquid in interstate commerce.

**Background**

From 1921 until 1960, the Interstate Commerce Commission (ICC) had the authority under the Transportation of Explosives Act (TOEA) to regulate the safety of pipelines transporting flammable liquids (including crude oil) by "common carriers engaged in interstate or foreign commerce."[9] But the ICC did not use that authority during this four-decade period, having concluded after studying the safety record of the oil pipeline industry in the 1930s and early 1940s that there was no "pressing" need to do so.[10]

---

[5] 49 U.S.C. § 60101(a)(7) (defining "interstate hazardous liquid pipeline facility").

[6] 49 U.S.C. § 60101(a)(10) (defining "intrastate hazardous liquid pipeline facility").

[7] 49 U.S.C. § 60105 (authorizing State authorities to regulate intrastate pipeline facilities by submitting an annual certification to PHMSA and meeting other program requirements); *see City & Cnty. of San Francisco v. U.S. Dep't of Transp.*, 796 F.3d 993, 996-997 (9th Cir. 2015); *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 878–79 (9th Cir. 2006).

[8] 49 U.S.C. § 60101(a)(7).

[9] Act of March 4, 1909, as amended by 41 Stat. 1445 (Mar. 4, 1921) and previously codified at 18 U.S.C. §§ 831-835.

[10] H. Rept. 588 to Accompany H.R. 5041, July 2, 1965, at p. 2-3.

In 1960, Congress inadvertently repealed the ICC's authority to regulate the safety of common carrier oil pipelines.[11] According to the legislative history, the repeal occurred when Congress added the phrase "other than pipelines" to the definition of "carrier" in the TOEA.[12] Congress corrected that error five years later, restoring the ICC's safety authority under the TOEA for common carrier oil pipelines.[13] The oil pipeline industry supported the 1965 amendment, primarily on preemption grounds.[14] Citing growing interest in the adoption of state and local safety regulations, the industry argued that, as with other modes of transportation, common carrier pipelines engaged in interstate or foreign commerce should be subject to uniform Federal safety regulations.[15]

From 1965 to 1979, the ICC and its successor agency, the Department of Transportation (DOT),[16] regulated the safety of certain common carrier oil pipelines under the TOEA.[17] Specifically, DOT prescribed safety regulations in 49 CFR Part 195 for common carrier pipelines transporting flammable liquids, including petroleum and petroleum products, "in interstate and foreign commerce."[18] DOT also applied its safety regulations to pipelines on the OCS transporting petroleum and petroleum products in interstate or foreign commerce.[19] In regulating OCS pipelines, DOT relied on the authority in the TOEA and an amendment that Congress enacted in the Deepwater Port Act (DWPA) of 1974.[20]

In 1979, a decade after authorizing DOT to regulate the safety of gas pipeline facilities in the Natural Gas Pipeline Safety Act (NGPSA),[21] Congress authorized DOT to regulate the safety of

[11] Pub. L. 86-10, 74 Stat. 808 (Sept. 6, 1960).

[12] H. Rept. 588 to Accompany H.R. 5041, July 2, 1965, at p. 3.

[13] Pub. L. 89-95, 74 Stat. 808 (Jul. 27, 1965); H. Rept. 588 to Accompany H.R. 5041, July 2, 1965, at p. 3.

[14] H. Rept. 588 to Accompany H.R. 5041, July 2, 1965, at p. 3-4.

[15] *Id.*

[16] Pub. L. 89-670, 81 Stat. 931 (Oct. 15, 1966).

[17] *See e.g.*, 30 Fed. Reg. 13,266 (ICC initiates rulemaking proceeding under TOEA to establish pipeline safety standards); 32 Fed. Reg. 1,098 (ICC proposes pipeline safety reporting requirements under TOEA); 32 Fed. Reg. 9,228 (DOT adopts pipeline safety reporting requirements originally proposed by ICC); 34 Fed. Reg. 15,473 (DOT adopts pipeline safety standards originally proposed by ICC).

[18] 34 Fed. Reg. at 15,476 (codifying scope provision in 49 CFR § 195.1(a)).

[19] 41 Fed. Reg. 34,035 (final rule codifying new safety standards in 49 CFR Part 195 for offshore pipeline facilities).

[20] Pu. L. 93–627, originally codified at 33 U.S.C. §§ 1507(a) ("For the purpose of chapter 39 of title 18, United States Code (18 U.S.C. 831-837), and part I of the Interstate Commerce Act (49 U.S.C. 1-27), a deep water port and storage facilities serviced directly by such deep water port shall be subject to regulation as a common carrier in accordance with the Interstate Commerce Act, as amended."), 1520(a) ("The Secretary [of Transportation], in cooperation with the Secretary of the Interior, shall establish and enforce such standards and regulations as may be necessary to assure the safe construction and operation of oil pipelines on the Outer Continental Shelf.").

[21] Pub. L. 90-481, 82 Stat. 720, originally codified at 49 U.S.C. §§ 1671–1684.

hazardous liquid pipeline facilities in the Hazardous Liquid Pipeline Safety Act (HLPSA).[22] Like the NGPSA, the HLPSA provided DOT with exclusive authority to regulate interstate pipeline facilities[23] and allowed State authorities that satisfied certain requirements to regulate intrastate pipeline facilities.[24] But unlike the NGPSA,[25] the HLPSA defined transportation in terms of the movement by pipeline of hazardous liquids, or storage incidental thereto, "in or affecting interstate or foreign commerce," subject to certain exceptions.[26] The HLPSA defined interstate pipeline facilities as those "used in the transportation of hazardous liquids in interstate or foreign commerce,"[27] and defined interstate or foreign commerce "as commerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof."[28] The HLPSA defined "intrastate pipeline facility" by exclusion, *i.e.*, as a pipeline facility that did not meet the definition of interstate pipeline facility.[29]

In 1981, DOT made certain conforming changes to the pipeline safety regulations in 49 CFR Part 195 to align with the HLPSA.[30] In particular, DOT limited the applicability of Part 195 to interstate hazardous liquid pipeline facilities, which DOT defined as (1) hazardous liquid pipeline facilities subject to the economic regulatory jurisdiction of the Federal Energy Commission (FERC) under the Interstate Commerce Act (ICA) over common carriers engaged in the transportation of oil by pipeline and (2) hazardous liquid pipeline facilities originating on the OCS not subject to FERC jurisdiction under the ICA.[31] DOT did not apply Part 195 to

---

[22] Pub. L. 96-129, title II, 93 Stat. 1003, originally codified at 49 U.S.C. §§ 2001-2014; H. Rep. No. 96-182, 267 (May 15, 1979).

[23] Sec. 203(d), originally codified at 49 U.S.C. § 2002(d).

[24] Sec. 205(a), originally codified at 49 U.S.C. § 2004.

[25] Section 2(3) of the NGPSA, originally codified at 49 U.S.C. § 1671(3) and currently codified as amended at 49 U.S.C. § 60101(a)(21), defined transportation as "the gathering, transmission or distribution of gas by pipeline or its storage in or affecting interstate or foreign commerce," subject to an exception for rural gas gathering lines.

[26] Sec. 202(3), originally codified at 49 U.S.C. § 2001(3). As explained below, the "affects interstate commerce" language extends to the full reach of Congress's Commerce Clause power and vests DOT with authority to regulate purely intrastate pipelines that "affect" interstate commerce. *See* 49 U.S.C. § 60102(a)(2). That authority is displaced only if a State authority obtains a certification to regulate intrastate pipelines. 49 U.S.C. § 60105(a). In all events, DOT has exclusive authority to regulate "interstate" hazardous liquid pipeline facilities, meaning pipelines used to transport hazardous liquid "in interstate commerce." *Id.* §§ 60101(7), 60104(c).

[27] Sec. 202(5), originally codified at 49 U.S.C. § 2001(5). Section 2(8) of the NGPSA, originally codified at 49 U.S.C. § 1671(8) and currently codified as amended at 49 U.S.C. § 60101(a)(6), defined an interstate gas pipeline facility based on the jurisdictional status of the facility under the Natural Gas Act of 1938, 15 U.S.C. 717 *et seq.*

[28] Sec. 202(7), originally codified at 49 U.S.C. § 2001(7).

[29] Sec. 202(6), originally codified at 49 U.S.C. § 2001(6).

[30] 46 Fed. Reg. 38,357.

[31] 46 Fed. Reg. 38,357-38,358 (discussing scope and applicability of Part 195); *id.* at 38,361 (codifying scope provision for Part 195 at 49 CFR § 195.1(a)). As explained in *W. Ref. Sw., Inc. v. FERC*, "Congress passed the [ICA] in 1887 to regulate railroads, and simultaneously created the [ICC] to administer the statute. Ch. 104, 24 Stat. 379 (1887). The Hepburn Act of 1906, Pub.L. No. 59–337, § 1, 34 Stat. 584, specifically extended the [ICA] to 'common carriers engaged in ... [t]he transportation of oil ... by pipeline.' 49 U.S.C. app. § 1(1)(b) (1988). In 1977, Congress transferred the [ICC's] authority over oil pipelines to the newly-created [FERC]. Department of Energy Reorganization Act, Pub.L. No. 95–91, § 402(b), 91 Stat. 565 (codified at 49 U.S.C. § 60502). The next year,

intrastate pipeline facilities at that time, primarily so State authorities could make the changes needed to fully participate in the Federal pipeline safety program.[32]

In 1985, DOT applied Part 195 to intrastate hazardous liquid pipeline facilities.[33] DOT defined intrastate hazardous liquid pipeline facilities consistent with the HLPSA and adopted a statement of policy for determining the jurisdictional status of hazardous liquid pipeline facilities.[34] The statement of policy generally codified the approach that DOT adopted in 1981 in applying Part 195 to interstate hazardous liquid pipeline facilities. Specifically, the statement of policy indicated that:

> In delineating which liquid pipeline facilities are interstate pipeline facilities within the meaning of the HLPSA, DOT will generally rely on the FERC filings; that is, if there is a tariff or concurrence filed with FERC governing the transportation of hazardous liquids over a pipeline facility or if there has been an exemption from the obligation to file tariffs obtained from FERC, then DOT will, as a general rule, consider the facility to be an interstate pipeline facility within the meaning of the HLPSA. The types of situations in which DOT will ignore the existence or non-existence of a filing with FERC will be limited to those cases in which it appears obvious that a complaint filed with FERC would be successful or in which blind reliance on a FERC filing would result in a situation clearly not intended by the HLPSA such as a pipeline facility not being subject to either State or Federal safety regulation.[35]

To demonstrate the application of these principles, the statement of policy included seven examples of hypothetical hazardous liquid pipeline systems that DOT would consider as either

---

Congress repealed much of the [ICA], but provided that transportation of oil by pipeline companies would be subject to '[t]he laws ... as they existed on October 1, 1977.' Act of Oct. 17, 1978, Pub.L. No. 95–473, § 4c, 92 Stat. 1337, 1470." 636 F.3d 719, 723–24 (5th Cir. 2011). For that reason, "[t]he 1977 version of the [ICA] remains the governing organic statute for FERC's oil pipeline authority, even though the Act is no longer part of the U.S. Code." *Petro Star Inc. v. FERC*, 166 F.4th 161, 166 (D.C. Cir. 2026). Moreover, as explained in *Re Bonito Pipe Line Co.*, FERC has concluded that the language of the ICA prohibits it from exercising jurisdiction over "pipelines transporting oil solely on or across the OCS." 61 FERC ¶ 61,050, 61,221 (1992). The ICA states that it only "appl[ies] to common carriers engaged in . . . [t]he transportation of oil . . . by pipeline . . .from one State or Territory of the United States . . . to any other State or Territory of the United States . . . or from one place in a Territory to another place in the same Territory, or from any place in the United States through a foreign country to any other place in the United States, or from or to any place in the United States to or from a foreign country, but only insofar as such transportation takes place within the United States." 61 FERC ¶ 61,221 (quoting section 1(1) of the ICA). Because "the OCS is not a State or Territory of the United States," FERC has found that it "does not come within the ICA's jurisdictional language." *Id.*

[32] 46 Fed. Reg. 38,359-38,360.

[33] 50 Fed. Reg. 15,895. As explained above, *see supra* note 26, DOT has jurisdiction to regulate intrastate hazardous liquid pipeline facilities under the "affects interstate commerce" language in the definition of transporting hazardous liquid. 49 U.S.C. §§ 60101(a)(22); 60102(a)(2).

[34] 50 Fed. Reg. 15,897-15,898.

[35] 50 Fed. Reg. 15,899-15,900 (codifying 49 CFR Part 195, Appendix A).

interstate or intrastate hazardous liquid pipeline facilities. One of those examples included a pipeline originating on the OCS and transporting hazardous liquid into the interior of an adjoining coastal State. The statement of policy indicated that DOT would consider such a pipeline to be an interstate hazardous liquid pipeline facility, even though the operator had no obligation under the ICA to file a FERC tariff for that system.

DOT has not made any significant changes to the regulations or policy statement in Part 195 that apply in determining interstate or intrastate status of hazardous liquid pipeline facilities since issuing the 1985 final rule. Aside from recodifying the Pipeline Safety Laws in 1994,[36] Congress has not made any substantive changes to the governing statutory provisions either.

**Facts**

The SYPS transports crude oil from the OCS to a terminal in Kern County, California. The SYPS originates at three offshore production platforms, named Heritage, Harmony, and Hondo, located on the OCS approximately 5 to 9 miles from the coastline of California. After passing through a separator, the offshore facilities produce crude oil as part of an emulsion that also contains water and other impurities. The crude oil emulsion moves through the SYPS to an onshore processing facility in Santa Barbara County, California.[37] The onshore processing facility is known as the Las Flores Canyon Facility (LFC Facility).

At the LFC Facility, the crude oil is metered and heated to reduce its viscosity for subsequent movement through the SYPS.[38] A "free water knock out" or "F.W.K.O" process is also performed to remove water and other corrosive constituents.[39] The crude oil is then sweetened by removing hydrogen sulfide and stabilized to reduce vapor pressure to levels suitable for subsequent storage and movement by pipeline.[40]

Following heating, dewatering, sweetening, and stabilization, the crude oil is either sent to a pump station for continued movement in the SYPS or to one of several aboveground tanks. The tanks are directly connected to the SYPS and receive crude oil for temporary storage and

---

[36] Pub. L. 103–272, §§ 1(e), 4(s), July 5, 1994, 108 Stat. 1301.

[37] The offshore platforms also produce raw natural gas. After passing through a separator at the offshore platforms, the raw natural gas is transported in a separate pipeline system to the LFC Facility for processing. The jurisdictional status of this gas pipeline system is not at issue in this proceeding.

[38] Portions of the SYPS downstream from the LFC Facility are insulated to maintain the heated temperature of the crude oil. For additional information on the impact of temperature, viscosity, and pour point on the operation of a crude oil pipeline, *see* Overview of the Design, Construction, and Operation of Interstate Liquid Petroleum Pipelines, Argonne National Laboratory, ANL/EVS/TM/08-1, p. 21-23 (Nov. 2007) (ANL/EVS/TM/08-1).

[39] The presence of water and other impurities in crude oil pipelines can cause internal corrosion. *See e.g., In the Matter of Plains Pipeline, LP*, 2015 WL 9287190, at *2 (PHMSA Nov. 12, 2015); *In the Matter of Kinder Morgan CO2 Company*, L.P., 2010 WL 6539184, at *6 (PHMSA Oct. 12, 2010).

[40] For additional information on the impact of vapor pressure on the operation of a crude oil pipeline, *see* ANL/EVS/TM/08-1 at p. 23.

reinjection back into the pipeline.[41] In addition to the processing facilities and tanks, the LFC Facility contains other equipment used in the operation of the SYPS, including pumps; valves and appurtenances; rectifiers; corrosion inhibitor injection points; and equipment necessary for performing in-line inspections and hydrostatic pressure testing.[42]

After leaving the LFC Facility, the SYPS transports the crude oil through two onshore pipeline segments, previously known as Line 901 and Line 903 and currently called CA-324 and CA-325, respectively, to a terminal. The terminal, known as Pentland Station, is the location designated as the delivery point in a current purchase agreement for the OCS-produced crude oil transported in the SYPS. The crude oil is delivered from Pentland Station in another pipeline system to refineries in California.

**Procedural History**

*May 2016 Letter from PHMSA to OSFM*

On May 18, 2016, PHMSA sent a letter to OSFM addressing the jurisdictional status of the onshore portions of the SYPS. The letter explained that Line 901 ruptured on May 19, 2015, resulting in the release of approximately 2,934 barrels of crude oil. The letter further explained that PHMSA issued a corrective action order (CAO) to the operator of Line 901, Plains Pipeline, LP (Plains), following the rupture, and that the CAO and subsequent amendments required Plains to shut down Line 901 and Line 903.[43]

The letter then explained that Plains operated Lines 901 and 903 as interstate crude oil pipelines subject to the jurisdiction of FERC under the ICA prior to the rupture, and that PHMSA had treated Line 901 and Line 903 as interstate hazardous liquid pipeline facilities on that basis. The letter noted that Plains had canceled the FERC tariffs for Lines 901 and 903 on February 12, 2016, and April 29, 2016, respectively, and that the cancelation made both lines intrastate hazardous pipeline facilities subject to OSFM's jurisdiction. The letter noted that PHMSA was reserving its right to investigate and to initiate enforcement actions for events that occurred prior to the tariff cancelation, and that PHMSA's understanding of the jurisdictional status of Lines 901 and 903 was "subject to change based on any future events or newly-discovered facts."

*November 2025 Letter from Sable to PHMSA*

On November 26, 2025, Sable sent a letter to PHMSA regarding the jurisdictional status of Lines 901 and 903, now called CA-324 and CA-325, respectively. The letter explained that Sable recently determined that Lines 901 and 903 should be reclassified as interstate hazardous liquid

---

[41] For additional information on the use of tanks in operating a crude oil pipeline, *see* ANL/EVS/TM/08-1 at p. 5-6.

[42] For additional information on the use of these and other components in operation of a crude oil pipeline, *see* ANL/EVS/TM/08-1 at p. 8-11, 29-38, 81-87. The LFC Facility also contains a power plant, a helipad, natural gas processing facilities, and equipment for biologically treating outfall water.

[43] Plains Pipeline, L.P., C.P.F. No. 5-2015-5011H, available at https://primis.phmsa.dot.gov/enforcement-data/case/520155011H.

facilities under the Pipeline Safety Act. The letter noted that Sable had acquired the SYPS from another operator in 2024, and that Sable intended to operate SYPS as part of a single pipeline system transporting crude oil from the OCS through the LFC Facility to Pentland Station.

The letter noted that the SYPS had operated differently prior to October 2022, with ExxonMobil owning and operating the offshore production platforms, the offshore-to-onshore oil emulsion pipeline, and the LFC Facility, and Plains owning and operating Lines 901 and 903. The letter further noted that PHMSA treated Lines 901 and 903 as interstate hazardous liquid pipeline facilities before Plains canceled the FERC ICA tariffs for the lines in early 2016. The letter then acknowledged PHMSA's conclusion in the May 2016 letter to OSFM that the cancelation of the ICA tariffs made the Lines 901 and 903 intrastate hazardous liquid pipeline facilities, "subject to change based on any future events or newly-discovered facts."

Pointing to the latter reservation, the letter explained that "intervening events" had impacted the jurisdictional status of Lines 901 and 903. The letter stated that, unlike the "arrangement considered by PHMSA in 2016 where different, unrelated entities operated portions" of the SYPS, Sable intended to operate the entire SYPS as a part of a single pipeline system transporting crude oil from the OCS through the LFC Facility to Pentland Station. The letter stated that Sable's intent to use the facilities in this manner made the SYPS an interstate hazardous liquid pipeline facility. The letter further explained that Lines 901 and 903 did not need a FERC tariff to attain that status, noting that the policy statement in Appendix A to Part 195 recognizes that the pipelines that originate on the OCS and transport crude oil to an adjoining coastal State can be classified as interstate hazardous liquid pipeline facilities even without a FERC tariff.

*December 2025 Letter from PHMSA to Sable*

On December 17, 2025, PHMSA responded to Sable's letter. In its letter, PHMSA began by acknowledging that Lines 901 and 903 had historically been treated as interstate hazardous liquid pipeline facilities but explained that both lines became intrastate hazardous liquid pipeline facilities when Plains canceled the ICA tariffs in 2016. The letter further acknowledged that Sable had acquired the SYPS in 2024 and intended to operate the entire SYPS as a single pipeline system transporting crude oil from the OCS through the LFC Facility to Pentland Station. The letter then explained that PHMSA had initiated a three-day, onsite jurisdictional audit of the SYPS after receiving Sable's letter, and that the audit included a review of written procedures and records and physical inspections of the offshore and onshore facilities. The letter noted that OSFM representatives had participated in the audit.

After providing that background information, the letter explained that determining the jurisdictional status of a hazardous liquid pipeline facility is a factual inquiry, and that Appendix A to Part 195 includes a statement of policy and interpretation to assist in making those determinations. The letter noted that Appendix A sets forth a general policy of deferring to the filing of an ICA FERC tariff in determining whether a hazardous liquid pipeline facility is interstate or intrastate. If the operator has a FERC tariff on file, PHMSA will generally consider

the hazardous liquid pipeline facility to be interstate. If the operator does not have a FERC tariff on file, PHMSA will generally consider the hazardous liquid pipeline facility to be intrastate. But the letter noted that Appendix A identifies several scenarios where a hazardous liquid pipeline facility will be treated as interstate without a FERC tariff. One of those scenarios is a pipeline that originates on the OCS and transports crude oil to an adjoining coastal State.

Citing the scenario in Appendix A for OCS pipelines and the results of its multi-day jurisdictional audit, letter stated that PHMSA agreed with Sable's determination that the entire SYPS is an interstate hazardous liquid pipeline facility under the Pipeline Safety Act. Because Lines 901 and 903 had previously been classified as intrastate hazardous liquid pipeline facilities, the letter stated that PHMSA would notify OSFM of the change in jurisdictional status.

**Analysis**

*Interstate Hazardous Liquid Pipeline Facilities*

Congress defined an "interstate hazardous liquid pipeline facility" in the Pipeline Safety Act as "a hazardous liquid pipeline facility used to transport hazardous liquid in interstate or foreign commerce."[44] Congress further defined "interstate or foreign commerce," in relevant part, as "commerce between—(i) a place in a State and a place outside that State; or (ii) places in the same State through a place outside the State."[45]

The key phrase in the definition of "interstate hazardous liquid pipeline facility"—"in interstate or foreign commerce"—has been used in Federal legislation for more than a century, including in the TOEA.[46] While construed more narrowly than the broader phrase "affecting interstate or foreign commerce,"[47] the U.S. Supreme Court has articulated certain basic principles that apply in determining whether something is "in interstate or foreign commerce."[48] Specifically, the Supreme Court has said that "[t]he question whether commerce is interstate or intrastate must be

---

[44] 49 U.S.C. § 60101(a)(7); *see also* 49 CFR § 195.2 (defining "interstate pipeline" as "a pipeline or that part of a pipeline that is used in the transportation of hazardous liquids or carbon dioxide in interstate or foreign commerce").

[45] 49 U.S.C. § 60101(a)(8)(B). Transportation is a particular type of commerce. Black's Law Dictionary 244 (5th ed. 1979) (defining commerce as "[i]ntercourse by way of trade and traffic between different peoples or states and the citizens or inhabitants thereof, including not only the purchase, sale, and exchange of commodities, but also the instrumentalities and agencies by which it is promoted and the means and appliances by which it is carried on, and transportation of persons as well as of goods, both by land and sea"); *id.* at 1344 (defining "transport" as "[t]o carry or convey from one place to another" and "transportation" as "[t]he movement of goods or persons from one place to another, by a carrier").

[46] Act of March 4, 1909, as amended by 41 Stat. 1445 (Mar. 4, 1921) and previously codified at 18 U.S.C. § 831-835; *see also* Federal Arbitration Act of 1925, codified at 9 U.S.C. § 1.

[47] *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 114-118 (2001); *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022); *Flowers Foods, Inc. v. Brock*, 146 S. Ct. 1358, 1365 (2026).

[48] *Kelley v. Rhoads*, 188 U.S. 1, 5-10 (1903); *Illinois Cent. R. Co. v. De Fuentes*, 236 U.S. 157, 163 (1915); *Champlain Realty Co. v. Town of Brattleboro*, 260 U.S. 366, 376 (1922); *Atlantic Coast Line R. Co. v. Standard Oil Co. of Kentucky*, 275 U.S. 257, 268-269 (1927); *U.S. v. Erie R. Co.*, 280 U.S. 98, 101-102 (1929); *Maryland v. Louisiana*, 451 U.S. 725, 753-756 (1981); *Flowers Foods Inc.,* 146 S. Ct. at 1364-1365.

determined by the essential character of the commerce," and that "the determination of the character of the commerce is a matter of weighing the whole group of facts in respect to it."[49] The Supreme Court has also said that once something "actually starts in the course of transportation" and "becomes a part of interstate commerce[,] . . . generally . . . this interstate character . . . continues, at least, until . . . the point where the parties originally intended that the movement should finally end."[50] Finally, the Supreme Court has said that an interruption on the way to an intended destination, such as a stop at a warehouse or processing facility, does not change the essential character of an interstate movement.[51] An interruption, for example, "to promote . . . safe or convenient transit" does not break the continuity of an interstate journey.[52]

Several Supreme Court cases addressing the effect of interruptions on the flow of interstate commerce are instructive. In *Kelley v. Rhoads*, for example, the Court held that a shepherd driving of a flock of sheep from Utah to Nebraska was engaged in interstate commerce throughout his journey and not subject to local taxation in Wyoming, even though he allowed his sheep to stop at various points along the way to graze.[53] The Court observed that the sheep were being driven through Wyoming for the purpose of shipment to another state, not for the purpose of grazing, that "they required sustenance on the journey, and could obtain it only by grazing," and "that they could hardly have been driven more rapidly without a loss of flesh during the transit."[54] Similarly, in *Flowers Foods*, a company transported baked goods across state lines to a warehouse in Colorado. A separate delivery driver then picked up the good from the warehouse and delivered them to stores in Colorado. The Court held that the delivery driver was engaged "in interstate commerce" because he performed "an intrastate leg of an interstate journey."[55] The Court rejected the argument that the interruption at the warehouse terminated the flow of interstate commerce. In *Maryland v. Louisiana*, the Court held that gas transported by pipeline from federal waters in the Gulf of America through an onshore processing facility in Louisiana and then onto consumers in over 30 states remained in interstate commerce throughout the journey.[56] The Court rejected an argument that the interruption at the processing facility terminated the flow of interstate commerce. The Court held that "[g]as crossing a state line at

---

[49] *Atlantic Coast Line R. Co.*, 275 U.S. at 268-269; *see also U.S. v. Erie R. Co.*, 280 U.S. at 101-102; *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. & Teamsters Joint Council No. 7 v. I.C.C.*, 921 F.2d 904, 907 (9th Cir. 1990) ("The characterization of transportation between two points within the same state as a continuation of an interstate shipment or as a distinct intrastate shipment depends upon the 'essential character' of the shipment.").

[50] *Illinois Cent. R. Co.*, 236 U.S. at 163; *see also Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 916 (9th Cir. 2020).

[51] *Flowers Foods*, 146 S. Ct. at 1364-1365; *Maryland v. Louisiana*, 451 U.S. at 754-756.

[52] *Champlain Realty Co.*, 260 U.S. at 376.

[53] *Kelley*, 188 U.S. 1.

[54] 188 U.S. at 8.

[55] *Flowers Foods*, 146 S. Ct. at 1363.

[56] *Maryland v. Louisiana*, 451 U.S. at 753-756.

any stage of its movement to the ultimate consumer is in interstate commerce during the entire journey."[57]

The pre-enactment history of the Pipeline Safety Act supports the conclusion that Congress intended to incorporate these basic principles in defining an "interstate hazardous liquid pipeline facility." As previously noted, Congress originally used the phrase "in interstate or foreign commerce" in the TOEA, the statute that the ICC and DOT used to regulate the safety of common carrier pipelines before the HLPSA. DOT clearly recognized the significance of that statutory language in determining the extent of its jurisdiction over oil pipelines under the TOEA,[58] and Congress retained the same language in defining an "interstate hazardous liquid pipeline facility" in the HLPSA.[59] As the Supreme Court has long held, "[w]here Congress employs a term of art 'obviously transplanted from another legal source,' it 'brings the old soil with it.'"[60] And as the Supreme Court recently reiterated in addressing analogous statutory language in the Federal Arbitration Act (FAA) of 1925, "we can hardly blind ourselves to what this Court's cases said, both before and around the time of the FAA's adoption, about what it means to be 'engaged in commerce between the States.'"[61]

The contemporaneous, post-enactment history confirms that Congress incorporated the traditional understanding of "in interstate or foreign commerce" into the Pipeline Safety Act as well.[62] As already noted, DOT issued a final rule in July 1981 amending Part 195 to conform to the new terminology in the HLPSA.[63] In so doing, DOT decided to "[r]estrict[] the application of Part 195" to interstate hazardous liquid pipeline facilities, *i.e.*, "to pipelines used for moving petroleum, petroleum products, or anhydrous ammonia *in interstate or foreign commerce*."[64] DOT also acknowledged in the July 1981 final rule that the HLSPA's "in interstate or foreign commerce" standard dated back to the TOEA and was comparable to the standard that FERC used in regulating pipelines under the ICA.[65] Lastly, DOT acknowledged that hazardous liquid pipeline facilities originating on the OCS, while not subject to FERC jurisdiction under the ICA, qualified as "interstate hazardous liquid pipeline facilities" for purposes of the DWPA and HLPSA.[66]

---

[57] 451 U.S. at 755-756.

[58] Interpretation Response #PI-72-055, available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-72-055.

[59] Sec. 202(5), originally codified at 49 U.S.C. § 2001(5).

[60] *George v. McDonough*, 596 U.S. 740, 746 (2022) (quoting *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019))

[61] *Flowers Foods, Inc.*, 146 S. Ct. at 1365.

[62] 46 Fed. Reg. at 38,357, 38,357-38,373; *Flowers Foods, Inc.*, 146 S. Ct. at 1365.

[63] 46 Fed. Reg. at 38,357.

[64] *Id.* (emphasis added).

[65] 46 Fed. Reg. at 38,359.

[66] *Id.*

*Intrastate Hazardous Liquid Pipeline Facilities*

Congress intended to go beyond the pre-HLPSA understanding of "interstate or foreign commerce" in regulating intrastate hazardous liquid pipeline facilities under the Pipeline Safety Act. The Pipeline Safety Act defines "transporting hazardous liquid" as "the movement of hazardous liquid by pipeline, or the storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline, *in or affecting* interstate or foreign commerce."[67] By adding the phrase "or affecting" to the definition of "transporting hazardous liquid," Congress invoked the full reach of its authority under the Commerce Clause.[68] And by excluding interstate hazardous liquid pipeline facilities from the definition of "intrastate hazardous liquid pipeline facility,"[69] Congress used that authority to assert jurisdiction over purely the local commerce that had not been previously subject to regulation under the TOEA and DWPA.[70] In other words, Congress defined "transporting hazardous liquid" and "intrastate hazardous liquid pipeline facility" to expressly authorize the regulation of movements of hazardous liquid by pipeline "affecting interstate or foreign commerce."

The contemporaneous, post-enactment history confirms that conclusion. In the April 1985 final rule that originally extended the applicability of Part 195 to intrastate hazardous liquid pipeline facilities,[71] DOT specifically noted that the HLPSA "requires the Secretary of Transportation to establish minimum Federal safety standards for the transportation of hazardous liquids by pipeline *in or affecting interstate or foreign commerce*," and that "[o]nce the Federal standards are established, . . . the HLPSA provides for state adoption and enforcement of the Federal standards with respect to *'intrastate pipelines,' or pipelines to which the HLPSA applies which are not used in interstate or foreign commerce*."[72]

DOT reiterated that principle in adopting the statement of agency policy and interpretation in Appendix A as part of the April 1985 final rule:

> In 1979, Congress enacted comprehensive safety legislation governing the transportation of hazardous liquids by pipeline, the Hazardous Liquids Pipeline

---

[67] 49 U.S.C. § 60101(a)(22)(A).

[68] *Circuit City*, 532 U.S. at 115–116, 118; *see also* Black's Law Dictionary 53 (5th ed. 1979) (defining "affecting commerce" as "[a]ny activity which touches or concerns business or industry, favorably or burdensomely; . . . in commerce, or burdening or obstructing commerce or the free flow of commerce").

[69] 49 U.S.C. § 60101(a)(10); *see also* 49 CFR § 195.2 (defining "intrastate pipeline" as "a pipeline or that part of a pipeline to which this part applies that is not an interstate pipeline").

[70] *Gonzales v. Raich*, 545 U.S. 1, 22 (2005); *see also* Black's Law Dictionary 244 (5th ed. 1979) (intrastate commerce is "[s]uch as is begun, carried on, and completed wholly within the limits of a single state").

[71] 50 Fed. Reg. at 15,895 ("The existing Federal safety standards for pipelines transporting hazardous liquids apply to pipelines operating in interstate or foreign commerce. This final rule extends the applicability of these standards to include pipelines transporting hazardous liquids that *affect interstate or foreign commerce, sometimes called intrastate pipelines*.") (emphasis added).

[72] 50 Fed. Reg. at 15,895 (emphasis added).

> Safety Act of 1979, 49 U.S.C. 2001 et seq. (HLPSA). The HLPSA expanded the existing statutory authority for safety regulation, which was limited to transportation by common carriers in interstate and foreign commerce, to transportation through facilities used in or affecting interstate or foreign commerce. . . . The HLPSA leaves to exclusive Federal regulation and enforcement the "interstate pipeline facilities," those used for the pipeline transportation of hazardous liquids in interstate or foreign commerce. For the remainder of the pipeline facilities, denominated "intrastate pipeline facilities," the HLPSA provides that the same Federal regulation and enforcement will apply unless a State certifies that it will assume those responsibilities.[73]

*Storage of Hazardous Liquid*

Congress defined "transporting hazardous liquid" in the Pipeline Safety Act to authorize the regulation of "the storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline."[74] Consistent with that authority, DOT issued a final rule in July 1981 applying Part 195 to "breakout tanks."[75] DOT defined a "breakout tank" as "a tank used to (a) relieve surges in a hazardous liquid pipeline system or (b) receive and store hazardous liquid transported by a pipeline for reinjection and continued transportation by pipeline."[76] In adopting that definition, DOT explained that "[s]ince its issuance in 1969, Part 195 has applied to storage called 'breakout tankage' by virtue of the inclusion of that term in the definition of 'pipeline system' or 'pipeline.'"[77] DOT further explained that it "believe[d] that it should try to make Part 195 more precise regarding the kinds of storage to which that Part applies and at the same time not extend its application to any storage not previously covered."[78]

To provide that precision, DOT defined a breakout tank to limit the "applicability of Part 195" to:

> two kinds of storage functions. First, tanks used to relieve surges in a hazardous liquid pipeline. This is sometimes called working tankage or a form of operating tankage. Second, tanks used to receive hazardous liquid from a pipeline and store it temporarily for reinjection into a pipeline for continued transportation. This type of storage aids in the dispatching of different types and grades of hazardous liquids through a pipeline system.[79]

---

[73] 50 Fed. Reg. at 15,899.

[74] 49 U.S.C. § 60101(a)(22)(A).

[75] 46 Fed. Reg. at 38,357.

[76] 46 Fed. Reg. at 38,362 (codified at 49 CFR § 195.2).

[77] 46 Fed. Reg. at 38,358.

[78] *Id.*

[79] *Id.*

The breakout tank definition adopted in the July 1981 final rule remains codified in Part 195.

*Exception for Onshore Production, Refining, or Manufacturing Facilities*

The Pipeline Safety Act contains an exception in the definition of "transporting hazardous liquid" for the movement of hazardous liquids "through onshore production, refining, or manufacturing facilities" and "storage or in-plant piping systems associated with onshore production, refining, or manufacturing facilities."[80] For purposes of that exception, a "hazardous liquid" includes, in relevant part, "petroleum or a petroleum product."[81]

When Congress originally enacted the exception for production, refining, or manufacturing facilities in the HLPSA, contemporaneous dictionaries provided definitions for the following key terms:

- Production was commonly understood as the "[p]rocess or act of producing" and "[t]hat which is produced or made; i.e. goods."[82]

- Manufacture was commonly understood as "[t]he process or operation of making goods or any material produced by hand, by machinery or by other agency; anything made from raw materials by the hand, by machinery, or by art. The production of articles for use from raw or prepared materials by giving such materials new forms, qualities, properties or combinations, whether by hand labor or machine."[83] Manufacture was also commonly understood as "something made from raw materials."[84]

- Refine was commonly understood as, among other things, "to reduce to a pure state."[85] A refinery was also commonly understood as "a building and equipment for refining or purifying metals, oil, or sugar."[86]

- Petroleum was commonly understood as "an oily flammable bituminous liquid that may vary from almost colorless to black, occurs in many places in the upper strata of the earth, is a complex mixture of hydrocarbons with small

---

[80] 49 U.S.C. § 60101(a)(22)(B)(ii)-(iii); *see also* 49 CFR 195.1(b)(8).

[81] 49 U.S.C. § 60101(a)(4)(A).

[82] Production, Black's Law Dictionary 1089 (5th ed. 1979).

[83] Manufacture, Black's Law Dictionary 870 (5th ed. 1979).

[84] Manufacture, Webster's New Collegiate Dictionary (1977).

[85] Refine, Webster's New Collegiate Dictionary (1977).

[86] Refinery, Webster's New Collegiate Dictionary (1977).

amounts of other substances, and is prepared for use as gasoline, naptha, or other products by various refining processes."[87]

- Product was commonly understood as "something produced."[88]

Taken together, these definitions suggest that the exception for "onshore production, refining, or manufacturing facilities" should be given a particular meaning when applied to the movement of petroleum and petroleum products.[89] Specifically, the exception should be applied with the understanding that petroleum is a raw material produced from the earth, and that petroleum products are manufactured from the process of refining that raw material.

The definitions in Part 195 support that understanding of the exception. The term "petroleum" is defined as "crude oil, condensate, natural gasoline, natural gas liquids, and liquefied petroleum gas," and the phrase "production facility" is defined as "piping or equipment used in the production, extraction, recovery, lifting, stabilization, separation or treating of petroleum or associated storage or measurement."[90] The Part 195 definition further states that "[t]o be a production facility . . ., piping or equipment must be used in the process of extracting petroleum from the ground and preparing it for transportation by pipeline."[91]

A "petroleum product," on the other hand, is defined as "flammable, toxic, or corrosive products obtained from distilling and processing of crude oil, unfinished oils, natural gas liquids, blend stocks and other miscellaneous hydrocarbon compounds."[92] Relying on the industry standard that formed the original basis for the Part 195 regulations, DOT has long recognized that the distilling and processing necessary to create a petroleum product from liquid petroleum "typically occurs at oil refineries . . . and gasoline plants."[93]

As important, DOT has further recognized that the exception for onshore production, refining, or manufacturing facilities "does not apply to any facilities that are used directly in the

---

[87] Petroleum, Webster's New Collegiate Dictionary (1977); *see also Wilshire Westwood Associates v. Atlantic Richfield Corp.*, 881 F.2d 801, 803 (1989) (quoting a similar definition from Webster's Third New International Dictionary Unabridged (1981) in interpreting the term "petroleum" for purposes of the Comprehensive Environmental Response, Compensation, and Liability Act).

[88] Product, Webster's New Collegiate Dictionary (1977).

[89] *Pulsifer v. United States*, 601 U.S. 124, 133 (2024) ("statutory construction" requires "reviewing text in context").

[90] 49 CFR § 195.2.

[91] *Id.*

[92] *Id.*; *see also* Notice of Interpretation and Partial Stay of Enforcement: Petroleum Products and Low-stress Pipelines, 61 Fed. Reg. 24, 244 (May 14, 1996); Interpretation Response #PI-24-0007 (Dec. 10, 2024), available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-24-0007.

[93] 61 Fed. Reg. at 24,245. Certain petroleum products are also extracted from natural gas that is delivered by pipeline to gas processing plants. *See Mobil Oil Corp. v. Fed. Energy Admin.*, 566 F.2d 87, 89 (Temp. Emer. Ct. App. 1977) (discussing similarities and differences in the extraction and recovery of natural gas liquids from gas processing plants and crude oil refineries).

transportation of hazardous liquids by pipeline."[94] DOT has applied that principle in exercising jurisdiction over midstream processing facilities that perform pipeline-transportation-related functions.[95] *In the Matter of ONEOK NGL Pipeline, L.P., et al.*, for example, PHMSA found that the exception for production, manufacturing, or refining facilities did not apply to a natural gas liquids (NGL) fractionation plant.[96] In reaching that conclusion, PHMSA was "guided by testimony presented by [the agency] that refining is a term commonly used in the industry to refer to the conversion of crude petroleum into new products, not the separation of a mixture," and "that common usage in the industry would never refer to an NGL fractionation facility as a refinery."[97]

*The Santa Ynez Pipeline System is an Interstate Hazardous Liquid Pipeline Facility*

The Pipeline Safety Act defines an "interstate hazardous liquid pipeline facility" as "a hazardous liquid pipeline facility used to transport hazardous liquid in interstate or foreign commerce."[98] In determining whether a hazardous liquid pipeline facility satisfies this definition, "the essential character of the commerce" must be considered in light of "the whole group of facts in respect to it."[99] Moreover, once the transportation of a hazardous liquid by pipeline in interstate or foreign commerce begins, it "generally . . . continues, at least, until . . . the point where the parties originally intended that the movement should finally end."[100] Finally, the continuity of a movement of a hazardous liquid in interstate or foreign commerce is not broken by an interruption "to promote the safe or convenient transit" by pipeline.[101]

Applying these basic principles to the facts at hand demonstrates that the SYPS is an interstate hazardous liquid pipeline facility. As previously discussed, the SYPS moves crude oil produced at offshore platforms on the OCS to the LFC Facility, where it is subject to certain processing, *i.e.*, heating, removal of water and other contaminants, sweetening, and stabilization, to facilitate further movement by pipeline.[102] After this processing is complete, the crude oil is either sent

---

[94] Interpretation Response #PI-17-0003, available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-17-0003; Interpretation Response #PI-96-015 (Jul. 22, 1996), available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-96-015 (the exception for manufacturing facilities does not apply to "facilities . . . operated primarily to further . . . transportation . . . by pipeline").

[95] *See* 85 Fed. Reg. 70,125 (Nov. 4, 2020) (draft guidance).

[96] *In the Matter of ONEOK NGL Pipeline, L.P., et al.*, 2016 WL 8315623 (PHMSA Oct. 12, 2016) appealed and resolved by consent agreement at 2018 WL 8058072 (PHMSA Oct. 23, 2018).

[97] 2016 WL 8315623, at *8.

[98] 49 U.S.C. § 60101(a)(7); *see also* 49 CFR § 195.2 (defining "interstate pipeline" as "a pipeline or that part of a pipeline that is used in the transportation of hazardous liquids or carbon dioxide in interstate or foreign commerce").

[99] *Atlantic Coast Line R. Co.*, 275 U.S. at 268-269; *see also U.S. v. Erie R. Co.*, 280 U.S. at 101-102.

[100] *Illinois Cent. R. Co.*, 236 U.S. at 163.

[101] *Champlain Realty Co.*, 260 U.S. at 376.

[102] Memorandum from Dustin Hubbard, Western Region Director, OPS to File, PHMSA-2026-0464, Document Review for Jurisdictional Determination in Support of Special Permit (June 25, 2026) (on file with PHMSA).

directly to a pump station for delivery to Pentland Station or to aboveground storage tanks at the LFC Facility. The tanks at the LFC Facility temporarily store the crude oil, which is later reinjected into the SYPS for shipment to Pentland Station, the location designated in a current purchase agreement as the delivery point for the OCS-produced crude oil transported through the SYPS. The crude oil is delivered from Pentland Station in another pipeline system to refineries in California.

The "essential character" of this commerce is interstate. First, the movement of a hazardous liquid by pipeline through the SYPS begins on the OCS. The offshore platforms produce an emulsion that contains crude oil, a hazardous liquid subject to regulation under the Pipeline Safety Act.[103] While the ICA prohibits FERC from exercising jurisdiction over "pipelines transporting oil solely on or across the OCS,"[104] the Pipeline Safety Act and DWPA clearly provide PHMSA with jurisdiction to regulate such pipelines.

Second, the movement of crude oil through the SYPS is also part of an interstate journey from the start. The Pipeline Safety Act defines "interstate or foreign commerce," in relevant part, as "commerce between . . . a place in a State and a place outside that State."[105] The SYPS transports crude oil from the OCS, "a place outside" of California, through state waters to inland points located within California. Once the crude oil produced at the offshore platforms enters the SYPS, it has begun an interstate journey.[106]

Third, the crude oil remains in interstate commerce at least until it reaches Pentland Station. A current purchase agreement identifies Pentland Station as the intended destination of the crude oil that begins its movement by pipeline on the OCS, and nothing breaks the interstate character of that movement during its transit through the SYPS. The heating, dewatering, sweetening, stabilization, and other processing functions performed at the LFC facility ensure that the crude oil can be safely transported by pipeline.[107] Such processing "to promote the safe or convenient transit" of crude oil by pipeline does not break the continuity of an interstate movement.[108] The aboveground storage tanks at the LFC Facility also provide storage incidental to pipeline

---

[103] 49 U.S.C. § 60101(a)(4)(A) (defining "hazardous liquid" to include "petroleum"); 49 CFR 195.2 (defining "hazardous liquid" to include "petroleum" and defining "petroleum" to include "crude oil"). The fact that the emulsion also contains water and other contaminants not subject to regulation as a hazardous liquid does not render the Pipeline Safety Act inapplicable to the offshore portions of the SYPS. PHMSA Letter of Interpretation, PI-20-0008 (June 15, 2020), available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-20-0008.

[104] *Re Bonito Pipe Line Co.*, 61 FERC ¶ 61,221.

[105] 49 U.S.C. § 60101(a)(8)(B).

[106] A different analysis would be required if the SYPS originated at offshore platforms located in California state waters. In that scenario, the movement of crude oil through the SYPS would not begin at a place outside of California, and that, in turn, would need to be considered in assessing the jurisdictional status of the pipeline under the Pipeline Safety Act. *See Southern Pacific Pipe Lines Inc. v. U.S. Dept. of Transp.*, 796 F.2d 539 (D.C. Cir. 1986).

[107] *See supra* notes 38-40.

[108] *Champlain Realty Co.*, 260 U.S. at 376.

transportation. The tanks, which qualify as PHMSA-regulated breakout tanks under Part 195, receive crude oil for reinjection and continued transportation in interstate commerce in the SYPS.[109]

In other words, Sable's onshore pipeline segments are just like the delivery driver and his truck in *Flowers Foods*. They are used to transport crude oil on an intrastate leg of an interstate journey. And just like the warehouse in *Flowers Foods* that repackaged the Butterscotch Krimpets from wholesale to retail packaging, and just like the onshore processing facility in *Maryland v. Louisiana*, the processing at the LFC Facility does not stop the flow of interstate commerce because the crude oil remains in interstate commerce until it reaches its final intended destination in Pentland.

Fourth, the exception for onshore production, refining, and manufacturing facilities does not apply to the LFC Facility. The crude oil that moves through the LFC facility is only subject to transportation-related processing[110] and remains a raw material until it reaches the California refineries downstream from the Pentland Station, where it is refined into petroleum products.[111] The fact that the transportation-related processing performed at the LFC Facility results in the removal of water, certain NGLs, and contaminants does not mean that the exception applies. Such phenomena are a regular feature of the transportation-related processing that occurs throughout the nation's hazardous liquid and natural gas pipeline network.[112]

---

[109] PHMSA Interpretation Response #PI-24-0009 (Jul. 28, 2025), available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-24-0009. Sable acknowledged in a letter submitted after the filing of the application for the non-emergency special permit that the tanks at the LFC Facility are breakout tanks under Part 195.

[110] Interpretation Response #PI-17-0003, available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-17-0003; Interpretation Response #PI-96-015 (Jul. 22, 1996), available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-96-015 (the exception for manufacturing facilities does not apply to "facilities . . . operated primarily to further . . . transportation . . . by pipeline").

[111] Nor would the applicability of the exception for onshore production, refining, and manufacturing facilities to certain movements of hazardous liquid through the LFC facility break the continuity of the interstate journey. The legislative history indicates that Congress added this exception to the HLPSA for policy reasons, *i.e.*, "because such lines present insufficient risk to life and property to require regulation." Senate Report No. 96-182 to Accompany S. 411, May 15, 1979, p. 18. The applicability of such a policy-based exception to a particular movement of hazardous liquid is not enough to change the "essential character" of the interstate commerce at issue in this case. *See Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. & Teamsters Joint Council No. 7 v. I.C.C.*, 921 F.2d 904, 910 (9th Cir. 1990) (holding "that goods shipped from a point in one state to a point in the same state may remain in interstate commerce even where an exempt movement of the goods precedes the single-state movement").

[112] *Oneok*, 2016 WL 8315623 at *7 ("Were the [Pipeline Safety Act] interpreted to exempt any facility used in removing unwanted substances, it would result in significant and unintended gaps in safety oversight. For example, every natural gas pipeline facility that removes unwanted moisture from its gas stream to aid in pipeline transportation could potentially fall under such concepts of refining and be excluded from the Act. PHMSA does not assume Congress intended to enact an exception so expansive that it would defeat much of the purpose of the legislation.").

Fifth, even if contrary to PHMSA's consistent interpretation going back many decades,[113] transportation-related processing facilities were outside the statutory definition of transporting hazardous liquid, PHMSA would still conclude that lines CA-324 and CA325 are used to transport hazardous liquid in interstate commerce under 49 U.S.C. § 60101(a)(7). Sable transports crude oil across state lines before it reaches the Las Flores Canyon facility and, after that crude oil exits the Las Flores Canyon facility, the crude oil continues its interstate journey through CA-324 and CA-325 until it reaches Pentland Station. Lines CA-324 and CA-325 are thus used to transport crude oil in interstate commerce because they perform an intrastate leg of an interstate journey. Based on our inspection and analysis, the processing that occurs at Las Flores does not change the essential character of the crude oil in any way that would terminate the flow of interstate commerce.

Finally, PHMSA's May 2016 letter to OSFM addressing the jurisdictional status of the SYPS does not change the essential character of the commerce today. PHMSA issued that letter shortly after Plains submitted filings with FERC canceling the ICA tariffs for CA-324 and CA-325. In those filings, Plains represented that the pipelines had been taken out of service and were no longer available to provide transportation in interstate commerce.[114] PHMSA had no reason to question the representations made in Plains' filings at that time, and there was no indication that Plains canceled the tariffs simply to avoid jurisdiction. To the contrary, PHMSA had mandated in the CAOs that CA-324 and CA-325 be shutdown following the May 2015 rupture, and the lines subsequently remained out of service for more than 10 years. The offshore platforms that produced crude oil for delivery into CA-324 and CA-325, then owned and operated by ExxonMobil, were also shut down at that time and remained in idle status for the next 10 years.[115]

PHMSA's conclusion in the May 2016 letter that Plains did not intend to use CA-324 and CA-325 in interstate commerce was reasonable under such circumstances. CA-324 and CA-325 were not operational and could not transport crude oil in interstate commerce, both because of the CAO and as a result of ExxonMobil's decision to idle the offshore platforms and eliminate the sole source of supply for the lines. And PHMSA relied, as it routinely does under Appendix A to Part 195, on the absence of a FERC tariff as a general proxy for jurisdiction under the HLPSA when there is no disputed issue as to jurisdiction.

But as PHMSA noted at the conclusion of the May 2016 letter, its views on the jurisdictional status of the SYPS were "subject to change based on any future events or newly-discovered

---

[113] *Id.*

[114] Plains Pipeline, L.P. Tariff Filing -- FERC Tariff No. 114.3.0, Document Accession No. 20160212-5032 (Feb. 12, 2016); Plains Pipeline, L.P. Tariff Filing -- FERC Tariff No. 114.4.0, Document Accession No. 20160429-5326 (Apr. 29, 2016), available at https://elibrary.ferc.gov/eLibrary/search

[115] U.S. Dep't of the Interior, Bur. of Safety and Envtl. Enf't, Finding of No Significant Impact: ExxonMobil/Sable Offshore Corp. Lease Extension of the Santa Ynez Unit at 2 (May 2025), https://www.boem.gov/sites/default/files/documents/environment/environmental-assessment/2025_0528_SableEA_FONSI_508c.pdf.

facts," a condition that is certainly met here. The SYPS is now under common ownership and control, production has resumed at the offshore platforms, and the pipeline is once again transporting crude oil from the OCS through the LFC Facility to Pentland Station. The movement of crude oil is consistent with the circumstances that existed prior to the May 2015 failure of Line 901, when PHMSA considered that pipeline and Line 903 to be part of an interstate hazardous liquid pipeline facility under the Pipeline Safety Act. For these reasons, the May 2016 letter does not undermine the determination that the SYPS is an interstate hazardous liquid pipeline facility.

**Conclusion**

As stated above, PHMSA finds that the SYPS is an interstate hazardous liquid pipeline facility subject to its jurisdiction under the Pipeline Safety Act.

# U.S. DEPARTMENT OF TRANSPORTATION
# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
## Special Permit Analysis and Findings
## Sable Special Permit

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | PHMSA-2026-0464 |
| **Requested By:** | Sable Offshore Corp. PPC |
| **Operator ID#:** | 40881 |
| **Original Date Requested:** | January 22, 2026 |
| **Original Issuance Date:** | June 25, 2026 |
| **Code Section(s):** | 49 CFR § 195.452(h)(4)(iii)(H) |

## Purpose:

The Pipeline and Hazardous Materials Safety Administration (PHMSA), Office of Pipeline Safety (OPS),[1] provides this information to describe the facts of the subject special permit application submitted by Sable Offshore Corp. PPC (Sable), to discuss significant public comments received with respect to the application, to present the engineering and safety analysis of the special permit application, and to make findings regarding whether the requested special permit should be granted and, if so, under what conditions.

## Pipeline System Affected:

On January 22, 2026, Sable applied for a special permit seeking to waive the applicability of the requirements in 49 CFR § 195.452(h)(4)(iii)(H) to approximately 124.42 miles of 24- and 30-inch diameter pipe in the Santa Ynez Pipeline System (SYPS). The pipe is part of two SYPS segments, known as Lines CA-324 and CA-325 (CA-325A and CA-325B), that continue the transportation of crude oil produced on the Outer Continental Shelf (OCS) from an onshore processing facility to a terminal in Kern County, California. Additional information about Sable's special permit application is provided below.

## Special Permit Request:

Sable, in its special permit application, requested a waiver of 49 CFR § 195.452(h)(4)(iii)(H) as applied to Lines CA-324 and CA-325. Without this special permit, 49 CFR § 195.452(h)(4)(iii)(H) would

[1] Throughout this special permit the usage of "PHMSA" or "PHMSA OPS" means the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration Office of Pipeline Safety.

require corrosion of or along a longitudinal seam weld to be scheduled for evaluation and remediation within 180 days of discovering the condition.[2]

Description and definition of the special permits segments and the pipeline specifications are detailed in Sable's application letter with attachments in Docket No. PHMSA-2026-0464, including a map of the special permit segments in Attachment A.

## Public Notice:

On February 24, 2026, PHMSA posted a notice of this special permit request in the Federal Register (91 FR 8949) with a closing date of March 26, 2026. On March 20, 2026, PHMSA posted a notice extending the comment period to April 3, 2026, to give the public additional time for review following the issuance of the Defense Production Act (DPA) Order by the Secretary of Energy on March 13, 2026. Sable's special permit application letter with attachments, the Federal Register notices, environmental assessment, and all other pertinent documents are available for review in Docket No. PHMSA-2026-0464 in the Federal Docket Management System (FDMS) located at www.regulations.gov.

PHMSA reviewed all public comments received for Docket Number PHMSA-2026-0464 through April 3, 2026. PHMSA received 58 public comments submitted by both identified and anonymous members of the public concerning this special permit request.[3] Significant comments are addressed below. Some comments, which specifically referenced possible environmental effects of the proposed special permit or the environmental assessment prepared by PHMSA, are addressed in the Finding of No Significant Impact (FONSI), also available on Docket Number PHMSA-2026-0464 at www.regulations.gov.

## Public Comments:

### Jurisdictional Comments

Several commenters questioned whether CA-324 and CA-325 are part of an interstate hazardous liquid pipeline facility subject to PHMSA's jurisdiction under the Pipeline Safety Act. One commenter argued that the system should be classified as an interstate pipeline because it connects offshore Federal waters to a system terminating at international ports, thereby falling under federal rather than strictly state oversight. PHMSA addresses these comments in a separate document, titled Jurisdictional Determination in Support of Special Permit, that is available for review in the docket.

### General Comments

Many commenters supported the issuance of the special permit, noting that the operation of the SYPS is essential for California's energy security, economic health, and national interests. Supportive commenters believed the SYPS is ready for a safe restart and referenced the numerous tests, repairs, and system enhancements completed in recent years as demonstrating that the pipeline meets safety

[2] OPS published a revision of Hazardous Liquid Integrity Management Frequently Asked Question 7.16 on September 12, 2025 clarifying that corrosion coincident with a longitudinal seam does not need to be mitigated per 49 CFR § 195.452(h)(4)(iii)(H).

[3] PHMSA received a total of 12,816 comments on the Sable Offshore Corp. Special Permit request (Docket ID: PHMSA-2026-0464). One comment from a non-profit included a form campaign with over 12,000 signatories. Aside from the form campaign comments, there were a total of 58 unique comments.

requirements. Supportive commenters explained that increasing domestic oil production will stabilize or lower gas prices, and that the operation of the SYPS is expected to support high wage jobs and generate state and local tax revenues to fund schools, infrastructure, and public services. Supporters pointed out that California imports a large percentage of its oil, that domestic production may protect the state from global supply disruptions, and that oil transported by pipeline has a lower carbon footprint than oil shipped by oceangoing tankers. Some commenters stated that the SYPS is critical infrastructure and argued that the Secretary of Energy's DPA Order demonstrates the strategic importance of the pipeline system for national energy reliability.

Thirty-one comments, submitted by anonymous and identified individuals as well as several organizations, opposed the issuance of the special permit. The opposing commenters stated that granting the special permit would prioritize corporate profit over the safety of the environment, wildlife, and local communities. Some commenters referenced the 2015 failure of Line CA-324 and resulting release of crude oil. Commenters pointed out that corrosion caused the 2015 spill, and stated that the special permit does not address the underlying cause of the incident – an inadequate coating and insulation system that shields the steel from effective cathodic protection – and would waive a regulatory provision involving corrosion repair deadlines.

In response to these comments, PHMSA notes that the special permit conditions address the risks of corrosion occurring underneath insulation on the SYPS. Corrosion-driven metal loss is detectable using ILI tools and can be remediated using more stringent repair criteria, including the use of corrosion growth rate assessments. PHMSA further notes that the special permit only waives the requirement that Sable remediate certain longitudinal seam weld corrosion within 180 days, and that the waiver is subject to additional and more stringent conditions, including anomaly detection and repair deadlines calibrated to address corrosion that could threaten the pipeline integrity. In addition, PHMSA notes that the pipe in segments CA-324 and CA 325 is not particularly susceptible to longitudinal seam weld corrosion, meaning that the waiver and conditions, in combination, enhance the safety of the pipeline. The limited effectiveness of cathodic protection beneath insulation does not mean that corrosion on the pipeline cannot be adequately addressed to maintain the safety of the pipeline, particularly in light of the additional and more stringent conditions included in the special permit.

**Comments Regarding the National Energy Emergency and the DPA Order**

PHMSA received several comments addressing the potential impact that the DPA order might have on issuing the special permit, including whether the special permit remains necessary. Sable submitted a comment asserting that the special permit is necessary to fulfill the DPA Order and to resume hydrocarbon transportation during a national energy emergency, while implementing safety measures that exceed standard Federal pipeline safety requirements. Sable's submission included an extensive expert declaration from Michael J. Rosenfeld, P.E., who explained that the use of state-of-the-art, multi-tool in-line inspections (ILIs) performed much more frequently than the industry standard—coupled with more stringent anomaly repair criteria—effectively mitigates risks related to cathodic protection shielding and elevated operating temperatures. Other commenters stated that issuing the special permit is consistent with the DPA, and that the Secretary of Energy directed Sable to re-start the pipeline on March 13, 2026, under the authority of the DPA, so issuing the special permit is justified. Other commenters disagreed and stated that the DPA has no bearing on the special permit. These commenters stated that the DPA Order itself is unlawful and does not supersede safety requirements

under the Pipeline Safety Act. In response to these comments, PHMSA notes that the Secretary of Energy issued the DPA Order separately from PHMSA's consideration of Sable's special permit request, and that PHMSA does not have authority to ignore, override, or otherwise nullify the DPA Order. PHMSA has determined that it remains appropriate to consider and to issue the special permit with conditions that are consistent with pipeline safety.

Opposing commenters stated that the operation of the SYPS is not needed to address a national energy emergency, pointing to data and economic models indicating that restarting the pipeline would have limited impact on statewide or national energy markets. They also claimed the local economic benefit would be negligible compared to the risk, stating the local economy relies on tourism, recreation, and fishing, which were negatively impacted following the 2015 spill. One commenter claimed that many workers are brought in from Gulf states and live on the offshore platforms, meaning the pipeline restart would result in no benefits to local jobs or businesses.

In response to these comments, PHMSA notes that Sable's application included multiple reports (Attachments C, D, E, and F) describing the economic and energy impact of the SYPS on Kern County and California. The possible negative impacts of a spill do not outweigh these benefits because PHMSA has determined that the special permit maintains pipeline safety, meaning there is no increased risk of spills occurring compared to operation of the SYPS absent the special permit. PHMSA also notes that while special permit applications must provide a description of impacts on affected stakeholders, the decision of whether to grant the application turns on whether the special permit would be consistent with pipeline safety. While PHMSA believes that operation of the SYPS will be economically beneficial, that determination is not necessary to issue this special permit. Instead, PHMSA issues this permit because it has determined that the pipeline's operation is consistent with pipeline safety.

Commenters also stated that PHMSA does not have the authority to issue the emergency special permit (ESP) or the special permit. Specifically, commenters stated that issuing the special permit per E.O. 14156 was improper because the E.O. does not supersede applicable law, statutory protections, or state governance. Commenters also stated that the ESP did not meet the definition of emergency, which should be reserved for incidents like hurricanes or spills. Another commenter stated that PHMSA's Notice of Limited Enforcement Discretion and Statement of Policy for Issuing Special Permits in Response to National Energy Emergency is an inappropriate application of PHMSA's enforcement responsibilities, and that PHMSA did not adequately justify how issuing the ESP and the special permit would meet the purpose and need and address the energy emergency.

In response to these comments, PHMSA notes that it is authorized to grant special permits on an emergency basis under 49 U.S.C. § 60118(c)(2) and 49 CFR 190.341(g), and that the ESP expired on its own terms in February 2026. PHMSA further notes that 49 CFR 190.341(g) defines emergency as an event that may be: local, regional, or national in scope and includes significant fuel supply disruptions and natural or manmade disasters such as hurricanes, floods, earthquakes, terrorist acts, biological outbreaks, releases of dangerous radiological, chemical, or biological materials, war-related activities, or other similar events. Only the President can declare a national energy emergency. PHMSA determined that granting the ESP was consistent with the requirements in the Pipeline Safety Act given

the national energy emergency declared by the President in E.O. 14156. PHMSA's decision to grant the ESP also implemented the directives in E.O. 14154 and avoided a potential gap in coverage under the waivers issued by OSFM. PHMSA's Notice of Limited Enforcement Discretion and Statement of Policy for Issuing Special Permits in Response to National Energy Emergency, which is separate from the permit itself, is an application of PHMSA's enforcement discretion. The Notice merely allows operators to request expedited consideration of requests for special permits which implicate the national energy emergency, and exercises PHMSA's discretion to forgo enforcement action while such requests are under PHMSA review. The Notice did not modify PHMSA's jurisdiction, rights of inspection or access, or investigatory authority, and did not prevent PHMSA from "pursuing an enforcement action if it determines that a significant safety issue warrants doing so" or if the request is ultimately denied. Even absent the issuance of the Notice, PHMSA would retain the discretion not to pursue enforcement actions as appropriate.

**Comments Regarding Proposed Special Permit Conditions**

An opposing comment highlighted that past ILIs on this system underestimated corrosion, meaning that ILI data should not continue to be relied upon to assess the pipeline segments. In response to this comment, PHMSA notes that the special permit conditions require ILI assessment of the pipeline segments to a much more exacting level than standard ILI tool runs. To ensure ILIs are an effective tool in assessing the integrity of the pipeline, the special permit conditions require accelerated reassessments, appropriate and complementary tool selection to address all threats, enhanced data analysis practices, more stringent repair criteria, and advanced corrosion growth data analysis techniques. In addition, PHMSA personnel have reviewed records related to actions that Sable has already taken to ensure the pipeline system will be operated safely, including safely completing hydrostatically pressure testing of Lines CA-324, CA-325A, and CA-325B in 2025 to 139-percent or greater of the pipelines' maximum operating pressure.

Other commenters stated that issuing the special permit for a pipeline with a history of incidents is inconsistent with pipeline safety. Commenters referenced previous instances of Sable's noncompliance. Commenters also stated that the terms of the special permit are misrepresented, and it is inaccurate to describe them as substantially the same as those in the State waivers. Other commenters noted that Sable has a positive safety reputation. Overall, PHMSA has determined that granting the special permit would be consistent with requirements under the Pipeline Safety Act and the policy priorities embodied in E.O. 14156 and E.O. 14154. The proposed non-emergency special permit requests to waive the same regulatory requirement as the ESP, and the conditions imposed are overwhelmingly aligned with the requirements from the prior state waivers. Any future non-compliance by Sable with the special permit conditions may be addressed by PHMSA's inspection program and enforcement actions as necessary.

Some commenters proposed changes to conditions, including limiting the term of the special permit to a fixed number of years, allowing PHMSA to revoke the special permit if Sable does not comply with all conditions, and allowing PHMSA to revoke, suspend, or modify the special permit under certain circumstances. In light of these comments, PHMSA is revising the conditions to grant the special permit for a period of ten years from the date of issuance, and removing the prior limitation in Condition 25(a). PHMSA reserves the right to include such a limitation in the future.

**Comments Regarding Sable as an Applicant**

Some opposing commenters questioned whether Sable submitted its application to bypass California state law AB 864, which imposes additional requirements on state-regulated pipelines, including a requirement to analyze the need for additional leak detection systems, shutoff systems, and valves, and to retrofit existing pipelines according to that analysis. In response to these comments, PHMSA notes that the Consent Decree required completion of an analysis to determine the need for emergency flow restricting devices, and that, as a result, Sable installed 27 new safety valves along Lines CA-324, CA-325A and CA-325B, including a safety valve only 1.25 miles downstream of the start of CA-324. The special permit conditions also impose more stringent repair criteria on the pipeline segments. These actions demonstrate that Sable has and will improve the safety of the pipeline segments regardless of the applicability of AB 864.

Other negative commenters questioned the trustworthiness of Sable as an operator due to investigations and enforcement proceedings conducted by other governmental entities. They also stated that restart was rushed due to financial deadlines faced by the operator. PHMSA notes that Sable has provided the agency with extensive records regarding testing and anticipated operations, and that PHMSA performed an on-site inspection of its onshore processing facility as well as its control room. As an interstate pipeline, the SYPS will also be subjected to mandated reporting requirements and PHMSA's inspection program, including enforcement action as appropriate. PHMSA notes that the restart is occurring pursuant to a detailed plan and under the agency's oversight following years of improvements to the pipeline. Lastly, due to the issuance of the DPA Order, the restart of the pipeline has already safely occurred, and PHMSA's special permit does not displace or nullify the DPA Order's requirement that Sable operate the SYPS.

**Comments Regarding the Prior State Waivers**

OSFM submitted a comment recommending PHMSA deny the special permit request. OSFM stated that the prior state-issued waivers and the proposed special permit are different in that the state waivers required Sable to repair all anomalies, plus tool tolerances, before the pipeline segments were restarted. OSFM also stated that PHMSA previously reviewed and did not object to the state waivers in February 2025.

In response to these comments, PHMSA notes that the tool tolerance requirement described by OSFM represents an allowance of a 10% margin of error for ILI measurements of anomalies detected on CA-324 and CA-325. Notwithstanding OSFM's assertion, PHMSA finds the prior state waivers did not clearly require this allowance for tool tolerance for *pre-restart* ILI runs. The prior state waivers only discussed tool tolerance adjustment for *post-restart* ILI runs, a requirement that is also in the special permit conditions. Even if the state waivers had included the requirement to remediate anomalies accounting for tool tolerance prior to restart, PHMSA has determined that the extra margin of error created by the tool tolerance allowance was not necessary for the special permit to be consistent with pipeline safety, and PHMSA's prior no objection would not mean that an otherwise substantially identical waiver is not also consistent with pipeline safety. In addition, due to the DPA Order, the pipeline has already restarted operation, and the special permit conditions will require Sable to remediate the same anomalies, plus tool tolerances, following the performance of initial ILI runs once the SYPS reaches steady-state operation.

One commenter was neutral, acknowledging special permits can be beneficial to pipeline safety by allowing flexibility in pipeline safety regulations, but urged PHMSA to complete a thoughtful evaluation of the safety benefits and to give careful consideration to the public's comments. PHMSA appreciates the need to conduct a thoughtful review and has done so.

The finalized special permit conditions include minor adjustments for clarity after PHMSA review of Sable records. Condition 3(c) includes a specific MOP for two subsections of Line CA-325B. Condition 13(f) clarifies that Sable must obtain PHMSA approval rather than a specific identification number for applicable hydrostatic testing, and similar language which appeared at Condition 14(g) in the proposed conditions was removed.

## Analysis:

### Background

Special permits may be granted upon request if unique circumstances make the applicability of a regulation or standard unnecessary or inappropriate for an applicant's pipeline facility. Special permits will only be granted when pipe conditions, integrity management (IM), and the proposed special permit conditions will provide a level of safety greater than or equal to the code requirements. The operator's Federal pipeline safety regulation compliance and incident history are also evaluated prior to issuance of a special permit.

PHMSA reviewed this special permit request to understand the known type of integrity threats that are in the special permit segments. This integrity information informed the special permit conditions which ensure that the operator has an ongoing program to locate and remediate safety threats.

### Enforcement History

The special permit segments were previously considered intrastate at the time of entry of the Consent Decree and were regulated by OSFM pursuant to its state certification with PHMSA under 49 U.S.C. § 60105(a). As discussed in the Jurisdictional Determination, the special permit segments are now considered part of an interstate hazardous liquid pipeline facility. PHMSA reviewed OSFM's inspection history of the special permit segments in the time since Sable became the operator of Lines CA-324 and CA-325 in 2024.[4] OFSM conducted 16 inspections of Sable's SYPS in 2024 and 2025, with no concerning or unsatisfactory findings or enforcement actions resulting from the inspections. Therefore, Sable's inspection and enforcement history does not indicate that granting the special permit would be inconsistent with pipeline safety.

### Incident History

PHMSA typically reviews the previous 5 years of incident history to assess the quantity and severity[5] of reported incidents on proposed special permit segments. Lines CA-324 and CA-325 remained

[4] In October 2022, Pacific Pipeline Company (PPC), then a subsidiary of ExxonMobil, acquired CA-324 and CA-325 from Plains. In 2024 Sable acquired PPC and became the designated operator of CA-324 and CA-325.

[5] "Significant Incidents" are those including any of the following conditions: (1) Fatality or injury requiring in-patient hospitalization; (2) $50,000 or more in total costs, measured in 1984 dollars; (3) Highly volatile liquid releases of 5 barrels or more or other liquid releases of 50 barrels or more; and (4) Liquid releases resulting in an unintentional fire or explosion. Gas distribution incidents caused by a nearby fire or explosion that impacted the pipeline system are excluded from this definition.

"active" pursuant to PHMSA's Part 195 regulations but did not transport crude oil from May 19, 2015,[6] until March 14, 2026. Including the time since the restart of the SYPS, no incidents have occurred in the last five years. Even taking a longer view of the special permit segment's incident history to include the May 2015 spill, actions taken by Sable in implementing safety requirements reflected in the Consent Decree and prior state waivers, as well as adherence to the special permit conditions, ensure that issues reflected in the incident history of the pipeline have been and will be addressed. Therefore, the incident history does not indicate that the granting of the special permit would be inconsistent with pipeline safety.

## Findings:

Based on the information submitted by Sable and PHMSA's review of the documentation, PHMSA finds that granting this special permit with conditions that waives the requirements of 49 CFR § 195.452(h)(4)(iii)(H) for Sable's Lines CA-324 and CA-325 is in the public interest and is not inconsistent with pipeline safety. This special permit requires Sable to implement the special permit conditions that include applying IM practices to the special permit segments.

**Completed in Washington D.C. on**: June 25, 2026

[6] In May 2015 Lines CA-324 and CA-325 were owned and operated by Plains Pipeline, L.P., and known as Lines 901 and 903, respectively.

U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

**FINDING AFTER ENVIRONMENTAL REVIEW**

**RESPONSIBLE AGENCY**: U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration

**ACTION:** Finding of No Significant Impact

**DATE:** June 25, 2026

**PROJECT & PROPONENT:** Issuance of an Emergency Special Permit (ESP) and issuance of a subsequent non-emergency Special Permit (SP), Sable Offshore Corp., PHMSA-2025-1502 and PHMSA-2026-0464

**SUMMARY:**

Pursuant to the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.,* the Pipeline and Hazardous Materials Safety Administration (PHMSA) prepared an Environmental Assessment (EA) to assess the environmental impacts associated with the Emergency Special Permit (ESP) issued to Sable Offshore Corp. (Sable) on December 23, 2025, and the proposed non-emergency special permit currently under review by PHMSA. The ESP granted Sable's request to waive compliance with the requirements of 49 CFR 195.452(h)(4)(iii)(H) for two onshore segments of the Santa Ynez Pipeline System (SYPS). PHMSA's decision to grant the ESP avoided a potential lapse in oversight for waivers issued by the state of California. The proposed non-emergency special permit requests to waive the same regulatory requirement as the ESP.

**Purpose and Need:** The terms of a court-approved Consent Decree required the prior operator to obtain a waiver or completely replace the line pipe prior to restarting the two onshore segments. Sable originally obtained the required waivers from California's Office of the State Fire Marshall (OSFM) but subsequently asked PHMSA to issue the waivers on an emergency basis to address an actual or impending emergency involving pipeline transportation[1] pursuant to Executive Order (E.O.) 14156 *Declaring a National Energy Emergency*. PHMSA's decision to grant the ESP avoided a potential lapse in oversight once PHMSA determined that the two onshore pipeline segments were part of an interstate pipeline. PHMSA found that issuing the ESP

[1] 49 U.S.C. § 60118(c)(2); 49 CFR 190.341(g).

was necessary to replace those waivers, which no longer had any legal effect due to the preemption provision in 49 U.S.C. § 60104(c).

**Action Alternative:** PHMSA has selected the Action Alternative, which involves granting the non-emergency special permit following PHMSA's review. This Action Alternative requires Sable to adhere to stringent safety conditions that provide an equal or greater level of safety compared to regular compliance with Federal pipeline safety regulations. Key conditions include:

- Mandatory annual in-line inspections (ILI) for metal loss and crack detection.
- Stringent anomaly repair criteria, such as the immediate repair of cracks at 50% wall thickness, which exceeds the standard regulatory threshold.
- Enhanced monitoring and enhanced integrity management, including but not limited to fracture toughness testing and spike hydrotesting.

**Environmental Impacts:**

A Draft and Final environmental impact statement (EIS) (Initial EIS)[2] was prepared in 1984 which analyzed the construction, operation, and ongoing repair and maintenance of an approximately 1,200-mile pipeline to transport Outer Continental Shelf (OCS) and other locally produced crude oils from the Santa Barbara and Santa Maria Basins in California to McCamey, Texas. Lines CA-324 and CA-325 were analyzed in the Initial EIS as part of that project. In the EA, PHMSA uses the Initial EIS to characterize impacts associated with the construction of CA-324 and CA-325, as well as routine maintenance and repair activities as part of ongoing operation..

Based on the analysis in the current EA and supporting consultations, PHMSA has determined that the Action Alternative will not have a significant impact on the human or natural environment. This section describes the resource areas that were evaluated as part of the EA. Descriptions of how PHMSA complied with other relevant environmental laws and regulations, that were not included in the EA published on February 23, 2026, are also provided in the appropriate sections below. New analyses in the FONSI relate to the following statutory requirements: Section 4(f) of the U.S. Department of Transportation Act of 1966; Coastal Zone Management Act; Section 106 of the National Historic Preservation Act of 1966; and Section 7 of the Endangered Species Act.

- **Land Use, Agriculture & Recreation**: The Action Alternative involves localized inspections and repairs within the existing right of -way (ROW). No new land conversion or significant recreation impacts will occur. Potential impacts from integrity assessments

[2] The Draft EIS and Final EIS can be accessed at http://cosantabarbara.app.box.com/s/gc3vhh8ns8aiwketnq35vwbehnhre672 and https://cosantabarbara.app.box.com/s/lkl9oo9xdsaangevdp6pasfo0cmimvlt, respectively.

have been previously determined insignificant under the EA issued during promulgation of PHMSA's Integrity Management Rule.[3]

- Section 4(f) of the U.S. Department of Transportation Act of 1966: Section 4(f) properties were identified adjacent to the pipeline segments. PHMSA has determined that the Action Alternative does not constitute a use of any protected Section 4(f) properties. The special permit authorizes localized preventative maintenance activities within the existing pipeline ROW. Because no properties are being permanently incorporated or converted into a transportation use, there is no direct use of Section 4(f) properties. Temporary noise or visual disturbance associated with maintenance activities are consistent with existing pipeline operations and will not substantially impair the properties protected activities, features, or attributes.

- Coastal Zone Management Act: The Action Alternative does not implicate the Coastal Zone Management Act (CZMA) because it is not a federal license or permit (15 CFR 930.51), Outer Continental Shelf (OCS) OCS exploration, development or production activity (930.71), or a federal agency activity (930.31). First, the waiver in the special permit is not an "authorization that an applicant is required by law to obtain in order to conduct activities affecting any land or water use or natural resource of the coastal zone and that any Federal agency is empowered to issue to an applicant." 15 CFR 930.51(a). Sable was not required "by law" to acquire the special permit from PHMSA to operate the SYPS. While the Consent Decree required obtaining a waiver, Sable is not a party to the Consent Decree and therefore its obligation to obtain a waiver was contractual as opposed to a statutory or regulatory. The California Coastal Commission's published list of federal licenses and permits subject to consistency certification does not include any PHMSA activities.[4] Second, the special permit is not an OCS exploration, development, or production activity. Existing pipeline segments link the production facilities on the OCS to onshore portions of the SYPS. The special permit does not change that infrastructure in any way and only applies to onshore pipeline segments. Third, the special permit is not a federal agency activity within the meaning of the CZMA. Federal agency activities are "any functions performed by or on behalf of a Federal agency in the exercise of its statutory responsibilities. The term 'Federal agency activity' includes a range of activities where a Federal agency makes a proposal for action initiating an activity or series of activities when coastal effects are reasonably foreseeable, e.g., a Federal agency's proposal to physically alter coastal resources, a plan that is

[3] 49 CFR 195.452

[4] https://www.coastal.ca.gov/fedcd/listlic_2015.pdf.

used to direct future agency actions, a proposed rulemaking that alters uses of the coastal zone." 930.31(a). In general, this applies to activities in "which the federal agency itself is the principal actor," and not "federally approved activities of third parties." *Secretary of the Interior v. California*, 464 U.S. 312, 332 (1984); see also *Environmental Defense Center v. Bureau of Ocean Energy Management*, 36 F.4th 850, 886 (9th Cir. 2022) (contrasting when "the federal agency takes the action itself" and when the agency "instead is approving a proposed plan or is issuing a federal license or permit to an applicant"). Here, PHMSA is not the principal actor for the operation of the SYPS, it is only approving the action by Sable.

- **Cultural & Historic Resources**: Mitigation measures from the Initial EIS have already been implemented, and any subsequent excavations or ground-disturbing activities will occur in previously disturbed areas. Consultation with the State Historic Preservation Office (SHPO) or the Tribal Historic Preservation Office (THPO) is ongoing for unanticipated discoveries, but no adverse effects to historic properties are anticipated. Where a known site exists, further monitoring or treatment would be required. In the event that a new site is found, Sable would coordinate with PHMSA, SHPO, and THPO before work can occur.

    - <u>Section 106 of the National Historic Preservation Act of 1966</u>: PHMSA began consultation with California (CA) SHPO and the one federally recognized Tribe listed on the public-facing California Native American Heritage Commission (NAHC) database (Santa Ynez Chumash) on February 25, 2026. In accordance with 36 CFR 800.4(d)(1), PHMSA determined the Action Alternative will result in No Adverse Effect to Historic Properties with the condition that the existing mitigation measures from the Initial EIS and PHMSA's Unanticipated Discovery Protocol (UDP) are followed. On Friday, March 27, 2026, PHMSA received a response from CA SHPO, requesting additional information. PHMSA requested relevant information from the appropriate California Historic Information Systems (CHRIS) center and NAHC, responding to SHPO's questions and reevaluating their findings. On May 7, 2026, PHMSA sent a continuing consultation to SHPO and to the four federally recognized Tribes that were identified in the process (Morongo Band of Mission Indians, Tejon Indian Tribe, Table Mountain Rancheria, Tule River Indian Tribe). On May 7th, the Morongo Band of Mission Indians responded that they had no specific interest in the project area. The THPO for the Tejon Indian Tribe requested additional information, which was provided by PHMSA on May 11, 2026. No further response from SHPO, the Tule River Indian Tribe, the Santa Ynez Chumash, the Table Mountain Rancheria, or the Tejon Indian Tribe had been received as of June 9, 2026, 30 days from PHMSA's most recent response to the Tejon Indian Tribe, and 34 days

from the initiation of the second consultation period with SHPO and the Tribes. In accordance with 36 CFR 800.3(c)(4), PHMSA therefore will proceed with the finding that there will be No Adverse Effects to Historic Properties with the conditions that PHMSA's UDP is in force and any necessary treatment plans will be developed and followed for the special permit area in coordination with the SHPO and interested Tribes, as specified in the Initial EIS. Should SHPO or any of the Tribes reenter consultation, PHMSA will continue to consult in accordance with 36 CFR 800.3(c)(4).

- **Biological Resources**: Minimal disturbance which is limited to existing ROW. The Action Alternative could result in ground disturbance which may result in temporary and localized effects. However, PHMSA has determined these impacts would not be significant to Federal and state listed species or other biological resources, due to the limited scope of anticipated activities, implementation of mitigation measures, and because ground disturbance would occur in the previously disturbed ROW.
    - <u>Section 7 of the Endangered Species Act:</u> On February 20, 2026, PHMSA submitted a request to consult with the U.S. Fish and Wildlife Service (USFWS), pursuant to the emergency Endangered Species Act (ESA) Section 7 consultation procedures (50 CFR 402.05). PHMSA determined the action is an emergency based upon implementation of E.O. 14156 *Declaring a National Energy Emergency*. The USFWS provided PHMSA with a list of General Project Design Guidelines to help avoid or to minimize adverse effects to listed species and to designated critical habitat. PHMSA then submitted an informal consultation letter to USFWS on February 26, 2026, and found that the Action Alternative *may affect, but is not likely to adversely affect* listed species and designated critical habitat. PHMSA submitted an amended Section 7 consultation request on June 11, 2026, requesting concurrence only for the ILI runs required by the special permit conditions. Localized excavations and repairs will be addressed through site-specific consultation(s) after the exact locations requiring repairs, if any, are identified. PHMSA determined that ILI runs *may affect but is not likely to adversely affect* listed species and designated critical habitat. The USFWS concurred in writing with this determination on June 11, 2026.
    - The Action Alternative does not involve any offshore activities, underwater noise generation, or potential discharges into the marine environment, therefore, PHMSA has determined the action will have *no effec*t on species or critical habitats under the National Marine Fisheries Service (NMFS) jurisdiction.
- **Air Quality**: The Action Alternative will not result in a significant emissions increase compared to pipeline replacement. Localized work in the ROW is negligible compared to

pipeline replacement. The Action Alternative will not result in capacity expansion of the SYPS, meaning that no changes would occur to operational air quality.

- **Hydrological Resources**: The Action Alternative will not result in significant effects on hydrological resources. None of the special permit segments are offshore, and any inland water resources intersecting the ROW are not expected to be at greater risk of spills compared to operation of the SYPS without the special permit. Inspections and repairs are not expected to have significant effects on hydrological resources above those already required by the pipeline safety regulations. Largescale excavation due to pipe replacement could cause erosion, cause sedimentation in waterways, or other negative impacts to hydrological resources.
- **Hazardous Waste/Substance Discharge**: Neither alternative involves hazardous waste streams. Petroleum is excluded under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). Lines CA-324 and CA-325 do not transport hazardous waste or materials regulated by CERCLA.
- **Geology & Topography**: The Action Alternative will not result in significant effects on geology or topography because no large-scale excavations will occur aside from isolated excavation and repair and the pipeline alignment remains fixed.
- **Noise & Visual Environment**: The Action Alternative may result in limited, temporary noise from localized maintenance during specific excavation and repair. The Action Alternative will not result in any new permanent facilities. Pipeline replacement would result in much more extensive noise and visual impacts on the surrounding environment.
- **Socioeconomics**: The Action Alternative would not result in significant socioeconomic disruptions when compared to pipeline replacement.

**RESPONSE TO COMMENTS:**

PHMSA received a total of 12,816 comments on the Sable Offshore Corp. Special Permit request (Docket ID: PHMSA-2026-0464). Over 12,000 of those comments were from the public; seven comments were from industry, non-profits, or other private sector companies; two comments were from a state agency, and one comment was from Sable. One comment from a non-profit included a form campaign with over 12,000 signatories. Aside from the form campaign comments, there were a total of 58 unique comments. The public comment period occurred from February 24, 2026 to March 26, 2026 and was extended to April 3, 2026. A summary of substantive comments related to the environment, and PHMSA's responses, are below.

<u>Comment:</u> Several commenters expressed support for the issuance of the special permit. Commenters stated that resuming operations will generate revenue, will create jobs, and will reduce energy costs by promoting domestic energy, resulting in economic benefits. Other

commenters that supported the issuance of the special permit stated that frequent inspections and other conditions specified in the special permit mitigate the risk corrosion issues and other safety concerns. Commenters also stated that Sable has completed requirements to resume safe operation of the pipeline and that transport of crude oil via pipeline is safer than other modes of transportation.

Response: PHMSA acknowledges the commenters' statements that issuing the special permit will result in economic and safety benefits. PHMSA's environmental analysis is located in Section VII of the EA.

Comment: Three commenters neither opposed nor supported the issuance of the special permit. They stated that PHMSA must evaluate the benefits and impacts of issuing the special permit and that all comments should be considered.

Response: PHMSA conducts a comprehensive technical analysis of each special permit application to ensure that issuing the special permit would be consistent with pipeline safety (49 CFR 190.341). PHMSA reviewed Sable's special permit application and proposed conditions that will provide an equal or greater level of safety than the actions required by the pipeline safety regulations. PHMSA also analyzed the impacts of issuing the special permit in the EA. The EA was published in the Federal Register for review and comment from February 24, 2026 to April 3, 2026. PHMSA reviewed and considered all substantive comments received on the docket. PHMSA evaluates all benefits, impacts, and public comments per the National Environmental Policy Act (NEPA) and DOT Order 5610.1D.

Comment: Commenters proposed timeframes for inspections and other conditions. One commenter recommended regular inspections, and another commenter proposed an inspection frequency of once per day. Commenters also proposed an alert system so Sable can promptly respond to issues, in addition to providing full inspection transparency to inform the public of potential risks. Commenters proposed other conditions, including: limiting the term of the special permit to a fixed number of years; allowing PHMSA to revoke the special permit if Sable does not comply with all conditions; allowing PHMSA to revoke, suspend, or modify the special permit under certain circumstances; and maintaining the pipeline in its current, non-operational status.

Response: The proposed special permit conditions, which outline inspection and repair requirements under the special permit, are provided in the docket under PHMSA-2026-0464-0002. In addition, PHMSA addresses public notification and disclosure of risk through the NEPA and public comment processes. PHMSA utilizes risk-based framework to determine inspection frequency, and the SYPS, as an interstate hazardous liquids pipeline, is subject to numerous inspections and mandatory reporting requirements in accordance with 49 CFR Part 195.

PHMSA notes that, irrespective of the issuance of the special permit, the SYPS is currently operating in accordance with a Defense Production Act Order.

Moreover, the EA does not evaluate alternatives beyond PHMSA's mandate. The EA considers only reasonable alternatives, including those which are consistent with the legal framework currently applicable to the special permit segments (i.e., the requirements specified in the Consent Decree and Part 195), and which meet the purpose and need. The EA does not consider, nor does NEPA require, consideration of every theoretical alternative. The EA only analyzes reasonable, foreseeable impacts of specifically the Action Alternative (i.e., granting the special permit) and No Action Alternative. Alternatives that require speculation outside of the current legal framework (as may occur in the possibility of prospective termination or modification of the Consent Decree or amendment to Part 195), or which do not meet the purpose and need for the proposed action (such as permanent abandonment of the special permit segments without replacement) are not considered in the EA. The alternatives proposed by the commenters do not meet the purpose and need and are outside the scope of the EA.

Comment: Several comments expressed concern about the analysis in the EA and the NEPA process. Commenters stated that the EA did not analyze reasonably foreseeable environmental impacts, such as those that may occur from a spill. Other commenters stated that the resource analysis in the EA was inadequate, that the EA did not consider the negative impacts that may occur from issuing the special permit, especially those related to a spill, and that the analysis in the EA did not support PHMSA's findings and relied upon outdated sources. Other commenters requested a more detailed analysis on state-protected species. One commenter stated that PHMSA bypassed the required public notice and comment period before issuing the ESP, and other commenters stated that a more robust environmental analysis, such as the preparation of an EIS, is needed. A commenter stated that PHMSA should also hold a public meeting in Santa Barbara. Other commenters stated that it was unclear if PHMSA will consult with the National Marine Fisheries Service (NMFS).

Response: Section VII of the EA discusses potential impacts from issuing the special permit, including reasonably foreseeable impacts and impacts that may occur in the event of an incident. Through this analysis, PHMSA subject matter experts, including engineers, determined that granting the special permit would provide an equal or greater level of safety compared to the operation of the pipeline in compliance with the existing federal pipeline safety regulations. PHMSA determined that existing NEPA documentation described in Section IV of the EA accurately characterizes the impacts associated with the No Action Alternative, and impacts associated with routine maintenance and repair activities as part of the ongoing operation of the pipeline. Section 6 of DOT Order 5610.1D states that Operating Administrations (OAs), including PHMSA, must use available reliable data sources and not undertake new scientific or technical research to inform their analysis unless it is essential. The EA describes the relevance

of these existing environmental reviews, analyses, and data sources in the context of the special permit. The operator is required to coordinate with the state natural resources agencies if they anticipate any impacts to state-protected species as a result of the pipeline maintenance activities. The issuance of the special permit does not excuse Sable from compliance with any other applicable federal, state, or local environmental law or regulation, unless such a law or regulation is preempted by the Pipeline Safety Act in accordance with 49 U.S.C. 60104(c).

Per Section 10 of DOT Order 5610.1D, PHMSA may, but is not required to, release an EA for public comment. PHMSA released an EA for public comment, fulfilling the public comment and notification requirements for an EA per DOT Order 5610.1D. When the expected environmental impacts of a proposed emergency action are not considered significant, PHMSA prepares an EA to the extent practicable. PHMSA subject matter experts determined that expected environmental impacts of issuing the ESP and special permit would not be significant, therefore, an EA was prepared.

PHMSA has determined that consultation with NMFS is not required. The scope of the special permit is strictly limited to the onshore portion of the SYPS. Because the proposed action does not involve any offshore activities, underwater noise generation, or potential discharges into the marine environment, PHMSA has determined the action will have "no effect" on species or critical habitats under NMFS jurisdiction, therefore consultation is not required.

<u>Comment:</u> Many commenters referenced the pipeline’s rupture and associated oil spill that occurred in 2015 due to corrosion and released 450,000 gallons of crude oil along 150 miles of coastline, killing birds and marine life. Commenters stated that Santa Barbara’s economy relies on tourism, fisheries, recreation, and access to the coast, and that the Santa Barbara area has high marine biodiversity and waters that provide ecological, economic, and cultural significance, all of which would be negatively impacted in the event of a spill. Several commenters stated that the economic benefits of resuming pipeline operations are not as robust as the scale of potential risk.

<u>Response:</u> Section VII of the EA discusses potential impacts from issuing the special permit, including impacts that may occur in the event of an incident. Through this analysis, PHMSA determined that granting the special permit would provide an equal or greater level of safety compared to the operation of the pipeline in compliance with the existing federal pipeline safety regulations.

<u>Comment:</u> Several commenters referenced the operator’s duty to install automatic shut-off valves (ASV) per PHMSA’s 2022 Final Rule (87 FR 20940), which establishes that ASVs are the national standard for mitigating catastrophic ruptures, and per California law (AB 864), which requires ASV for pipelines near sensitive coastal areas.

Response: PHMSA requires interstate hazardous liquid pipeline operators to meet specific safety and operational standards under 49 CFR Part 195, including standards for valve placement and inspection. PHMSA's recent Pipeline Safety: Requirement of Valve Installation and Minimum Rupture Detection Standards Final Rule, which went into effect in 2022, amended the regulations regarding installation of rupture-mitigation valves (RMVs). An RMV is an ASV or remote-control valve (RCV). For an "entirely replaced onshore hazardous liquid or carbon dioxide pipeline segment" or an, "entirely replaced onshore gas transmission pipeline segment" replaced after April 10, 2023, operators must install RMVs or alternative equivalent technology whenever a valve must be installed in order to meet valve spacing requirements. Sable installed 27 new safety valves along lines CA-324 and CA-325 in response to an analysis on the need for emergency flow restricting devices (EFRDs). These safety valves limit the spill volume in the event of a rupture, reflecting best available technology to minimize spill volume. Sable also installed leak detection systems and an automatic shutoff system that shuts down pumps and closes valves in the event of a rupture. Section 2 of Sable's special permit application in Docket no. PHMSA-2026-0426 provides additional information on operating information, leak history, and testing and assessment results.

Comment: The California Attorney General's Office stated that PHMSA improperly invoked the ESA's emergency consultation procedures.

Response: PHMSA determined that granting the ESP was consistent with the requirements in the Pipeline Safety Act given the national energy emergency declared by the President in E.O. 14156. PHMSA's decision to grant the ESP also implements the directives in E.O. 14154, and PHMSA's decision to grant the ESP avoided a potential gap in coverage under the waivers issued by OSFM. Based on the emergency determination, PHMSA proceeded in accordance with 50 CFR 402.05 of the ESA. PHMSA also completed post-emergency informal consultation as part of the non-emergency special permit process, during which the Fish and Wildlife Service (FWS) concurred in PHMSA's judgment that the ILI requirements in the special permit conditions were not likely to affect endangered species, and that post-ILI repair and maintenance could be adequately mitigated using ongoing consultations once repair and maintenance excavation activities were identified.

Comment: The Environmental Defense Center and Center for Biological Diversity commented that the scope of the EA was too narrow, and that PHMSA should have analyzed the impacts resulting from the restart of the SYPS.

Response: In December, PHMSA conducted a review of Sable's restart plan and several related documents and procedures. Based on that review, on December 22, 2025, PHMSA issued a letter approving Sable's restart plan. However, Sable did not restart the pipeline at that time.

Subsequently, on March 13, 2026, the Secretary of Energy issued a Defense Production Act (DPA) Order requiring Sable to restart the pipeline. Sable restarted the pipeline on March 14, 2026. In light of the comments received about the scope of the EA, PHMSA has considered whether its approval of Sable's restart plan has a significant environmental impact. Because the pipeline will be operated in accordance with established pipeline safety standards (with the exception noted in this special permit, which itself has no significant environmental impact), PHMSA finds its approval of the restart plan also has no significant environmental impact. In addition, PHMSA notes that notwithstanding its approval of the restart plan, the pipeline must be operated pursuant to the DPA Order. Finally, as described in the EA, the No-Action Alternative of the special permit was for the segment pipe to be replaced, and the segments subsequently operated. And following the issuance of the DPA Order, failure to issue the special permit will not affect the operating status of the SYPS. At no point has the No Action Alternative been the non-operation of the SYPS.

**DETERMINATION**:

___ CE: No Extraordinary Circumstances Present

_X_ FONSI

___ EIS

In consideration of the factors detailed in the EA and summarized above, PHMSA finds that the Action Alternative would not result in significant impacts to the human environment. PHMSA therefore approves this FONSI pursuant to the National Environmental Policy Act (NEPA), as amended (42 United States Code (U.S.C.) § 4321 et seq.). No EIS is required for this proposal.

| PHMSA Review | Printed Name and Role of Reviewer | Sign and Date |
|---|---|---|
| EACD Environmental Protection Specialist | Dr. Amanda L. Murphy, FPO & Environmental Protection Specialist | AMANDA LAUREN MURPHY Digitally signed by AMANDA LAUREN MURPHY Date: 2026.06.25 23:06:35 +02'00' |
| Agency Environmental Coordinator | Carolyn Nelson, P.E., Agency Environmental Coordinator | CAROLYN LAVONNE NELSON Digitally signed by CAROLYN LAVONNE NELSON Date: 2026.06.25 17:30:45 -04'00' |

**CONTACT:** For further information on this FONSI, please contact Dr. Amanda Murphy, Federal Preservation Officer and Environmental Protection Specialist, at amanda.l.murphy@dot.gov.

CALIFORNIA
DEPARTMENT OF JUSTICE

**Rob Bonta**
**Attorney General**

600 WEST BROADWAY, SUITE 1800
SAN DIEGO, CA 92101

Public: (619) 738-9000
Telephone: (619) 321-5780
Facsimile: (916) 732-7920
E-Mail: Rafael.Hurtado@doj.ca.gov

April 3, 2026

**Via www.regulations.gov**

Linda Daugherty
Acting Associate Administrator of Pipeline Safety
Pipeline and Hazardous Materials Safety Administration
U.S. Department of Transportation
Docket Operations, M–30
West Building Ground Floor, Room W12–140,
1200 New Jersey Avenue SE,
Washington, DC 20590

RE: COMMENTS OF ATTORNEY GENERAL OF CALIFORNIA
*Pipeline Safety: Request for Special Permit; Sable Offshore Corp. (Sable)*, 91 Fed.Reg. 8949 (Feb. 24, 2026)
Docket No. PHMSA-2026-0464

Dear Acting Administrator Daugherty:

The Attorney General of the State of California (hereinafter referred to as "California"), acting in his independent capacity to protect the state's public interest, public health and the environment, submits the following comments to the Pipeline and Hazardous Materials Safety Administration ("PHMSA") on Sable Offshore Corp.'s ("Sable") special permit application ("Application"). The Application requests a waiver of the requirement in 49 C.F.R. § 195.452(h)(4)(iii)(H) to remediate certain longitudinal seam weld corrosion on hazardous liquid pipelines within 180 days of discovery. The waiver would apply to Lines CA–324 and CA–325 (including CA–325A and CA–325B) (hereinafter collectively referred to as "Lines CA-324/325").

PHMSA published notice of the Application on the Federal Register on February 24, 2026, setting a deadline of March 26, 2026, for public comments. On March 20, 2026, PHMSA published a notice extending the comment deadline to April 3, 2026. 91 Fed.Reg. 13698.

## I. EXECUTIVE SUMMARY

California urges PHMSA to deny Sable's Application for a special permit that would waive the requirement in 49 CFR 195.452(h)(4)(iii)(H) to evaluate and remediate longitudinal

seam weld corrosion on Lines CA-324/325 within 180 days of discovery. First, PHMSA is without authority to grant such a special permit because Lines CA-324/325 are intrastate pipelines and California regulators have sole regulatory oversight over any attempt to restart these Lines and issue state waivers. Second, California has vested interests in ensuring Lines CA-324/325 operate safely and PHMSA's proposed special permit would dilute the higher state safety standards that were imposed on Sable and therefore it is inconsistent with pipeline safety. 49 C.F.R. § 190.341(d). Third, given the fact Line CA-324 already failed and caused a catastrophic oil spill in 2015 in Santa Barbara County, even if PHMSA had authority to issue a special permit (which it does not), a more robust environmental analysis needs to be performed. Fourth, PHMSA unlawfully invokes the Endangered Species Acts's emergency consultation procedures and has given no indication that it will consult with the National Marine Fisheries Service, in violation of the Act. Finally, Secretary Wright's March 13, 2026, order ("DPA Order") does not change anything about the propriety of the Application, because the DPA Order itself is unlawful.

## II. THE STATE OF CALIFORNIA HAS SOVEREIGN AND LEGAL INTERESTS

### A. California Has an Interest in the Enforcement of its Laws

The State of California has an interest in the enforcement of its own laws. *Missouri v. Holland*, 252 U.S. 416, 431 (1920); *Maine v. Taylor*, 477 U.S. 131, 137 (1986). Under California law, the Office of the State Fire Marshal is granted "exclusive safety regulatory and enforcement authority over intrastate . . . hazardous liquid pipelines" and tasked with implementing the federal Hazardous Liquid Pipeline Safety Act of 1979 (49 U.S.C. Sec. 60101 et seq.) ("Pipeline Safety Act") and federal pipeline safety regulations and obtaining annual federal certification. Cal. Gov. Code § 51010. The Pipeline Safety Act expressly forbids PHMSA[1] from prescribing or enforcing standards and practices for an intrastate pipeline facility to the extent that they are regulated by a State authority that submits an annual certification for the facility. 42 U.S.C. § 60105(a). PHMSA may reject a certification and assert jurisdiction only if it decides that the State authority is not satisfactorily enforcing compliance with applicable safety standards. 42 U.S.C. § 60105(f). However, prior to rejecting any certification and assuming regulatory control, PHMSA must first provide the State authority with notice and an opportunity for a hearing before taking final action. *Id*. Here, PHMSA has not rejected the State's certification and the State Fire Marshal and the State of California have and continue to dutifully enforce compliance with all applicable safety standards.

On May 18, 2016, approximately one year after the 2015 Refugio Beach Oil Spill,[2] and after Plains Pipeline, LP ("Plains"), the then operator, cancelled its Federal Energy Regulatory

[1] The Secretary of Transportation's duties related to pipeline transportation and safety were delegated to PHMSA by the Norman Y. Mineta Research and Special Programs Improvement Act (P.L. 108-426, November 30, 2004).

[2] The National Oceanic and Atmospheric Administration describes some of the damage caused by the 2015 Refugio Beach Oil Spill at the following webpage: https://darrp.noaa.gov/oil-spills/refugio-beach-oil-spill.

Commission ("FERC") tariffs, PHMSA re-designated Lines CA-324/325 as intrastate, and identified the Office of the State Fire Marshal as the safety regulator pursuant to state certification. 49 U.S.C. § 60105; Letter from Zach Barrett, Director for State Programs, PHMSA, to Bob Gorham Program Manager, Pipeline Safety Division, California State Fire Marshal (May 18, 2016) ("May 2016 MOU"). As intrastate hazardous liquid pipelines, Lines CA-324/325 are subject to the Elder California Pipeline Safety Act of 1981, California Government Code Section 51010, et seq.

Four years later, in 2020, the United States and the State of California, through their respective agencies, including PHMSA and the State Fire Marshal, entered into a Consent Decree with Plains and its parent company Plains All American Pipeline, L.P. *See* Consent Decree, *United States, et al. v. Plains All American Pipeline, L.P., et al.*, No. 2:20-cv-02415 (C.D. Cal. Mar. 13. 2020) ("Consent Decree"). The Consent Decree conveyed "sole regulatory oversight" over the restart of Lines CA-324/325 to the State Fire Marshal and requires the owner of the pipelines[3] to obtain state waivers providing conditions in lieu of modern safety regulations for cathodic protection. *See* Consent Decree, Appendices B and D. The Consent Decree also assigns the State Fire Marshal with exclusive authority to approve a restart plan after the pipelines' owner complies with the conditions set out in the Consent Decree, including obtaining state waivers through the State Fire Marshal for the limited effectiveness of cathodic protection. Consent Decree, Appendix B at 75 and Appendix D at 92-93. As part of its acquisition of Lines CA-324/325, Sable agreed to be bound by the Consent Decree. Letter from Megan B. Prout, Senior Vice President, Commercial Law and Litigation, Plains All American, L.P., to Joshua Cleaver, Staff Counsel, Legal Services Office, California Department of Forestry and Fire Protection (Oct. 14, 2022); Letter from Andrew Craig, Venture Manager, ExxonMobil Pipeline Company LLC, to Joshua Cleaver, Staff Counsel, Legal Services Office, California Department of Forestry and Fire Protection (Feb. 19, 2024).

To date, the Consent Decree remains the final judgment of the Central District of California. As such, PHMSA and the State Fire Marshal, as well as all other parties, remain bound by the Consent Decree's terms and conditions, including its conveyance of authority to the State Fire Marshal. *See Mi Familia Vota v. Fontes*, 111 F.4th 976, 982 (9th Cir. 2024); *Hook. v. State of Ariz., Dep't of Corr.*, 972 F.2d 1012, 1017 (holding that a state agency was bound by a consent decree the agency was a party to until the court ruled otherwise); *see also Moore v. Deal,* 240 F.Supp.1004, 1006 (E.D. Pa. 1965).

**B. California's Proprietary and Other Interests**

California has a panoply of property, financial, economic, and other interests that have already been harmed by corrosion of Line CA-324 that should be safeguarded from future potential future harm.

[3] The Consent Decree applies not only to the parties to it but to "any successors, assigns, as well as any other entities or persons otherwise bound by law to comply with this Consent Decree."

From Point Conception in Santa Barbara County southward to Los Angeles County, California State Parks has several state parks and beaches that are frequented by Californians and non-Californians alike. Among them are Gaviota State Park, Refugio State Beach, El Capitan State Beach, Carpinteria State Beach, Emma Wood State Beach, San Buenaventura State Beach, McGrath State Beach, Mandalay State Beach, Point Mugu State Park, Leo Carrillo State Park, Robert H. Meyer Memorial State Beach, Point Dume State Beach, Malibu Lagoon State Beach, Will Rogers State Beach, Santa Monica State Beach, Dockweiler State Beach, and more.[4] Many of these state parks and beaches were within the 2015 Refugio Beach Oil Spill affected area, including Gaviota State Park and Refugio State Beach. The state parks and beaches "along the Gaviota coast provide the public with unique camping and recreational opportunities that are highly sought after and are booked well in advance." Cal. Dep't of Fish and Wildlife, et al., Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment at 30 (June 2021) ("Final Damage Assessment").[5] They are special to many, not only because "they are among the few places on the California coast where one can camp immediately adjacent to the beach[,]" but also because these are places where Californians form lifelong memories with their loved ones. They are also home to countless flora and fauna.

The area that was affected by the 2015 Refugio Beach Oil Spill "has one of the most diverse and abundant assemblages of marine organisms in the world." Final Damage Assessment at 31. The various flora and fauna that live or migrate through the area affected by the spill are too numerous to list here but they include: kelp forests; seals; sea lions; gray, blue, and humpback whales; dolphins; otters, including the threatened southern sea otter; birds, including brown pelicans, gulls, California least terns, horned larks, and western snowy plovers; fish, including gopher rockfish, giant kelp fish, cabezon, anchovies, sardines, the federally endangered Southern California Coast Distinct Population Segment of steelhead trout, coho salmon, Chinook salmon, and giant black sea bass; lobsters; invertebrates and insects like sandcastle worms, sea stars, and sea urchins; algae such as surfgrass and eelgrass; and many more. *Id.* at 31-37. Among the threatened or endangered species in the area, it is known that "[a]t least three state- and/or federally-listed species were exposed to [Line CA-324] oil from the spill: the threatened western snow plover, the endangered black abalone, and the endangered humpback whales." *Id.* at 37. However, other "state- and federally-listed or protected species occur in areas exposed to the spill[]" and could face mortality from potential future spills. *Id.*

California and its people also have important archeological and cultural resources that were affected by the 2015 Refugio Beach Oil Spill and that must be protected from another potential oil spill. "The density of Native American sites is particularly high within the central response area along the western Santa Barbara Channel, where the narrow coastal plain concentrated settlement within a thin band of land. The area also contains numerous historical

[4] The public may view a map of California state parks, beaches, and other sites at https://csparks.maps.arcgis.com/apps/instant/basic/index.html?appid=065b067caa204e8da48d4b53c9483ab0 (last visited on March 25, 2026).

[5] The Final Damage Assessment is available at https://www.nfwf.org/sites/default/files/2022-09/refugio-beach-oil-spill-final-damage-assessment-restoration-plan-2-03-2021.pdf (last visited on April 1, 2026).

sites dating to the Spanish, Mexican, and American periods . . ." Final Damage Assessment at 38.

California's recreational offerings are well known throughout the world and represent a valuable sector of California's economy. Recreational activities in Santa Barbara, Ventura, and Los Angeles Counties include "camping, sunbathing, beach combing, exercising, swimming, wildlife viewing, as well as more specialized activities such as fishing, diving, boating, and surfing." Final Damage Assessment at 151-152. The 2015 Refugio Beach Oil Spill caused popular state campgrounds and day use areas to close for up to 59 days in Santa Barbara County, as well as beach closures as far south as Los Angeles County. It was estimated that there were "140,000 lost recreational user days in Santa Barbara and Ventura Counties; six days of beach closures in Los Angeles County; and lost research, education, and outreach opportunities at the University of California, Santa Barbara Coal Oil Point Natural Reserve." Final Damage Assessment at 3. Financially, the estimated total lost consumer surplus value to the public was $4,468,707.

A potential future oil spill from the lack of adequate evaluation and remediation of corrosion on Lines CA-324/325 may impact California's economy as well. The 2015 Refugio Beach Oil Spill resulted in the closure of commercial fisheries and impacted businesses dependent on the recreational economy. Cal. Dep't of Fish and Wildlife, et al., Refugio Beach Oil Spill Natural Resource Damage Assessment Update (Nov. 2015) ("RBOS NRDA Update").[6] There are also numerous other businesses that depend on the resources and activity offerings of the Southern California coast. Any disruption may cause damage to these businesses.

## III. PHMSA HAS NO AUTHORITY TO ISSUE A SPECIAL PERMIT TO SABLE FOR LINES CA-324/325

The Attorney General objects to Sable's special permit Application, because PHMSA has no authority to issue such a permit. Pursuant to the Pipeline Safety Act, Lines CA-324/325 are intrastate hazardous liquid pipeline facilities and the Act expressly forbids PHMSA from prescribing or enforcing safety standards and practices for them. *See* 49 U.S.C. § 60105(a). In addition, pursuant to the Consent Decree, the owner of Lines CA-324/325 must apply for a state waiver through, and receive such waiver from, the State Fire Marshal, not PHMSA. Accordingly, PHMSA lacks authority to issue a special permit, because the authority is vested in the State Fire Marshal.

//

[6] The RBOS NRDA Update is available at https://www.google.com/url?sa=t&source=web&rct=j&opi=89978449&url=https://nrm.dfg.ca.gov/FileHandler.ashx%3FDocumentID%3D111070&ved=2ahUKEwiZn7qQ88-TAxVEPEQIHTL2AEIQFnoECBoQAQ&usg=AOvVaw3tZnYzEabglahiYJcCWxyF (last visited on April 1, 2026).

### A. Under the Pipeline Safety Act, Lines CA-324/325 are Intrastate Hazardous Liquid Pipeline Facilities

An "interstate hazardous liquid pipeline facility" is a pipeline facility that transports hazardous liquid "between (i) a place in a State and a place outside that State; or (ii) places in the same State through a place outside the State." 49 U.S.C. § 60101(a)(8)(B). Conversely, "'intrastate hazardous liquid pipeline facility' means a hazardous liquid pipeline facility that is not an interstate hazardous liquid pipeline facility." 49 U.S.C. § 60101(a)(10). The term "facility" is not defined in the Pipeline Safety Act, but a "facility" is generally understood as "[s]omething that is built or installed to perform some particular function …."[7] *See Facility*, Black's Law Dictionary (6th ed. 1990); *see also Facility*, Black's Law Dictionary (5th ed. 1979); *Facility*, Black's Law Dictionary (4th ed.1968); *Hooks v. Clark Cnty. Sch. Dist.*, 228 F.3d 1036, 1040 (9th Cir. 2000) (quoting Webster's II, New Riverside University Dictionary 460 (1994)) ("a 'facility' can be commonly defined as '[s]omething created to serve a particular function[]'"). "Transporting hazardous liquid," in turn:

> (A) means—
> (i) the movement of hazardous liquid by pipeline, or the storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline, in or affecting interstate or foreign commerce; and
> (ii) the movement of hazardous liquid through regulated gathering lines; but
> (B) does not include moving hazardous liquid through—
> (i) gathering lines (except regulated gathering lines) in a rural area;
> (ii) onshore production, refining, or manufacturing facilities; or
> (iii) storage or in-plant piping systems associated with onshore production, refining, or manufacturing facilities;
>
> 49 U.S.C. § 60101(a)(22).

Lines CA-324/325 originate onshore in Santa Barbara County, California, and terminate in the Central Valley in Kern County, California, without passing through any other state. PHMSA, U.S. Dep't of Transp., Emergency Special Permit (Dec. 23, 2025) ("ESP Conditions"). At the time of their construction in the early 1990s, the plans for Lines CA-324/325 indicated an intention to cross Arizona and New Mexico and to connect to refineries in Texas. *See* Letter from Julie Teel Simmonds, Senior Counsel, Center for Biological Diversity, to Tristan Brown, Deputy Administrator PHMSA, and Joe Tyler, Director, CalFIRE (Dec. 23, 2024) citing the Final Environmental Impact Report/Environmental Impact Statement, Cal. State Lands Comm'n, et al. (Jan. 1985) (1985 EIR/EIS). However, the line to Texas was never built; instead, Lines CA-324/325 terminate at Pentland, in Kern County, where they connect to other pipelines. Letter from J. Caldwell Flores, President and COO, Sable Offshore Corp., to Linda Daugherty, Acting Associate Administrator for Pipeline Safety, PHMSA (Nov. 26, 2025) ("Sable's Request for

[7] All three relevant editions of Black's Law Dictionary also note that facility "also means something that promotes the ease of any action or course of conduct." This second definition is not applicable.

PHMSA Jurisdiction"). The purpose of constructing Lines CA-324/325 was to transport crude oil from Santa Barbara County to Kern County. 1985 EIR/EIS at Abstract. That purpose remains to this day.

In a May 18, 2016, letter agreement, PHMSA re-designated Lines CA-324/325, as intrastate, and identified the State Fire Marshal as the safety regulator. May 2016 MOU. After the Refugio Beach Oil Spill, state and federal agencies, including PHMSA, engaged with Plains regarding harm from the spill, projects to remedy that harm, and civil penalties. Those efforts culminated in 2020 with the agreed Consent Decree, filed in and approved by the Central District of California (Hon. Philip S. Gutierrez). Consent Decree. In seeking approval of the Consent Decree, the United States itself identified Lines CA-324/325 as intrastate. United States' Memorandum in Support of Motion to Enter Consent Decree, *United States of America, et al. v. Plains All American Pipeline, L.P., et al.*, No. 2:20-cv-02415 (C.D. Cal., Aug. 19, 2020) ("Motion to Enter Consent Decree"). The Consent Decree considered Lines CA-324/325 to be intrastate and assigned to the State Fire Marshal regulatory authority over Lines CA-324/325, including authority to issue state waivers—the state equivalent of a special permit. Consent Decree. Removing any ambiguity about whose job it was to regulate Lines CA-324/325, in October 2020, PHMSA sent a letter to Plains:

> Upon entry, the Consent Decree . . . transferred all outstanding corrective actions in PHMSA's closed CAO, and amendments, to the **sole regulatory oversight of the California Department of Forestry and Fire Protection's - Office of the State Fire Marshal.**

Letter from Dustin B. Hubbard, Director, Western Region, PHMSA, to Patrick D. Hodgins, VP Health, Safety & Environmental, Plains All American (Oct. 29, 2020) (emphasis added).

PHMSA ostensibly asserts jurisdiction over Lines CA-324/325 by attempting to re-cast the pipelines as part of a single "pipeline facility" that also includes an offshore pipeline, as well as a processing, treatment and storage facility. The offshore pipeline transports an emulsion of oil, water, and other hydrocarbons from the Santa Ynez Unit drilling platforms (the "Offshore Emulsion Pipeline"), located in federal waters on the Outer Continental Shelf, to the Las Flores Canyon oil processing and treatment facilities (the "LFC Facilities") immediately onshore in Santa Barbara County, California. Letter from Linda Gail Daugherty, Acting Associate Administrator for Pipeline Safety, PHMSA, to J. Caldwell Flores, President and COO, Sable Offshore Corp. (Dec. 17, 2025); Inspection Output Report (Dec. 28, 2025). The LFC Facilities—located on a 113-acre parcel approximately a mile inland from the coastline—process, treat, and store gas and crude oil and remove water for return and reinjection on the Outer Continental Shelf. Sable's Request for PHMSA Jurisdiction; *see* Sable Offshore Corp., Spill Prevention, Control, and Countermeasure ("SPCC") Plan at 8 (Mar. 2025). As described by Sable's subsidiary, Pacific Pipeline Company, in its Complaint filed last fall in Kern County Superior Court:

> The onshore facilities in Las Flores Canyon separate oil, propane, butane, sulfur products, and fuel quality gas. The natural gas is dried, treated, compressed, and

> delivered to a local utility company. Oil is transferred through the Las Flores Pipelines to a refinery for final processing.

Complaint, *Pacific Pipeline Co. v. California*, No. BCV-25-103508 (Kern County Sup. Court, Sept. 29, 2025), ¶ 19). In addition to gas and oil processing plants, the LFC Facilities also include, among other infrastructure, a cogeneration power plant, a biologic water treatment plant, two 270,000-gallon capacity crude oil storage tanks, a warehouse, a laboratory, and office buildings. SPCC Plan at Figs. 2-5, and F-4.

Historically, the LFC Facilities have consistently been treated as separate from Lines CA-324/325. For instance, they were reviewed in an Environmental Impact Report and Environmental Impact Statement separate from Lines CA-324/325. *See* Letter from Julie Teel Simmonds, Senior Counsel, Center for Biological Diversity to Joe Tyler, Director/Fire Chief, CalFIRE, et al. (Sept. 24, 2024) citing to 1985 EIR/EIS. The LFC Facilities also have been historically regulated separately from Lines CA-324/325 by the County of Santa Barbara. *See*, e.g., Verified Petition for Writ of Mandamus and Complaint, *Sable v. California*, Case No. 26WM000036 at 9 (Sacramento Sup. Ct., Feb. 17, 2026). Notably, prior to December 2025, no federal, state, or local authority had ever asserted that Lines CA-324/325, the Offshore Emulsion Pipeline, and the LFC Facilities are all part of a single interstate "pipeline facility."

### B. The Consent Decree Conveys the Authority and Responsibility to Review, Approve, and Issue State Waivers to the State Fire Marshal, Not PHMSA

The Application states that Sable is seeking relief from 49 C.F.R. § 195.452(h)(4)(iii)(H) to "implement Appendix B, Article I.1.A and Appendix D, Section 1.b.10 and 1.f of the Consent Decree[.]" Application at 1 and 18-19. According to Sable, PHMSA's designation of Lines CA-324/325 as interstate removes "any regulatory jurisdiction of OSFM over these pipelines" and instead requires obtaining a special permit from PHMSA. Letter from J. Caldwell Flores, President and COO, Sable Offshore Corp., to Linda Daugherty, Acting Associate Administrator for Pipeline Safety, PHMSA at 14 (Dec. 19, 2025). However, Sable's assertion is false. PHMSA, as an arm of the Executive, does not have the authority to revise, overturn, or refuse faith and credit to a final judgment of the district court. *Taylor v. U.S.*, 181 F.3d 1017, 1024 (1999) ("[O]nce court decisions achieve finality they 'may not lawfully be revised, overturned or refused faith and credit by another Department of Government.'" (citations omitted)). Appendix B.1.A. and B of the Consent Decree explicitly dictates that an application for a State Waiver shall go through, and be reviewed and approved by, *the State Fire Marshal*, not PHMSA.

PHMSA has no authority to unilaterally modify the Consent Decree. To lawfully issue a special permit for Lines CA-324/325, PHMSA would need to first modify or terminate the Consent Decree through the proper process. *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 388 (1992). The Consent Decree provides that a modification may occur only "by a subsequent written agreement signed by the Parties." Consent Decree at 54-55. If the modification is a "material change" then it must be approved by the district court. *Id*. If there are disputes concerning modification, then the Consent Decree provides dispute resolution procedures that must be followed. *Id*. The party seeking relief from a consent decree "bears the

burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo*, 502 U.S. at 383.

On March 30, 2026, the United States filed a motion to terminate or modify the Consent Decree. The motion is set for hearing on June 1, 2026. However, as of the date of this comment letter, PHMSA has obtained a modification of the Consent Decree and it remains the final judgment of the district court. As a government agency and party to the Consent Decree, PHMSA is bound by it and cannot unilaterally assert regulatory jurisdiction over Lines CA-324/325 in contravention of the Consent Decree's express delegation of that authority to the State Fire Marshal. *Hook. v. State of Ariz., Dep't of Corr.*, 972 F.2d 1012, 1017 (holding that a state agency was bound by a consent decree the agency was a party to until the court ruled otherwise). The fact that the United States filed a motion to terminate or modify the Consent Decree only supports that the United States understands that PHMSA is bound by the Consent Decree and has no authority to issue a special permit. As such, PHMSA should deny Sable's Application.

## IV. PHMSA SHOULD NOT ISSUE A SPECIAL PERMIT WHILE IT REFRAINS FROM TAKING ENFORCEMENT ACTION

According to its own regulations, a special permit may only be issued by PHMSA if the Associate Administrator determines that the application complies with the requirements of 49 C.F.R. § 190.341 and "that the waiver of the relevant regulation or standard is not inconsistent with pipeline safety[.]" 49 C.F.R. § 190.341(d). As part of the overall special permit scheme, the regulations contemplate enforcement action for non-compliance with any terms and conditions of a special permit. *See* 49 C.F.R. § 190.341. This is in line with the Pipeline Safety Act's express purpose "to provide adequate protection against risks to life and property posed by pipeline transportation . . ." 49 U.S.C. § 60102(a)(1). Yet, on January 12, 2026, PHMSA issued a Notice of Limited Enforcement Discretion and Statement of Policy for Issuing Special Permits in Response to National Energy Emergency ("Limited Enforcement Discretion Policy"), announcing that it "will refrain from taking any enforcement action against a regulated party who defers the performance of an activity that would otherwise be required under the Federal pipeline or hazardous materials safety regulations" if: (1) performing the required activity would contribute to the purported national energy emergency by adversely impacting the transportation of energy, (2) the "regulated party demonstrates that deferring the performance of the required activity will not create an unreasonable risk to public safety, property, or the environment," and (3) the regulated party "files an application for a special permit promptly, but no later than 45 days after determining that the required activity should not be performed in response to the national energy emergency." Limited Enf. Disc. Policy at 2. (Jan. 12, 2026).[8] While the second criterion appears to require a demonstration that deferring the required activity will not create a reasonable risk, the Limited Enforcement Discretion Policy makes it clear that PHMSA will not take enforcement action even if a special permit application is denied for failing to make such a demonstration:

[8] The Limited Enforcement Discretion Policy is available at https://www.phmsa.dot.gov/regulatory-compliance/phmsa-guidance/notice-limited-enforcement-discretion-and-statement-policy (last visited on April 2, 2026).

> if the application for a special permit is denied, PHMSA will continue to refrain from taking any enforcement action for a reasonable period of time thereafter, so that the party who sought the waiver or exemption can take appropriate action to perform the required activity without incurring any additional enforcement risk.

Limited Enforcement Discretion Policy at 2-3. In other words, whether a special permit applicant follows PHMSA's safety regulations or not is immaterial because PHMSA will take no enforcement action regardless. Instead, PHMSA has made it clear that regulated parties "may rely on this notice as a temporary safeguard from PHMSA regulatory enforcement . . ." Limited Enforcement Discretion Policy at 3. If PHMSA is going to enact this policy, it should refrain from exercising jurisdiction over Sable's Application because it has already predetermined that it will not enforce its own regulations. Instead, granting the Application and issuing special permits to Sable will defeat the express purpose and requirements of the Pipeline Safety Act and will only endanger the safety of California's environment and public health.

## V. PHMSA SHOULD PREPARE AN ENVIRONMENTAL IMPACT STATEMENT

Even if PHMSA had the authority to act on Sable's Application (which it does not), the scope of the draft Environmental Assessment ("EA") prepared in connection with the Application is far too narrow. PHMSA should instead prepare and publish for public comment an environmental impact statement ("EIS"). The National Environmental Policy Act ("NEPA") requires the preparation of an environmental impact statement for "major Federal actions significantly affecting the quality of the human environment . . ." 42 U.S.C. § 4332(C). To the extent that an EIS was previously prepared, a supplemental environmental impact statement ("SEIS") is required if there is new information that is sufficient to show that the remaining action will "affect[t] the quality of the human environment" in a significant manner or to a significant extent not already considered. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989) (citations omitted). The Department of Transportation's own Procedures for Considering Environmental Impacts (DOT Order 5610.D) indicate that major federal actions may include "grants, construction, regulatory actions, certifications, licenses, **permits**, approval of policies and plans, adoption or implementation of programs, **waivers**, legislation proposed by DOT, and **any renewals or approvals of the above**." U.S. Dep't of Transp., Procedures for Considering Environmental Impacts (Jul. 1, 2025) ("DOT Order 5610.1D") (emphasis added.)[9]

### A. PHMSA Must Analyze All Reasonable Alternatives

NEPA requires project proponents to provide a "detailed statement" regarding the "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). The requirement to consider reasonable alternatives "lies at the heart of any NEPA analysis." *California ex rel. Lockyer v. U.S. Dept. of Agric.*, 459 F. Supp. 2d 874, 905 (N.D. Cal. 2006). The draft Environmental Assessment (Document No. PHMSA-2026-0464-0005_attachment_1) ("EA") states:

---

[9] DOT Order 5610.1D is available at https://www.transportation.gov/mission/dots-procedures-considering-environmental-impacts (last visited on April 2, 2026).

> PHMSA evaluates whether granting a special permit would provide an equal or greater level of safety compared to the operation of the pipeline in regular compliance with the federal pipeline safety regulations. PHMSA's environmental review associated with a special permit is limited only to impacts that would result from granting or denying a special permit.

EA at 1. The EA further states that "PHMSA's EA for the Emergency Special Permit and non-emergency [Special Permit] is limited to an evaluation of the significance of impacts associated with the Action Alternative, compared to those that would result under the No Action Alternative." EA at 15. The Action Alternative is the granting of the waiver and the No Action Alternative "involves the failure to issue a regulatory waiver and the construction of approximately 123 miles of new pipe at or near segments CA-324 and CA-325's existing right-of-way. . ." EA at 15. Yet these are not the only reasonable alternatives. The EA conspicuously ignores the alternative of granting a special permit that would retain compliance with 49 C.F.R. § 195.452(h)(4)(iii)(H). Additional reasonable alternatives that PHMSA should consider include: limiting the term of the special permit to a fixed number of years; allowing PHMSA to revoke the special permit if Sable does not comply with all conditions; allowing PHMSA to revoke, suspend, or modify the special permit under certain circumstances; among others.

**B. The Purpose and Need Conveyed in the Draft EA for the Emergency Special Permit and Special Permit Inappropriately Relies on Executive Orders 14154 and 14156 to Justify the Inadequate Environmental Analysis**

NEPA requires an agency to analyze all "reasonably foreseeable environmental effects" and "make use of reliable data and resources in carrying" out its statutory obligation. *See* 42 U.S.C. § 4331(C)(i) and (E). Pursuant to PHMSA's regulations, an emergency special permit may be issued only if the Associate Administrator determines that: "(i) it is in the public interest to grant the waiver; (ii) the waiver is not inconsistent with pipeline safety; and (iii) the waiver is necessary to address an actual or impending emergency involving pipeline transportation, including an emergency caused by a natural or manmade disaster." 49 U.S.C. § 60118(c)(2)(A); *see also* 49 C.F.R. § 190341(g).

PHMSA provided scant reasoning for how the emergency special permit would address an actual or impending emergency. In its Special Permit Analysis and Findings, PHMSA stated that the Emergency Special Permit is necessary because it "would enable and facilitate the ***special permit segments*** to meet regional energy demands, reduce refinery feedstock prices, mitigate the risks of fuel shortages on the West Coast, and reduce United States dependency on imported oil and the associated energy security risks of such imports." U.S. Dep't of Transp., PHMSA, Special Permit Analysis and Findings, Emergency Special Permit at 3 (Dec. 19, 2025) (emphasis in original). However, PHMSA did not explain how the granting of the Emergency Special Permit will enable and facilitate, reduce, mitigate, or meet any of these purported needs. PHMSA gave no indication that it examined any data or considered any factors to conclude that the granting of an emergency special permit would indeed address the alleged energy

"emergency." PHMSA only provided a few conclusory statements, which is insufficient to establish that the Emergency Special Permit indeed addresses an impending or actual emergency.

Similarly, neither the EA nor the other Application materials explain how PHMSA's decision to grant the Emergency Special Permit addresses the "high energy costs" described in Executive Order 14154.

PHMSA should provide reliable data and resources to support *how* the granting of the Emergency Special Permit will address any emergency or the energy needs listed in the Executive Orders as well as the reasonably foreseeable environmental effects.

**C. The EA Improperly Relies on Past Environmental Statements or Analyses**

PHMSA "has a continuing duty to gather and evaluate new information relevant to the environmental impacts of its actions." *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1024 (9th Cir. 1980). PHMSA cannot rely on past environmental statements and analyses for a determination on the Application. None of the past analyses considered a waiver like the one proposed by the Application. Additionally, PHMSA now has new information such as the known corrosion issues that Lines CA-324/325 suffer from, and the damage that already occurred from corrosion of Line CA-324.

The damage caused by corrosion on Line CA-324 in 2015 is well documented, including in the Final Damage Assessment. Despite the known corrosion issue and the extensive damage from the 2015 Refugio Beach Oil Spill, the EA states that granting a special permit "would not present significant impacts to biological resources due to potential oils spills." EA at 23. This determination was made despite there being no indication in the EA that PHMSA consulted with the National Marine Fisheries Service ("NMFS") even though it knows of damage to marine life. The EA also acknowledges that consultation with the California State Historic Preservation Office, Advisory Council on Historic Preservation, and Native American Tribes, all remain pending. EA 21-22.

In addition to the damage caused by the 2015 Refugio Beach Oil Spill, PHMSA fails to analyze other reasonably foreseeable environmental impacts from a potential granting of a special permit. For example, the EA acknowledges that the right-of-way segments for Lines CA-324/325 "have experienced forest and range fires, particularly during dry years and under strong easterly wind conditions[]" but provides no analysis of how wildfires would impact the environment in light of the special permit and the lack of evaluation and remediation of corrosion on the pipelines. This is especially concerning when there have been wildfires caused by oil and gas pipeline ruptures or wildfires near oil and gas pipelines in recent years.[10] PHMSA must identify and thoroughly analyze all reasonably foreseeable impacts.

[10] *See* https://www.cbc.ca/news/canada/edmonton/tsb-report-edson-pipeline-rupture-9.6934226; https://www.reuters.com/business/environment/canada-wildfire-reaches-jasper-firefighters-work-protect-trans-mountain-oil-2024-07-25/

## VI. USE OF THE ESA'S EMERGENCY CONSULTATION PROCEDURES IS IMPROPER

The record includes a letter from the U.S. Department of the Interior's ("Interior") Fish and Wildlife Service ("USFWS") (Document No. PHMSA-2026-0464-0004_attachment_1 hereinafter referred to as "USFWS Letter") acknowledging receipt of a request by PHMSA to consult pursuant to the emergency Endangered Species Act ("ESA") Section 7 consultation procedures, 50 C.F.R. § 402.05.[11] The USFWS Letter states that PHMSA "determined their action is an emergency based upon implementation of Executive Order 14156[.]" The request is improper because reliance on Executive Order 14156 alone does not provide a lawful justification for the use of the USFWS's emergency consultation procedures. The ESA and its implementing regulations do not allow agencies to routinely avoid and delay implementation of the ESA's protections of endangered and threatened species and their critical habitats.

The USFWS and NMFS (collectively "the Services")" have adopted joint regulations on interagency consultation under the ESA. *See* 50 C.F.R. Part 402. The Services' joint regulations allow for expedited, informal consultation when emergency circumstances require them, i.e., "situations involving acts of God, disasters, casualties, national defense or security emergencies, etc." 50 C.F.R. § 402.05(a). They allow for a delay of the initiation of formal consultation until "as soon as practicable after the emergency is under control." *Id*. § 402.05(b). The Services' implementing regulations only allow for the use of emergency consultation procedures for emergency responses to sudden, unanticipated events, when necessary to prevent the loss of life, protect public safety, or avoid other imminent harm. *Washington Toxics Coal. v. U.S. Dep't of Interior, Fish & Wildlife Serv.*, 457 F. Supp. 2d 1158, 1195 (W.D. Wash. 2006) ("The overwhelming impression conveyed by [the examples of emergency used in 50 C.F.R. § 402.05] and by the general-purpose ordinary language meaning of 'emergency' itself includes the element of surprise and unexpectedness"); *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, 397 F. Supp. 2d 1241, 1257 (D. Mont. 2005) ("The emergency exception is meant for unexpected exigencies"). As the USFWS's Handbook on ESA Consultations explains, "[p]redictable events . . . usually do not qualify as emergencies under the section 7 regulations unless there is a significant unexpected human health risk."[12] Such an emergency is not presented by Executive Order 14156, and the letter from USFWS does not indicate that PHMSA provided any other justification for the application of the emergency procedures.

Rather than rely on Section 7 emergency consultation to decide the Application, PHMSA should comply with the clear mandates of the ESA before considering the Application. Section 7 of the ESA requires federal agencies, "in consultation with and with the assistance of the

---

[11] The letter also references the Department of Interior's alternative procedures adopted pursuant to Executive Order 14516; however, Interior's alternative procedures for ESA consultations incorporate the ESA's implementing regulations at 50 C.F.R. § 402.05 so there is no real distinction between the two.

[12] U.S. Fish and Wildlife Service, Final ESA Section 7 Consultation Handbook 8-1 (March 1998), https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf.

[USFWS and the National Marine Fisheries Service (jointly referred to as "Services"), to] insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered [] or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). Section 7 consultation is mandatory "if the applicant has any reason to believe that an endangered species or a threatened species may be present in the area affected by his project and that implementation of such action will likely affect such species." 16 U.S.C. § 1536(a)(3).

Pursuant to the Services' joint regulations, each federal agency "shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). Biological assessments are "required" for major construction and must be prepared "before construction is begun." *Id.* § 402.12(b). "Major construction activities" are defined as projects with physical impacts that are major federal actions "significantly affecting the quality of the human environment," as the term is used in NEPA. 50 C.F.R. § 402.02. Formal consultation is required if the agency determines its "action may affect listed species or critical habitat" unless it "determines, with the written concurrence of the [agency's] Director, that the proposed action is not likely to adversely affect any listed species or critical habitat." 50 C.F.R. § 402.14(a), (b)(1). The biological assessment is then used to determine whether formal consultation with the agency is required. *Id.* § 402.12(k). Once consultation is initiated, agencies may not irreversibly commit resources that effectively foreclose reasonable and prudent alternatives to the proposed action. *Id.* § 402.09; *see also* 16 U.S.C. § 1536(d).

If formal consultation is required, the agency must provide the Service with a written description of the proposed action. It must contain "sufficient detail to assess the effects of the action on listed species and critical habitat," a description of the effects of the action, information on listed species and habitat in the geographic area, and any other relevant information. 50 C.F.R. § 402.14(c).

The EA acknowledges that consultation is needed and states that "PHMSA is in the process of initiating non-emergency consultation with USFWS." EA at 23. Because the request for emergency consultation is based on Executive Order 14156 rather than for a reason provided under the ESA, PHMSA should comply with the ESA's formal interagency cooperation requirements. Additionally, PHMSA has not indicated that it will consult with NFMS.[13] PHMSA knows that in 2015 corrosion of Line CA-324 resulted in damage to marine life. It is more than reasonably foreseeable that a special permit that waives evaluation and remediation of corrosion on Lines CA-324/325 may lead to additional future harm. If granting the special permit "may effect" any species under the responsibility of NMFS, then PHMSA must also consult with NMFS.

[13] To the extent that PHMSA has begun or plans to use emergency consultation procedures for endangered and threatened species under NMFS' responsibility, it is unlawful for the same reasons explained above. NMFS is responsible for most marine species and anadromous fish species.

For the foregoing reasons, PHMSA must wait to decide on the Application until non-emergency ESA consultation with the Services is completed.

## VII. SECRETARY WRIGHT'S ORDER PURSUANT TO THE DEFENSE PRODUCTION ACT IS UNLAWFUL

In its second notice extending the deadline, PHMSA requested "public comments on any potential impact that the DPA order might have on this proceeding, including whether the special permit remains necessary and, if so, whether safety or environmental analysis should be adjusted in light of the restart of the pipeline segments." 91 Fed.Reg. 13698, 13699. Secretary Wright's DPA Order does not change this analysis—i.e., whether PHMSA should have granted an Emergency Special Permit or whether it should grant the Application—in that, for the reasons discussed above, PHMSA does not have the authority to grant an emergency special permit or special permit in the first place. Further, the DPA Order itself is unlawful. As alleged in California's Complaint for Declaratory and Injunctive and Other Relief, No. 2:26-cv-3396 (C.D. Cal. Mar. 31, 2026), the DPA Order violates the Administrative Procedure Act because it is contrary to law, in excess of the Department of Energy's Authority, and arbitrary and capricious. Additionally, the DPA Order violates the United States Constitution by impeding on the federal judiciary's and Congress' authority, and infringes upon California's sovereign power to own, manage, and dispose of its property.

Even if PHMSA had the authority to issue a special permit (which it does not) and that the DPA Order were lawful (which it is not), then PHMSA must still comply with NEPA and other applicable laws. *See Nat. Res. Def. Council v. Winter*, 527 F.Supp.2d 1216, 1230-1232 (C.D. Cal., Feb. 4, 2008) ("it is well established that NEPA contains no 'national security' or 'defense' exception." (citations omitted)). PHMSA must consider all reasonably foreseeable environmental impacts in an environmental impact statement and request public comments before deciding on the Application.

## VIII. CONCLUSION

For the foregoing reasons, California urges PHMSA to deny Sable's application for a special permit. California concurs with the recommendations and statements made by the State Fire Marshal in his comment letter submitted on April 3, 2026. The State Fire Marshal's comment that his office has jurisdiction over Lines CA-324/325 is correct. Pursuant to the Pipeline Safety Act and the Consent Decree, PHMSA had no authority to issue an emergency special permit for Lines CA-324/325 and has no authority to decide on the Application. Even if PHMSA had authority to decide on the Application (which it does not), it still must follow the requirements of NEPA and all other applicable laws. PHMSA has not done so because it has failed to consider all the reasonable alternatives, has not considered all the reasonably foreseeable environmental impacts, and improperly relies on inapplicable and outdated past environmental analyses. Further, PHMSA unlawfully invokes the ESA's emergency consultation procedures and has given no indication that it will consult with NMFS. Lastly, the DPA Order does not affect PHMSA's consideration of the Application because PHMSA has no authority to grant a special permit to begin with and the DPA Order itself is unlawful. Even if the DPA Order

were lawful (which it is not), PHMSA must still comply with NEPA, the ESA, and all other applicable laws before deciding on the Application. For these reasons, PHMSA must deny the Application.

Sincerely,

RAFAEL J. HURTADO
Deputy Attorney General

For ROB BONTA
Attorney General

RH:

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY Gavin Newsom, Governor

**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
P.O. Box 944246
SACRAMENTO, CA 94244-2460
(916) 653-7772
Website: www.fire.ca.gov

March 25, 2026

RE: PHMSA Docket ID PHMSA-2026-0464 Sable Offshore Corp. Special Permit Request

To Whom it May Concern,

The California Department of Forestry and Fire Protection's – Office of the State Fire Marshal (OSFM) respectfully submits the following comments related to the above captioned PHMSA docket.

OSFM and PHMSA are currently engaged in a dispute regarding the appropriate safety and regulatory jurisdiction over the pipelines that are the subject of Sable's Special Permit Request, the appropriate manner in which such jurisdiction can and should be exercised, and the impact of the 2020 Consent Decree requiring a State Waiver from OSFM to operate the relevant pipelines. Nonetheless, OSFM maintains significant subject-matter and engineering expertise, and has analyzed the proposed Special Permit to provide substantive comments in the event that PHMSA chooses to exercise jurisdiction before the dispute has been resolved. OSFM's comments herein should not be understood as an agreement to any action proposed by PHMSA, and OSFM maintains its arguments regarding exercise of jurisdiction and reserves all of its rights with respect to ongoing litigation and disputes.

OSFM's Jurisdiction over the Safety of Hazardous Liquid Pipelines in California

The Office of the State Fire Marshal supports the mission of the California Department of Forestry and Fire Protection (CAL FIRE) by focusing on fire prevention. Among its numerous fire safety responsibilities, the OSFM regulates and ensures the safety of intrastate hazardous liquid pipelines in California with its Pipeline Safety Division, which conducts inspections and enforces state and federal law to safeguard California communities. These tasks are completed through the work of staff who inspect pipeline operators to ensure compliance with federal and state pipeline safety laws and regulations, and consist of engineers, Geographical Information System (GIS)/mapping staff, analytical staff, and support staff throughout the state.

The OSFM has exclusive safety, regulatory, and enforcement authority over intrastate hazardous liquid pipelines in California through its certification by the United States Department of Transportation Pipeline Hazardous Materials Safety Administration (PHMSA), in conjunction with California's Hazardous Liquid Pipeline Safety Act of 1981. While it maintains jurisdiction over intrastate hazardous liquid pipelines, OSFM works alongside state and federal partners to ensure safety and regulatory compliance of various aspects of petroleum production.

Not all pipelines in California are subject to OSFM's oversight; OSFM only regulates intrastate hazardous liquid pipelines. These pipelines can carry commodities such as crude oil, gasoline, propane, and other types of hydrocarbons, and are located entirely within the borders of California, including offshore state waters. As a result of its focused jurisdiction, OSFM's Pipeline Safety Division has developed significant expertise in the field of pipeline safety in California's unique and varied ecosystems.

Background: 2015 Refugio Oil Spill and 2020 Consent Decree

Between 1976 and 1993, the offshore oil platforms Hondo, Harmony, and Heritage were constructed and commenced drilling operations in federal waters off the coast of Santa Barbara, California. The platforms initially shipped product via treating vessels, but later an undersea pipeline was constructed between the platforms and the Las Flores Canyon processing facility. After the processing facility, oil is transferred to Lines 324 and 325, where it is transported to a refinery in central California for final processing. Until 2015, these pipelines were treated as interstate pipelines.

On May 19, 2015, Line 324 ruptured, releasing nearly 3,000 barrels of crude oil into the environment. In early 2016, then-operator Plains Pipeline, L.P. cancelled its tariffs with FERC; on May 18, 2016, PHMSA re-designated Lines 324 and 325 as intrastate, with OSFM as the safety regulator.

Meanwhile, following the Refugio Oil Spill, state and federal agencies engaged with the operators at the time Plains All American Pipeline, L.P. and Plains Pipeline L.P. (collectively Plains) regarding harm from the spill, projects to remedy that harm, and civil penalties. Those efforts culminated in the 2020 Consent Decree that resolved state and federal government agency claims. Among other things, the Consent Decree required that, "Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901." [1]

OSFM Issued State Waivers for the Pipelines on December 17, 2024, With Support from PHMSA

Just over two years ago, in February 2024, Sable Offshore Corporation (Sable)acquired a 100% interest in Pacific Pipeline Company, which owns and operates Lines 324 and 325. In acquiring the pipelines, Sable explicitly agreed to be bound by the Consent Decree, including its provisions for State Waivers, to be issued by OSFM.

A State Waiver does not lessen the safety standards to which a pipeline is held. Rather, it is an order that modifies compliance with a regulatory requirement if an operator demonstrates that alternative measures are consistent with pipeline safety. The OSFM evaluates State Waiver applications in consultation with PHMSA to determine if the proposed alternative measures can provide an equal or greater level of safety than the required regulation. If so, OSFM may grant a State Waiver that allows the pipeline to operate with the modifications. Because of the insulation on Lines 324 and 325, cathodic protection—a technique that reduces corrosion on pipelines—is not fully effective in all locations of the pipelines.

In April 2024, due to the limited effectiveness of cathodic protection on Lines 324 and 325, Sable applied to OSFM for State Waivers for both pipelines. While this process is

[1] Nowhere in the Consent Decree does it state or even imply that the State Waiver requirement can be alternatively satisfied by a Special Permit, like the one Sable seeks here.

consistent with concurrent jurisdiction, which allows state regulators to adopt and enforce safety standards in addition to or more stringent than PHMSA's standards, the OSFM worked in collaboration with PHMSA to draft the initial state waiver terms considered for the intrastate pipelines. To mitigate against the limited effectiveness of cathodic protection on these particular lines, the State Waiver imposes additional stringent inspection and repair requirements. After months of review, and back-and-forth with Sable and PHMSA on feasibility of certain protections, OSFM issued State Waivers for Line 324 and Line 325 on December 17, 2024. Those waivers were transmitted to PHMSA for review and opportunity to object, and on February 11, 2025, PHMSA provided to OSFM its notices of non-objection regarding the two State Waivers. Sable never objected to the terms of the State Waivers and complied with the vast majority of the Waivers' terms until last fall, when Sable and OSFM disputed the interpretation of the final outstanding term of the State Waivers.

Sable's Application for a Special Permit from PHMSA

On December 19, 2025, Sable applied for an Emergency Special Permit from PHMSA, the federal analogue to OSFM's State Waiver. The Emergency Special Permit was granted on December 23, 2025, and was valid for 60 days. The Emergency Special Permit was similar in many ways to the State Waivers issued by OSFM. The primary difference can be found in the provision that provided Sable additional time to repair certain conditions after the pipeline had been restarted. The Emergency Special Permit has expired, and on January 22, 2026, Sable applied to PHMSA for a Special Permit. The approval of that Special Permit is the proposed action by PHMSA on which OSFM is commenting here.

Sable's Proposed Special Permit Lacks a Key Provision that was Present in the State Waiver

The OSFM reviewed the content and draft Special Permit requested by Sable and associated with PHMSA's proposed action. While it is true that the proposed Special Permit contains many important provisions designed to ensure pipeline safety similar to those required under the OSFM-issued State Waivers, the proposed Special Permit omits the essential condition that Sable repair all anomalies, plus tool tolerances, prior to resuming operation of the pipeline (see General Condition 10 in draft Special Permit). These requirements complement the others in the State Waivers (and proposed Special Permits) to mitigate risks of corrosion on the lines. This was the key provision in the State Waivers on which Sable and OSFM disagreed in October 2025, despite the clear language in the State Waivers that these conditions shall be repaired *before* oil begins flowing through the pipelines.

As described above, OSFM and PHMSA worked together on the State Waivers ultimately issued by OSFM in December 2024. And PHMSA had additional opportunities to review and object to the State Waivers or any terms in it between December 17, 2024, and February 11, 2025, when PHMSA issued its notice of non-objection. At no time has PHMSA objected to the repair of these conditions (all anomalies plus tool tolerances) prior to operating the pipeline. This pre-operation repair condition is essential to confirm pipeline safety and the accuracy of tools used for in-line inspections now and in the future. The repair of these anomalies serves the additional useful purpose of determining corrosion growth rates and addressing assumptions made in incorporating data and integrity management necessary to ensure pipeline safety and address the known corrosion under insulation issues facing this particular pipeline.

PHMSA Should Deny Sable's Request for a Special Permit

While the Consent Decree and the State Waiver requirement, as well as the jurisdiction of the pipelines, is a matter of dispute between PHMSA and OSFM,[2] both regulators have historically been united in their goals of ensuring pipeline safety and integrity. Because Sable's application for a Special Permit removes a key pre-start-up provision from the State Waiver that was issued by OSFM and approved by PHMSA, and appears to be an end-run around OSFM's carefully considered State Waivers, PHMSA should deny Sable's request for a Special Permit as currently drafted.

Daniel Berlant
State Fire Marshal

[2] OSFM and PHMSA are opposing parties in ongoing federal litigation relating to the ultimate regulatory jurisdiction of Lines 324 and 325.

**DEPARTMENT OF TRANSPORTATION**

**Pipeline and Hazardous Materials Safety Administration**

**[Docket No. PHMSA–2026–0464]**

## Pipeline Safety: Request for Special Permit; Sable Offshore Corp. (Sable)

**AGENCY:** Pipeline and Hazardous Materials Safety Administration (PHMSA); U.S. Department of Transportation (DOT).

**ACTION:** Notice.

**SUMMARY:** PHMSA is publishing this notice to solicit public comments on a request for a special permit submitted by Sable Offshore Corp. (Sable). Sable is seeking relief from compliance with certain requirements in the Federal pipeline safety regulations. PHMSA has proposed conditions to ensure that the special permit is not inconsistent with pipeline safety. At the conclusion of the 30-day comment period, PHMSA will review the comments received from this notice as part of its evaluation to grant or deny the special permit request.

**DATES:** Submit any comments regarding this special permit request by March 26, 2026

**ADDRESSES:** Comments should reference the docket number for this special permit request and may be submitted in the following ways:

- *E-Gov Website: http://www.regulations.gov.* This site allows the public to enter comments on any **Federal Register** notice issued by any agency.
- *Fax:* 1–202–493–2251.
- *Mail:* Docket Management System: U.S. Department of Transportation, Docket Operations, M–30, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue SE, Washington, DC 20590.
- *Hand Delivery:* Docket Management System: U.S. Department of Transportation, Docket Operations, M–30, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue SE, Washington, DC 20590, between 9:00 a.m. and 5:00 p.m., Monday through Friday, except Federal holidays.

*Instructions:* You should identify the docket number for the special permit request you are commenting on at the beginning of your comments. If you submit your comments by mail, please submit two copies. To receive confirmation that PHMSA has received your comments, please include a self-addressed stamped postcard. Internet users may submit comments at *http://www.regulations.gov.*

**Note:** There is a privacy statement published on *http://www.regulations.gov.* Comments, including any personal information provided, are posted without changes or edits to *http://www.regulations.gov.*

*Confidential Business Information:* Confidential business information (CBI) is commercial or financial information that is both customarily and treated as private by its owner. Under the Freedom of Information Act (FOIA) (5 U.S.C. § 552), CBI is exempt from public disclosure. If your comments responsive to this notice contain commercial or financial information that is customarily treated as private, that you treat as private, and that is relevant or responsive to this notice, it is important that you clearly designate the submitted comments as CBI. Pursuant to 49 Code of Federal Regulations (CFR) § 190.343, you may ask PHMSA to give confidential treatment to information you give to the agency by taking the following steps: (1) mark each page of the original document submission containing CBI as ''Confidential''; (2) send PHMSA, along with the original document, a second copy of the original document with the CBI deleted; and (3) explain why the information you are submitting is CBI. Unless you are notified otherwise, PHMSA will treat such marked submissions as confidential under the FOIA, and they will not be placed in the public docket of this notice. Submissions containing CBI should be sent to Lee Cooper, DOT, PHMSA–PHP–80, 1200 New Jersey Avenue SE, Washington, DC 20590–0001. Any commentary PHMSA receives that is not specifically designated as CBI will be placed in the public docket for this matter.

**FOR FURTHER INFORMATION CONTACT:**

*General:* Mr. Lee Cooper by telephone at 202–913–3171, or by email at *lee.cooper@dot.gov.*

*Technical:* Ms. Gabrielle St. Pierre by telephone at 907–202–0029, or by email at *gabrielle.st.pierre@dot.gov.*

**SUPPLEMENTARY INFORMATION:** On January 22, 2026, PHMSA received a special permit application from Sable requesting a waiver of the requirement in 49 CFR 195.452(h)(4)(iii)(H) to remediate certain longitudinal seam weld corrosion on hazardous liquid pipelines within 180 days of discovery. The waiver would apply to two segments of the Santa Ynez Pipeline System, an interstate hazardous liquid pipeline facility that transports crude oil produced on the Outer Continental Shelf through an onshore processing facility located in Santa Barbara County, California, to a terminal located in Kern County, California. The two segments that would be subject to the waiver are known as Lines CA–324 and CA–325 (including CA–325A and CA–325B).

Sable filed this application for a special permit to implement the terms of a Consent Decree entered in Civil Action No. 2:20–CV–02415 by the U.S. District Court for the Central District of California following a rupture that occurred on the Santa Ynez Pipeline System in May 2015. Lines CA–324 and CA–325 have not been used to transport hazardous liquid since the rupture, and the Consent Decree required the prior operator of the pipeline to obtain a waiver before restarting Lines CA–324 and CA–325 to make sure that effective measures were in place to mitigate the risk of corrosion.

Sable, which acquired Lines CA–324 and CA–325 after the entry of the Consent Decree, previously obtained a waiver of the regulation at issue in this proceeding from the California Office of the State Fire Marshall. PHMSA also granted a waiver of that regulation in an emergency special permit that it issued to Sable on December 23, 2025. Sable has agreed to continue following the terms and conditions in the emergency special permit until PHMSA issues a decision on the pending application.

PHMSA has reviewed the draft conditions and preliminarily determined that the issuance of the special permit would not be inconsistent with pipeline safety. The requested pipeline segments are as follows:

| Line name | County, state | Outside diameter (inches) | Length (miles) | Year installed |
|---|---|---|---|---|
| CA–324 | Santa Barbara, CA | 24 | 10.86 | 1990 |
| CA–325A | Santa Barbara, CA | 30 | 38.72 | 1986 |
| CA–325B | Santa Barbara, San Luis Obispo, and Kern, CA | 30 | 74.84 | 1986 |

Case: 26-4629, 11/09/2026, DktEntry: 48.1, (63 of 293)



The special permit application including attachments, draft proposed special permit with conditions, and draft environmental assessment (DEA) for the above-described Sable pipeline segments are available for review and public comment in Docket No. PHMSA–2026–0464. PHMSA invites interested persons to review and submit comments in the docket on the special permit request, draft proposed special permit, and DEA. Please submit comments on any potential safety, environmental, and other relevant considerations implicated by the special permit request. Comments may include relevant data.

Before issuing a decision on the special permit request, PHMSA will evaluate all comments received on or before the comment closing date. PHMSA will consider each relevant comment it receives in making its decision to grant or deny this special permit request.

Issued in Washington, DC, under authority delegated in 49 CFR 1.97.

**Linda Daugherty,**

*Acting Associate Administrator for Pipeline Safety.*

[FR Doc. 2026–03686 Filed 2–23–26; 8:45 am]

BILLING CODE 4910–60–P

## DEPARTMENT OF TRANSPORTATION

### Office of the Secretary of Transportation

**[Docket No. DOT–OST–2026–0760]**

### Guidance on Multimodal State Freight Plans and State Freight Advisory Committees

**AGENCY:** Office of the Secretary of Transportation (OST), Federal Aviation Administration (FAA), Federal Highway Administration (FHWA), Federal Motor Carrier Safety Administration (FMCSA), Federal Railroad Administration (FRA), Maritime Administration (MARAD), Pipeline and Hazardous Materials Safety Administration (PHMSA), Great Lakes St. Lawrence Seaway Development Corporation (GLS); U.S. Department of Transportation (DOT or Department).

**ACTION:** Notice of Guidance.

**SUMMARY:** The Fixing America's Surface Transportation (FAST) Act included a provision requiring each State that receives funding under the National Highway Freight Program (NHFP) to develop a State Freight Plan (the Plan) that provides a comprehensive approach for the immediate and long-range planning activities and investments of the State with respect to freight, and meets all the required plan contents listed in the Act. The Infrastructure Investment and Jobs Act (IIJA) added several new required elements and updated procedures for State Freight Plans. This guidance document updates and replaces the prior guidance on State Freight Plans and State Freight Advisory Committees issued on January 12, 2023. It also updates the guidance to be consistent with recent Executive Orders issued by President Trump and DOT Orders issued by Secretary Duffy. Except for any requirements specified in the statutes cited in the guidance document, the contents of this guidance document do not have the force and effect of law and do not bind the public in any way. The contents will not be relied upon by the Department as a separate basis for affirmative enforcement action or other administrative penalty. Conformity with any recommendations in this guidance document, as distinct from statutory requirements, is voluntary only, and nonconformity will not affect rights and obligations under existing statutes.

**DATES:** Unless otherwise stated in this Notice, this guidance is effective February 24, 2026.

**FOR FURTHER INFORMATION CONTACT:** Paul Baumer, 1200 New Jersey Avenue SE, Washington, DC 20590. Telephone: 202–366–1092. Email: *Freight@dot.gov.*

**SUPPLEMENTARY INFORMATION:** Pursuant to 23 U.S.C. 167, States receiving funding under the NHFP are required to have a State Freight Plan developed in accordance with 49 U.S.C. 70202 in order to obligate those funds. Section 21104 of IIJA, Public Law 117–8, 135 Stat. 429 (2021), added new required contents and updated procedures for State Freight Plans, including reducing the update cycle for State Freight Plans from five years to four. Following the passage of IIJA, the Department issued revised guidance on State Freight Plans and State Freight Advisory Committees to address changes made by IIJA. This document replaces the prior guidance on State Freight Plans and State Freight Advisory Committees issued on January 12, 2023. The updated guidance document describes the required contents of State Freight Plans under 49 U.S.C. 70202 and continues to encourage States strongly to establish State Freight Advisory Committees, as directed by 49 U.S.C. 70201. The updates to the guidance document ensure consistency with recent Executive Orders issued by the President and DOT Orders issued by Secretary Duffy, as well as an attempt to make the guidance easier to follow.

The following list of required elements that all State Freight Plans must address for each of the transportation modes is provided in 49 U.S.C. 70202:

1. An identification of significant freight system trends, needs, and issues with respect to the State;

2. A description of the freight policies, strategies, and performance measures that will guide the freight-related transportation investment decisions of the State;

3. When applicable, a listing of—

A. Multimodal critical rural freight facilities and corridors designated within the State under 49 U.S.C. 70103 (National Multimodal Freight Network);

B. Critical rural and urban freight corridors designated within the State under 23 U.S.C. 167 (NHFP);

4. A description of how the Plan will improve the ability of the State to meet the national multimodal freight policy goals described in 49 U.S.C. 70101(b) and the NHFP goals described in 23 U.S.C. 167;

5. A description of how innovative technologies and operational strategies, including freight intelligent transportation systems, that improve the safety and efficiency of the freight movement, were considered;

6. In the case of roadways on which travel by heavy vehicles (including mining, agricultural, energy cargo or equipment, and timber vehicles) is projected to deteriorate the condition of the roadways substantially, a description of improvements that may be required to reduce or to impede the deterioration;

7. An inventory of facilities with freight mobility issues, such as bottlenecks, within the State, and for those facilities that are State owned or operated, a description of the strategies the State is employing to address those freight mobility issues;

8. Consideration of any significant congestion or delay caused by freight movements and any strategies to mitigate that congestion or delay;

9. A Freight Investment Plan that, subject to 49 U.S.C. 70202(c)(2), includes a list of priority projects and describes how funds made available to carry out 23 U.S.C. 167 would be invested and matched;

10. The most recent commercial motor vehicle parking facilities assessment conducted by the State under 49 U.S.C. 70202(f);

11. The most recent supply chain cargo flows in the State, expressed by mode of transportation;

12. An inventory of commercial ports in the State;

13. If applicable, consideration of the findings or recommendations made by any multi-State freight compact to

# U.S. DEPARTMENT OF TRANSPORTATION

# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION

# ENVIRONMENTAL ASSESSMENT

**Special Permit Information:**

| | |
|---|---|
| **Docket Number:** | PHMSA-2025-1502 |
| **Requested By:** | Sable Offshore Corp. |
| **Operator ID#:** | 40881 |
| **Original Date Requested:** | December 19, 2025 |
| **Issuance Date:** | December 23, 2025 |

## I. INTRODUCTION

The National Environmental Policy Act (NEPA), 42 United States Code (USC) §§ 4321 – 4375 *et seq*., and U.S. Department of Transportation (DOT) Order No. 5610.1D, require the Pipeline and Hazardous Materials Safety Administration (PHMSA) to analyze a proposed action to determine whether such action would have a significant impact on the human and natural environment. PHMSA analyzes special permit requests for potential risks to public safety and the environment that could result from the decision to grant, grant with additional conditions, or deny the request. As part of this analysis, PHMSA evaluates whether granting a special permit would provide an equal or greater level of safety compared to the operation of the pipeline in regular compliance with the federal pipeline safety regulations. PHMSA's environmental review associated with a special permit is limited only to impacts that would result from granting or denying the special permit.

Pipeline special permits are authorized by statute in 49 USC § 60118(c) and the regulatory requirements, including the application process, are set forth in 49 CFR 190.341. PHMSA is also authorized to grant special permits on an emergency basis under 49 U.S.C. § 60118(c)(2) and 49 CFR 190.341(g). When the expected environmental impacts of a proposed emergency action are

not considered significant, PHMSA prepares an environmental assessment to the extent practicable.[1]

This Environmental Assessment (EA) is being developed to assess the environmental impacts associated with the Emergency Special Permit issued to Sable Offshore Corp. (Sable) on December 23, 2025, in addition to the proposed non-emergency Special Permit (SP) currently under review by PHMSA. The Emergency Special Permit (ESP) granted Sable's request to waive compliance with the requirements of 49 CFR § 195.452(h)(4)(iii)(H) for two segments of the Santa Ynez Pipeline System (SYPS). The proposed non-emergency SP requests to waive the same regulatory requirement.

## II. PROJECT DESCRIPTION

### 1) Description of Location

The SYPS is a Part 195-regulated interstate pipeline facility that originates at offshore oil production platforms located on the Outer Continental Shelf (OCS). The SYPS transports the oil produced at the platforms through Federal and State waters and an onshore processing facility in Santa Barbara County, California, known as the Las Flores Canyon Processing Facility (LFC), before transporting the oil through two downstream pipeline segments, CA-324 and CA-325 (formerly known as "Line 901" and "Line 903", respectively), that traverse portions of Santa Barbara, San Luis Obispo, and Kern Counties.[2] A map depicting the location of segments CA-324 and CA-325 within the SYPS is provided below:

[1] USDOT Order 5610.1D: DOT's Procedures for Including Environmental Impacts, Sec. 23(b).

[2] Crude oil has been transported from offshore oil production platforms through the SYPS up to LFC since May 2025. Petroleum flowed through the entire SYPS, including segments CA-324 and CA-325, until May 19, 2015, when a rupture occurred along segment CA-324 approximately 100 yards north of Highway 101 and 0.25 miles west of Refugio State Beach in Santa Barbara County, California. The SYPS has remained in an active state, but petroleum did not flow through it, from the time that 2015 rupture occurred until May 2025.




Segment CA-324 is approximately 10.86 miles in length. It generally runs parallels to the north of U.S. Highway 101 along the southern coast between the LFC consolidated oil and gas processing facility and Gaviota Pump Station. The pipeline segment ends at Las Flores Canyon. This pipeline segment is located north of U.S. Highway 101 and generally follows powerline and/or natural gas pipeline rights-of-way across coastal terraces and incised canyons. Segment CA-325 is split into two portions – CA-325A and 325B. The CA-325A segment is approximately 38.72 miles in length. This pipeline segment extends west from Gaviota Pump Station to a motor operated valve (MOV) located east of Gaviota Creek and U.S. Highway 101. It then enters Gaviota State Park approximately 0.5 miles east of U.S. Highway 101 and extends westerly across the gently sloping coastal terrace and Cañada del Barro before dropping into the Cañada de la Gaviota drainage area. From there, the segment crosses U.S. Highway 101 and Gaviota Creek (Cañada de la Gaviota) immediately south of the U.S. Highway 101 "Caltrans" rest stop area. The pipeline segment then extends west and north from the Gaviota Creek MOV.

CA-325A continues west up a broad spur ridge to the ridge crest and the westerly boundary of Gaviota State Park. The pipeline segment traverses narrow ridge crests, crosses out of the Park and onto Hollister Ranch for approx. 0.5 miles, before crossing back into the Park and descending toward the west fork of Gaviota Creek (Betty Creek). The right-of-way passes west of the Vista del Mar School and Las Cruces Adobe and then crosses beneath Highway 1 west of its intersection with U.S. Highway 101. The pipeline segment continues northward along the west side of U.S. Highway 101 through the Santa Ynez Mountains. It crosses long expanses of grasslands across the Las Cruces Ranch and steep walled canyons that form part of the Nojoqui Creek watershed. North of Moonshine Creek, the route crosses ridges with rock outcroppings. The pipeline crosses beneath the Santa Ynez River west and south of Buellton and continues north across the Purisima and Solomon Hills. It crosses the northern edge of the San Rafael Mountains and the eastern edge of the Santa Maria Valley. The pipeline segment crosses beneath the Sisquoc River and continues north across the River Valley. It traverses moderately to severely sloping foothills at Kelly Canyon and extends west to the Sisquoc Pump Station at the southern end of Santa Maria Canyon.

The CA-325B 30-inch pipeline segment (formerly referred to as Line 903 – Sisquoc to Pentland) is approximately 74.84 miles in length. The pipeline segment follows Santa Maria Canyon after leaving the Sisquoc Pump Station. It then extends northeast towards Tepusquet Road. The route crosses relatively gentle terrain until it reaches the crest of the Sierra Madre Mountains, where it traverses steep slopes approaching Suey Canyon and Buckhorn Canyon. The pipeline segment follows the northern edge of the Sierra Madre Mountains south of State Highway 166 through the Los Padres National Forest. The route crosses rugged terrain across the crests of the Sierra Madre Mountains, descends the mountains, crosses the Sierra Madre Ridge Road, and enters the Cuyama River Valley near Gypsum Canyon. At the Cuyama River crossing, CA-325B exits Santa Barbara County and enters San Luis Obispo County. The pipeline segment continues for approximately 44.5 miles through ranch land, terminating at the Pentland Station in Kern County.

High Consequence Areas (HCAs)[3] along segments CA-324 and 325 are provided below:

| Pipeline Segment Designation | Total Mileage | High Consequence Area (HCA) Type |
|---|---|---|
| CA-324 | 10.86 | Impact to ecologically sensitive regions (coastline) |
| CA-325A | 38.72 | Impact to the city of Buellton (population center, drinking water), and ecologically sensitive regions |
| CA-325B | 74.84 | Impact to ecologically sensitive regions |

Lines CA-324 and 325 traverse multiple counties as well as State and federal land. Approximate mileage is included below:

| | Jurisdiction | CA-324 (miles) | CA-325A (miles) | CA-325B (miles) | Total (miles) |
|---|---|---|---|---|---|
| **County** | Santa Barbara County | 10.9 | 38.7 | 23.8 | 73.4 |
| | San Luis Obispo County | 0 | 0 | 37.2 | 37.2 |
| | Kern County | 0 | 0 | 13.8 | 13.8 |
| | Total | 10.9 | 38.7 | 74.8 | 124.4 |
| **Sub-Jurisdiction *(Note 1)*** | California State Parks and Recreation (Gaviota State Park) | 0 | 4.1 | 0 | 4.1 |
| | U.S. Forest Service | 0 | 0 | 6.3 | 6.3 |
| | U.S. Fish and Wildlife (Bitter Creek Wildlife Refuge) | 0 | 0 | 4.5 | 4.5 |
| | California Dept. of Fish and Wildlife (Carrizo Plain Ecological Reserve) | 0 | 0 | 4.5 | 4.5 |

[3] See 49 CFR § 195.450 (defining high consequence area for purposes of the integrity management requirements in 49 CFR § 195.452).

| | | | | |
|---|---|---|---|---|
| Bureau of Land Management | 0 | 0 | 1.0 | 1.0 |
| City of Buellton | 0 | 1.1 | 0 | 1.1 |
| Total | 0 | 5.2 | 16.3 | 21.5 |

*Note 1: Mileage included in County jurisdiction.*

**2) Description of Action**

PHMSA developed this EA to assist in analyzing the environmental impacts associated with the ESP issued to Sable on December 23, 2025 and proposed non-emergency SP currently under PHMSA consideration. Sable sought the ESP to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the U.S. District Court for the Central District of California ("Consent Decree"). The Consent Decree, entered in response to a failure that occurred near Refugio State Beach in May 2015, imposed certain conditions on the resumption of petroleum transportation through CA-324 and CA-325. Specifically, the Consent Decree required the prior operator to obtain certain waivers to address "the limited effectiveness of cathodic protection" for CA-324 and CA-325.[4]

At the time of entry of the Consent Decree, CA-324 and CA-325 were considered intrastate pipeline facilities subject to regulation by the California Office of the State Fire Marshall (OSFM) pursuant to the terms of its State certification with PHMSA under 49 U.S.C. § 60105(a). Section 60118(d) of the Pipeline Safety Act (PSA) authorizes certified state authorities to issue waivers of the safety standards that would otherwise apply to an intrastate pipeline facility, subject to review by PHMSA under a 60-day prior notice and objection process. For several decades prior to the entry of the Consent Decree, however, CA-324 and CA-325 were considered interstate

[4] Consent Decree at Appx. B, Article I, Section 1.A and B. The Consent Decree did not require the prior operator to obtain these waivers from OSFM if it replaced CA-324 and CA-325. Id. at Appx. B, Article I, Section 2. Appendix D of the Consent Decree also provides for the submission and approval of a "Restart Plan" prior to resuming petroleum transportation through the segments.

pipeline facilities subject to regulation by PHMSA under the PSA.[5] Indeed, PHMSA issued a Corrective Action Order (CAO) to the operator of CA-324 and CA-325 at the time of the failure, Plains All American Pipeline, LP (Plains), pursuant to its sole and exclusive regulatory authority, and the terms and conditions of that CAO provided the basis for many of the provisions subsequently included in the Consent Decree.[6]

The interstate status of CA-324 and CA-325 changed in 2016, when Plains canceled the tariffs filed with the Federal Energy Regulatory Commission (FERC) for providing interstate oil transportation service on both pipeline segments under the Interstate Commerce Act. Pursuant to a longstanding and well-established Statement of Agency Policy and Interpretation codified in Appendix A to part 195, PHMSA "generally rel[ies] on the FERC filings; that is, if there is a tariff or concurrence filed with FERC governing the transportation of hazardous liquids over a pipeline facility or if there has been an exemption from the obligation to file tariffs obtained from FERC," in determining whether to "consider the facility to be an interstate pipeline facility within the meaning of the [PSA]." *Id.* Accordingly, Plains decision to cancel the FERC tariffs had the effect of transforming CA-324 and CA-325 into intrastate pipeline facilities, a status that both pipeline segments retained when the District Court approved the Consent Decree.

In 2024, Sable acquired the SYPS from another operator and sought to obtain the waivers required under the Consent Decree for CA-324 and CA-325 from OFSM. On December 17, 2024, OFSM issued those waivers, and on February 11, 2025, PHMSA notified OSFM that it had no objection to the same under the 60-day notification provision in the PSA.

Several months later, on November 26, 2025, Sable notified PHMSA that it had recently determined that CA-324 and CA-325 were once again part of an interstate pipeline facility under the PSA. Citing the definitions in the PSA and policy statement in Appendix A to part 195, Sable

---

[5] Except for purposes of enforcing the requirements in State one-call damage prevention programs, State authorities are prohibited from regulating the safety of interstate pipeline facilities under the PSA. 49 U.S.C. § 60104(c). Interstate pipeline facilities are subject to PHMSA's sole and exclusive regulatory authority for safety purposes.

[6] Plains Pipeline, LP, CPF No. 5-2015-5011H, Corrective Action Order (May 21, 2015), subsequently amended on June 3, 2015, November 12, 2015, and June 16, 2016.

explained that its acquisition and intention to operate the entire SYPS as a single pipeline system transporting oil produced on the OCS into and through the State of California supported the conclusion that the SYPS was an interstate pipeline facility. On December 17, 2025, PHMSA sent a response concurring with Sable's November 26, 2025 determination that the SYPS, including segments CA-324 and CA-325, is an interstate pipeline facility under the PSA. PHMSA further stated that it had sole and exclusive authority to regulate the safety of that interstate pipeline facility, including for purposes of issuing and administering any waivers that might be required for CA-324 and CA-325.

After receiving PHMSA's response, on December 19, 2025, Sable applied for an ESP for segments CA-324 and CA-325. In its application, Sable asked PHMSA to adopt "substantially the same measures" in the ESP as those "that have already been reviewed and approved by [OSFM] through issuance of [the] State Waivers." Specifically, Sable's application sought (1) regulatory relief from 49 C.F.R. § 195.452(h)(4)(iii)(H) and (2) "a special permit from PHMSA for [the] limited effectiveness of cathodic protection" as provided under the Consent Decree.

On December 23, 2025, PHMSA granted the application and issued the ESP to Sable. The ESP included substantially the same conditions as those contained in the two State Waivers previously issued by OFSM, which are summarized further below. Sable's application for the non-emergency SP includes substantially the same conditions as the ESP and the State Waivers.

## III. PURPOSE AND NEED

Issuance of a special permit is necessary to resume transportation of petroleum through CA-324 and CA-325 under the terms of the Consent Decree. The Consent Decree required the prior operator, Plains, to obtain waivers from OFSM as an alternative to completely replacing the line pipe in both segments. Sable subsequently acquired CA-324 and CA-325 from another operator and obtained the waivers required from OFSM under the Consent Decree. Having recently decided to begin using the SYPS once again as an interstate pipeline facility, Sable appropriately sought to obtain the waivers required under the Consent Decree from PHMSA.

Moreover, Sable asked PHMSA to grant those waivers on an emergency basis to address an actual or impending emergency involving pipeline transportation pursuant to Executive Order

14156.[7] Issued in accordance with the authority provided in the National Emergencies Act (50 U.S.C. § 1601 et seq.), the President declared a national energy emergency in Executive Order 14156 based on his finding that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[8] The Executive Order directs agencies, such as PHMSA, to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate," among other activities, the "production, transportation, refining, and generation of domestic energy resources."[9] The Executive Order further directs agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States . . . ."[10]

PHMSA determined that granting the ESP was consistent with the requirements in the PSA given the national energy emergency declared by the President in Executive Order 14156. Specifically, the ESP would enable and facilitate the ***special permit segments*** to meet regional energy demands, reduce refinery feedstock prices, mitigate the risks of fuel shortages on the West Coast, and reduce United States dependency on imported oil and the associated energy security risks of such imports. As described in Executive Order 14156, the national energy emergency requires the expeditious deployment of domestic "unrealized energy resources" and the United States' "current inadequate development of domestic energy resources leaves us vulnerable to hostile foreign actors and poses an imminent and growing threat to the United States' prosperity and national security."[11] As an executive agency, PHMSA must "exercise any

[7] 49 U.S.C. § 60118(c)(2); 49 CFR 190.341(g).

[8] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 1.

[9] Id. at Sec. 2(a). The order's definition of "energy" or "energy resources" includes "crude oil," and its definition of "transportation" includes "the physical movement of energy, including through, but not limited to, pipelines." Sec. 1(a); 1(c).

[10] Id. at Sec. 3(b).

[11] Id. at Sec. 1.

lawful emergency authorities" and "all other lawful authorities" to facilitate the transportation of "domestic energy resources."[12]

In addition, the current crude oil supply conditions in California create the additional risk of a statewide motor fuel supply emergency. The reduction in regional sources of crude caused by declining onshore production, and the current inability to move oil out of the Santa Ynez Unit due to the lack of adequate pipeline transportation into California, has increased the state's reliance on imported crude oil from countries such as Iraq, Ecuador, and Brazil. Oil from these locations must be shipped significant distances to California by ocean-going tankers at greater expense and a potentially greater environmental impact than oil produced in-state. California's reliance on foreign crude creates significant risk of disruptions given current geopolitical conditions. Issuance of ESP will facilitate the prompt and safe restart of CA-324 and CA-325, which would immediately and significantly improve energy security by offsetting the need for imported crude. For these reasons, the President's declaration of a national energy emergency in Executive Order 14156 supports the issuance of the ESP and the subsequent non-emergency SP.

PHMSA's decision to grant the ESP also implements the directives in Executive Order 14154 (January 20, 2025) ("Unleashing American Energy"), in which the President identified that "high energy costs devastate American consumers by driving up the cost of transportation, heating, utilities, farming and manufacturing, while weakening our national security."[13] Executive Order 14154 establishes a policy to "encourage energy exploration and production on Federal lands and waters, including on the Outer Continental Shelf, in order to meet the needs of our citizens and solidify the United States as a global energy leader long into the future," as well as to "protect the United States'[] economic and national security and military preparedness by ensuring that an abundant supply of reliable energy is readily accessible in every State and territory of the Nation."[14] Executive Order 14154 further directs multiple agencies, including the Department of Transportation, to "undertake all available efforts to eliminate all delays within

---

[12] Id. at Sec. 2(a).

[13] Exec. Order 14154: Unleashing American Energy (Jan. 20, 2025), Sec. 1.

[14] Id. at Sec. 2.

their respective permitting processes," and to use "all possible authorities, including emergency authorities, to expedite the adjudication of Federal permit" for projects deemed "essential for the Nation's economy or national security."[15] As with Executive Order 14156, grant of the ESP implements Executive Order 14154 by facilitating the transportation of petroleum through CA-324 and CA-325 in an expedient fashion and allowing for the realization of the above-described energy supply and security benefits.

Finally, PHMSA's decision to grant the ESP avoided a potential gap in coverage under the waivers issued by OSFM. Because CA-324 and 325 were reconfigured as an interstate pipeline, the ESP was necessary to replace those waivers, which no longer have any legal effect due to the operation of the preemption provision in 49 U.S.C. § 60104(c). Sable's recent invocation of the *Notice of Limited Enforcement Discretion and Statement of Policy for Issuing Special Permits in Response to the National Energy Emergency* (*National Energy Emergency Enforcement Discretion*) that PHMSA issued on January 12, 2026, in applying for a non-emergency special permit provides further assurance that any gap in coverage will be avoided.[16] Consistent with the *National Energy Emergency Enforcement Discretion*, Sable has committed to following the conditions in the ESP after it expires on February 21, 2026 pending a final determination from PHMSA on its application for a non-emergency SP.

## IV. BACKGROUND AND REGULATORY REQUIREMENTS

### 1) Existing Part 195 Requirement

Section 195.452(h)(4)(iii)(H) provides that certain corrosion of or along a longitudinal seam weld must be mitigated within 180 days of discovery. On September 12, 2025, PHMSA published a revised interpretation clarifying the applicability of the requirements in § 195.452(h)(4)(iii)(H). Specifically, PHMSA clarified that corrosion that coincidentally occurs

---

[15] Id. at Sec. 5.

[16] A copy of the *National Energy Emergency Enforcement Discretion* is available on the PHMSA website at https://www.phmsa.dot.gov/news/notice-limited-enforcement-discretion-and-statement-policy-issuing-special-permits-response.

along a longitudinal seam but which is not otherwise preferential to the seam does not need to be mitigated per section 195.452(h)(4)(iii)(H).[17]

**2) <u>Consent Decree Requirements</u>**

Appendix B of the Consent Decree provides that, as a condition of resuming petroleum transportation through segments CA-324 and CA-325, the operator must either (1) obtain a waiver for both segments from OSFM "for the limited effectiveness of cathodic protection," or (2) completely replace the line pipe in both segments. As noted above, Sable obtained the waivers required from OSFM, but those waivers are no longer effective due to the change in the jurisdictional status of CA-324 and CA-325, which are now interstate pipeline facilities subject to the sole and exclusive regulatory authority of PHMSA under the PSA.

Consistent with the terms of the Consent Decree and the requirements in the PSA, PHMSA issued the ESP for segments CA-324 and CA-325 to replace the OSFM waivers. The ESP included conditions that are substantially the same as those included in the prior waivers.

**3) <u>Existing Environmental Review</u>**

*<u>Initial EIS</u>:* On July 18, 1984, the US Department of the Interior (DOI) and the California State Lands Commission (CSLC) prepared a draft joint Environmental Impact Report/Environmental Impact Statement ("Draft EIS"), pursuant to the requirements in NEPA and the California Environmental Quality Act (CEQA), analyzing the construction, operation, and ongoing repair and maintenance of segments CA-324 and CA-325.[18]

Following public comment, in January 1985, the DOI and CSLC prepared a Final Environmental Impact Report/Environmental Impact Statement ("Final EIS"). Both the Draft EIS

---

[17] PHMSA, Hazardous Liquid Integrity Management Frequently Asked Question 7.16 (September 12, 2025).

[18] The Draft EIS analyzed the "Celeron / All American Pipeline Proposal," which consisted of the construction, operation, and ongoing repair and maintenance of an approximately 1,200-mile pipeline to transport Outer Continental Shelf and other locally produced crude oils from the Santa Barbara and Santa Maria Basins to McCamey, Texas. Segments CA-324 and CA-325 were analyzed in the Draft EIS as part of the "Celeron segment" of the proposal. The operational life of these segments were assumed to continue until "the availability of crude oil" for use in the segments was exhausted. (*See* Draft EIS, p. 2-35.)

and Final EIS also analyzed the environmental effects of identified routing alternatives to determine the significance of these potential impacts, the avoidability of these impacts, and potential mitigative measures. Collectively, this EA refers to the Draft EIS and Final EIS as the "Initial EIS."[19] The Initial EIS serves to characterize impacts associated with the construction of CA-324 and CA-325, as well as routine maintenance and repair activities as part of ongoing operation.

*Replacement EIR/EA.* In 2022, Santa Barbara County and the DOI's Bureau of Land Management prepared a joint Revised Notice of Preparation of a Draft Environmental Impact Report/Environmental Impact Assessment ("Replacement EIR/EA") for the proposed Plains Replacement Pipeline Project (Project). The notice assessed the significance of potential environmental impacts associated with the replacement of CA-324 and CA-325 to determine which issue areas to cover in an environmental impact statement.[20] The Replacement EIR/EA determined potentially significant impacts could result to biological resources, cultural resources, and hydrological resources. In October 2023, the pipeline operator withdrew its application for the proposed project, stating that potential environmental impacts associated with the proposed project would be unnecessary and avoidable given that the existing pipeline could be responsibly restarted.[21] The Replacement EIR/EA now characterizes impacts associated with the No Action Alternative, discussed further below.

*IM Rule EA*. In 2000, PHMSA conducted an environmental assessment in conjunction with the Integrity Management Rule (IM Rule) at 49 CFR 195.452, which governs the frequency of integrity assessments and prescribes a schedule of anomaly repairs for covered pipelines not

---

[19] The Draft EIS and Final EIS can be accessed at http://cosantabarbara.app.box.com/s/gc3vhh8ns8aiwketnq35vwbehnhre672 and https://cosantabarbara.app.box.com/s/lkl9oo9xdsaangevdp6pasfo0cmimvlt, respectively, and are incorporated into this EA.

[20] The Revised Notice of Preparation of a Draft Environmental Impact Report/Environmental Impact Assessment can be accessed at https://cosantabarbara.app.box.com/s/xs3savjcx9rkdsrmobc2eedzec8cn78k and is incorporated into this EA.

[21] The Withdrawal Letter can be accessed here: https://cosantabarbara.app.box.com/s/3gvdwbzta1l19ss9r7cpkuvinte1byuv/file/1343281220509

otherwise subject to a special permit (see Appendix A). PHMSA's EA associated with that rulemaking determined that hydrostatic testing could be associated with minor environmental impacts, including:

- slight disturbance of the right-of-way to uncover short segments of the line;
- potential for leaks of water and oil residue mixture; and
- disposition of the spent water test medium that mixes with residue oil.

PHMSA's EA also determined that internal inspections may have minor environmental impacts, including:

- possible need to install pig launchers and receivers and valves or other appurtenances to accommodate inspection tools; and
- possibility of additional localized disturbances along the right-of-way for excavations to examine and repair identified anomalies.[22]

PHMSA determined that these impacts would be limited to small areas on the applicable pipeline segment's right-of-way and would not involve additional vegetation or environmental disturbances beyond the equipment site. PHMSA concluded that these adverse impacts would not be significant, and determined that:

> the combined impacts of the initial baseline assessment (pressure testing or internal inspection), the subsequent periodic assessments, and additional preventive and mitigative measures that may be implemented to protect high consequence areas will result in positive environmental impacts. The number of incidents and the environmental damage from failures in and near high consequence areas are likely to be reduced. However, from a national perspective, the impact is not expected to be significant for the pipeline operators covered by the final rule.[23]

---

[22] Appx. A at 23.

[23] 65 Fed. Reg. at 75405.

The IM rule EA also determined that acceleration of integrity assessments of affected segments would "only shift[] the improved integrity assurance forward for a few years for most high consequence areas."[24]

The IM Rule EA serves to establish the environmental insignificance of integrity assessments and anomaly repair activities that are required under the ESP, including in-line inspections and excavations and repair of pipe anomalies. The focus of the IM EA is generalized impacts of the mitigations resulting from the rulemaking. It does not assess location-specific impacts related to this pipeline itself. However, PHMSA reviewed the IM EA and determined that the environmental resource areas analyses are applicable to site specific actions, such as this emergency special permit.

## V. PHMSA NEPA REVIEW

PHMSA's EA for the ESP and non-emergency SP is limited to an evaluation of the significance of impacts associated with the Action Alternative, compared to those that would result under the No Action Alternative. These alternatives are discussed in more detail below.

### 1) Alternatives

*Alternative 1: No Action Alternative*. This Alternative involves the failure to issue a regulatory waiver and the construction of approximately 123 miles of new pipe at or near segments CA-324 and CA-325's existing right-of-way, pursuant to Appendix B, Article I, Section 2 of the Consent Decree. This Alternative would involve substantially greater earth disturbances compared to the Action Alternative, based on the need to excavate the entire pipeline route, install

---

[24] *Id*. Apart from these previous NEPA reviews, the US Department of Interior Bureau of Safety and Environmental Enforcement ("BSEE") also recently determined that BSEE's decision to approve an extension of time to resume operations on the 16 federal offshore leases comprising Sable's Santa Ynez Unit will not significantly affect the quality of the human environment under NEPA. See US Dept. of Interior Bureau of Ocean Energy Management, Bureau of Safety and Environmental Enforcement, "Finding of No Significant Impact, ExxonMobil/Sable Offshore Corporation Lease Extension of the Santa Ynez Unit – Environmental Assessment," May 2025 (available at https://www.boem.gov/sites/default/files/documents/environment/environmental-assessment/2025_0528_SableEA_FONSI_508c.pdf). Santa Ynez Unit production activities send oil through the SYPS for eventual downstream transportation.

line pipe, and backfill. Upon completion of replacement, the new pipeline segments would transport oil and continue to comply with the existing requirements of Part 195. This includes performance of integrity assessments, such as ILIs, on an operator-determined schedule not to exceed once every five years, and the potential repair of anomalies identified from assessments according to the requirements in 49 CFR 195.452, generally through excavation and localized replacement of affected pipe.

*Alternative 2: Action Alternative.* The Action Alternative is the grant of the waiver sought in the ESP and non-emergency SP. This would address the energy emergency conditions identified above, including regional fuel shortages and resultant economic and national security issues, through facilitating the transportation of petroleum through CA-324 and CA-325 within the framework of the Consent Decree and at an equivalent or greater level of safety as provided under the Consent Decree and Part 195. No large-scale earth disturbances involved with pipeline replacement would be required under the No Action Alternative.[25] Under the Proposed Alternative, additional maintenance, inspection, and localized repair activities ("Special Permit Conditions") would be required as further described below.

PHMSA personnel separately reviewed information regarding the location of segments CA-324 and CA-325 and the conditions in the ESP and non-emergency SP. PHMSA personnel previously determined that the ESP would achieve at least an equivalent level of safety as adhering to the Part 195 regulations in full.

In addition, this EA does not evaluate alternatives beyond PHMSA's mandate. This EA considers only reasonable alternatives, including those which are consistent with the legal framework currently applicable to the special permit segments (i.e., the requirements specified in the Consent Decree and Part 195), and which meet the above-described purpose and need for the

---

[25] The Action Alternative does not include actions taken by the operator that are not required under the ESP, or which are discrete tasks that had already been completed prior to the issuance of the ESP. These actions include the installation of numerous safety valves and real-time transient model (RTTM) leak detection system to reduce spill volumes, performance of integrity assessments and repairs of identified anomalies pursuant to the Consent Decree's specifications, and spike hydrostatic testing pursuant to the State Waivers, each of which lower the risk of a pipeline failure. Nor does the Action Alternative include initial construction of CA-324 and 325.

ESP.[26] This EA does not consider, nor does NEPA require, consideration of every theoretical alternative. This EA only analyzes reasonable, foreseeable impacts of specifically the Action Alternative (i.e., granting the special permit) and No Action Alternative. Alternatives that require speculation outside of the current legal framework (as may occur in the possibility of prospective termination or modification of the Consent Decree or amendment to Part 195), or which do not meet the purpose and need for the proposed action (such as permanent abandonment of the special permit segments without replacement) are not considered in this EA.

## VI. OVERVIEW OF SPECIAL PERMIT CONDITIONS

The ESP and non-emergency SP conditions require maintenance, inspection, and repair activities that are more stringent than required under Part 195. In particular, the conditions require fracture toughness testing, spike hydrotesting, more frequent integrity assessments and direct examinations, and more stringent anomaly repair criteria. The conditions do not provide for or allow any expansion in capacity or new or expanded physical infrastructure along segments CA-324 or CA-325.

A summary of conditions imposing the above requirements is provided below.

- *Condition 14(c):* Requires two Ultrasonic Wall Measurement (UTWM) ILI assessments per year for the first two years following restart, then, at minimum, annual ILI assessments thereafter, to assess metal loss, including due to corrosion. Part 195 only requires such integrity assessments on a once-per-five-year schedule, and the Special Permit Segments were previously only assessed on a once-per-three-year schedule. The higher assessment frequency established in the ESP will facilitate the timely detection and repair of such anomalies before they pose integrity risks.
- *Condition 14(d):* Requires, at minimum, annual Ultrasonic Shear Wave Crack Detection (USCD) ILI assessments. Part 195 only requires such assessments on a once-per-five-year schedule. The higher assessment frequency established in the ESP will facilitate the timely detection and repair of such anomalies before they pose integrity risks.

---

[26] USDOT Order 5610.1D.

- *Condition 14(e):* Requires running high-resolution deformation ILI tool along with each UTWM ILI assessments.
- *Condition 14(i)-(k):* Requires ILI tool vendor to determine tool tolerance per API 1163 2nd Ed. and include that tolerance in determining the size of each indication reported to Sable. Sable must account for this tool tolerance and anomaly growth rates in scheduling repairs and future reassessment intervals and must demonstrate ILI tool accuracy for each run by using calibration, excavations, and unity plots demonstrating tool accuracy meets the vendor's specifications (typical for depth within 10% accuracy for 80% of the time). Sable must perform at least four validation digs in accordance with Level 2 of API 1163.
- *Conditions 16-17:* Requires immediate repair of crack or crack-like anomalies equal to or greater than 50% of wall thickness (vs 80% threshold in § 195.452(h)(4)(i)). Requires 180-day repair of all internal or external metal loss anomalies with an ILI-reported depth of 40% wall loss or more, including tool tolerance (vs 50% wall loss threshold in § 195.452(h)(4)(iii)(F)).
- *Condition 18:* Requires Sable to develop a corrosion growth rate procedure to annually calculate corrosion growth rates between successive ILI assessments, including the most accurate signal matching between ILI data sets.
- *Condition 21(b)-(f):* Requires Sable to field-analyze a sample of assessment-identified anomalies to compare, and to apply 6t by 6t interaction criteria, and to use an approved third-party to review all ILI reports, verification dig results, unity plots, field findings, and any other finding that could affect the integrity of the Special Permit Segments within 6 months of each ILI assessment.

Some of the activities specified in the conditions already have been completed prior to the grant of the ESP, namely fracture toughness testing and spike hydrotesting. Moreover, multiple integrity assessments and substantial anomaly repairs have also been performed by Sable along segments CA-324 and CA-325 prior to the grant of the ESP. These discrete, previously-completed activities are not considered for purposes of characterizing impacts associated with the Action Alternative.

## VII. AFFECTED RESOURCES AND ENVIRONMENTAL CONSEQUENCES

1) **Land Use, Agriculture, and Recreation**

The right-of-way for segments CA-324 and CA-325 runs parallel to US Highway 101 along Santa Barbara County's southern coast, until CA-325 turns north toward the Sisquoc Pump Station and then continues east toward the Pentland Station terminal in Kern County, California. The route primarily crosses grazing land between side canyons containing riparian vegetation, as well as oak woodland, rangeland, and irrigated cropland. There are also mountainous portions along the segments' route, and coastal and eastern foothill areas. Portions of these areas have experienced forest and range fires, particularly during dry years and under strong easterly wind conditions. Recreational facilities surrounding or in proximity to segments CA-324 and CA-325 include Refugio and Gaviota State Parks, which include beaches and campgrounds. Beyond Gaviota Pass, the segments enter the Los Padres National Forest, in which various recreational activities occur, ranging from hunting, camping, and off-roading.

The No Action Alternative would require construction of new pipeline and would potentially be subject to Santa Barbara County's Inland and Coastal Zoning Ordinance standards as well as Santa Barbara County's Comprehensive Plan, including its Coastal Land Use Plan, as well as similar standards within San Luis Obispo and Kern Counties. The No Action Alternative could result in significant land use impacts, which would be determined upon review by local agencies pursuant to these authorities.

Under the Action Alternative, no new construction will occur beyond localized excavations that may be required based on the results of the integrity assessments. As no land use conversion is proposed, no significant impacts to land use, agriculture, or recreational resources will occur. Although the Action Alternative would involve the performance of integrity assessments on a more frequent basis than is otherwise required under Part 195, which may result in the need to perform localized excavations to repair anomalies discovered from such assessments (according to the more stringent repair criteria in the permit conditions), these activities were already addressed and determined to be insignificant in the IM rule EA. There is no evidence to suggest that more frequent integrity assessments would result in significant environmental impacts. The degree of excavation under the Action Alternative would be substantially less as

compared to the No Action Alternative, which would entail large-scale excavation for the entire length of the special permit segments.

Moreover, the Action Alternative will not alter the segments' existing oil transmission capacity, route, or facilities so as to introduce new impacts related to land use and recreation, such as agricultural land conversions, providing uncontrolled access to previously inaccessible areas, or affecting forest fire or wildfire risks. Nor would the Action Alternative produce any new impacts related to conflicts with land use policies limiting pipeline crossings at environmentally sensitive habitat areas or recreational areas beyond what was already determined in the Initial EIS. As such, other land use impacts (other than impacts related to potential oil spill impacts, as described below) associated with the Action Alternative would not be significant.[27]

The Action Alternative would not present significant impacts to agricultural or recreational resources due to potential oil spills, as PHMSA will not issue the special permit if it does not achieve an equivalent level of safety to the regulations. Specifically, the Action Alternative's heightened inspection, monitoring, testing, maintenance, and repair requirements collectively will minimize the risk of an oil spill and minimize the magnitude of any such spill should it occur relative to the initial construction, operation, and ongoing repair and maintenance of segments CA-324 and 325, to a degree equivalent or superior to Part 195 requirements. Compliance with the permit conditions provide that segments CA-324 and CA-325 will be operated in accordance with inspection and repair standards that are more stringent than required under Part 195.

**2) <u>Cultural and Historic Resources</u>**

The Initial EIS identified the presence of cultural resource sites within segments CA-324 and CA-325's right of way, including lithic scatters, bedrock millingstones, rock shelters, campsites, habitations, quarries, pit houses, and burial sites, among others, and as part of construction of these segments, imposed Mitigation Measure 30, which required the pipeline

---

[27] Sable has also installed 27 new safety valves along CA-324 and 325 that serve to limit the spill volume in the event of a rupture, reflecting best available technology to minimize spill volume pursuant to California AB 864.

operator to comply with a cultural resources inventory and treatment plan to be finalized by federal and state land management agencies, including the State Historic Preservation Office, before construction commenced. (Draft EIS, p. 4-159, Final EIS, p. 3-7.) The Initial EIS required that the plan would include an intensive cultural resource survey, site-specific mitigation measures, data recovery programs, archaeological monitoring, and cooperation with appropriate Native American groups. (Draft EIS, pp. 4-159 through 4-160; Final EIS, pp. 4-13 through 4-14.) Mitigation Measure 30 has already been implemented as part of the initial construction of the segments.

Under the Action Alternative, no new construction will occur beyond localized excavations that may be required based on integrity assessments. The Action Alternative would involve the performance of integrity assessments on a more frequent basis, which may result in the need to perform localized excavations to repair anomalies discovered from such assessments (under the more stringent repair criteria in the permit conditions). These excavations will take place within disturbed soil within the existing rights-of-way for segments CA-324 and CA-325. Because of these prior mitigations it is unlikely that eligible cultural resources exist.

Continued operation of the already-constructed pipeline is a non-invasive activity which has no potential to impact historic properties under NHPA. Although future maintenance and anomaly repairs may involve ground disturbance in discrete areas, such work would occur within the existing, previously disturbed right-of-way, where additional NRHP-eligible resources are not expected. Because survey and mitigation occurred prior to the construction of the pipeline, it is believed that no additional resources remain. However, full review of the initial EIS and subsequent EIR was not possible due to the emergency nature of this special permit request. Emergency consultation with CA State Historic Preservation Officer (SHPO), Santa Ynez Band of Chumash Indians Tribal Historic Preservation Officer (THPO), and the Advisory Council on Historic Preservation (ACHP) is ongoing due to the possibility that some ground disturbance could be required to repair anomalies which could otherwise pose a hazard to health and human safety, within the disturbed pipeline ROW. PHMSA has requested comment on our finding that the current action will have no adverse effect on historic properties, with the conditions that the operator follow the mitigation requirements of the initial EIS, an Unanticipated Discovery

Protocol is implemented, and any additional mitigations determined following consultation with SHPO/THPOs should potentially eligible historic properties be discovered.

On the other hand, the No Action Alternative could potentially result in significant impacts to cultural resources, as determined in the 2020 EIA (EIA, pp. 13-14), due to the substantially greater degree of subsurface disturbance associated with the wholesale replacement of the existing pipe along CA-324 and 325.

**3) <u>Biological Resources</u>**

As noted above, Segments CA-324 and CA-325's rights-of-way are primarily alongside grazing land between side canyons containing riparian vegetation, as well as oak woodland, rangeland, and irrigated cropland. There are also mountainous portions along the segments' route, as well as coastal and eastern foothill areas. The Initial EIS determined that no significant adverse impacts to aquatic biology would occur during construction due to the limited and temporary nature of construction activities. (Draft EIS, p. 4-42.) The Initial EIS nonetheless imposed Mitigation Measure 8 to further limit potential impacts, which restricted the amount of construction equipment fuel and lubrication that could be located near sensitive streams and where construction equipment fueling and lubrication activities could occur. (Draft EIS, p. 4-153; Final EIS, p. 4-6.) Mitigation Measure 8 continues to be implemented by Sable when conducting any applicable repair and maintenance activities along segments CA-324 and CA-325, independent of the grant of the ESP.

The Initial EIS further determined that construction of segments CA-324 and CA-325 would result in significant adverse impacts to sensitive plant and wildlife species (Draft EIS, pp. 4-45 through 4-46.), and imposed several mitigation measures to address these impacts. Based on a review of the U.S. Fish and Wildlife Service (USFWS) Information for Planning and Consultation (IPaC) tool, PHMSA identified 31 federally listed or proposed species and critical habitat with the potential to occur in the Action Area. Due to the ongoing performance of such repair and maintenance activities since segments CA-324 and CA-325 were constructed, their rights-of-way have remained relatively clear of mature vegetation. However, PHMSA

acknowledges some areas within and immediately adjacent to the project area may contain suitable habitat for these species.

Under the Action Alternative, no new construction will occur beyond localized excavations that may be required based on integrity assessments. Therefore, no significant impacts to terrestrial or aquatic biological resources are expected to occur. Although the Action Alternative would involve the performance of integrity assessments on a more frequent basis, which may result in the need to perform localized excavations to repair anomalies discovered from such assessments (under the more stringent repair criteria in the permit conditions), these activities were already addressed and determined to be insignificant in the IM rule EA, and are otherwise of a limited scope that no significant impacts to biological resources would be expected. Moreover, these excavations are not expected to affect biological resources because they are within the existing rights-of-way for segments CA-324 and CA-325, where such resources are not expected to be found.

The Action Alternative would not present significant impacts to biological resources due to potential oil spills. Specifically, the Action Alternative's heightened inspection, monitoring, testing, maintenance, and repair requirements collectively will minimize the risk of an oil spill and minimize the magnitude of any such spill should it occur relative to the initial construction, operation, and ongoing repair and maintenance of segments CA-324 and 325, to a degree equivalent or superior to Part 195 requirements that are applicable to other pipelines, including replacement of CA-324 and 325. Compliance with the permit conditions provide that segments CA-324 and CA-325 will be operated in accordance with inspection and repair standards that are more stringent than required under Part 195.

To address the uncertainty of future repair locations, PHMSA is consulting with the USFWS. PHMSA completed emergency consultation with USFWS. PHMSA is in the process of initiating non-emergency consultation with USFWS. Sable should consult the "Official Species List for General Project Design Guidelines," which provides recommendations to help avoid or minimize adverse effects to listed species and designated critical habitat. Through its non-emergency consultation with USFWS, PHMSA and USFWS may determine different mitigation measures are needed. Based on the limited scope of the potential ground disturbance

activities, duration, and confinement of work to the existing ROW, PHMSA anticipates that the proposed action may affect, but is not likely to adversely affect listed species or designated critical habitat under Section 7 of the Endangered Species Act. Future consultation is needed.

The No Action Alternative could potentially result in significant impacts to biological resources, as determined in the Replacement EIR/EIA (Replacement EIR/EIA, pp. 11-12), due to the substantially greater degree of subsurface disturbance associated with wholesale replacement of CA-324 and 325. This includes some 123 new trenched stream crossings (requiring a Section 404 Clean Water Act permit from the US Army Corps of Engineers) and potential vegetation trimming and clearing that would result in removal or trimming of habitats for threatened and endangered species listed in the California Natural Diversity Database (Replacement EIR/EIA, p. 12).

**1) Air Quality**

Segments CA-324 and CA-325 pass through the South Central Coast and San Joaquin Valley Air Basins of California and are located within Santa Barbara, Kern, and San Luis Obispo Counties. Currently, Santa Barbara County and the portion of San Luis Obispo County in which the segments pass through are in attainment with all National Ambient Air Quality Standards.[28] The San Joaquin Valley Air Basin in Kern County is currently designated as nonattainment for the following pollutants: 8-hour ozone (2008 and 2015 National Ambient Air Quality Standard (NAAQS)), PM2.5 (1997, 2006, 2001 NAAQS), and in maintenance for 8 hour ozone (1997 NAAQS) and PM10. .[29]

The Initial EIS determined that construction-related emissions (primarily resulting from heavy-duty vehicle traffic) would not result in any significant air quality impacts because such emissions would account for a small portion of the background ambient emissions in the

---

[28] EPA, "California Nonattainment/Maintenance Status for Each County by Year for all Criteria Pollutants", available at https://www3.epa.gov/airquality/greenbook/anayo_ca.html. These two Counties are listed as in nonattainment or "nonattainment-transitional" pursuant to the 2023 area designations for the California Ambient Air Quality Standards for ozone. See https://ww2.arb.ca.gov/sites/default/files/2024-10/State_2023_O3.pdf.

[29] EPA, "California Nonattainment/Maintenance Status for Each County by Year for all Criteria Pollutants", available at https://www3.epa.gov/airquality/greenbook/anayo_ca.html.

surrounding area and any such emissions would be temporary and transient. (Draft EIS, pp. 4-3, 4-5.) The Initial EIS also concluded that operation of segments CA-324 and CA-325 and associated pump stations would result in a minor incremental increase in ambient background concentrations of nitrogen oxides, carbon monoxide, hydrocarbons, and sulfur dioxide. As such, no significant impacts related to air quality were anticipated to occur. (Draft EIS, p. 4-5.) The air quality impacts described in the Initial EIS would be comparable to what would occur under the No Action Alternative given that there would be similar types of construction activities occurring.

The air quality impacts described in the Initial EIS would be comparable to what would occur under the No Action Alternative given that there would be similar types of construction activities occurring. Although the Action Alternative would involve the performance of integrity assessments on a more frequent basis, which may result in the need to perform localized excavations to repair anomalies discovered from such assessments, inspection-related activities were already addressed and determined to be insignificant in the IM rule EA and are not otherwise associated with significant emissions. There is no evidence to suggest that more frequent integrity assessments would result in significant environmental impacts. Moreover, the Action Alternative would not increase these segments' oil transmission capacity beyond that contemplated in the Initial EIS, and therefore will not directly or indirectly increase operational emissions at any pump stations or other final delivery points.

Future routine repair and maintenance work conducted under the Action Alternative would require substantially less excavation activities than initial construction of segments CA-324 and CA-325 (whose air quality impacts were already deemed insignificant in the Initial EIS) and as compared to the No Action Alternative (involving wholesale replacement of CA-324 and CA-325). Therefore, the Proposed Action is not associated with significant air quality impacts.

**4) <u>Hydrological Resources</u>**

Segments CA-324 and CA-325 cross three bodies of water, as noted in the table below.

| Name | USGS QUAD | Longitude (DD) | Latitude (DD) |
|---|---|---|---|
| Santa Ynez River | Solvang | -120.2124695 | 34.6143644 |
| Sisquoc River | Foxen Canyon | -120.2207732 | 34.8471759 |
| Cuyama River | Miranda Pine Mtn | -120.0690660 | 35.0982197 |

The Initial EIS determined that construction and operation of CA-324 and CA-325 would not result in any significant adverse impacts to surface water resources due to the limited and temporary nature of construction activities. (Draft EIS, p. 4-31 through 4-33, S-5, 4-163.) The Initial EIS further determined that the initial construction or operation of segments CA-324 and CA-325 would not result in any significant impacts to groundwater resources. (Draft EIS, pp. 4-34 - 35.). The hydrological resource impacts described in the Initial EIS would be comparable to what would occur under the No Action Alternative given that there would be similar types of construction activities occurring.

Under the Action Alternative, no new construction will occur beyond localized excavations that may be required based on integrity assessments. Therefore, no significant impacts to hydrological resources will occur. Although the Action Alternative would involve the performance of integrity assessments on a more frequent basis, which may result in the need to perform localized excavations to repair anomalies discovered from such assessments (under the more stringent repair criteria in the permit conditions), inspection-related activities were already addressed and determined to be insignificant in the IM rule EA. There is no evidence to suggest that more frequent integrity assessments would result in significant environmental impacts. Moreover, these excavations are not expected to affect hydrological resources because they are within the existing rights-of-way for segments CA-324 and CA-325. In fact, the extent of excavation associated with these repair activities is considerably less than the degree of excavation associated with initial construction of these segments (which was deemed to present insignificant impacts to hydrological resources) or complete replacement under the No Action Alternative.

The Action Alternative would also not present significant impacts to hydrological resources due to potential oil spills. Specifically, the Action Alternative's heightened inspection,

monitoring, testing, maintenance, and repair requirements collectively will minimize the risk of an oil spill and minimize the magnitude of any such spill should it occur relative to the initial construction, operation, and ongoing repair and maintenance of segments CA-324 and 325, to a degree equivalent or superior to part 195 requirements that are applicable to other pipelines, including replacement of CA-324 and 325. Compliance with the conditions of the ESP provide that segments CA-324 and CA-325 will be operated in accordance with inspection and repair standards that are more stringent than required under Part 195.

On the other hand, the No Action Alternative could potentially result in significant impacts to hydrological resources, as determined in the 2020 EIA (EIA, p. 14), due to the substantially greater degree of excavation and grading activities associated with wholesale replacement of the existing pipe along CA-324 and 325, and the resulting erosion and sedimentation along adjacent areas. The Action Alternative avoids these potentially significant impacts associated with replacement because it does not involve such large-scale construction activities.

**5) <u>Hazardous Waste and Substance Discharge</u>**

Segments CA-324 and CA-325 are not regulated under the Resource Conservation and Recovery Act (RCRA) or the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). Segments CA-324 and CA-325 are not expected to generate hazardous waste or non-excluded hazardous substances.[30] The US Environmental Protection Agency (EPA) lists no superfund sites in the vicinity of the Action Alternative.

The Action Alternative will not alter segments CA-324 or CA-325's existing route or facilities so as to introduce new streams of hazardous waste or substance discharges. Given that segments CA-324 and CA-325 do not handle hazardous waste or hazardous substances, nor do the Action Alternative or No Action Alternative involve the introduction of any activities that would involve hazardous waste or hazardous substances, neither alternative will produce any significant environmental impacts associated with the discharge of hazardous waste or hazardous

[30] Petroleum substances, including crude oil, are excluded from the definition of hazardous substances under CERCLA, see 42 U.S.C. Section 9601(10).

substances. Although hydrotesting can generate some small waste streams consisting of a water and oil residue mixture, hydrotesting has already been previously completed in 2025, prior to the grant of the ESP, and is not a new waste stream specific to the Action Alternative.

**6) <u>Geology and Topography</u>**

As noted above, Segments CA-324 and CA-325's rights-of-way are primarily alongside grazing land between side canyons containing riparian vegetation, as well as oak woodland, rangeland, and irrigated cropland. There are also mountainous portions along the segments' route, as well as coastal and eastern foothill areas. The Initial EIS concluded that, although some temporary and permanent changes to topography would occur from the initial construction of CA-324 and 325, the scale of such changes was sufficiently minor such that no significant impacts related to subsidence and physiology would occur. (Draft EIS, p. 4-15.) Potential impacts related to subsidence and impacts related to paleontology, unique geologic features, and mineral/petroleum resources were also not determined to be significant. (Draft EIS, pp. 4-19 through 4-20.)

The Initial EIS imposed several mitigation measures associated with potential impacts associated with seismicity and faulting. Mitigation Measures 1 and 3 required detailed geologic, seismologic, and geotechnical studies to be prepared and recommendations to be incorporated into the segments' final design and route. Mitigation Measure 2 required the pipeline design also to incorporate appropriate ground motion parameters. (Draft EIS, pp. 4-150 through 4-151; Final EIS, pp. 4-2 through 4-4.) With the implementation of these mitigation measures, the Initial EIS determined that all geology-related impacts would be less than significant. (Draft EIS, p. S-4.). Ultimately, these mitigation measures were implemented as part of initial construction of the segments. The impacts to geology and topography described in the Initial EIS would be comparable to what would occur under the No Action Alternative given that there would be similar types of construction activities occurring

Under the Action Alternative, no new construction or reroutes will occur beyond localized excavations that may be required based on integrity assessments. Therefore, the Action Alternative would have no potential to effect geology or topography. The Action Alternative does

not involve any changes to the segments' existing alignment so as to involve different geologic conditions than those which were implicated by the segments' initial construction. Although the Action Alternative would involve the performance of integrity assessments on a more frequent basis, which may result in the need to perform localized excavations to repair anomalies discovered from such assessments, these activities will not result in reroutes or design changes that could cause significant topographic impacts or disturb geological resources.

**7) Noise and Visual Environment**

The construction efforts associated with the No Action Alternative are comparable to those undertaken as part of the original construction of CA-324 and CA-325. The Initial EIS determined that the segments' initial construction noise impacts would be significant and unavoidable at sensitive receptors near their rights-of-way, including at schools, parks, residential subdivisions, and individual residences. (Draft EIS, pp. 4-94, 4-100.)[31] Further, the Initial EIS determined that potentially significant visual impacts would result from construction of CA-324 and CA-325 as part of right-of-way clearing through the Los Padres National Forest (LPNF), and from the construction of permanent, aboveground facilities associated with the Sisquoc Pump Station in the Santa Barbara County. (Draft EIS, pp. 4-88 through 4-93; Final EIS, p. 3-6.) The Initial EIS directed implementation of certain Mitigation Measures to reduce these construction-related impacts to a less-than-significant level, each of which have been implemented.[32] Accordingly, replacement of the segments under the No Action Alternative would potentially raise significant

---

[31] Moreover, the Initial EIS directed implementation of Mitigation Measure 34 (which required the Pump Station to be shielded from the school by a noise barrier such as a berm or structural enclosure) to limit to a non-significant level noise impacts to the former location of the Vista del Mar school, near the Gaviota Pump Station. (Draft EIS, pp. 4-162 and S-12; Final EIS, p. 4-16.) However, the Vista del Mar school has since relocated to a location remote from the Gaviota Pump Station, and Mitigation Measure 34 has been implemented.

[32] The Initial EIS imposed Mitigation Measures 31 and 32 in order to mitigate these significant impacts. Measure 31 required screening the Gaviota Pump Station and Sisquoc Pump Station with native shrubs, trees, and/or naturalized masses of evergreen shrubs and trees as appropriate for each site's location and climatic conditions. (Draft EIS, pp 4-160 through 4-161; Final EIS, p. 4-14 through 4-15.) Measure 32 required that the pipeline use a 50-foot construction corridor within the Los Padres National Forest (LPNF), protect existing large diameter trees, feather the edges of the cleared right-of-way, and reseed cleared areas with native species. (Draft EIS, p. 4-161; Final EIS, p. 4-15.) Implementation of these mitigation measures reduced the potentially significant visual resources impacts identified at the Gaviota Pump Station and Sisquoc Pump Station to a less than significant level. (*Id.*, p. 4-165.)

noise and visual impacts, particularly associated with the construction and land-clearing activities of the replacement project.

Under the Action Alternative, no new construction will occur beyond localized excavations that may be required based on integrity assessments. Therefore, no significant impacts to noise and the visual environmental will occur. Although the Action Alternative would involve the performance of integrity assessments on a more frequent basis, which may result in the need to perform localized excavations to repair anomalies discovered from such assessments, inspection-related activities were already addressed and determined to be insignificant in the IM rule EA. There is no evidence to suggest that more frequent integrity assessments would result in significant environmental impacts. The Action Alternative will not alter segments CA-324 and CA-325's existing route or facilities or any pump stations so as to introduce new noise- or visual environment-related impacts to sensitive receptors. Therefore, the Action Alternative will not result in significant noise or visual impacts.

**8) <u>Socioeconomic Impacts</u>**

The replacement of CA-324 and CA-325 under the No Action Alternative is comparable to the project involving the original construction of CA-324 and CA-325, which was previously assessed by the Initial EIS. The Initial EIS determined that all socioeconomic impacts related to construction and operation of the segments would be insignificant. (Draft EIS, pp. 4-60 through 4-64.) The socioeconomic impacts described in the Initial EIS would be comparable to what would occur under the No Action Alternative given that there would be similar types of construction activities occurring.

Under the Action Alternative, no new construction will occur beyond localized excavations that may be required based on integrity assessments. Therefore, no significant impacts to socioeconomics are anticipated to occur. Although the Action Alternative would involve the performance of integrity assessments on a more frequent basis, which may result in the need to perform localized excavations to repair anomalies discovered from such assessments, inspection-related activities were already addressed and determined to be insignificant in the IM rule EA. There is no evidence to suggest that more frequent integrity assessments would result in

significant environmental impacts. None of the activities associated with the Action Alternative are expected to produce significant socioeconomic impacts in the area.

## VIII. CONCLUSIONS

PHMSA finds that issuance of the ESP and subsequent non-emergency SP does not result in significant environmental impacts. The Action Alternative's scope is narrow and does not involve any new construction in areas not previously disturbed by the initial construction of segments CA-324 and CA-325. The Action Alternative requires routine repair, inspection, and maintenance activities (albeit under a more stringent schedule), which culminate only in, at most, the performance of limited excavations localized within the existing segments' right-of-way. Such activities have already been determined to be insignificant in previous environmental assessment by PHMSA associated with the IM Rule. In comparison, the No Action Alternative (replacement of CA-324 and 325) could raise significant environmental impacts, particularly to land use, hydrological resources, cultural resources, and biological resources.

In accordance with USDOT Order 5610.1D, PHMSA has independently evaluated this EA for its accuracy, scope, and contents. To ensure the integrity of the review, PHMSA provided comprehensive guidance to the operator, specifically outlining the types of data and information essential for the preparation of the environmental document. Furthermore, PHMSA collaborated directly with the applicant to direct the analytical focus toward areas with a higher potential for significant impacts, ensuring a rigorous evaluation of potential environmental effects. The ESP can be found on the Federal Docket Management System located on the Internet at www.regulations.gov under docket no. PHMSA-2025-150.

**Completed by PHMSA in Washington, D.C., on:** February 20, 2026

**Prepared by:**

| Staff | Title |
|---|---|
| Lance Yearwood | Vice President, Pacific Pipeline Company and Sable Offshore Corp. |
| Steve Rusch | Vice President of Regulatory and Environmental Affairs, Sable Offshore Corp. |

| | |
|---|---|
| Nathan Soderberg | Manager, Rights of Way, Sable Offshore Corp. |
| James Thompson | Project Manager, SCS Engineers (Consultant) |
| Sarah Nicchitta | Principal, Vice President, Albion Environmental (Consultant) |
| Chris Dunn, Manager | Biology, Padre Associates, Inc. (Consultant) |

**Reviewed by:**

| Staff | Title |
|---|---|
| Carolyn Nelson | Director, Environmental Analysis and Compliance Division, PHMSA |
| Amanda Murphy | Federal Preservation Officer/Environmental Protection Specialist, PHMSA |
| Matt Fuller | Senior Environmental Protection Specialist, PHMSA (Contractor) |
| Natisha Joseph | Environmental Protection Specialist, PHMSA (Contractor) |
| Travis Mast | Environmental Protection Specialist, USDOT Volpe Center |
| Leah Epstein | Environmental Protection Specialist, USDOT Volpe Center |

**Appendix A**

**Environmental Assessment for Final Rule: Pipeline Integrity Management in High Consequence Areas, Docket No. RSPA 00-7408**

MICHAEL N. MILLS, SBN 191762
michael.mills@stoel.com
KELLY V. BESKIN, SBN 341084
kelly.beskin@stoel.com
STOEL RIVES LLP
500 Capitol Mall, Suite 1600
Sacramento, CA 95814
Telephone: 916.447.0700
Facsimile: 916.447.4781

*Attorneys for Plaintiff and Petitioner Sable Offshore Corp.*

ELECTRONICALLY FILED
Superior Court of California
County of Sacramento
02/17/2026
By: B. Lopez Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SACRAMENTO

| | |
|---|---|
| SABLE OFFSHORE CORP.,<br><br>Plaintiff and Petitioner,<br><br>v.<br><br>CALIFORNIA GEOLOGIC ENERGY MANAGEMENT DIVISION, a state agency; CALIFORNIA DEPARTMENT OF CONSERVATION, a state agency; DOUGLAS ITO, in his official capacity as acting State Oil and Gas Supervisor, Department of Conservation Geologic Energy Management Division; JENNIFER LUCCHESI, in her official capacity as acting Director of the Department of Conservation; and DOES 1-50, inclusive,<br><br>Defendants and Respondents. | Case No. 26WM000036<br><br>UNLIMITED JURISDICTION<br><br>**VERIFIED PETITION FOR WRIT OF MANDAMUS AND COMPLAINT**<br><br>1. Writ of Mandamus [Code Civ. Proc., § 1085]<br><br>2. Declaratory Relief [Code Civ. Proc., § 1060] |

Plaintiff and Petitioner Sable Offshore Corp. ("Sable") hereby brings this Verified Petition for Writ of Mandamus and Complaint against Defendants and Respondents the California Department of Conservation's Geologic Energy Management Division ("CalGEM"); the California Department of Conservation; Douglas Ito, in his official capacity as acting State Oil and Gas Supervisor in charge of CalGEM; Jennifer Lucchesi, in her official capacity as acting Director of the Department of Conservation; and Does 1-50.

**PARTIES**

1. Plaintiff and Petitioner Sable is a Delaware corporation, registered to do business in California, with its principal place of business in Texas.

2. Defendant and Respondent CalGEM is a state agency charged with the regulation of drilling, operation, maintenance, and plugging and abandonment of onshore and offshore oil, gas, and geothermal wells within the State of California.

3. Defendant and Respondent Department of Conservation, through and under CalGEM, is charged with the regulation of drilling, operation, maintenance, and plugging and abandonment of onshore and offshore oil, gas, and geothermal wells within the state.

4. Defendant and Respondent Supervisor Ito is the State Oil and Gas Supervisor responsible for managing CalGEM.

5. Defendant and Respondent Director Lucchesi is the Director of the Department of Conservation.

6. Defendants and Respondents Does 1 through 50, inclusive, are sued under fictitious names. Their true names and capacities, whether individual, corporate, partnership, associate, or otherwise are unknown to Sable, which sues each Defendant/Respondent by such fictitious names. Sable is informed and believes and based thereon alleges each of the Defendants/Respondents designated herein as a Doe is, and in some manner was, responsible for events and happenings referred to herein, either contractually or tortiously. When Sable ascertains the true names and capacities of Does 1 through 50, it will amend this Petition and Complaint accordingly.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction pursuant to Code of Civil Procedure sections 1060 and 1085.

8. Venue is proper in Sacramento County under Code of Civil Procedure section 395 because Defendants are headquartered in Sacramento County and the acts and decisions giving rise to this dispute were made, issued, or implemented from CalGEM's Sacramento office.

/ / /

9. Venue is further proper under Code of Civil Procedure section 393(b) because this action seeks to restrain and declare invalid the actions of a public officer acting in his or her official capacity, and such actions occurred, and are continuing to occur, in Sacramento County.

## BACKGROUND

### A. CalGEM Jurisdiction

10. Under Public Resources Code section 3106, the CalGEM Supervisor is required to "supervise the drilling, operation, maintenance, and abandonment of wells and the operation, maintenance, and removal or abandonment of tanks and facilities attendant to oil and gas production, including pipelines not subject to regulation pursuant to Chapter 5.5 (commencing with Section 51010) of Part 1 of Division 1 of Title 5 of the Government Code that are within an oil and gas field, so as to prevent, as far as possible, damage to life, health, property, and natural resources; damage to underground oil and gas deposits from infiltrating water and other causes; loss of oil, gas, or reservoir energy, and damage to underground and surface waters suitable for irrigation or domestic purposes by the infiltration of, or the addition of, detrimental substances."

11. The Public Resources Code and its implementing regulations impose various requirements on "production facilities." These include Public Resources Code section 3205.8, which requires the operator of a well or production facility to provide a bond in an amount determined by the Supervisor to fully cover the costs of plugging and abandonment, facility decommissioning, and site restoration. Division 3, Chapter 1, Article 4.4 of the Public Resources Code imposes additional requirements on production facilities, including facility maintenance standards, inspection requirements, and the obligation to prepare and submit a spill contingency plan. Production facilities are also subject to the limitations under Public Resources Code section 3280 et seq., also known as Senate Bill ("SB") 1137. In brief, SB 1137 limits oil and gas production in areas within 3,200 feet of a "sensitive receptor." *See* Pub. Resources Code, §§ 3280, 3281.

12. Public Resources Code section 3010 defines a "production facility" as "any equipment *attendant to* oil and gas production or injection operations including, but not limited to, tanks, flowlines, headers, gathering lines, wellheads, heater treaters, pumps, valves,

compressors, injection equipment, and pipelines that are not under the jurisdiction of the State Fire Marshal pursuant to Section 51010 of the Government Code." (Emphasis added.)

**B. Office of the State Fire Marshal ("OSFM") Jurisdiction**

13. OSFM regulates certain "tank facilities" under the Aboveground Petroleum Storage Act (the "APSA"), Health and Safety Code section 25270 et seq.

14. The APSA applies to, among others, tank facilities subject to the federal Spill Prevention, Control, and Countermeasure ("SPCC") rule (40 C.F.R pt. 112) or tank facilities with an aggregate storage capacity of 1,320 gallons or more of petroleum in aboveground storage containers. (Health & Saf. Code, § 25270.3.)

15. Health and Safety Code section 25270.2, subdivision (n) defines a "tank facility" as "one or more aboveground storage tanks, including any piping that is integral to the tanks, that contain petroleum and that are used by an owner or operator at a single location or site." The definition of "aboveground storage tank" explicitly excludes "[a]n aboveground oil production tank that is subject to Section 3106 of the Public Resources Code." (Health & Saf. Code, § 25270.2(a)(3).)

16. Since the APSA's enactment, responsibility for implementation, enforcement, and administration of the law has been delegated to local Unified Program Agencies (the "UPAs"). OSFM retains statewide oversight, including authority to adopt implementing regulations, issue interpretive guidance to the UPAs, and oversee UPA implementation of the APSA. (See AB 1566 (2012).)

17. Implementation of the APSA requires the UPAs to review annual tank facility statements, review SPCC plans prepared by tank owners/operators, and conduct inspections of aboveground storage tanks at APSA-regulated facilities.

18. Because OSFM and CalGEM historically exercised jurisdiction over differently situated oil-related tank (also called vessel) facilities, CalGEM's predecessor (DOGGR) and OSFM entered into a Memorandum of Agreement in 2014 (the "MOA") to clarify their respective jurisdictions.

/ / /

19. The MOA explains that facilities are "attendant to" oil and gas production, and therefore subject to CalGEM jurisdiction, only when they are within the lease area of oil and gas fields. The MOA makes clear that (1) CalGEM's jurisdiction does not extend beyond the leasehold, and (2) CalGEM and OSFM (i.e., the UPAs) do not exercise overlapping jurisdiction over the same facilities.

**C. Las Flores Canyon Facility**

20. In February 2024, Sable acquired the Santa Ynez Unit ("SYU") assets from ExxonMobil Corporation. The SYU consists of approximately 76, 200 acres of offshore oil and gas leaseholds located in federal waters off the coast of Santa Barbara County, past the three-mile state boundary line. It includes three offshore production platforms—Platform Heritage, Platform Harmony, and Platform Hondo (together, the "Platforms"). The SYU also includes offshore pipeline segments, onshore processing facilities, and onshore pipeline segments. Oil and gas produced from the Platforms are transported to shore via miles of federally regulated pipeline segments and arrive at the Las Flores Canyon Facility ("LFC").

21. Initial processing of extracted oil and gas occurs on the Platforms before the product is transported to LFC, including separation of gas and oil mixtures, gas dehydration, and removal of some water from the oil-water mixture. The separated gas and oil streams are then sent by separate pipeline segments (that are regulated by the federal Pipeline and Hazardous Materials Safety Administration) to LFC. At LFC, the oil mixture is further processed through dehydration, separation or filtration, blending, heating and cooling, and distillation, and the resulting treated crude oil is then sent downstream for continued transportation through onshore pipeline segments. Natural gas arriving at LFC is sent to the POPCO Gas Plant for further processing through dehydration, non-methane hydrocarbon stripping, and sulfur removal (among other things). Eventually, some of this gas will be used onsite to power a 45-megawatt cogeneration facility that provides electricity to the onshore and offshore facilities and unused gas will be delivered at LFC into Southern California Gas Company's common carrier line to be sold on the open market. LFC does not impart a chemical change (such as through hydrocarbon "cracking" performed at refineries) to the oil or gas streams.

22. LFC is not located within any operating designated oil and gas field nor within the boundary of any oil and gas lease. In fact, the entirety of LFC is located on real property owned by petitioner, Sable Offshore Corp. There are no oil or gas wells located at LFC.

23. LFC and the Platforms have been in operation since approximately 1993. No California state agency—not CalGEM, nor its predecessor, DOGGR—has previously asserted that LFC is a "production facility" subject to CalGEM jurisdiction at any time in its more than 30-year history.

24. Rather, during its entire operational history, Santa Barbara County, acting as the UPA, has exercised regulatory jurisdiction over LFC as a tank facility subject to the APSA, as LFC is subject to the federal SPCC rule and is a facility with an aggregate storage capacity of 1,320 gallons or more of petroleum in aboveground storage containers.

25. On September 26, 2024, CalGEM sent Sable's outside counsel a letter asserting, for the first time in the history of the facility, that LFC is a "production facility" under Public Resources Code section 3010. Based on this determination, CalGEM claimed that LFC also was now subject to CalGEM's new bonding requirements under Public Resources Code section 3205.8, along with inspection, testing, spill-contingency, and other regulatory requirements applicable to "production facilities." A true and correct copy of this letter is attached here as **Exhibit A**.

26. Between October and December 2024, Sable's outside counsel and CalGEM exchanged additional letters disputing CalGEM's new assertion of jurisdiction over LFC. In these letters, counsel for Sable explained that Sable was subject to the jurisdiction of Santa Barbara County, acting as the UPA under the APSA, to the exclusion of CalGEM's jurisdiction. True and correct copies of these letters are attached here as **Exhibit B** and **Exhibit C**. Sable's last letter to CalGEM was sent on December 24, 2024. A true and correct copy of this letter is attached here as **Exhibit D**.

27. But CalGEM did not relent. Almost five months went by, and then Sable received a May 9, 2025 letter reiterating CalGEM's position that LFC is a "production facility." This letter also included a decommissioning and site-restoration cost estimate of $31.9 million, representing

the bond CalGEM purported to require for LFC, and warned that civil penalties would be imposed if Sable did not comply. A true and correct copy of this letter is attached here as **Exhibit E**.

28. Between May and July 2025, Sable and CalGEM continued discussions to explore potential resolutions to the jurisdictional dispute, including the appropriate amount of any such bond, all while reserving its rights and all jurisdictional objections. True and correct copies of these letters are attached here as **Exhibit F** and **Exhibit G**. After July, another six months elapsed without any further correspondence from CalGEM.

29. On January 27, 2026, Sable then received a letter from CalGEM stating that, following a more detailed inspection and review of additional information, it had recalculated LFC's estimated decommissioning and site-remediation costs to be $57,258,121, nearly double its previous estimate of $31.9 million. CalGEM stated that Sable must post a bond in that amount to comply with Public Resources Code section 3205.8 and warned that failure to comply would result in an enforcement action. It also set a date of February 17, 2026 for Sable's response to the letter. A true and correct copy of this letter is attached here as **Exhibit H**.

30. In the enclosure to CalGEM's January 27, 2026 letter, CalGEM explained that part of its purported justification for the significant increase in the bonding amount was a "vessel-size factor multiplier . . . to account for the substantially greater size and complexity of numerous vessels observed in 2025." CalGEM's letter concedes that LFC is unlike a typical "production facility." For example, the letter states, "As previously noted, certain facility components, most notably vessels, did not align with the Method 1 unit cost assumptions applied to production facilities (i.e., separators, free-water knockouts, steam generators, boilers, and heater treaters). Multiple vessels at LFC have height dimensions exceeding 30 feet in height, which is not typical of conventional oil field production facilities."

/ / /

/ / /

/ / /

/ / /

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

31. Sable contends that the exhaustion of administrative remedies doctrine does not apply because there is no clear mechanism for challenging CalGEM's determination that LFC is a "production facility" under the Public Resources Code or CalGEM's assertion that associated statutory and regulatory requirements apply to LFC.

32. Even if exhaustion were applicable, which Sable denies, Sable has satisfied any condition precedent to filing this action and has exhausted any administrative avenues to the extent required by law, including extensive engagement and written correspondence with CalGEM regarding its jurisdictional assertion over LFC.

33. In the alternative, recognized exceptions to the exhaustion doctrine apply, including the futility exception, because CalGEM has repeatedly and unequivocally stated its position that LFC is a "production facility," leaving no reasonable possibility that further administrative efforts would alter the agency's determination.

## FIRST CAUSE OF ACTION

**Petition for Traditional Mandamus (Code Civ. Proc., § 1085)**

34. Sable hereby incorporates by reference, as if they are set forth fully herein, Paragraphs 1 through 33 inclusive.

35. "Mandamus under section 1085 is the appropriate vehicle to challenge the constitutionality or validity of statutes or other official acts." *City of Redondo Beach v. Padilla* (2020) 46 Cal.App.5th 902, 909.

36. CalGEM's actions are ultra vires because it is attempting to exert jurisdiction over LFC, which is not "attendant to oil and gas production" within an oilfield or leasehold as required by Public Resources Code sections 3106 and 3010.

37. CalGEM's statutory authority is expressly limited to wells and "tanks and facilities attendant to oil and gas production" that exist on the lease or within an oil or gas field. While CalGEM has the authority to regulate a "production facility," its jurisdiction is also limited to facilities "attendant to oil and gas production or injection operations" existing within the leasehold or oil or gas field, none of which is applicable to LFC.

38. LFC is not "attendant to" production within a leasehold or oil and gas field. LFC is located outside any lease area or recognized oil and gas field. Oil and gas are produced offshore in federal waters and are then transported into California, to LFC via miles of federally regulated pipelines. LFC therefore lies outside the geographic and functional scope of CalGEM's "attendant to" authority and outside CalGEM's oilfield/leasehold jurisdictional boundary.

39. CalGEM's actions are further unlawful because LFC has been historically regulated under the jurisdiction of Santa Barbara County, acting as the UPA under the APSA, leaving CalGEM with no jurisdiction to regulate those same facilities.

40. The 2014 MOA recognizes that CalGEM's jurisdiction does not extend past the leasehold and that CalGEM and the UPA do not exercise overlapping jurisdiction over the same facilities. Therefore, Santa Barbara County's oversight of LFC under the APSA framework is necessarily to the exclusion of CalGEM's jurisdiction over LFC.

41. Overall, CalGEM's determination that LFC is a "production facility" and attempts to enforce the requirements of such facilities on Sable, are in violation of the law, arbitrary and capricious, an abuse of discretion, and lacking in evidentiary support because they:

(a) disregard statutory limits on CalGEM jurisdiction;

(b) conflict with the UPA's jurisdiction and the 2014 MOA;

(c) conflict with the County of Santa Barbara's longstanding oversight of LFC; and

(d) lack any reasoned factual or legal basis.

42. Sable has no plain, speedy, and adequate remedy in the ordinary case of law because CalGEM has threatened regulatory enforcement action against Sable unless it complies with CalGEM's unlawful demands. CalGEM's actions have caused and will continue to cause irreparable harm, including unlawful enforcement and compliance demands, duplicative or conflicting regulatory requirements, threats of civil penalties, and ongoing uncertainty regarding the applicable regulatory framework governing LFC's operations.

/ / /

/ / /

## SECOND CAUSE OF ACTION

**Declaratory Relief (Code Civ. Proc., § 1060)**

43. Sable hereby incorporates by reference, as if they are set forth fully herein, Paragraphs 1 through 42 inclusive.

44. An actual controversy has arisen and now exists between Sable and Defendants over whether LFC is a "production facility" subject to CalGEM's jurisdiction and various statutory and regulatory obligations thereunder, including, without limitation, the bonding obligations of Public Resources Code section 3205.8 and SB 1137.

45. CalGEM has asserted that LFC is a "production facility" under the Public Resources Code and subject to the requirements applicable to those facilities.

46. Sable contends that CalGEM's authority is limited to wells and "tanks and facilities attendant to oil and gas production" that exist on the lease or within an oil or gas field and that LFC is not "attendant to" production within a leasehold or oil and gas field.

47. Moreover, Sable asserts that LFC is subject to the jurisdiction of Santa Barbara County, acting as the UPA under the APSA, and not subject to CalGEM's jurisdiction per the provisions of the Public Resources Code.

48. Sable further asserts that any interpretation of Public Resources Code sections 3106 and 3010 that extends CalGEM jurisdiction to LFC would (a) contravene the statutory text limiting CalGEM to facilities "attendant to" production within the oil or gas field/leasehold, and (b) conflict with the exclusive jurisdiction conferred on Santa Barbara County, acting as the UPA under the APSA framework for tank facilities.

49. CalGEM's contrary position and actions create an actual, present controversy concerning Sable's legal obligations and have caused and will continue to cause immediate and concrete harm to Sable. This harm includes exposure to unlawful enforcement and compliance demands, duplicative or conflicting regulatory requirements, threats of civil penalties, and ongoing uncertainty regarding the applicable regulatory framework governing LFC's operations.

## PRAYER FOR RELIEF

WHEREFORE, Sable prays for judgment as follows:

1. For an alternative and peremptory writ of mandate directing Defendants to:
   a. vacate and rescind its determination that LFC is a "production facility";
   b. cease asserting jurisdiction over LFC and enforcing Public Resources Code section 3205.8, SB 1137, and any and all other statutory or regulatory obligations and requirements of a "production facility" under the Public Resources Code; and
   c. withdraw its bond and other compliance demands issued on September 26, 2024; December 17, 2024; May 9, 2025; and January 27, 2026;
2. For a declaration that:
   a. LFC is not a "production facility" under Public Resources Code section 3010, and therefore is not subject to CalGEM's jurisdiction or any "production facility" requirements, including, but not limited to, Public Resources Code section 3205.8 and SB 1137; and
   b. LFC is subject to the jurisdiction of Santa Barbara County, acting as the UPA under the APSA, thereby excluding any CalGEM jurisdiction over LFC;
3. For temporary and permanent injunctive relief enjoining Defendants from enforcing or attempting to enforce any "production facility" requirements against LFC;
4. For the cost of suit and attorneys' fees as permitted by law, including, but not limited to, Code of Civil Procedure section 1021.5 and Government Code section 800; and
5. For any and all other relief the Court deems just and proper.

DATED: February 17, 2026

STOEL RIVES LLP

MICHAEL N. MILLS
michael.mills@stoel.com
KELLY V. BESKIN
kelly.beskin@stoel.com

*Attorneys for Plaintiff and Petitioner Sable Offshore Corp.*

# VERIFICATION

I, Michael N. Mills, declare:

I am an attorney at law duly admitted and licensed to practice before all courts of this State and I have my professional office at Stoel Rives LLP, 500 Capitol Mall, Suite 1600, Sacramento, California 95814.

I am one of the attorneys of record for Plaintiff and Petitioner Sable Offshore Corp. ("Sable") in the above-entitled matter.

Sable's principal place of business is outside of the county in which I have my office, and for that reason I am making this verification on its behalf.

I have read the foregoing Verified Petition for Writ of Mandamus and Complaint, and know the contents thereof.

I am informed and believe that the matters stated therein are true and, on that ground, I allege that the matters stated therein are true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Sacramento, California on this 17th day of February, 2026.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Michael N. Mills

**SABLE**
**OFFSHORE CORP.**

February 13, 2026

Linda Daugherty
Acting Associate Administrator for Pipeline Safety
Pipeline and Hazardous Materials Administration (PHMSA)
United States Department of Transportation
1200 New Jersey Ave, SE
Washington, DC 20590

*Via E-Mail*

Dear Ms. Daugherty,

Sable Offshore Corp. (Sable) is writing in regards to the December 23, 2025 Emergency Special Permit (ESP) issued by PHMSA. The ESP is currently scheduled to expire on February 21, 2026. Sable has also submitted an Application for Special Permit on January 22, 2026. Sable understands that, based on the procedures in 49 C.F.R. § 190.341 (including publishing notice of the Application in the Federal Register and holding a public comment period), the ESP will expire before PHMSA makes a final determination on Sable's Application for Special Permit.

Notwithstanding the ESP's expiration, Sable will continue to comply with the conditions of the ESP until PHMSA makes a determination on the Application for Special Permit, and we respectfully request expedited consideration of the Application consistent with the National Energy Emergency Declaration in E.O 14156 and PHMSA's January 12, 2026 Notice of Limited Enforcement Discretion and Statement of Policy for Issuing Special Permits In Response to National Energy Emergency.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

J. Caldwell Flores
President
Sable Offshore Corp.

Cc:
Timothy O’Shea
Keith Coyle

U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

12300 W. Dakota Ave., Suite 340
Lakewood, CO 80228

**VIA ELECTRONIC MAIL TO: lyearwood@sableoffshore.com**

December 22, 2025

Mr. Lance Yearwood
Vice President
Pacific Pipeline Company / Sable Offshore Corp.
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**RE: Approval of Sable Offshore Corp.'s Restart Plan for the Las Flores Pipeline System Line CA-324 and Line CA-325**

Dear Mr. Yearwood:

From December 4 to December 12, 2025, the Pipeline and Hazardous Materials Safety Administration (PHMSA) received several documents from Sable Offshore Corp. These documents included:

1. Line CA-324 and Line CA-325 Fill Plan and Startup Procedures
2. A letter requesting the removal of pressure restrictions for Line CA-324
3. A letter requesting the removal of pressure restrictions for Line CA-325
4. The Las Flores Pipeline Linefill Positioning Plan Assignments
5. The Las Flores Pipeline Linefill Contact List

These documents addressed the Restart Plan for Line CA-324 and Line CA-325 (previously known as Plains Line 901 and Line 903, respectively). In addition, PHMSA conducted a field inspection with Sable Offshore Corp. to discuss its process and safety procedures for the pipeline restart.

PHMSA has reviewed these documents and hereby approves the submitted Restart Plan. This approval is valid from the date of this letter.

Should you have any questions or concerns, please contact me at (720) 963-3160 or by email at dustin.hubbard@dot.gov.

Sincerely,

DUSTIN B HUBBARD Digitally signed by DUSTIN B HUBBARD
Date: 2025.12.22 13:19:33 -07'00'

Dustin Hubbard
Director, Western Region
Pipeline and Hazardous Materials Safety Administration

cc: Trent Fontenot, Sr. Vice President - Operations, tfontenot@sableoffshore.com
Jim Hosler, Assistant Deputy Director – Pipeline Safety and CUPA, CalFire, jim.hosler@fire.ca.gov

U.S. Department
of Transportation

**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue SE
Washington, D.C. 20590

December 17, 2025

Via Electronic Mail to: cflores@sableoffshore.com

J. Caldwell Flores
President and Chief Operating Officer
Sable Offshore Corp.
845 Texas Ave. Ste 2920
Houston, TX 77002

Re: Determination of Interstate Classification

Dear Mr. Flores:

This responds to your letter of November 26, 2025 regarding the Las Flores Pipeline owned and operated by Sable Offshore Corp. (Sable). Your letter notifies the Pipeline and Hazardous Materials Safety Administration (PHMSA) that Sable has determined the pipeline to be an interstate pipeline facility under the Pipeline Safety Act (PSA) and requests PHMSA transition regulatory oversight from the California Office of the State Fire Marshal (OSFM) to PHMSA.

As noted in your letter, portions of the Las Flores Pipeline (previously known as Lines 901 and 903) have been considered intrastate since 2016 and subject to regulatory oversight by OSFM pursuant to its certification with PHMSA under 49 U.S.C. § 60105(a). Prior to 2016, Lines 901 and 903 were considered interstate and regulated by PHMSA. The classification change in 2016 corresponded to the pipelines' previous owner cancelling tariffs with the Federal Energy Regulatory Commission (FERC). In 2024, Sable acquired Lines 901 and 903 and other assets comprising the Las Flores Pipeline, including offshore pipelines transporting crude oil from the Outer Continental Shelf (OCS) and an onshore processing facility at Las Flores Canyon. Sable operates the Las Flores Pipeline assets as a single pipeline system transporting crude oil from the OCS to the Pentland Station terminal in Kern County, California.

Upon receipt of your letter, PHMSA initiated a review of the Las Flores Pipeline. This review included an on-site inspection on December 9 through December 11, 2025. OSFM representatives accompanied PHMSA on the inspection. PHMSA also reviewed Sable's written procedures and records and conducted field observations of the Las Flores facility, the pump stations at Gaviota and Sisquoc, the control room in Santa Maria, and the offshore Harmony platform. In addition, PHMSA reviewed the 2025 program inspections conducted by OSFM. For

the following reasons, PHMSA agrees with your determination that the Las Flores Pipeline is an interstate pipeline.

The PSA authorizes PHMSA to prescribe and enforce minimum safety standards for pipeline transportation and for pipeline facilities.[1] The PSA vests with PHMSA exclusive regulatory authority over interstate pipelines and preempts States from adopting or continuing in force safety standards for interstate pipelines.[2] With respect to intrastate pipelines, the PSA provides a State authority may regulate the intrastate pipelines within its borders upon submission to PHMSA of an annual certification.[3] Both the PSA and the Federal pipeline safety regulations define interstate and intrastate pipelines.[4] An interstate pipeline is a pipeline or part of a pipeline used to transport hazardous liquids in interstate or foreign commerce; an intrastate pipeline is a hazardous liquid pipeline that is not an interstate pipeline.

Determining whether a hazardous liquid pipeline is an interstate or intrastate pipeline requires a factual inquiry.[5] To assist in that determination, PHMSA adopted Appendix A to 49 CFR Part 195 providing a statement of agency policy and interpretation on the delineation between Federal and State jurisdiction.[6] In short, "if there is a tariff or concurrence filed with FERC governing the transportation of hazardous liquids over a pipeline facility . . . then [PHMSA] will, as a general rule, consider the facility to be an interstate pipeline facility within the meaning of the [PSA]." The absence of a FERC tariff generally means a pipeline is intrastate; however, in certain situations, PHMSA will consider a pipeline to be interstate despite the lack of a filing with FERC. Several examples of this are listed in Appendix A. As it relates to the Las Flores Pipeline, one example provides that a pipeline originating on the OCS will be considered an interstate pipeline even if the pipeline does not have a tariff with FERC.[7]

PHMSA's evaluation of the Las Flores Pipeline confirms that it transports crude oil from the OCS to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from Las Flores Canyon to Pentland, California. Consistent with Appendix A, the Las

---

[1] 49 U.S.C. § 60101 et seq.

[2] 49 U.S.C. § 60104(c). *See* Olympic Pipe Line Co. v. City of Seattle, 437 F.3d 872, 878 (9th Cir. 2006) (discussing how the "PSA differentiates between the regulation of interstate and intrastate hazardous liquid pipelines.")

[3] 49 U.S.C. § 60105(a). OSFM has a certification with PHMSA to regulate intrastate hazardous liquid pipelines in California.

[4] 49 U.S.C. § 60101(a)(7), (a)(8)(B), (a)(10); 49 CFR § 195.2. *See* S. Pac. Pipe Lines Inc. v. DOT, 796 F.2d 539 (D.C. Cir. 1986) (finding PHMSA's definition of interstate and intrastate pipelines reasonable under the PSA).

[5] Transportation of Liquids by Pipeline, 46 Fed. Reg. 38,357, 38,359 (Jul. 27, 1981) (PHMSA's predecessor agency (hereafter PHMSA) explained that it had "reviewed examples of what it believes are the most frequent and likely configurations of liquid pipelines and pipeline facilities and considered various ways of cataloging or classifying them as either interstate or intrastate."); *see also* Shell Oil Co. v. City of Santa Monica, 830 F.2d 1052, 1064 (9th Cir. 1987) (noting that whether the pipeline was interstate or intrastate turned on a disputed issue of fact).

[6] Transportation of Hazardous Liquids by Pipeline; Regulation of Intrastate Pipelines, 50 Fed. Reg. 15,895, 15,897 (Apr. 23, 1985).

[7] 49 CFR Part 195, App. A. "Example 7. Pipeline Company P operates a pipeline that originates on the Outer Continental Shelf. P does not file any tariff for that line with FERC. [PHMSA] will consider the pipeline to be an interstate pipeline facility."

Flores Pipeline is an interstate pipeline.[8] As portions of the Las Flores Pipeline were previously considered to be intrastate and regulated by OSFM, PHMSA is notifying OSFM that the Las Flores Pipeline is subject to the regulatory oversight of PHMSA. Please direct further correspondence on this matter to Dustin Hubbard, Director, Western Region, Office of Pipeline Safety, PHMSA, at (720) 963-3183.

Sincerely,

LINDA GAIL DAUGHERTY
Digitally signed by LINDA GAIL DAUGHERTY
Date: 2025.12.17 07:56:55 -05'00'

Linda Daugherty
Acting Associate Administrator for Pipeline Safety

cc: James Hosler, Chief, Pipeline Safety Division, OSFM
Varun Shekhar, Shareholder, Babst Calland Clements & Zomnir, PC

[8] PHMSA regulations consider the Las Flores Pipeline to be an "active" pipeline. *See* Pipeline Safety: Clarification of Terms Relating to Pipeline Operational Status, 81 Fed. Reg. 54,512 (Aug. 12, 2016) ("The regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned.")

**From:** "Hubbard, Dustin (PHMSA)" <dustin.hubbard@dot.gov>
**To:** "Yearwood, Lance" <lyearwood@sableoffshore.com>, "Pirok, Frank (PHMSA)" <frank.pirok@dot.gov>
**Cc:** "Nguyen, Trung (PHMSA)" <trung.nguyen1@dot.gov>
**Subject:** RE: PHMSA-Sable inspection topics
**Date:** Mon, 8 Dec 2025 17:29:17 +0000
**Importance:** Normal
**Inline-Images:** image001.jpg; image002.png

---

That sounds good Lance, we can provide those.
I was going through the Sharepoint to find a document that details the processing that happens at the Las Flores facility, comes in as an emulsion and leaves as a high-quality crude. But, what happens in between. If there is a document and I missed it can you point me to it?

Thank you,

**Dustin Hubbard**
Director, Office of Pipeline Safety-Western Region

US Department of Transportation,
**Pipeline and Hazardous Materials Safety Administration**
12300 West Dakota Avenue, Suite 340, Lakewood, CO, 80228
Office: 720.963.3183 ◇ Mobile: 303.330.5537

PHMSA Home | LinkedIn | Twitter | HAZMAT | OPS

---

**From:** Yearwood, Lance <lyearwood@sableoffshore.com>
**Sent:** Monday, December 8, 2025 10:27 AM
**To:** Hubbard, Dustin (PHMSA) <dustin.hubbard@dot.gov>; Pirok, Frank (PHMSA) <frank.pirok@dot.gov>
**Cc:** Nguyen, Trung (PHMSA) <trung.nguyen1@dot.gov>
**Subject:** RE: PHMSA-Sable inspection topics

**CAUTION:** This email originated from outside of the Department of Transportation (DOT). Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Good morning Dustin-

If you can provide such a list that would be very helpful in best managing our time together. I just went through the list of inspection topics, and we can adequately cover everything for your team between what we've provided in SharePoint, what we can show you in TaskOp, and the field visits. A question list would certainly facilitate the process as well. Thank you!

Lance Yearwood
Vice President
Pacific Pipeline Company / Sable Offshore Corp.
845 Texas Avenue, Suite 2920
Houston, Texas 77002
(O): 713-579-8118
(C): 832-434-9461
lyearwood@sableoffshore.com

---

**From:** Hubbard, Dustin (PHMSA) <dustin.hubbard@dot.gov>
**Sent:** Monday, December 8, 2025 9:03 AM
**To:** Yearwood, Lance <lyearwood@sableoffshore.com>; Pirok, Frank (PHMSA) <frank.pirok@dot.gov>
**Cc:** Nguyen, Trung (PHMSA) <trung.nguyen1@dot.gov>
**Subject:** RE: PHMSA-Sable inspection topics

**Caution:** This is email originated outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning Lance,

Normally we do not provide specific questions that will be covered during in an inspection. But, since this is a unique inspection with a quick turnaround and needs to be completed quickly, we can provide those specific questions if you think it would be helpful for your staff.

**Dustin Hubbard**
Director, Office of Pipeline Safety-Western Region

US Department of Transportation,
**Pipeline and Hazardous Materials Safety Administration**

12300 West Dakota Avenue, Suite 340, Lakewood, CO 80228
Office: 720.963.3183 ◊ Mobile: 303.330.5537

PHMSA Home | LinkedIn | Twitter | HAZMAT | OPS

Know what's below. Call before you dig.

CHECK THE BOX Is Hazardous Matt hiding in your package?

---

**From:** Yearwood, Lance <lyearwood@sableoffshore.com>
**Sent:** Monday, December 8, 2025 10:00 AM
**To:** Pirok, Frank (PHMSA) <frank.pirok@dot.gov>
**Cc:** Hubbard, Dustin (PHMSA) <dustin.hubbard@dot.gov>; Nguyen, Trung (PHMSA) <trung.nguyen1@dot.gov>
**Subject:** RE: PHMSA-Sable inspection topics

Some people who received this message don't often get email from lyearwood@sableoffshore.com. Learn why this is important

**CAUTION:** This email originated from outside of the Department of Transportation (DOT). Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Thank you, Frank. I'll review now. Appreciate it!

Lance Yearwood
Vice President
Pacific Pipeline Company / Sable Offshore Corp.
845 Texas Avenue, Suite 2920
Houston, Texas 77002
(O): 713-579-8118
(C): 832-434-9461
lyearwood@sableoffshore.com

---

**From:** Pirok, Frank (PHMSA) <frank.pirok@dot.gov>
**Sent:** Monday, December 8, 2025 8:59 AM
**To:** Yearwood, Lance <lyearwood@sableoffshore.com>
**Cc:** Hubbard, Dustin (PHMSA) <dustin.hubbard@dot.gov>; Nguyen, Trung (PHMSA) <trung.nguyen1@dot.gov>
**Subject:** PHMSA-Sable inspection topics

**Caution:** This is email originated outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning Lance,

Please see the attached list of topics we plan to cover during our site visit this week. We will be asking selected questions from the PHMSA Hazardous Liquid IA Question Set, which you can download from our website here: https://www.phmsa.dot.gov/forms/phmsa-hazardous-liquid-ia-question-set

Please let me know if you have any questions.

Thanks,

**Frank Pirok**
General Engineer-Inspector, Office of Pipeline Safety – Western Region

US Department of Transportation
**Pipeline and Hazardous Materials Safety Administration**
3401 Centrelake Drive, Suite 550B, Ontario, CA 91761
Office: (TBD) ◊ Mobile: 202.870.2430

PHMSA Home | LinkedIn | Twitter | HAZMAT | OPS

Know what's below. Call before you dig.

CHECK THE BOX Is Hazardous Matt hiding in your package?

# Sable Offshore Corp.

## SYU Overview

December 2025

SABLE OFFSHORE



# SYU Overview – Offshore Leases




SABLE OFFSHORE

# SYU Facilities Images












# Las Flores Canyon (LFC) Facility




SABLE OFFSHORE

# Oil Treating Block Flow Diagram




SABLE OFFSHORE

# Las Flores Canyon Inlet Emulsion to Oil Treating




SABLE OFFSHORE

# Las Flores Canyon Inlet Emulsion to Oil Treating




SABLE OFFSHORE

# Las Flores Pump Station – MOV-121




SABLE OFFSHORE

# Backup Information

# Las Flores Canyon Inlet Emulsion

[redacted]

Confidential – CBI and CEII

PIPING AND INSTRUMENT DIAGRAM
EMULSION PIPELINE PIG RECEIVER
TRANSPORTATION TERMINAL
LAS FLORES CANYON
SANTA YNEZ UNIT SANTA BARBARA, CA.

SABLE OFFSHORE

# Las Flores Pump Station

[redacted]

Confidential – CBI and CEII

LAS FLORES PUMP STATION
MECHANICAL
PROCESS FLOW DIAGRAM

SABLE OFFSHORE

# OTP Block Flow Diagram – Crude Processing




SABLE OFFSHORE

# PWT Block Flow Diagram – Produced Water Processing




SABLE OFFSHORE

# SGTP Block Flow Diagram – Overhead Gas Processing




SABLE OFFSHORE

# CPP Block Flow Diagram – Steam & Power Generation



# POPCO Block Flow Diagram – Gas Sales






1-CalER2-000132

# Hondo Block Flow Diagram




SABLE OFFSHORE

# Harmony Block Flow Diagram




SABLE OFFSHORE

# Heritage Block Flow Diagram




SABLE OFFSHORE

# Offshore Power Distribution System

| Cable | Install Year | Capacity (MW) |
|---|---|---|
| A (removed), B, E | 1990 | 25 |
| D | 1990 | 15 |
| C1 (removed), D1 | 2003 | 30 |
| F2, G2, A2 | 2015 | 32 |



SABLE
OFFSHORE CORP.

November 26, 2025

Linda Daugherty
Acting Associate Administrator for Pipeline Safety
Pipeline and Hazardous Materials Administration (PHMSA)
United States Department of Transportation
1200 New Jersey Ave, SE
Washington, DC 20590

*Via E-Mail and U.S. Mail*

Dear Ms. Daugherty,

Sable Offshore Corp. (Sable) is writing to notify the Pipeline and Hazardous Materials Safety Administration (PHMSA) of its determination that a pipeline facility that it operates on the Outer Continental Shelf (OCS) and in southern California constitutes an interstate pipeline facility under the Pipeline Safety Act (PSA). Consequently, Sable believes that PHMSA is the agency responsible for pipeline safety regulatory oversight on the portions of the pipeline facility that are subject to 49 C.F.R. Parts 194, 195 and 199. Sable requests from PHMSA concurrence with Sable's determination, as well as guidance on the orderly transition of regulatory oversight from the California Office of the State Fire Marshal (OSFM) to PHMSA.

Sable shares PHMSA's commitment to pipeline safety and looks forward to working with the agency. Sable also notes that this transition only affects the interstate status of the subject pipelines, and will not otherwise change the regulatory classification of the pipelines. All portions of the pipelines that are currently subject to the pipeline safety regulations at 49 C.F.R. Parts 194, 195, and 199 will remain subject to those programs going forward.

**<u>Background</u>**

In 2024, Sable acquired certain assets, including, among other things, three offshore oil production platforms on the OCS off the coast of Santa Barbara, CA (Hondo, Heritage, and Harmony platforms), offshore subsea pipelines transporting oil from these platforms to onshore pipelines that, in turn, transport oil to the Las Flores Canyon facility to process crude oil for subsequent transportation, and onshore pipelines to transport oil from Las Flores Canyon to the Pentland Station terminal in Kern County, CA (Las Flores Pipeline). Sable operates all of these assets as part of a single system that moves crude oil from the OCS into California. Attachment A to this letter contains a map of these assets.

Prior to October 2022, Plains All American (Plains) owned and operated the Las Flores Pipeline (then-called Lines 901 and 903), and ExxonMobil owned the offshore platforms, subsea lines, and the Las Flores Canyon processing facility. Before 2016, Plains filed Interstate Commerce Act (ICA) tariffs with the Federal Energy Regulatory Commission (FERC) for Lines 901 and 903, and these pipelines were considered interstate pipelines subject to PHMSA's regulatory oversight. On February 12 and April 29, 2016, respectively, Plains cancelled these tariffs following the May 2015 release. On May 18, 2016, PHMSA sent a letter to OSFM indicating that, as a result of the cancelled tariffs, these pipelines were considered intrastate pipelines, subject to the regulatory jurisdiction of OSFM, pursuant to its state certification from PHMSA under 49 U.S.C. § 60105(a). The May 2016 letter indicated that the determination of intrastate status is "subject to change based on future events or newly-discovered facts."

**<u>Interstate Classification</u>**

Since PHMSA's May 2016 letter, there have been intervening events affecting the pipelines, which merit reassessment of the interstate versus intrastate status of these assets. As noted, Sable operates each of the offshore and onshore assets described above, which is distinct from the arrangement considered by PHMSA in 2016 where different, unrelated entities operated portions of the facility. Sable has determined that this pipeline facility is properly considered as an interstate hazardous liquid pipeline facility PSA, and therefore subject to PHMSA's exclusive regulatory authority under 49 U.S.C. § 60104(c).

This conclusion is based on applicable language from the PSA and PHMSA's hazardous liquid pipeline safety regulations at 49 C.F.R. Part 195. Under 49 U.S.C. § 60101(a)(5), a "hazardous liquid pipeline facility" is broadly defined as inclusive of "a pipeline, a right of way, a facility, a building, or equipment intended to be used in transporting hazardous liquid." The term "transporting hazardous liquid" is, in turn, defined at § 60101(a)(22) as "the movement of hazardous liquid by pipeline, or the storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline, in or affecting interstate or foreign commerce", but excludes, in relevant part, "onshore production, refining, or manufacturing facilities". Furthermore, the term "interstate or foreign commerce" is defined at § 60101(a)(8)(B) to mean, in the context of hazardous liquid, commerce between "a place in a State and a place outside that State."

Although PHMSA has generally considered the presence of a filed tariff to be an indicator of whether a line is interstate, PHMSA has recognized in Appendix A to its Part 195 regulations that there are certain situations in which a pipeline facility is interstate "despite the lack of a filing with FERC," providing specific examples of such circumstances. In one example, PHMSA stated that hazardous liquid pipelines that "originate[] on the Outer Continental Shelf" may be considered interstate pipeline facilities, regardless of whether the operator filed tariffs with FERC for them. See Part 195, Appendix A, Example 7.

As noted above, the assets that Sable operates include offshore lines connecting offshore production platforms to an onshore processing facility, as well as the Las Flores Pipeline. Collectively, these pipelines constitute a "pipeline facility" through which hazardous liquid

moves in transportation from its point of production on the OCS to the onshore Pentland Station terminal in California, and are not otherwise excluded in the PSA's definition of "transporting hazardous liquid." As this pipeline facility originates on the OCS (which is located outside of California), and then travels within California, it constitutes commerce between a place in California and a place outside California and is thus properly considered as "interstate" pursuant to the PSA and Part 195, Appendix A.

**Transition of Regulatory Authority**

Sable seeks to coordinate with PHMSA to obtain concurrence with this determination and rescind the May 18, 2016 letter to OSFM, and to establish an orderly process to transition regulatory oversight over the pipeline facility from OSFM to PHMSA. This includes, among other things, a framework for review of Sable's procedures, transitioning OSFM's December 17, 2024 State Waivers to federally administered special permits, review and approval of a Restart Plan submitted consistent with the 2020 Consent Decree in *U.S. et al v. Plains All American Pipeline, LP and Plains Pipeline, LP*, No. 20-cv-2415 (C.D. Cal.), as well as, more generally, Sable's performance of restart actions consistent with the applicable provisions of this Consent Decree. Sable will provide all reasonable assistance to PHMSA in coordinating with OSFM to facilitate this transition. Transition of regulatory oversight to PHMSA does not affect Sable's adherence to Part 195 or its performance of action items indicated in the Consent Decree. Moreover, applicable injunctive measures specified in the Consent Decree, as well as the applicable requirements of the State Waivers, will be incorporated on a prospective basis into Sable's procedures, which are enforceable under Part 195.

Sable appreciates the positive working relationship it has developed with OSFM staff and looks forward to developing a similarly productive relationship with PHMSA going forward.

Sincerely,

J. Caldwell Flores
President and Chief Operating Officer
Sable Offshore Corp.

Cc: Ben Fred (PHMSA)

ATTACHMENT A – Map of Assets Acquired by Sable



October 23, 2025

Mr. Daniel Berlant
Office of the State Fire Marshal
California Department of Forestry and Fire Protection
PO Box 944246
Sacramento, CA 94244-2460

**RE: Response to October 22, 2025 OSFM Letter re CA-324 and CA-325A/B**

Dear Mr. Berlant,

Sable Offshore Corp. (Sable) provides this response to the California Office of the State Fire Marshal's (OSFM's) letter dated October 22, 2025. OSFM asserts that Sable has not satisfied Condition 9 of the February 11, 2025 State Waivers.

OSFM conclusions are in error, ignore the remainder of the Waivers and are inconsistent with numerous discussions between OSFM and Sable.

Condition 9 provides:

> All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions (emphasis added).[1]

Despite the imprecise language used in the first sentence of Condition 9, it is readily apparent when considering the full text of Condition 9 and the rest of the State Waivers that immediate and 180-day repair conditions that are "listed in this state waiver" are only those which were identified through the UTWM and USCD ILI runs prescribed in Condition 9. As expressly stated in Condition 9, these ILI runs only will (or could) occur

[1] See also Condition 9 of the State Waiver for CA-324.

after restart, which is a necessary precursor to achieving the requirement of "within 7 days of achieving initial steady state operation." Further, under the last sentence of Condition 9, Sable is required to use only the "most recent" ILI runs as prescribed in Condition 9 (specifically not older runs) when identifying the "repair conditions" referenced in the first sentence. By definition, conditions from pre-waiver ILI runs cannot constitute repair conditions "listed in this state waiver".

Pre-waiver anomalies and the ILIs used to detect them are separately and independently subject to the Consent Decree's Integrity Management Requirements at Appendix B, Article I, Section 4.A.1.a, which requires remediation of "all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, within one year of discovery." Tool tolerance is not a part of these requirements. As it was required to do by law, Sable complied in good faith with the repair criteria in the Consent Decree when actioning the results of ILI runs performed before the State Waivers were issued.

Further, the State Waivers consistently use the present or future tense in each of the assessment and repair-related conditions. For example, in Condition 19, the State Waivers require Sable to provide a 90-day advance notification to OSFM detailing several specifications of an ILI it intends to perform pursuant to Conditions 21 – 23, and which (per Condition 30) are to be used to "discover" repair conditions listed in Conditions 31-37 of the State Waivers. In Condition 26, the State Waivers provide that "Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater … prior to adding in any correction for tool tolerance." And in Condition 27, the State Waivers provide that "Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable."

There is nothing in the text of any of these conditions that suggests that the requirements *retroactively* apply to ILIs performed *prior* to the issuance of the State Waivers. Rather, they indicate that the requirements to account for tool tolerance in discovering an immediate or 180-day repair condition listed in the State Waivers are *prospective* in nature, attaching only to ILIs conducted and repair conditions discovered after the Waivers were issued and pursuant to the protocols and inspection timelines proscribed in the Waivers – which apply ***after restart***.

Additionally, Footnote 10 of the State Waivers states as follows: "For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, **temporarily reduce the operating pressure**, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or **until otherwise authorized by OSFM.**" This footnote is consistent with the understanding articulated above that the State

Wavier conditions are *prospective* and apply after restart has occurred. Specifically, unless the restart has occurred, it would be impossible for Sable to "temporarily reduce the operating pressure" as required by Footnote 10.

In addition to this background on the content of the State Waivers and the Consent Decree, I have been personally involved in numerous discussions with OSFM personnel concerning restart and the application of Condition 9. In those discussions, OSFM personnel have consistently and repeatedly confirmed to Sable that the requirements of Condition 9 apply prospectively after restart has commenced – and that the State Waiver requirements are distinct from the requirements in the Consent Decree applicable to the anomaly repair program Sable already has conducted.

More specifically, in July 2024, OSFM's Tuan Tran confirmed to Sable that it should continue its ongoing anomaly repair program (which began in May 2024—long before the State Waivers were issued by OSFM or became effective) consistent with federal law, applicable regulations, and the Consent Decree. As part of that discussion, OSFM further confirmed that Sable's ongoing anomaly repair program would not be affected by any conditions adopted as part of the State Waivers, and that Sable would not be required to perform additional maintenance activities on already-completed anomaly repairs to comply with any alternate standards imposed by the State Waivers. In discussions with OSFM's Tuan Tran and Alin Podreanu on August 5, 2024, Sable confirmed the scope of its ongoing repair program and intention to continue repairing identified anomalies with 40% metal loss or greater, consistent with the Consent Decree. The OSFM representatives did not indicate that the Consent Decree's 40% metal loss threshold should include an allowance for tool tolerance.

After the State Waivers were issued, Sable repeatedly confirmed to OSFM that it had repaired anomalies with 40% or greater metal loss, and OSFM never required tool tolerance be considered. For example, in a presentation shared with OSFM in advance of hydrotesting Line CA-325 in March 2025, Sable confirmed that "[a]ll metal loss anomalies [on Lines CA-324 and CA-324] that have an ILI reported depth of 40% and greater wall loss" were repaired. As part of the same discussions, during a meeting with OSFM on March 12, 2025, OSFM asked Sable about the tool sizing tolerances used during the inspections that took place in 2023, which generated the metal loss rates used to determine which anomalies were repaired by Sable. OSFM also identified several "State Waiver Remediation Conditions" that were intended to be "[r]equirements prior to hydrotest … and restart." OSFM specifically asked whether Sable's anomaly repair threshold accommodated for tool sizing tolerance, consistent with Footnote 10. Sable explained its understanding (based on the 2024 discussions with OSFM described above) that OSFM intended the State Waiver Conditions to apply on a prospective basis after restart, such that Sable would not be required to modify its repair methodology or perform any additional repairs to account for tool tolerance prior to restart. OSFM concurred with Sable's understanding and approved proceeding with the hydrotests.

On May 19, 2025, Sable once again reconfirmed to OSFM that it had repaired all anomalies of 40% or greater metal loss as of May 18, 2025. As part of those discussions, OSFM did not assert that a tool sizing tolerance should have been considered. And, during Sable's recent August 12-14, 2025, Operations and Maintenance inspection with OSFM, which were attended by Assistant Deputy Director Hosler and at least five additional OSFM engineers, Sable again confirmed with OSFM that the State Waivers' tool tolerance condition was intended to apply prospectively—after restart occurs—given the successful spike and 8-hour hydrotests on the Pipelines. At this meeting, OSFM again agreed with Sable's understanding, and there was consensus among Sable and OSFM that the successful spike and 8-hour hydrotest was more than sufficient to confirm the integrity of the line and account for any possible tool tolerance from the 2022-23 ILI runs.

Based on this history, and the consistent interpretation of the State Waiver Conditions by OSFM experts and personnel, we believe that OSFM's letter contains a misunderstanding of the Conditions and how OSFM has consistently interpreted and applied them.

**Conclusion**

CA-324 and CA-325 A/B have received an extraordinary level of assessment, testing and repair – far beyond what industry standards require. That heightened assessment repair will continue after restart, with ILI runs and even more conservative repair criteria. To the extent that anomalies remain, Sable will address them pursuant to the terms of the State Waivers. Sable understands and respects OSFM's focus on pipeline safety, and that safety is of Sable's utmost concern. The correct interpretation of the State Waivers – with prospective application of anomaly repair requirements - ensures pipeline safety and that all conditions are remediated within 180 days of resuming oil transportation.

We respectfully request that, given this background, you coordinate further with the expert team at OSFM and revisit the statements in your October 22nd letter. We would be happy to discuss these issues with you further and look forward to the successful and prompt restart of CA-324 and CA-325 A/B.

Sincerely,

B. Lance Yearwood

B. Lance Yearwood
Vice President, Pacific Pipeline Company
Sable Offshore Corp.

cc: James Hosler, OSFM, Assistant Deputy Director
Alin Podoreanu, OSFM, Supervising Pipeline Safety Engineer
Joshua Cleaver, CAL FIRE, Staff Counsel

**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov

October 22, 2025

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT: STATE WAIVER REQUIREMENTS PRIOR TO RESTART OF LINES CA-324 AND CA-325A/B**

Dear Mr. Yearwood,

On December 17, 2024, the CAL FIRE - Office of the State Fire Marshal (OSFM) issued State Waivers for the above captioned pipelines. The Pipeline and Hazardous Materials Safety Administration (PHMSA) issued the concurrence with the terms of the State Waivers on February 11, 2025. Those State Waivers were issued in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

Sable sought the State Waivers to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection (CP) due to the shielding effects of the polyurethane foam and the polyethylene tape wrap surrounding the pipelines. It is critical to stress that a State Waiver prescribes alternative measures that provide an equal or greater level of safety than the required regulation. The OSFM granted the State Waivers on the condition that Sable complies with the specific requirements contained therein.

On September 11, 2025, Sable submitted a restart plan to OSFM for review and approval. OSFM's review of the restart plan is ongoing. During this process, OSFM identified a requirement of the State Waivers that has not yet been met and that Sable must complete prior to any potential restart. Pursuant to item 9 in the State Waivers, Sable must repair all immediate and 180-day repair conditions prior to restart. Those conditions are further clarified in the sections titled "Immediate Repair Conditions" and "180-Day Repair Conditions." Most pertinent here is the 180-day repair condition language (see Condition 35 in the CA-324 State Waiver and Condition 36 in the CA-325A/B State Waiver) that includes "anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth." Footnotes 7 and 9 further

clarify that remediation means “a permanent repair method.” The State Waivers require all such anomalies to be remediated, including tool tolerance. According to OSFM records, Sable has not satisfied this condition in the State Waivers.

The above findings alone and the inconsistencies with the State Waiver requirements prevent restart under the law. The OSFM continues to review the restart plan submitted by Sable in September, and while OSFM is providing this initial notification of deficiency to Sable regarding the State Waiver requirements, OSFM may have further comment or requirements arising out of that review.

Sincerely,

DANIEL BERLANT
State Fire Marshal

cc: James Hosler, OSFM, Assistant Deputy Director
Alin Podoreanu, OSFM, Supervising Pipeline Safety Engineer
Joshua Cleaver, CAL FIRE, Staff Counsel

U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

February 11, 2025

Mr. James Hosler
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs
Department of Forestry and Fire Protection
Office of the State Fire Marshal
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

**Re: Docket No. PHMSA-2025-0003**

Dear Mr. Hosler:

On December 17, 2024, pursuant to 49 United States Code (USC) § 60118(d), the Pipeline and Hazardous Materials Safety Administration (PHMSA) received a notification letter from CAL FIRE – Office of the State Fire Marshal (OSFM), granting a waiver of 49 Code of Federal Regulations (CFR) § 195.452(h)(4)(iii)(H) to Sable Offshore Corp (Sable). This waiver will allow Sable to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam insulation and the polyethylene tape wrap.

The OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 113.56 miles of 30-inch diameter pipeline (Sable CA-325A/B) between Gaviota, Sisquoc, and Pentland, California. The state waiver requires Sable comply with over 60 conditions, including this pipeline be hydrostatically tested using a "spike" hydrostatic test prior to putting the pipeline into operation, and the pipeline be inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies within seven days of achieving initial steady state operation of the pipeline. Thereafter, the pipeline must be reassessed at least every year.

Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-325A&B pipeline. PHMSA requests that a copy of OSFM's final waiver to Sable be forwarded to PHMSA within 30 days of the issuance.

If you wish to discuss this or any other pipeline safety matter, my staff would be pleased to assist you. Please contact Max Kieba, Director of Engineering and Research Division at 202-493-0595, for technical matters.

Sincerely,

ALAN KRAMER MAYBERRY

Digitally signed by ALAN KRAMER MAYBERRY
Date: 2025.02.11 12:30:44 -05'00'

Alan K. Mayberry,
Associate Administrator for Pipeline Safety

U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

February 11, 2025

Mr. James Hosler
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs
Department of Forestry and Fire Protection
Office of the State Fire Marshal
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

**Re: Docket No. PHMSA-2025-0002**

Dear Mr. Hosler:

On December 17, 2024, pursuant to 49 United States Code (USC) § 60118(d), the Pipeline and Hazardous Materials Safety Administration (PHMSA) received a notification letter from CAL FIRE – Office of the State Fire Marshal (OSFM), granting a waiver of 49 Code of Federal Regulations (CFR) § 195.452(h)(4)(iii)(H) to Sable Offshore Corp (Sable). This waiver will allow Sable to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam insulation and the polyethylene tape wrap.

The OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 10.86 miles of 24-inch diameter pipeline (Sable CA-324) between Las Flores Canyon and Gaviota, California. The state waiver requires Sable comply with over 60 conditions, including this pipeline be hydrostatically tested using a “spike” hydrostatic test prior to putting the pipeline into operation, and the pipeline be inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies within seven days of achieving initial steady state operation of the pipeline. Thereafter, the pipeline must be reassessed at least every year.

Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-324 pipeline. PHMSA requests that a copy of OSFM's final waiver to Sable be forwarded to PHMSA within 30 days of the issuance.

If you wish to discuss this or any other pipeline safety matter, my staff would be pleased to assist you. Please contact Max Kieba, Director of Engineering and Research Division at 202-493-0595, for technical matters.

Sincerely,

ALAN KRAMER MAYBERRY
Digitally signed by ALAN KRAMER MAYBERRY
Date: 2025.02.11 12:30:07 -05'00'

Alan K. Mayberry,
Associate Administrator for Pipeline Safety

**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov

**CERTIFIED MAIL No: 9589-0710-5270-1475-5353-15**

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT: LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-325A/B)**

Operator: Sable Offshore Corp
OPID# 40851
845 Texas Avenue, Suite 2920
Houston, Texas 77002

Pipeline: OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa Barbara County, San Luis Obispo County, and Kern County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-325 A/B.

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the

shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation. Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-325A/B (OSFM Line ID 0001) which consists of a 113.56 mile long, 30-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara County, San Luis Obispo County, and Kern County, California and shall be referred herein as CA-325A/B. CA-325A/B consists of two shorter pipeline segments, CA-325A and CA-325B. The pipeline segment CA-325A, located completely in Santa Barbara County, starts in Gaviota and ends at Sisquoc. CA-325A is approximately 38.72 miles long. The other pipeline segment, CA-325B, which is directly downstream of CA-325A, begins at Sisquoc and terminates in Pentland. CA-325B is approximately 74.84 miles long and traverses Santa Barbara County, San Luis Obispo County, and Kern County, California. The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-325 A/B, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these

state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control. Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-325 A/B shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) cannot exceed:
   a. 1000 pounds per square inch gauge (psig) for CA-325A.
   b. 1292 psig for CA-325B.
3. The maximum operating temperature of the crude oil must not exceed:
   a. 125 Fahrenheit for more than 12 consecutive hours for CA-325A. Temperature transmitters must be installed on CA-325A at Gaviota station to monitor the temperature of CA-325A/B at this facility.
   b. 110 Fahrenheit for more than 12 consecutive hours for CA-325B. Temperature transmitters must be installed on CA-325A/B at Sisquoc station to monitor the temperature of CA-325A/B at this facility.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI)
   c. Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI

8. Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30” pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30” pipe specifications:
   a. API 5L X70 pipe with a nominal thickness of 0.281” that was manufactured by the various pipe mills in the 1980s.
   b. API 5L X65 pipe with a nominal thickness of 0.344” that was manufactured by the various pipe mills in the 1980s.

   At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]
9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.
10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.
11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.
[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

**Pressure Testing**

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:
    **a.** All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    **b.** All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.
13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum of 1.25 times the MOP.
14. Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the state waiver pipeline segment *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.
15. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test segment and have the approved independent testing firm forward the certified test results to the OSFM.
16. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.
17. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
    Subject: OSFM State Waiver - Hydrotest Failure.
18. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

**In-Line Inspection (ILI) Assessment and Frequency**

19. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:
    a) Dates for integrity assessment
    b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications
    c) In-line inspection tool vendor(s)
    d) Required tool specifications including operational specifications and anomaly sizing tolerances
    e) Tool validation methodology
    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications
    g) Criteria used to identify locations for excavation and field verification
    h) Non-destructive examination
20. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.
21. Metal Loss Tool(s)
    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.
    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If,

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

22. Crack Detection Tools - Sable must run at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or the ILI assessment must be assessed at more frequent intervals if Condition 49 determined a shorter assessment interval.
    a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.
    b. USCD Performance Specification Requirements
        i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.
        ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.
        iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.
        iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.
23. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.
24. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.
25. All ILI tool runs must obtain the Test ID from the OSFM prior to run.
26. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.
27. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to the OSFM and PHMSA approval.

28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.
29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

**<u>Discovery of Condition</u>**

30. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

**<u>Immediate Repair Conditions</u>**[7]

31. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.
32. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.
33. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[8] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

**180-Day Repair Conditions**[9]

34. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
35. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
36. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
37. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

**Corrosion Growth Rate Analysis (CGRA)**

38. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11] The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
39. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
40. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
41. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

---

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii). All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

42. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**Pressure Reduction**

43. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

**In Field Direct Examination of Pipe**

44. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.
45. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:
    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.
    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.
    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.
46. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

---

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.
[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

47. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]
48. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

49. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).
50. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.
51. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).
52. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.
53. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.
54. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC)

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

55. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.
56. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

57. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.
58. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions
    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
o. Safety factors used for fatigue life and/or predicted failure pressure calculations
p. Reassessment time interval and safety factors
q. The date of the review
r. Confirmation of the results by qualified technical subject matter expert(s)
s. Approval by responsible Sable management personnel
t. Records of additional preventive and mitigative (P&M) measures performed
u. Reports required by this State Waiver.

**Reporting**

59. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification*.[17]
60. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-325 A/B*. The email notification shall include, if applicable:
    d. Tool type and run date
    e. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
    f. Dig sheets
    g. Field contact information for Sable
    h. Time and location of the field evaluation and repair.
61. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-325 A/B* and include:
    i. Tool type
    j. Run date
    k. Summary of Conditions Report[18]
    l. Final Vendor Report and Pipe Tally
62. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report*

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.
[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

*CA-325 A/B*. At a minimum, the annual report shall contain the following, if applicable:

a. A Closure Report for the previous calendar (CY) which contains:
    i. Features that were remediated in previous CY
        1. Provide documentation for the in-the-ditch assessments and repairs
    ii. Identify features that remain to be assessed
    iii. Unity Plots for previous ILI runs
b. Fracture mechanics and pressure cycling analyses in accordance with Condition 49
c. The third-party ILI expert reviews in accordance with Condition 53
d. AC and DC Interference surveys that are due in accordance with Condition 54
e. A copy of the CGRA for prior year including:
    i. Mean corrosion growth rate for the pipeline
    ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

**<u>Limitations</u>**

63. This state waiver is limited to a term of no more than ten (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
64. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
65. The OSFM may order the pipeline shutdown at any time.
66. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.
67. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
68. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.

Sincerely,

DocuSigned by:
James Hosler
980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-325 A/B

cc: Doug Allen, Supervising Pipeline Safety Engineer, OSFM
Andy Chau, Supervising Pipeline Safety Engineer, OSFM
Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
Tuan Tran, Pipeline Safety Engineer, OSFM
Josh Cleaver, Staff Counsel, CAL FIRE
Max Kieba, Engineering and Research Division, PHMSA
Joshua Johnson, Engineering and Research Division, PHMSA

**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov

**CERTIFIED MAIL No: 9589-0710-5270-1475-5353-08**

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT: LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-324)**

Operator: Sable Offshore Corp
OPID# 40851
845 Texas Avenue, # 2920
Houston, Texas 77002

Pipeline: OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-324.

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation. Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-324 (OSFM Line ID 0015) which consists of a 10.86 mile long, 24-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara, California and shall be referred herein as *CA-324.*

The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-324, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In the event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control.

Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-324 shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) of CA-324 cannot exceed 1003 pounds per square inch gauge (psig).
3. The maximum operating temperature of the crude oil that transports in CA-324 must not exceed 140 Fahrenheit for more than 12 consecutive hours.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
    a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
        i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
        ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
    b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).
    c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI.
8. Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24” pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24” pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344” that was manufactured by

Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.
10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.
11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324.

**Pressure Testing**

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.
[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
b. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segments at a minimum of 1.25 times the MOP.
14. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM.
15. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.
16. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure
17. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

**<u>In-Line Inspection (ILI) Assessment and Frequency</u>**

18. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:
a) Dates for integrity assessment
b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.
[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

c) In-line inspection tool vendor(s)
d) Required tool specifications including operational specifications and anomaly sizing tolerances
e) Tool validation methodology
f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications
g) Criteria used to identify locations for excavation and field verification
h) Non-destructive examination

19. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.
20. Metal Loss Tool(s)
    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.
    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).
21. Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15

months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval.

a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.
b. USCD Performance Specification Requirements
    i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.
    ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.
    iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.
    iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

22. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.
23. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.
24. All ILI tool runs must obtain the Test ID from the OSFM prior to run.
25. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.
26. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.
27. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval.

document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

28. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

**<u>Discovery of Condition</u>**

29. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

**<u>Immediate Repair Conditions</u>**[7]

30. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.
31. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.
32. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

**180-Day Repair Conditions**[9]

33. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
34. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
35. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
36. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

**Corrosion Growth Rate Analysis (CGRA)**

37. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11] The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
38. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

---

[8] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii). All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

39. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
40. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].
41. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**Pressure Reduction**

42. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

**In Field Direct Examination of Pipe**

43. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.
44. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:
    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.
[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.
[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.
c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

45. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.
46. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]
47. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

48. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).
49. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.
50. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

51. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.
52. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.
53. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

**Data Requirements for Predicted Failure Analysis**

54. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.
55. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

**Recordkeeping**

56. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.
57. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions

e. Evaluation methodology used
f. Models used
g. Direct in situ examination data
h. All in-line inspection tool assessments information evaluated
i. Pressure test data and results
j. All in-the-ditch assessments performed on the pipeline segments
k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
l. All finite element analysis results
m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology
n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
o. Safety factors used for fatigue life and/or predicted failure pressure calculations
p. Reassessment time interval and safety factors
q. The date of the review
r. Confirmation of the results by qualified technical subject matter expert(s)
s. Approval by responsible Sable management personnel
t. Records of additional preventive and mitigative (P&M) measures performed
u. Reports required by this State Waiver.

**Reporting**

58. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification*.[17]
59. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324*. The email notification shall include, if applicable:
    a. Tool type and run date
    b. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
    c. Dig sheets
    d. Field contact information for Sable
    e. Time and location of the field evaluation and repair.
60. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-324* and include:

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

   a. Tool type
   b. Run date
   c. Summary of Conditions Report[18]
   d. Final Vendor Report and Pipe Tally

61. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report CA-324*. At a minimum, the annual report shall contain the following, if applicable:
   a. A Closure Report for the previous calendar (CY) which contains:
      i. Features that were remediated in previous CY
         1. Provide documentation for the in-the-ditch assessments and repairs
      ii. Identify features that remain to be assessed
      iii. Unity Plots for previous ILI runs
   b. Fracture mechanics and pressure cycling analyses in accordance with Condition 48
   c. The third-party ILI expert reviews in accordance with Condition 52
   d. AC and DC Interference surveys that are due in accordance with Condition 53
   e. A copy of the CGRA for prior year including:
      i. Mean corrosion growth rate for the pipeline
      ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

**Limitations**

62. This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
63. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
64. The OSFM may order the pipeline shutdown at any time.
65. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.

66. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
67. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.

Sincerely,

DocuSigned by:
James Hosler
980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-324

cc: Doug Allen, Supervising Pipeline Safety Engineer, OSFM
Andy Chau, Supervising Pipeline Safety Engineer, OSFM
Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
Tuan Tran, Pipeline Safety Engineer, OSFM
Josh Cleaver, Staff Counsel, CAL FIRE
Max Kieba, Engineering and Research Division, PHMSA
Joshua Johnson, Engineering and Research Division, PHMSA

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>Plaintiffs,<br><br>v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P.,<br><br>Defendants. | Civil Action No.<br>2:20-cv-02415<br>**CONSENT DECREE** |

XAVIER BECERRA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL ZARRO (CA Bar Number: 110171)
JESSICA BARCLAY-STROBEL (CA Bar Number: 280361)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6635
E-mail: Jessica.BarclayStrobel@doj.ca.gov
*Counsel for Plaintiffs California Department of Fish and Wildlife, Central Coast Regional Water Quality Control Board, and California Department of Forestry and Fire Protection's Office of State Fire Marshal*

XAVIER BECERRA
Attorney General of California
CHRISTINA BULL ARNDT
Supervising Deputy Attorney General
NICOLE RINKE (CA Bar Number: 257510)
MITCHELL E. RISHE (CA Bar Number: 193503)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6394
E-mail: Mitchell.Rishe@doj.ca.gov
*Counsel for Plaintiffs California Department of Parks and Recreation and California State Lands Commission*

MARGARET WU (CA Bar Number: 116588)
Deputy General Counsel
BARTON LOUNSBURY (CA Bar Number: 253895)
Senior Counsel
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, California 94607-5200
Tel: (510) 987-9800
E-mail: barton.lounsbury@ucop.edu
*Counsel for Plaintiff The Regents of the University of California*

Case: 26-4629, 11/09/2026, DktEntry: 48.1, (183 of 293)

## TABLE OF CONTENTS

I. BACKGROUND ........ - 5 -
II. JURISDICTION AND VENUE ........ - 6 -
III. APPLICABILITY ........ - 7 -
IV. DEFINITIONS ........ - 7 -
V. CIVIL PENALTIES ........ - 13 -
VI. NATURAL RESOURCE DAMAGES ........ - 17 -
VII. TRUSTEES' MANAGEMENT AND APPLICABILITY OF JOINT NRD FUNDS ........ - 21 -
VIII. TRUSTEES' MANAGEMENT OF RECREATIONAL USE FUNDS ........ - 22 -
IX. INJUNCTIVE RELIEF ........ - 23 -
X. CORRECTIVE ACTION ORDER ........ - 27 -
XI. STIPULATED PENALTIES ........ - 27 -
XII. FORCE MAJEURE ........ - 35 -
XIII. DISPUTE RESOLUTION ........ - 37 -
XIV. REPORTING ........ - 39 -
XV. CERTIFICATION ........ - 40 -
XVI. INFORMATION COLLECTION AND RETENTION ........ - 40 -
XVII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ........ - 43 -
XVIII. TRANSFER AND ACQUISITION OF ASSETS ........ - 49 -
XIX. COSTS ........ - 50 -
XX. NOTICES ........ - 51 -
XXI. EFFECTIVE DATE ........ - 54 -
XXII. RETENTION OF JURISDICTION ........ - 54 -
XXIII. MODIFICATION ........ - 54 -

XXIV. TERMINATION ........ - 55 -
XXV. PUBLIC PARTICIPATION ........ - 56 -
XXVI. SIGNATORIES/SERVICE ........ - 56 -
XXVII. INTEGRATION ........ - 57 -
XXVIII. FINAL JUDGMENT ........ - 57 -
XXIX. 26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION ........ - 57 -

A. WHEREAS, on or about May 19, 2015, a hazardous liquid pipeline known as the Line 901 pipeline ("Line 901") owned and operated by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P., (jointly, "Plains" or "Defendants"), failed and discharged approximately 2,934 barrels of heavy crude-oil ("Refugio Incident") in Santa Barbara County, California. A portion of the oil reached the Pacific Ocean and coastal areas such as Refugio State Beach. The Refugio Incident adversely impacted Natural Resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and the State of California ("California" or the "State").

B. WHEREAS, cleanup actions began immediately after the Refugio Incident at the direction of a Unified Command established by the United States Coast Guard ("USCG") and the State of California Department of Fish and Wildlife ("CDFW"), Office of Spill Prevention and Response ("OSPR"). The Unified Command was comprised of the United States, State agencies, the County of Santa Barbara, and Plains.

C. WHEREAS, on May 21, 2015, the United States Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued Plains a Corrective Action Order ("Original CAO"), CPF No. 5-2015-5011H, which was subsequently amended on June 3, 2015 ("CAO Amendment No. 1"), November 12, 2015 ("CAO Amendment No. 2"), and June 16, 2016 ("CAO Amendment No. 3"), (collectively, "the PHMSA CAO"). The PHMSA CAO directed Plains, among other things, to purge Line 901 and a portion of the adjoining Line 903 pipeline ("Line 903"), between Plains' Gaviota and Pentland pump stations, and to keep Line 901 and the purged sections of Line 903 shut down until the actions required by the PHMSA CAO were satisfactorily completed.

D. WHEREAS, on May 19, 2016, PHMSA issued a Failure Investigation Report, which included PHMSA's findings of the "proximate or direct" causes and the "contributing" causes of the Refugio Incident.

E. WHEREAS, Defendants reimbursed Plaintiffs' costs incurred for cleanup, and Plaintiffs have no known unreimbursed claims for cleanup costs arising from the Refugio Incident.

F. WHEREAS, CDFW incurred certain additional costs arising from the administration and civil enforcement of pollution laws, including attorneys' fees that have been reimbursed by Plains.

G. WHEREAS, Plains represents that it has implemented and will continue to utilize an electronic tracking tool and software for maintenance activities, including those activities related to mainline valves. The software tracks which maintenance activities are performed, who performs the activity, when prior notifications of maintenance activities by field personnel are received, when problems requiring maintenance are first discovered, and when maintenance problems are corrected. Plains maintains a separate software program to track the training and qualifications of all maintenance personnel.

H. WHEREAS, Plains represents that, following the Refugio Incident and pursuant to PHMSA's CAO, Plains performed a comprehensive review of its Emergency Response Plan and Training Program, and revised and updated its Response Plan for Onshore Oil Pipelines for Line 901 and Line 903 ("Bakersfield District Response Zone Plan") to reflect modifications resulting from the review and the incorporation of lessons learned. As part of the revision, Plains identified the locations of culverts along the pipelines' rights-of-way and provided containment and recovery techniques for responding to spills that may occur near those culverts. Plains provided drafts of the updated Bakersfield District Response Zone Plan to PHMSA, incorporated comments provided by PHMSA, and received approval of the revised plan from PHMSA on September 26, 2017.

I. WHEREAS, Plains represents that it also created a more detailed Geographic Information System ("GIS") based online Tactical Response Plan for its onshore oil pipelines in Southern California, including Line 2000 and the operational portion of Line 903, that, among other things, identifies culverts along the pipelines' rights-of-way, potential receptors and the equipment, supplies and resources that would be necessary to respond to a spill occurring at any given location along those pipelines, identifies the sources and locations for obtaining those resources, and, in some instances, establishes stored inventories of those resources in specific locations. Plains represents that it intends to keep its Tactical Response Plan updated and available for use in drills and spill response, and that it will make the Tactical Response Plan available to the Plaintiffs upon reasonable request and as needed in connection with a drill or response to a spill.

J. WHEREAS, Plains represents that Plains personnel responding to incidents that trigger the standup of an incident command structure ("ICS") have been provided ICS training appropriate to their responsibilities.

K. WHEREAS, the relevant Natural Resources trustees ("Trustees") for the Refugio Incident are the United States Department of the Interior ("DOI"); United States Department of Commerce, on behalf of the National Oceanic and Atmospheric Administration ("NOAA"); CDFW; California Department of Parks and Recreation ("CDPR"); California State Lands Commission ("CSLC"); and The Regents of the University of California ("UC").

L. WHEREAS, pursuant to Section 1006 of the Oil Pollution Act (''OPA''), 33 U.S.C. 2701, *et seq*., the United States and the State Trustees allege that oil from the Refugio Incident caused injuries to Natural Resources, including birds, marine mammals, shoreline and subtidal habitats, and also had an impact upon human uses of Natural Resources and other public resources. The Federal Trustees are designated pursuant to the National Contingency Plan,

40 C.F.R. § 300.600 and Executive Order 12777. CDFW and CDPR are designated state trustees pursuant to the National Contingency Plan, 40 C.F.R. § 300.605, and the Governor's Designation of State Natural Resource Trustees pursuant to Section 1006(b)(3) of OPA and the Comprehensive Environmental Response, Compensation and Liability Act of 1980. In addition, CDFW has state natural resource trustee authority pursuant to California Fish and Game Code §§ 711.7 and 1802 and the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (California Government Code § 8670.1 *et seq*.). CDPR and UC have jurisdiction over natural resources within the state park system and the UC Natural Reserve System, respectively, which are held in trust for the people of the State of California. CSLC is a state trustee pursuant to its jurisdiction under Public Resources Code § 6301 and Civil Code § 670.

M. WHEREAS, after the Refugio Incident, the Trustees and Defendants entered into a cooperative Natural Resource Damage Assessment process pursuant to 15 C.F.R. § 990.14, whereby the Trustees and Defendants jointly and independently planned and conducted a number of injury assessment activities. These activities included gathering and analyzing data and other information that the Trustees used to determine and quantify resource injuries and damages. As a result of this process and other activities, the Trustees identified several categories of injured and damaged Natural Resources, including birds, marine mammals, and shoreline and subtidal habitats, as well as effects to human use/recreation resulting from impacts on these Natural Resources, and determined the cost to restore, rehabilitate, replace, or acquire the equivalent of injured Natural Resources. By entering this Consent Decree, Defendants do not admit or agree that the Trustees' NRD findings and determinations are accurate.

N. WHEREAS, due to the specific facts surrounding the Refugio Incident, including the timing, degree, and nature of the spill and the affected

environment, the Trustees will not seek additional damages, costs, or expenses for Natural Resources resulting from the Refugio Incident.

O. WHEREAS, Plains agrees to reimburse costs incurred by the Trustees in connection with the NRDA through November 15, 2018, and will not reimburse costs incurred by the Trustees in connection with the NRDA after that date.

P. WHEREAS, by entering into this Consent Decree, Plains does not admit the allegations in the Complaint filed in this action, or any liability to the Plaintiffs.

Q. WHEREAS, on January 28, 2019, PHMSA initiated a regularly-scheduled "Integrated Inspection" of a portion of Defendants' Regulated Pipelines, as described below, and other pipeline facilities and records, pursuant to 49 U.S.C. § 60117.

R. WHEREAS, the Parties agree that settlement of this matter without further litigation is in the public interest and that the entry of this Consent Decree is the most appropriate means of resolving this action.

S. WHEREAS, the Parties agree and the Court by entering this Consent Decree finds, that this Consent Decree: (1) has been negotiated by the Parties at arm's-length and in good faith; (2) will avoid prolonged litigation between the Parties; (3) is fair and reasonable; and (4) furthers the objectives of the federal and state environmental protections, and the federal and state pipeline safety laws.

## I. BACKGROUND

The United States, on behalf of PHMSA, the United States Environmental Protection Agency ("EPA"), DOI, NOAA, and USCG; and the People of the State of California *Ex Relatione* CDFW, CDPR, CSLC, UC, the California Central Coast Regional Water Quality Control Board ("RWQCB"), and the California Department of Forestry and Fire Protection's - Office of the State Fire

Marshal ("OSFM"), filed a Complaint in this matter pursuant to the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*., and associated regulations and orders; OPA, 33 U.S.C. §§ 2701 *et seq*., and associated regulations and orders; the federal Pipeline Safety Laws, 49 U.S.C. §§ 60101 *et seq*., and associated regulations and orders; the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, California Government Code §§ 8670.1 *et seq*. and associated regulations; California Fish and Game Code §§ 2014, 5650, 5650.1, 12016, 13013; California Water Code §§ 13350, 13385; and the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq*. The Complaint against Plains, *inter alia*, asserts allegations of violations, and seeks penalties, injunctive relief, and Natural Resource Damages.

NOW, THEREFORE, before the trial of any claims and without adjudication or admission of any issue of fact or law and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II. JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of the United States' claims in this action pursuant to Section 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. § 1321(b)(7)(E) and (n), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Sections 60120 and 60122 of the Pipeline Safety Laws, 49 U.S.C. §§ 60120 and 60122; and 28 U.S.C. §§ 1331, 1345, and 1355. This Court has supplemental jurisdiction over the State law claims pursuant to 28 U.S.C. § 1367. To the extent the OPA presentment requirement described in 33 U.S.C. § 2713 applies, the United States and the State Agencies have satisfied the requirement.

2. Venue is proper in this District pursuant to Section 311(b)(7)(E) of the CWA, 33 U.S.C. § 1321(b)(7)(E), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Section 60120 of the Pipeline Safety Laws, 49 U.S.C. § 60120; and 28 U.S.C. §§ 1391 and 1395(a), because Plains

does business in this District and the alleged claims occurred in this District.

3. For purposes of this Consent Decree or any action to enforce this Consent Decree, Defendants consent to the Court's jurisdiction over this Consent Decree for such action and Defendants consent to venue in this judicial district. For purposes of this Consent Decree and without admission of liability, Defendants agree that the Complaint states claims upon which relief may be granted.

## III. APPLICABILITY

4. Subject to the terms herein, the obligations of this Consent Decree apply to and are binding upon the Parties and any successors, assigns, as well as any other entities or persons otherwise bound by law to comply with this Consent Decree.

5. Defendants shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include ensuring compliance with any provision of this Consent Decree, as well as to any contractor retained for the purpose of performing work required under this Consent Decree. Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree by specifying that contractors are obligated to perform work in compliance with this Consent Decree.

6. In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## IV. DEFINITIONS

7. Terms used in this Consent Decree that are defined in the CWA, OPA, Pipeline Safety Laws, the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, and the Elder California Pipeline Safety Act of 1981 shall

have the meanings assigned to them in these statutes and their regulations, unless otherwise provided in this Consent Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Appendix A" is the set of maps that generally depict Lines 901, 903, and 2000;

"Appendix B" is the Injunctive Relief that Plains is required to perform under this Consent Decree;

"Appendix C" is intentionally left blank;

"Appendix D" is the list of remaining corrective actions from the PHMSA CAO that Plains is still required to implement under this Consent Decree. For the terms of the PHMSA CAO, *see* https://primis.phmsa.dot.gov/comm/reports/enforce/CaseDetail_cpf_520155011H.html?nocache=4888#_TP_1_tab_1;

"CDFW" shall mean the California Department of Fish and Wildlife and any of its successor departments or agencies;

"CDPR" shall mean the California Department of Parks and Recreation and any of its successor departments or agencies;

"Complaint" shall mean the Complaint filed by the Plaintiffs in this action;

"Consent Decree" shall mean this Consent Decree and all Appendices attached hereto;

"Control Room Management Plan" shall mean Plains' Control Room Management Plan, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"Control Center General Procedures" shall mean Plains' Control Center General Procedures, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"CSLC" shall mean the California State Lands Commission and any of its successor departments or agencies;

"Day" shall mean a calendar day unless expressly stated to be a working day. In computing any period of time under this Consent Decree, the rules set forth in Rule 6 of the Federal Rules of Civil Procedure shall apply;

"Defendants" shall mean Plains All American Pipeline, L.P. and Plains Pipeline, L.P.;

"Delivery Lines" as stated in Appendix B shall mean any pipeline that generally operates to move oil from a delivery meter on a pipeline or facility to another pipeline or facility in close proximity;

"DOI" shall mean the United States Department of the Interior, including its bureaus and agencies, and any of its successor departments or agencies;

"Elder California Pipeline Safety Act" shall mean the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq*.;

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

"Effective Date" shall have the definition provided in Section XXI (Effective Date);

"Federal Trustees" shall mean DOI and NOAA in their capacities as Natural Resource Trustees;

"Integrity Management Plan" or "IMP" shall mean Plains' Integrity Management Plan, dated September 2019, as delivered to PHMSA by letter dated November 19, 2019, from counsel for Defendants;

"Line 901" is Defendants' 24-inch diameter crude-oil pipeline that extends approximately 10.7 miles in length from the Los Flores Pump Station to the Gaviota Pump Station, in Santa Barbara County, California, as generally depicted in Appendix A;

"Line 903" is Defendants' 30-inch diameter crude-oil pipeline that extends approximately 129 miles in length from the Gaviota Pump Station in Santa Barbara County, California to the Emidio Pump Station in Kern County,

California, with intermediate stations at Sisquoc Mile Post 38.5 and Pentland Mile Post 114.57, as generally depicted in Appendix A;

"Line 2000" is Defendants' 20-inch diameter pipeline that extends approximately 130 miles in length and transports crude-oil produced in the outer continental shelf and the San Joaquin Valley. Line 2000 runs from Bakersfield, California, over the Tehachapi Mountains and through the Grapevine I-5 corridor and extends to delivery locations in the Los Angeles metropolitan area, as generally depicted in Appendix A;

"Mainline pipeline" as stated in Appendix B shall mean the principal pipeline or the parallel pipeline in a given pipeline system, excluding connected lateral lines or branch lines that are used locally to deliver product either into the mainline pipeline from, or out of the mainline pipeline to, a nearby facility or a third-party line;

"Natural Resource" and "Natural Resources" shall mean land, fish, mammals, birds, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and/or the State or any subdivision thereof, and shall also mean the services provided by such resources to other resources or to humans;

"Natural Resource Damages" or "NRD" shall mean all damages, including restoration or rehabilitation costs, recoverable by the United States or State Trustees for injuries to, destruction of, loss of, or loss of use of, natural resources including any services such natural resources provide, including the reasonable costs of assessing the damage, as described in 33 U.S.C. § 2702(b)(2)(A), resulting from the Refugio Incident;

"Natural Resource Damage Assessment" or "NRDA" shall mean the process of collecting, compiling, and analyzing information, statistics, or data through prescribed methodologies to determine damages for injuries to Natural

Resources, as described in 15 C.F.R. Part 990, resulting from the Refugio Incident;

"NRD Payment" shall mean the payment Defendants are required to pay for the Natural Resource Damages as described in Section VI (Natural Resource Damages);

"Natural Resource Trustees" or "Trustees" are those federal and state agencies or officials designated or authorized pursuant to the CWA, OPA, and/or applicable state laws to act as Trustees for the Natural Resources belonging to, managed by, controlled by, or appertaining to the United States or the State. Participating Trustees in the Natural Resource Damage Assessment and in this Consent Decree are DOI, NOAA, CDFW, CDPR, CSLC, and UC;

"NOAA" shall mean the National Oceanic and Atmospheric Administration and any of its successor departments or agencies;

"Oil Spill Liability Trust Fund" or "OSLTF" shall mean, *inter alia*, the fund established pursuant to 26 U.S.C. § 9509, including the claim-reimbursement provisions set forth in 33 U.S.C. § 2712;

"OSFM" shall mean the California Department of Forestry and Fire Protection's - Office of the State Fire Marshal and any of its successor departments or agencies;

"Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral;

"Parties" shall mean the Plaintiffs and Defendants, collectively;

"PHMSA" shall mean the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration and any of its successor departments or agencies;

"PHMSA Corrective Action Order" or "PHMSA CAO" shall mean the Original CAO issued on May 21, 2015, by PHMSA, which was subsequently amended on June 3, 2015, November 12, 2015, and June 16, 2016;

"Pipeline Safety Laws" shall mean 49 U.S.C. §§ 60101 *et seq*., and regulations promulgated thereunder, including 49 C.F.R. Parts 190-199;

"Plaintiffs" shall mean the United States and the State Agencies;

"Refugio Incident" shall mean the release of approximately 2,934 barrels of crude-oil from Plains' Line 901 Pipeline, in Santa Barbara County, California on or about May 19, 2015;

"Regulated Pipeline" shall mean any pipeline operated by Plains subject to regulation under 49 C.F.R. Subchapter D, 19 California Code of Regulations Div. 1 Ch. 14, or the pipeline safety regulations of any other state certified by PHMSA pursuant to 49 U.S.C. § 60105, but excludes facilities other than pipelines;

"Requests for Information" or "RFI" shall mean PHMSA's RFIs dated August 19, 2015, August 21, 2015, and September 1, 2016. RFIs shall also refer to PHMSA's subpoenas issued to Plains dated July 27, 2016 and June 2, 2017;

"Restore" or "Restoration" shall mean any action or combination of actions to restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including Natural Resource-based recreational opportunities that were injured, lost, or destroyed as a result of the Refugio Incident;

"RWQCB" shall mean the California Central Coast Regional Water Quality Control Board and any of its successor departments or agencies;

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral;

"Segment" as stated in Appendix B shall mean any contiguous portion of a pipeline system for which a single hydrostatic test or ILI may be performed, as determined by Defendants;

"State Agencies" shall mean the People of the State of California, *Ex Relatione* CDFW, CDPR, CSLC, OSFM, RWQCB, and UC. The State Agencies do not include any entity or political subdivision of the State of California other than those agencies herein designated the "State Agencies";

"State Trustees" shall mean CDFW, CDPR, CSLC, and UC in their capacities as Natural Resource Trustees;

"United States" shall mean the United States of America, on behalf of PHMSA, EPA, DOI, NOAA, and USCG;

"UC" shall mean The Regents of the University of California and any of its successor departments or agencies; and

"USCG" shall mean the United States Coast Guard and any of its successor departments or agencies.

## V. CIVIL PENALTIES

A. Within thirty (30) Days after the Effective Date, Defendants shall pay to the United States, CDFW, and RWQCB a total civil penalty of twenty-four million dollars ($24,000,000), together with interest accruing from the date on which the Consent Decree is lodged with the Court, at a rate specified in 28 U.S.C. § 1961 (the "Penalty Payment"). The Penalty Payment shall be allocated as follows:

8. Penalty Payment to the United States (PHMSA). For violations of the Pipeline Safety Laws alleged in the United States' Complaint, Defendants shall pay to the United States a civil penalty of fourteen million five hundred thousand dollars ($14,500,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

a. Thirteen million two hundred fifty thousand dollars ($13,250,000) attributed to Plains' alleged Pipeline Safety Law violations; and

b. One million two hundred fifty thousand dollars ($1,250,000) attributed to Plains' alleged non-compliance with the RFIs.

c. Payment shall be made by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice in accordance with written instructions to be provided to Defendants by the

Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Central District of California Western Division after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

Megan Prout
Senior Vice President
Commercial Law and Litigation
Plains All American Pipeline, L.P.
333 Clay Street, Suite 1600
Houston, TX 77002

on behalf of Defendants. Defendants may change the individual to receive payment instructions on their behalf by providing written notice of such change to the United States in accordance with Section XX (Notices).

d. At the time of payment, Defendants shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state the payment is for the civil penalty owed pursuant to this Consent Decree in the *United States of America and the People of the State of California v. Plains All American Pipeline, L.P.*, *et al.*, and shall reference the Civil Action Number assigned to this case, CDCS Number, and DOJ case number 90-5-1-1-11340, to the United States in accordance with Section XX (Notices).

9. <u>Penalty Payment to the United States (EPA) shared with CDFW and RWQCB</u>. The Penalty Payment shall be allocated as follows:

a. As a CWA penalty for violations of 33 U.S.C. § 1321(b) and

the California statutes alleged in the Complaint other than California Government Code § 8670.66(b), Defendants shall pay a civil penalty of nine million four hundred fifty thousand dollars ($9,450,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

1) To CDFW, one million twenty-five thousand dollars ($1,025,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife. The check shall be sent by overnight or certified mail to:

California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill." CDFW shall deposit the money as follows: one million dollars ($1,000,000) into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70; and twenty-five thousand dollars ($25,000) into the Fish and Wildlife Pollution Account pursuant to California Fish and Game Code §§ 12017 and 13011.

2) To RWQCB, two million five hundred thousand dollars ($2,500,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to the "State Water Pollution Cleanup and Abatement Account" and sent to:

State Water Resources Control Board
Division of Administrative Services, ATTN: Civil Liability Payment
P.O. Box 1888
Sacramento, California 95812-1888

The check shall reference the "Refugio Oil Spill."

3) To the United States, five million nine hundred twenty-five thousand dollars ($5,925,000), together with a proportionate share of the interest accrued on the Penalty Payment, by EFT to the United States Department of Justice, in accordance with instructions to be provided to Defendants by the FLU of the United States Attorney's Office for the Central District of California Western Division. Such monies are to be deposited in the OSLTF. The Penalty Payment shall reference the Civil Action Number assigned to this case, DOJ case number 90-5-1-1-11340, and USCG reference numbers FPNs A15017 and A15018, and shall specify that the payment is made for CWA civil penalties to be deposited into the OSLTF pursuant to 33 U.S.C. § 1321(s), Section 4304 of Pub. L. No. 101-380, and 26 U.S.C. § 9509(b)(8). Any funds received after 11:00 a.m. Eastern Standard Time shall be credited on the next business day. Defendants shall simultaneously provide notice of payment in writing, together with a copy of any transmittal documentation to EPA and the United States in accordance with Section XX (Notices) of this Consent Decree, and to EPA by email to acctsreceivable.CINWD@epa.gov and to EPA and the National Pollution Funds Center at the following addresses:

Case: 26-4629, 11/09/2026, DktEntry: 48.1, (201 of 293)

U.S. Environmental Protection Agency
Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268

and

Patricia V. Kingcade
Attorney Advisor
National Pollution Funds Center
U.S. Coast Guard
2703 Martin Luther King Jr. Avenue SE
Washington, D.C. 20593-7605

10. Penalty Payment to be Paid to CDFW. For alleged violations of California Government Code § 8670.25.5, Defendants shall pay a civil penalty pursuant to California Government Code § 8670.66(b) of fifty thousand dollars ($50,000) together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife. The check shall be sent by overnight or certified mail to:

California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill." CDFW shall deposit the money into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70.

11. Defendants shall not deduct or capitalize any penalties paid under this Section or under Section XI (Stipulated Penalties) in calculating their federal or state income taxes.

## VI. NATURAL RESOURCE DAMAGES

12. Within thirty (30) Days after the Effective Date, Defendants shall pay an NRD Payment of twenty-two million three hundred twenty-five thousand

dollars ($22,325,000) together with interest accruing from November 16, 2018, at a rate specified in 28 U.S.C. § 1961. The NRD Payment shall be allocated as follows:

a. To DOI, eighteen million four hundred twenty-two thousand dollars ($18,422,000) together with a proportionate share of the interest accrued on the NRD Payment. Such payment shall be used by the Trustees for the purposes set forth in Section VII (Trustees' Management and Applicability of Joint NRD Funds). Defendants shall make such payment by EFT to the United States Department of Justice in accordance with instructions that the FLU of the United States Attorney's Office for the Central District of California Western Division shall provide to Defendants following the Effective Date of this Consent Decree by this Court. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree and to:

Department of the Interior
Natural Resource Damage Assessment and
Restoration Program
Attention: Restoration Fund Manager
1849 "C" Street, N.W. Mail Stop 4449
Washington, D.C. 20240

The EFT and transmittal documentation shall reflect that the payment is being made to the Department of the Interior Natural Resources Damage Assessment and Restoration Fund ("Restoration Fund"), Account Number 14X5198. DOI will maintain these funds as a segregated subaccount named REFUGIO BEACH OIL SPILL NRD Subaccount within the Restoration Fund.

b. To CDPR, two million eighty-four thousand dollars ($2,084,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into the State Park Contingent Fund. Payment shall be made by check payable to the California Department of Parks and Recreation. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

The California Department of Parks and Recreation
Attn: Laura Reimche, Senior Counsel
1416 Ninth Street, Room 1404-6
Sacramento, California 95814

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the State Parks Contingent Fund. CDPR shall use such monies to fund appropriate projects within State Parks' properties from Gaviota to El Capitan State Park to compensate for recreation losses resulting from the Refugio Incident. CDPR shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

c. To the National Fish and Wildlife Foundation ("NFWF"), one million seven hundred ninety-three thousand dollars ($1,793,000) together with a proportionate share of the interest accrued on the NRD Payment, on behalf of the State Trustees for deposit into the California South Coast Shoreline Parks and Outdoor Recreational Use Account established by NFWF. Payment shall be made by check payable to the National Fish and Wildlife Foundation. At the time of payment, Defendants shall simultaneously send written

notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

California Department of Fish and Game
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California 95816-0362

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the California South Coast Shoreline Parks and Outdoor Recreational Use Account. The California South Coast Shoreline Parks and Outdoor Recreational Use Account shall be managed in accordance with the South Coast Shoreline Parks and Outdoor Recreational Use Account Memorandum of Agreement among the State Trustees and NFWF and shall be used by the Trustees for the purposes set forth in Section VIII (Trustees' Management of Recreational Use Funds).

d. To UC, twenty-six thousand dollars ($26,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into Natural Reserve System Account. Payment shall be made by check payable to The Regents of the University of California. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

The Regents of the University of California
Attn: Michael Kisgen, Associate Director
Natural Reserve System
University of California, Office of the President
1111 Franklin Street, 6th Floor
Oakland, California 94607-5200

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the Natural Reserve System Account. The University of California Natural Reserve System will administer the monies to fund projects selected by the University of California in coordination with the Trustees. The projects shall address the research, education, and outreach missions of the University of California. UC shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

13. The NRD Payment is in addition to the NRDA costs incurred by the Trustees through November 15, 2018, which have been separately reimbursed by Defendants. To date, Plains has paid approximately ten million dollars ($10,000,000) for NRDA costs incurred by the Trustees through November 15, 2018.

## VII. TRUSTEES' MANAGEMENT AND APPLICABILITY OF JOINT NRD FUNDS

14. DOI shall, in accordance with law, manage and invest funds in the REFUGIO BEACH OIL SPILL NRD Subaccount, paid pursuant to Paragraph 12, and any return on investments or interest accrued on the REFUGIO BEACH OIL SPILL NRD Subaccount for use by the Natural Resource Trustees in connection with Restoration of Natural Resources affected by the Refugio Incident. DOI shall not make any charge against the REFUGIO BEACH OIL SPILL NRD Subaccount for any investment or management services provided.

15. DOI shall hold all funds in the REFUGIO BEACH OIL SPILL NRD

Subaccount, including return on investments or accrued interest, subject to the provisions of this Consent Decree.

16. The Natural Resource Trustees commit to the expenditure of the funds set forth in Paragraph 12 for the design, implementation, permitting (as necessary), monitoring, and oversight of Restoration projects and for the costs of complying with the requirements of the law to conduct a Restoration planning and implementation process. The Natural Resource Trustees will use the funds to Restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including lost human use of such services, injured, lost, or destroyed as a result of the Refugio Incident and for the administration and oversight of these Restoration projects.

17. The specific projects or categories of projects will be contained in a Restoration Plan prepared and implemented jointly by the Trustees, for which public notice, opportunity for public input, and consideration of public comment will be provided. Plains shall have no responsibility nor liability for implementation of the Restoration Plan or projects relating to the Refugio Incident, including any future project costs other than the payments set forth in Section VII herein. The Trustees jointly retain the ultimate authority and responsibility to use the funds in the REFUGIO BEACH OIL SPILL NRD Subaccount to Restore Natural Resources in accordance with applicable law, this Consent Decree, and any memorandum or other agreement among them.

## VIII. TRUSTEES' MANAGEMENT OF RECREATIONAL USE FUNDS

18. CDPR shall allocate the monies paid pursuant to Paragraph 12 for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

19. The State Trustees shall allocate the funds in the Recreational Use Account held by NFWF for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

20. UC shall allocate the monies paid pursuant to Paragraph 12 for research, education, and outreach projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

## IX. INJUNCTIVE RELIEF

21. Plains agrees to implement the injunctive relief set forth in Appendix B to this Consent Decree for Plains' Regulated Pipelines.

22. Material Changes to Plains' IMP.

a. Plains' Integrity Management Plan shall serve as the baseline IMP for purposes of this Consent Decree. Plains agrees that it will not make any material changes to the following parts of the IMP throughout the term of this Consent Decree without following the process set forth in this Paragraph:

1) Procedure for the Assessment of In-Line Inspection ("ILI") Results;

2) Section 9.5, "Continual Evaluation and Assessment of Pipeline Integrity;"

3) White Papers 32-200.09-S001, "Reassessment Interval Determination on Pipelines with Possible Shielded Coatings," and 32-200.09-S002, "Reassessment Interval Determination on Pipelines with Possible Corrosion Under Insulation;"

4) Section 11.3, "Conducting Preventive and Mitigative Evaluation Meetings;"

5) Section 11.4, "Documentation of P&M Evaluation Meetings;" and

6) Section 11.6, "Implementation of P&M Recommendations."

For purposes of this Paragraph, the term "material change" refers to any substantive modification in the IMP Procedures that could affect the outcome or effect of a particular procedure or requirement.

b. At least thirty (30) Days prior to making a material change to the above sections of the IMP, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s). In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of the material change and they cannot informally resolve the matter, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

c. In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the IMP described in Subparagraph 22.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material change, stating the basis for the abbreviated notice. In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d. In the event PHMSA provides a written objection to a material modification of Defendants' IMP, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30)

Days. Following the notice period specified in Subparagraphs 22.b and 22.c, Defendants may implement the modification until the dispute is resolved. If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII. Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

23. Material Changes in Control Room Management Plan and Control Center General Procedures.

a. Plains' Control Room Management Plan and Control Center General Procedures (collectively, "Control Center Plan and Procedures") shall serve as the baseline Control Center Plan and Procedures for purposes of this Consent Decree. Plains agrees that it will not make any material changes to sections 6.5.5, 6.6.8, 8, 9.6.4, 9.6.9, 9.6.13, and 9.6.14 of its Control Room Management Plan and procedures 100-2, 100-8, 100-9, 200-1, 300-1, 300-3, 300-5, 400-0, and 500-12 of its Control Center General Procedures throughout the term of this Consent Decree without following the process set forth in this Paragraph. For purposes of this Paragraph, the term "material change" refers to any substantive modification in the Control Center Plan and Procedures that could affect the outcome or effect of a particular procedure or requirement.

b. At least thirty (30) Days prior to making a material modification to the above sections of its Control Room Management Plan and Control Center General Procedures, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s). In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of

the material change(s), Defendants shall have the right to submit the issue to Dispute Resolution (Section XII).

c. In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the Control Room Management Plan and Control Center General Procedures described in Subparagraph 23.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material modification, stating the basis for the abbreviated notice. In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d. In the event PHMSA provides a written objection to a material modification of Defendants' Control Room Management Plan and Control Center General Procedures, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30) Days. Following the notice period specified in Subparagraphs 23.b and 23.c, Defendants may implement the modification until the dispute is resolved. If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII. Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

24. Where any compliance obligation under this Consent Decree requires Defendants to obtain a federal, state, or local permit or approval, Defendants shall submit timely applications and take all other actions reasonably necessary to obtain all such permits or approvals. Defendants may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of any such

obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendants have submitted timely applications and have taken all other actions reasonably necessary to obtain all such permits or approvals.

## X. CORRECTIVE ACTION ORDER

25. Upon the Effective Date of this Consent Decree, the PHMSA CAO shall close and be of no further force or effect. All outstanding terms and obligations under the PHMSA CAO as of the Effective Date and which Plains is still required to implement under this Consent Decree are set forth in Appendix D.

## XI. STIPULATED PENALTIES

26. Unless excused under Section XII (Force Majeure), Defendants shall be liable for stipulated penalties for violations of this Consent Decree as specified below. A violation includes failing to perform any obligation required by the terms of this Consent Decree according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

27. Late Payment of Civil Penalties and NRD Payment.

a. If Defendants fail to pay any portion of the Penalty Payment to the United States required under Section V (Civil Penalties) when due, Defendants shall pay to the United States a stipulated penalty of ten thousand dollars ($10,000) per Day for each Day payment is late.

b. If Defendants fail to pay any portion of the Penalty Payment to the CDFW and/or RWQCB as required under Section V (Civil Penalties) when due, Defendants shall pay to the CDFW and/or RWQCB a stipulated penalty of ten thousand dollars ($10,000) each, as applicable, per Day for each Day payment is late.

c. If Defendants fail to pay any portion of the NRD Payments

required under Section VI (Natural Resource Damages) when due, Defendants shall pay a stipulated penalty of five thousand dollars ($5,000) to the United States, and five thousand dollars ($5,000) to the State Trustees, per Day for each Day payment is late.

28. Stipulated Penalties for Non-Performance of Injunctive Relief. Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section IX (Injunctive Relief) when due:

a. For failure to timely submit to OSFM the applications for State waivers as specified in paragraphs 1.A, 1.B, 1.C, and 1.D of Appendix B;

b. For failure to implement the Integrity Management provisions as specified in paragraphs 4.A.1.a, e, f, g, h, and 4.A.2 of Appendix B;

c. For failure to timely submit to OSFM the EFRD analyses as specified in paragraphs 5.A-5.B of Appendix B;

d. For failure to timely submit to OSFM the risk analysis as specified in paragraph 6.A of Appendix B;

e. For failure to timely submit to PHMSA the modified Section 9.5 of Plains' IMP, as specified in paragraph 9.A.3 of Appendix B;

f. For failure to timely submit to PHMSA the modified P&M Recommendation forms, as specified in paragraph 9.B of Appendix B;

g. For failure to timely conduct EFRD analyses for all Regulated Pipelines for which Plains has not previously conducted an EFRD analysis, as specified in paragraph 10.A of Appendix B;

h. For failure to timely have in place revised valve maintenance procedures, as specified in paragraph 10.B of Appendix B;

i. For failure to timely create a list of rupture detection methods utilized, as specified in paragraph 11.A of Appendix B;

j. For failure to timely conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change, as specified in paragraph 11.B of Appendix B;

k. For failure to timely submit to PHMSA the computational pipeline monitoring ("CPM") systems analysis, as specified in paragraph 11.C of Appendix B;

l. For failure to timely submit to PHMSA the selection of leak detection method procedure, as specified in paragraph 11.D of Appendix B;

m. For failure to hold or document periodic (at least annual) meetings regarding potential improvements to leak detection, as provided in paragraph 11.E of Appendix B;

n. For failure to timely have in place a procedure for tracking when instrumentation has been impeded, as provided in paragraph 11.F of Appendix B;

o. For failure to complete, prior to resuming operations on Lines 901 or 903, the items identified in paragraph 12.A.1-4 of Appendix B;

p. For failure to timely submit to OSFM confirmation that all alarm descriptors are accurate, as specified in paragraph 12.B of Appendix B;

q. For failure to timely conduct the surveys and update the

emergency response plans, as specified in paragraph 13.B.1 of Appendix B;

r. For failure to timely provide emergency response training to employees, as specified in paragraph 13.B.2 of Appendix B;

s. For failure to timely provide control room supervisor training, as specified in paragraph 13.B.4 of Appendix B;

t. For failure to timely submit to PHMSA and/or OSFM, and/or OSPR, as applicable, notice of drills, as specified in paragraph 13.B.5 of Appendix B, provided that the penalty under this subsection shall not exceed one Day per drill;

u. For failure to timely submit to PHMSA the third-party Safety Management System report, as specified in paragraph 14.A.1 of Appendix B;

v. For failure to timely review and revise the drug and alcohol misuse plans, as specified in paragraph 15 of Appendix B;

w. For failure to timely submit to PHMSA notice of any material modification to the IMP, as required by Paragraph 22; and

x. For failure to timely submit to PHMSA notice of any material modification to the Control Room Management Plan or Control Center General Procedures, as required by Paragraph 23;

y. The penalties stipulated in this Section shall accrue as follows:

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

29. Stipulated Penalties for Non-Compliance with Corrective Action Order Terms. Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section X (Corrective Action Order) when due:

a. For operation of Line 901 in violation of paragraph 1.a of Appendix D;

b. For failure to timely submit to OSFM a Line 901 Restart Plan, as specified by paragraph 1.b of Appendix D;

c. For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 901 specified by paragraphs 1.c and 1.d of Appendix D;

d. For operation of Line 903, in violation of paragraph 1.e of Appendix D;

e. For failure to timely submit to OSFM a Line 903 Restart Plan, as specified by paragraph 1.f of Appendix D;

f. For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 903 specified by paragraphs 1.g and 1.h of Appendix D;

g. For failure to timely submit to OSFM any notification specified by paragraph 1.i of Appendix D; and

h. For failure to submit to OSFM a final Appendix D Documentation Report, as specified by paragraph 1.j of Appendix D.

i. The penalties stipulated in this Section shall accrue as follows:

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

30. Defendants shall pay stipulated penalties due pursuant to this Section within thirty (30) Days of a written demand.

31. For stipulated penalties accrued pursuant to Subparagraphs 27.a, 28.e, 28.f, 28.g, 28.h, 28.i, 28.j, 28.k, 28.l, 28.m, 28.n, 28.s, 28.t, 28.u, 28.v, 28.w, or 28.x of this Consent Decree, the United States shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to the United States the full amount of any stipulated penalties due and will not be liable to the State Agencies for any such stipulated penalties.

32. For stipulated penalties accrued pursuant to Subparagraph 27.b of this Consent Decree, only CDFW and RWQCB shall have the right to issue a written demand for stipulated penalties and Defendants must pay to the CDFW and RWQCB the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

33. For stipulated penalties accrued pursuant to Subparagraphs 28.a, 28.b, 28.c, 28.d, 28.o, 28.p, or Paragraph 29 of this Consent Decree, only OSFM shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to OSFM the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

34. For stipulated penalties accrued pursuant to Paragraphs 28.q, 28.r, 28.t, or Paragraph 30 of this Consent Decree, the United States, CDFW, OSFM, or all, may demand stipulated penalties by sending a joint or individual written demand to Defendants, with a copy simultaneously sent to the other Plaintiff(s).

a. Where only one or two of the Plaintiffs referenced in Paragraph 35 demand stipulated penalties under Paragraph 35, a copy of the demand will simultaneously be sent to the remaining Plaintiff(s) and they will have forty-five (45) Days to join in the demand.

b. Where multiple Plaintiffs referenced in Paragraph 35 demand stipulated penalties for the same violation, Defendants shall pay fifty (50) percent to each of the demanding Plaintiffs (when two Plaintiffs join in the demand); one third to each demanding Plaintiff (when all three Plaintiffs join in the demand); or as allocated by the United States, CDFW, and OSFM.

c. Where only one Plaintiff referenced in Paragraph 35 demands stipulated penalties, and the other Plaintiffs do not join in the demand within forty-five (45) Days of receiving the demand, Defendants shall pay one hundred (100) percent to the Plaintiff making the demand.

d. If a Plaintiff joins in the demand within forty-five (45) Days but subsequently elects to waive or reduce stipulated penalties, in accordance with Paragraphs 38 or 39 for that violation, Defendants shall not be liable for such portion of the stipulated penalties waived or reduced by such Plaintiff and shall be liable for any stipulated penalties due to the other Plaintiffs joining such demand pursuant to the allocation set forth in Subparagraph 34(b).

35. For stipulated penalties arising from a failure to perform obligations pursuant to Subparagraph 27.c, the United States and the State Trustees may demand stipulated penalties by sending a joint written demand to Defendants.

36. For all payments made pursuant to this Section, Defendants must follow the payment instructions set forth in Section V (Civil Penalties). Any

transmittal correspondence shall state that payment is for stipulated penalties and shall identify the date of the written demand to which the payment corresponds.

37. Stipulated penalties under this Section shall begin to accrue on the Day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed, or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

38. The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due to the United States under this Consent Decree.

39. The applicable State Agencies may, in the unreviewable exercise of their discretion, reduce or waive stipulated penalties otherwise due to the applicable State Agencies under this Consent Decree.

40. Stipulated penalties shall continue to accrue as provided in Paragraphs 27 through 29, during any Dispute Resolution, but need not be paid until the following:

a. If the dispute is resolved by agreement or by a decision of the United States or the State Agencies, as applicable, that is not appealed to the Court, Defendants shall pay accrued penalties determined to be owing to the United States or the State Agencies, as applicable, together with interest, within thirty (30) Days of the effective date of the agreement or the receipt of the United States' or the State Agencies' decision.

b. If the dispute is appealed to the Court and the Plaintiffs prevail in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

c. If any Party appeals the Court's decision and a Plaintiff prevails in whole or in part, Defendants shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

41. If Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or the State Agencies from seeking any remedy otherwise provided by law for Defendants' failure to pay any stipulated penalties.

42. The payment of stipulated penalties, if any, shall not alter in any way Defendants' obligation to complete the performance of the requirements of this Consent Decree.

43. Subject to the provisions of Section XVII (Effect of Settlement/Reservation of Rights) of this Consent Decree, the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or the State Agencies (including, but not limited to, statutory penalties, additional injunctive relief, mitigation or offsets measures, and/or contempt) for Defendants' violation of this Consent Decree or applicable laws.

## XII. FORCE MAJEURE

44. "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation. The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any

potential Force Majeure event (a) as it is occurring and (b) following the potential Force Majeure, such that the delay and any adverse effects of the delay are minimized. "Force Majeure" does not include Defendants' financial inability to perform any obligation under this Consent Decree.

45. If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendants shall provide notice orally or by electronic transmission to the relevant Plaintiff(s), within five (5) Days of when Defendants first knew that the event might cause a delay. Within ten (10) Days thereafter, Defendants shall provide in writing to such Plaintiffs an explanation and description of the reasons for the delay; the anticipated duration of the delay; the actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare or the environment. Defendants shall provide with any notice the documentation that Defendants are relying on to support the claim that the delay was attributable to a Force Majeure event. Failure to comply with the above requirements shall preclude Defendants from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors knew or should have known.

46. If Plaintiffs agree that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by

Plaintiffs for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation. Plaintiffs will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

47. If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, Plaintiffs will notify Defendants in writing of their decision.

48. If Defendants elect to invoke the Dispute Resolution procedures set forth in Section XIII (Dispute Resolution), in response to Plaintiffs' determination in Paragraph 47 above, it shall do so no later than thirty (30) Days after receipt of Plaintiffs' notice. In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 44 and 45. If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to Plaintiffs and the Court.

## XIII. DISPUTE RESOLUTION

49. Unless otherwise expressly provided for in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendants' failure to seek resolution of a dispute under this Section shall preclude Defendants from raising any such issue as a defense to an action by Plaintiffs to enforce any obligation of Defendants arising under this Consent

Decree.

50. Informal Dispute Resolution. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendants send the relevant Plaintiff(s) a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement. If the parties cannot resolve a dispute by informal negotiations, then the position advanced by Plaintiffs shall be considered binding unless, within forty-five (45) Days after the conclusion of the informal negotiation period, Defendants invoke formal Dispute Resolution procedures as set forth below.

51. Formal Dispute Resolution. Defendants shall invoke formal Dispute Resolution procedures, within the time period provided in the preceding Paragraph, by serving on Plaintiffs a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

52. Plaintiffs shall serve their Statement of Position within forty-five (45) Days of receipt of Defendants' Statement of Position. Plaintiffs' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by Plaintiffs. Plaintiffs' Statement of Position shall be binding on Defendants, unless Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

53. Defendants may seek judicial review of the dispute by filing with the Court and serving on the relevant Plaintiff(s), in accordance with Section XX (Notices), a motion requesting judicial resolution of the dispute. The motion

must be filed within thirty (30) Days of receipt of Plaintiffs' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree.

54. Plaintiffs shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court or by a schedule set by the Court. Defendants may file a reply memorandum to the extent permitted by the Local Rules.

55. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 51, Defendants shall bear the burden of demonstrating that its position complies with this Consent Decree, based on the Statements of Position, and under applicable standards of review.

56. The invocation of Dispute Resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue until the final resolution of the dispute. Payment shall be stayed pending resolution of the dispute. If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XI (Stipulated Penalties).

## XIV. REPORTING

57. After the Effective Date, by March 31 and September 30 of the following years until termination of this Consent Decree per Section XXIV (Termination), Defendants shall submit to the Plaintiffs in accordance with Section XX (Notices) bi-annual reports that shall describe the status of Defendants' compliance with the Consent Decree, including implementation of

the injunctive relief requirements set forth in Appendices B and D. The report will be organized to show the measures taken to comply with each of the requirements set forth in Appendices B and D, whether the measures were taken timely, the status of any permitting action that may affect compliance with the Consent Decree, and whether the measures taken have achieved compliance with the requirement.

## XV. CERTIFICATION

58. Each report submitted by Defendants under Section XIV (Reporting) shall be signed by either the Chief Executive Officer, the President, an Executive Vice President, a Senior Vice President, or General Counsel who is an authorized representative of Defendants, and must contain the following statement:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on any personal knowledge and my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

## XVI. INFORMATION COLLECTION AND RETENTION

59. Plaintiffs and their representatives shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times and upon reasonable notice, upon presentation of credentials, to:

a. monitor the progress of activities required under this Consent Decree;

b. verify any data or information submitted to the Plaintiffs in accordance with the terms of this Consent Decree;

c. obtain documentary evidence, including photographs and similar data; and

d. assess Defendants' compliance with this Consent Decree.

60. Until one (1) year after the termination of this Consent Decree, Defendants shall retain, and shall instruct their contractors and agents to preserve or deliver to Plains, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in their or their contractors' or agents' possession or control, or that come into their or their contractors' or agents' possession or control, and that relate in any manner to Defendants' performance of their obligations under this Consent Decree. At any time during this information-retention period, upon request by the Plaintiffs, Defendants shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

61. This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State Agencies pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

62. For any documents, records, or other information required to be submitted to Plaintiffs pursuant to this Consent Decree, Plains may assert a claim of business confidentiality or other protections applicable to the release of information by Plaintiffs, covering part or all of the information required to be submitted to Plaintiffs pursuant to this Consent Decree in accordance with, as applicable, 49 C.F.R. Part 7, 49 C.F.R. Part 190, and 40 C.F.R Part 2. Plains must mark the claim of confidentiality in writing on each page, and include a statement specifying the grounds for each claim of confidentiality.

63. The federal agency Plaintiffs are subject to applicable laws

governing the disclosure of information under the Freedom of Information Act ("FOIA") (5 U.S.C. § 552 *et seq*.). If a federal agency Plaintiff receives a request pursuant to FOIA for records produced pursuant to the Consent Decree, that Plaintiff will, to the extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to identify portions of documents Defendants have claimed as confidential and that may be subject to the request, and to specify the grounds for each claim of confidentiality. In accordance with applicable regulations, if the federal agency Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

64. For documents provided to PHMSA under this Consent Decree, Defendants need not provide redacted copies when the documents are produced. Within fourteen (14) Days of notification from PHMSA of a FOIA request, or such other time as agreed upon, Defendants will provide a copy of the relevant records with confidential information redacted along with explanations of the asserted grounds for confidentiality.

65. State Agency Plaintiffs are subject to the California Public Records Act ("CPRA") (California Government Code §§ 6250 *et seq*.). If a State Agency Plaintiff receives a request pursuant to the CPRA for records produced pursuant to the Consent Decree, that Plaintiff will, to the maximum extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to submit redacted copies of the requested records. If the Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

66. The requirements of this Paragraph apply to Defendants' production of documents to PHMSA only. Defendants shall produce all documents required

to be produced in connection with this Consent Decree in, at Defendants' option, either native format via electronic media or secure file transfer protocol ("FTP"). Any encryption or access restriction shall be on a container level only, *i.e.*, only the electronic media or the top-level folder containing the documents shall be encrypted and Plaintiffs shall have unrestricted access to the files/folders within the electronic media or the top-level folder without need for additional decryption or access codes. Regardless of production method or encryption, individual documents shall be produced in a manner that allows the Plaintiffs to view, print, copy, save, download, and share each document within Plaintiffs' own environment without restriction, tracking or monitoring by Defendants, or automatically generated changes to the document (*e.g.*, without entering access codes prior to each download, and without automatically generated watermarks stating the download date and time).

67. At the conclusion of the information-retention period, Defendants shall provide ninety (90) Days' notice to Plaintiffs of Defendants' resumption of internal document destruction policies for documents, records, or other information subject to the requirements of Paragraph 60.

68. [*Intentionally left blank.*]

## XVII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

69. This Consent Decree resolves the civil claims of the United States and the State Agencies for the matters alleged in the Complaint filed in this action for the Refugio Incident.

70. Subject to the reservations of rights specified in Paragraph 71, this Consent Decree also resolves all civil and administrative penalty claims that could be brought by PHMSA, for violations of the Pipeline Safety Laws specified below that occurred on any of Defendants' Regulated Pipelines prior to January 28, 2019, the date that PHMSA's ongoing "Integrated Inspection" of a portion of Defendants' Regulated Pipelines and other pipeline facilities began. The specific

Pipeline Safety Laws subject to this Paragraph are the following (including other regulations expressly incorporated therein):

a. 49 C.F.R. Part 194 Subpart B – Response Plans;

b. 49 C.F.R. Part 195 Subpart B – Reporting;

c. 49 C.F.R. Part 195 Subpart E – Pressure Testing;

d. 49 C.F.R. Part 195 Subpart F – Operation and Maintenance, sections 195.402, 195.403, 195.404, 195.406, 195.408, 195.412, 195.420, 195.422, 195.428, 195.436, 195.442, 195.444, 195.446, 195.452;

e. 49 C.F.R. Part 195 Subpart G – Qualification of Pipeline Personnel, as it relates to valve maintenance;

f. 49 C.F.R. Part 195 Subpart H – Corrosion Control;

g. 49 C.F.R. Part 199 – Drug and Alcohol Testing; and

h. All recordkeeping, documentation, and document production requirements in the provisions listed in subsections 70.a-70.g, and 49 C.F.R. section 190.203 and Part 195.

71. The United States, on behalf of PHMSA, reserves all legal and equitable remedies to address violations of the Pipeline Safety Laws described in Paragraph 70 that occur on or after January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. A separate violation of the Pipeline Safety Laws occurs for each day that the violation continues, pursuant to 49 U.S.C. § 60122(a).

72. This Consent Decree also resolves all civil and administrative penalty claims that could be brought by OSFM against Defendants for violations of the Pipeline Safety Laws and the Elder California Pipeline Safety Act as specified below relating to Line 901, Line 903, or Line 2000 that occurred prior to January 28, 2019. OSFM reserves all legal and equitable remedies to address violations of the specified Pipeline Safety Laws that occur on or after

January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. The specific Pipeline Safety Laws and Elder California Pipeline Safety Act subject to this Paragraph are:

a. The Pipeline Safety Laws specified in Paragraph 70; and

b. California Government Code §§ 51012.3, 51013, 51013.5, 51014, 51015, 51015.4, 51015.5 (for Line 901 and Line 903 only), and 51018.

73. For any reportable pipeline accident, as defined in 49 C.F.R. § 195.50, occurring on or after January 28, 2019, on any of Defendants' Regulated Pipelines, Paragraphs 70 and 72 shall not limit the right of PHMSA and OSFM to sue or pursue administrative or other remedies for violations (including penalties) under the Pipeline Safety Laws and the Elder California Pipeline Safety Act for such accident. Nothing in Paragraphs 70 through 72 shall be construed to limit the legal and equitable remedies of the United States or State Agencies, other than PHMSA and OSFM.

74. The United States and the State Agencies reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States or the State Agencies to obtain penalties, injunctive relief, or other administrative or judicial remedies under the CWA, OPA, Pipeline Safety Laws, or under other federal or state laws, regulations, or permit conditions, except as specified in Paragraphs 69, 70, and 72.

75. The United States reserves all legal and equitable remedies to address any imminent and substantial endangerment or threat to the public health or welfare or the environment arising at, or posed by, Defendants' operations, whether related to the violations addressed in this Consent Decree or otherwise. PHMSA further reserves the right to issue to Defendants corrective action orders pursuant to 49 C.F.R § 190.233; emergency orders pursuant to 49 C.F.R.

§ 190.236; and safety orders pursuant to 49 C.F.R. § 190.239. The State Agencies reserve all legal and equitable remedies under California Government Code §§ 8670.57, 8670.69.4, 51013.5, 51015.5, 51018.6, 51018.7 and 51018.8, California Water Code §§ 13301, 13304, 13340, and 13386, and California Health & Safety Code § 13107.5 to address (1) conditions threatening to cause or creating a substantial risk of an unauthorized discharge of oil into waters of the State of California, (2) a discharge of waste threatening to cause a condition of pollution or nuisance, or (3) a discharge which poses a substantial probability of harm to persons, property or natural resources.

76. This Consent Decree also shall not be construed to in any way limit or waive the claims set forth in the case entitled *California State Lands Commission, et al. v. Plains Pipeline, L.P., et al.*, Case No. 18CV02504 (Cal. Sup. Court) and Case No. B295632 (Cal. Ct. App.).

77. In any subsequent administrative or judicial proceeding initiated by the United States or the State Agencies for injunctive relief, civil penalties, other appropriate relief relating to Defendants' violations alleged in Plaintiffs' Complaint, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State Agencies in the subsequent proceeding should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraphs 69, 70, and 72.

78. This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws, or regulations. Defendants are responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action

commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and the State Agencies do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, OPA, Pipeline Safety Laws, or with any other provisions of federal, state, or local laws, regulations, or permits.

79. This Consent Decree does not limit or affect the rights of Defendants or of the United States or the State Agencies against any third-parties, not party to this Consent Decree, nor does it limit the rights of third-parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.

80. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third-party not party to this Consent Decree.

81. Plaintiffs will not submit any claim for restitution for Natural Resource Damages in *The People of the State of California v. Plains All American Pipeline, L.P.*, Case No. 1495091 (Cal. Sup. Court).

82. By entering into this settlement, Defendants do not admit the Pipeline Safety Laws violations alleged in the Complaint or described in this Consent Decree by the United States on behalf of PHMSA; therefore, any allegations of violations of these Pipeline Safety Laws do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree. However, the allegations of violations set forth in the Complaint may be: (1) considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains, and (2) used for statistical purposes to identify violations that PHMSA deems as causal to an incident or to increase the consequences of an incident. Notwithstanding the forgoing, alleged violations subject to Paragraph 70 shall not

Case: 26-4629, 11/09/2026, DktEntry: 48.1, (232 of 293)

be considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains.

83. By entering into this settlement, Defendants do not admit the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint; therefore, any allegations of violations of these statutes do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree. However, the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint may be considered by the State Water Resources Control Board or Regional Water Quality Control Boards to constitute prior offenses in any future enforcement action brought by any of these agencies against Plains.

84. Subject to the terms of this Consent Decree, no provision contained herein affects or relieves Plains of their responsibilities to comply with all applicable requirements of the CWA, OPA, the Pipeline Safety Laws, federal or state laws, and the regulations and orders issued thereunder. Subject to the terms of this Consent Decree, nothing herein shall limit or reduce the Plaintiffs' right of access, entry, inspection, and information-gathering or their authority to bring enforcement actions against Defendants pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, the regulations and orders issued thereunder, or any other applicable provision of federal or state law.

85. Defendants hereby covenant not to sue Plaintiffs for any claims related to the Refugio Incident, or response activities in connection with the Incident, pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, or any other law or regulation for acts or omissions through the date on which this Consent Decree is lodged with the Court.

86. Defendants covenant not to sue and agree not to assert any direct or

indirect claim for reimbursement related to the Refugio Incident from the OSLTF or pursuant to any other provision of law.

87. The United States reserves the right to seek reimbursement from Defendants for claims relating to the Refugio Incident paid after the date on which the Consent Decree is lodged with the Court from the OSLTF pursuant to 33 U.S.C. § 2712.

## XVIII. TRANSFER AND ACQUISITION OF ASSETS

88. In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants will obtain from the transferee an agreement to be bound by those provisions of this Consent Decree and Appendices B and D that are specifically applicable to the asset(s) acquired, unless Defendants have already completed the required action or unless OSFM agrees to relieve the transferee of the obligations of any otherwise applicable provision. Those provisions of Appendix B are:

a. For existing but non-operational segments of Lines 901 and 903, paragraphs 1.A, 1.B, 1.E, 2.B, 2.C., 4, 5, 6, 7.A, 12.A of Appendix B;

b. For the operational segment of Line 903 from Pentland to Emidio, paragraphs 1.C, 1.E, 4, 5, 6, 7.A of Appendix B;

c. For any lines built to replace Lines 901 or 903, paragraphs 2.A.1, 5, 7.B, 12.A of Appendix B; and

d. For Line 2000, paragraphs 1.D, 1.E, 4, 5, 6, 7.A, 12.B. of Appendix B.

89. In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants shall provide a copy of this Consent Decree to the prospective transferee at least fourteen (14) Days prior to such transfer. Defendants shall

provide written notice of any such transfer to OSFM within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier. Prior to the transfer, Defendants may notify OSFM that Defendants have completed certain required actions of this Consent Decree, or request that OSFM relieve the transferee of certain obligations of otherwise applicable provisions, such that the transferee will not be bound by those requirements. Defendants shall provide to Plaintiffs documentation demonstrating the transferee's agreement to be bound by the relevant provisions of the Consent Decree. Defendants shall provide to the transferee copies of those portions of relevant emergency response plans that relate to the transferred asset.

90. In the event of the sale or transfer pursuant to an arm's-length transaction of Defendants' Regulated Pipelines other than Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, to an independent third-party transferee, the transferee shall not be subject to the requirements of this Consent Decree. Defendants shall provide a copy of this Consent Decree to the transferee at least fourteen (14) Days prior to such transfer. Defendants shall provide written notice of any such transfer, including documentation demonstrating that the Consent Decree was provided to the transferee, to PHMSA within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier. Defendants' obligations under this Consent Decree with respect to all non-transferred assets shall not be affected.

91. For all Regulated Pipeline assets that Defendants assume operating responsibility for after the Effective Date, Plains is obligated to apply Article II (Company Wide Provisions) of Appendix B of this Consent Decree to the newly acquired assets.

## XIX. COSTS

92. Except as otherwise stated in this Consent Decree, the Parties shall bear their own costs related to this action and this Consent Decree, including

attorneys' fees; provided, however, the United States and the State Agencies shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendants.

## XX. NOTICES

93. Unless otherwise specified in this Consent Decree, whenever notifications, submissions, reports, or communications are required by this Consent Decree, they shall be made in writing, sent electronically by email provided by the Parties, and addressed to all Parties as follows:

| | |
|---|---|
| As to the United States by email: | eescdcopy.enrd@usdoj.gov<br>Re: DJ # 90-5-1-1-11340 |
| As to the United States by mail: | EES Case Management Unit<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>P.O. Box 7611<br>Washington, D.C. 20044-7611<br>Re: DJ # 90-5-1-1-1130 |
| As to PHMSA: | James M. Pates<br>Assistant Chief Counsel for Pipeline Safety<br>U.S. Department of Transportation<br>Pipeline and Hazardous Materials Safety Administration<br>1200 New Jersey Ave. SE. E-26<br>Washington, DC. 20590 |
| As to EPA: | Andrew Helmlinger<br>Attorney Advisor<br>U.S. EPA Region IX<br>75 Hawthorne Street (ORC-3)<br>San Francisco, California 94104 |

| | |
|---|---|
| As to DOI: | Clare Cragan<br>U.S. Department of the Interior<br>Office of the Solicitor<br>755 Parfet St., Suite 151<br>Lakewood, Colorado 80215 |
| As to NOAA: | National Oceanic and Atmospheric Administration<br>Office of General Counsel<br>Natural Resources Section<br>ATTN: Christopher J. Plaisted<br>501 W. Ocean Blvd, Suite 4470<br>Long Beach, California 90802 |
| As to USCG: | Patricia V. Kingcade<br>Attorney Advisor<br>National Pollution Funds Center, US Coast Guard<br>2703 Martin Luther King Jr. Ave SE<br>Washington, DC 20593-7605 |
| As to the State Agencies: | Michael Zarro<br>Deputy Attorney General<br>Office of the Attorney General<br>Natural Resources Law Section<br>300 S. Spring St., Suite 11220<br>Los Angeles, California 90013 |
| As to CDFW: | California Department of Fish and Wildlife<br>Office of Spill Prevention and Response<br>Attn: Katherine Verrue-Slater<br>Senior Counsel<br>P.O. Box 160362<br>Sacramento, California 95816-0362 |

| | |
|---|---|
| As to CDPR: | California Department of Parks and Recreation<br>Attn: Laura A. Reimche, Senior Counsel<br>1416 Ninth Street, Room 1404-6<br>Sacramento, California 95814 |
| As to CSLC: | California State Lands Commission<br>Attn: Patrick Huber, Legal Division<br>100 Howe Avenue, Suite 100-South<br>Sacramento, California 95825 |
| As to OSFM: | California Department of Forestry and Fire Protection<br>Legal Services Office<br>Attn: Joshua Cleaver, Staff Counsel<br>P.O. Box 944246<br>Sacramento, California 94244-2460 |
| As to RWQCB: | California Central Coast Regional Water Quality Control Board<br>Attn: Naomi Rubin, Attorney III<br>801 K Street<br>Sacramento, California 95814 |
| As to UC: | Barton Lounsbury, Senior Counsel<br>University of California<br>Office of the General Counsel<br>1111 Franklin Street, 8th Floor<br>Oakland, California 94607 |
| As to Defendants: | Megan Prout<br>Senior Vice President<br>Commercial Law and Litigation<br>333 Clay Street, Suite 1600<br>Houston, Texas 77002 |

Henry Weissmann
Daniel B. Levin
Colin Devine
Munger, Tolles & Olson LLP
350 S. Grand Ave, 50th Floor
Los Angeles, California 90071

Steven H. Goldberg
Nicole Granquist
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, California 95814

94. Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

95. Notices submitted pursuant to this Section shall be deemed submitted upon mailing, or emailing unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XXI. EFFECTIVE DATE

96. The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court, or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XXII. RETENTION OF JURISDICTION

97. The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of effectuating or enforcing compliance with the terms of this Consent Decree.

## XXIII. MODIFICATION

98. The terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by the Parties. Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval of the Court.

99. Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XIII (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 55, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXIV. TERMINATION

100. After Defendants have: (a) operated under this Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of this Consent Decree, including payment of all penalties and accrued stipulated penalties required by this Consent Decree, Defendants may serve on Plaintiffs a Request for Termination, stating that Defendants have satisfied these requirements, together with all necessary supporting documentation. Plaintiffs shall respond within ninety (90) Days to Defendants' Request for Termination. If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

101. Following receipt by Plaintiffs of Defendants' Request for Termination, Plaintiffs shall respond within ninety (90) Days regarding any disagreement that the Consent Decree may be terminated and state the reason for such disagreement. The Parties shall confer informally concerning the Request for Termination and any disagreement that the Parties may have as to whether Defendants have complied with the requirements for termination of this Consent Decree. If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

102. If Plaintiffs do not agree that the requirements for termination have been satisfied, Defendants may invoke Dispute Resolution under Section XIII (Dispute Resolution). However, Defendants shall not seek Dispute Resolution of

any dispute regarding termination until sixty (60) Days after receipt of the Plaintiffs' response to Defendants' Request for Termination.

## XXV. PUBLIC PARTICIPATION

103. This Consent Decree shall be lodged with the Court for a period of not fewer than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The Parties agree and acknowledge that the final approval by Plaintiffs and entry of this Consent Decree are subject to notice of lodging of the Consent Decree and a public comment period. Plaintiffs reserve the right to withdraw or withhold consent if the comments disclose facts or considerations that indicate that this Consent Decree is inappropriate, improper, or inadequate.

104. Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless Plaintiffs have notified Defendants in writing that Plaintiffs no longer support entry of the Consent Decree.

## XXVI. SIGNATORIES/SERVICE

105. Each undersigned representative of Defendants, the State of California Attorney General's Office, CDFW, CDPR, CSLC, OSFM, RWQCB, UC, the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, PHMSA, and EPA certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to the terms of this Consent Decree.

106. This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect. For purposes of this Consent Decree, a signature page that is transmitted electronically (*e.g.*, by emailed PDF) shall have the same effect as an original.

## XXVII. INTEGRATION

107. This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXVIII. FINAL JUDGMENT

108. Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Parties.

## XXIX. 26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

109. For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section III (Applicability), Paragraph 5; Section VI (Natural Resource Damages), Paragraph 12; Section IX (Injunctive Relief), Subparagraphs 22.a, 22.b, 22.c, 23.a, 23.b, 23.c, Paragraph 24, and related Appendix B; Section XIV (Reporting), Paragraph 57; Section XV (Certification), Paragraph 58; and Section XVI (Information Collection and Retention), Paragraphs 59, 60, and 66 is restitution or required to come into compliance with law to the extent it applies to federal agencies.

Dated and entered this _____ day of __________, 20__.

___________________________________
UNITED STATES DISTRICT JUDGE

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES OF AMERICA:

3/12/2020
Date

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources
Division U.S. Department of Justice

3/13/2020
Date

BRADLEY R. O'BRIEN
ANGELA MO
Environmental Enforcement Section
Environment and Natural Resources
Division

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P and Plains Pipeline, L.P.*

FOR THE UNITED STATES DEPARTMENT OF TRANSPORTATION, PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION:

3 March 2020
Date

PAUL ROBERTI
Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, DC 20590

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

3-2-20
Date

SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and Compliance Assurance

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

2/26/2020
Date

AMY C. MILLER
Region 9 Director
Enforcement and Compliance Assurance Division
U.S. EPA Region 9
Mail Code ENF-1
75 Hawthorne Street
San Francisco, CA 94105

Case: 26-4629, 11/09/2026, DktEntry: 48.1, (246 of 293)

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FISH and WILDLIFE:

3/4/2020
Date

THOMAS M. CULLEN, JR.
Administrator
Office of Spill Prevention and Response

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF PARKS AND RECREATION:

3/2/20
Date

LISA ANN L. MANGAT
Director
California Department of Parks
and Recreation

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA STATE LANDS COMMISSION:

2/28/2020
Date

JENNIFER LUCCHESI
Executive Officer
California State Lands Commission

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S - OFFICE OF THE STATE FIRE MARSHAL:

3/4/2020
Date

THOMAS W. PORTER
Director
California Department of Forestry and Fire Protection

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, CENTRAL COAST REGION:

March 2, 2020
Date

JOHN ROBERTSON
Executive Officer
Central Coast Regional Water
Quality Control Board

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

3/3/20
Date

[signature]
BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel

Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

| | |
|---|---|
| ____________ | ____________ |
| Date | BARTON LOUNSBURY<br>Senior Counsel<br>Office of the General Counsel |
| 3 March 2020 | [signature] |
| Date | PEGGY FIEDLER<br>Executive Director<br>UC Natural Reserve System |

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS ALL AMERICAN PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

# APPENDIX A

# (*Set of maps that generally depict Lines 901, 903, and 2000*)




*Appendix A – Line 901*

Scale: 1:100,000

Sheet No: 1/1

Owner: PLAINS ALL AMERICAN PIPELINE, L.P.

1-CalER2-000256

2026-000681




*Appendix A – Line 903*

Scale: 1:700,000

Sheet No: 1/1

Owner: PLAINS ALL AMERICAN PIPELINE, L.P.

1-CalER2-000257

2026-000682




*Appendix A – Line 2000*

Scale: 1:966,574

Sheet No: 1/1

Owner:

PLAINS ALL AMERICAN PIPELINE, L.P.

1-CalER2-000258

2026-000683

# APPENDIX B

# *(PHMSA Injunctive Relief)*

# APPENDIX B

## ARTICLE I – CALIFORNIA-SPECIFIC PROVISIONS

1. **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):**

   A. Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

   B. Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

   C. Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

   D. Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

   E. To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

2. **Replacement, Restart, or Abandonment of Lines 901 and 903:**

   A. Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners. Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

1. On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

   a. Test for potential AC/DC interference. Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

   b. Conduct a close interval survey (CIS) and AC/DC interference survey.

   c. Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

B. As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

C. As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations.

3. **<u>Third-Party Analysis of Line 2000 ILI Data</u>**

A. Plains shall select, subject to OSFM's approval, a third-party consultant to review and analyze ILI data for Line 2000 and provide a report to the OSFM on its findings.

B. The consultant shall:

1. Review all ILI results and reports that Plains has received from ILI vendors for Line 2000;

2. Review Plains' processes and procedures for analyzing ILI data, and Plains' analysis of Line 2000 ILI results, and suggest potential improvements, if any, to Plains' current processes or procedures for analyzing ILI data;

3. Analyze Plains' implementation of its ILI assessment procedures for Line 2000.

4. Evaluate ILI vendor specifications to ensure that proper criteria and technology considerations are taken in to account in selecting the specific inspection tool(s) used in the future, with consideration given to best available technology for reliably detecting corrosion, general corrosion, selective seam-weld corrosion, and seam anomalies;

5. Consider disclosed industry standards and regulations, including, but not limited to: 49 CFR § 195.452, the California Elder Pipeline Safety Act, ASME B31.4 (Pipeline Transportation Systems for Liquids and Slurries), ASME B31G (Manual for Determining Strength of Corroded Pipelines) or RSTRENG, API 1160 (Managing System Integrity for Hazardous Liquid Pipelines), API 1163 (In-Line Inspection Systems Qualification), ANSI/ASNT ILI-PQ (In-Line Inspection Personnel Qualification and Certification), NACE SP0169 (Control of External Corrosion on Underground or Submerged Metallic Piping Systems), and the PRCI Pipeline Repair Manual;

6. Comply with additional requirements specified in the scope of work.

C. The third-party consultant shall prepare a written report reflecting its findings, conclusions, and any recommendations for improvement found in conducting the analysis.

1. The consultant may recommend improvements to Plains' ILI analysis process and procedures to improve the quality and integration of ILI data into its IMP going forward. Plains shall give due consideration to the results of the analysis and recommendations of the consultant but will maintain discretion over whether and how to implement any recommendations.

2. The report shall include a list of documents and data reviewed in conducting the analysis, which shall be provided to the OSFM, if requested.

3. Within 150 days of entry of the CD, the consultant shall provide a draft report to the OSFM and Plains for comment at the same time. Plains and the OSFM may provide comments to the consultant on the report within 21 days of receipt of the draft.

4. Within 45 days after receiving comments (if any) from Plains and the OSFM, the consultant shall provide a final report to PHMSA, the OSFM and Plains.

4. **<u>Integrity Management</u>**

A. For any operating segments of Lines 901, 903, and 2000 (not to include any replacement lines):

1. Plains shall implement the following measures and amend its IMP, as needed, to include the requirements of this section for the applicable lines:

a. In addition to other dig criteria specified by regulation or in its IMP, Plains shall remediate all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall

loss, within one year of discovery. If Plains is unable to remediate such anomalies within one year of discovery, Plains shall notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).

b. Analyze a sample of additional anomalies of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten, unless fewer than ten anomalies are reported within that range, in which case Plains would examine the number of anomalies called.

c. When sizing anomalies, apply interaction/clustering criteria of 6t by 6t for applicable ILI tools;

d. Require its ILI tool vendor to include in the vendor's inspection report all metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance;

e. Any time a shrink sleeve is exposed during an anomaly investigation, remove the shrink sleeve, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy;

f. Send all field measurements to the tool vendor within 90 days of completing all digs for any ILI, provided that available data must be submitted prior to the next ILI run, and conduct annual meetings with the tool vendor to discuss tool performance;

g. For any use of magnetic flux leakage (MFL) tools, require its ILI tool vendor to manually grade any metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss (i.e., have human eyes on the raw data and not simply rely on a computer algorithm), and require that the vendor's ILI report note any differences between what the computer algorithm reported and the vendor's manual grade;

h. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, re-run the ILI tool to cover the area of failure;

i. Integrate and analyze available data in its P&M process, including:

   i. Assessment data from ILI tool runs;

   ii. Dig and repair data;

iii. Corrosion data, such as survey results, chemical treatments, and cleaning-pig results;

iv. Operational data, such as pressure and flow data;

v. Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans;

vi. Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results;

vii. Other pipeline characteristics, such as length, diameter, presence in HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government Code § 8574.7(d), including 14 CCR 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume.

2. ILI Measures

a. Initial ILI Runs. Each year during the first two years after entry of the CD, Plains shall conduct at least two ILIs using: (1) a high-resolution MFL tool; and (2) a UT tool with an inertial measurement unit (IMU). Plains shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. If a UT tool run is unsuccessful, Plains shall identify the limitations that prevented the UT tool run from being successful, consider changes to increase the likelihood of a successful UT tool run, and use best efforts to rerun the UT tool within six months (subject to tool availability).

i. All ILI assessments in the first two years shall include a sizing tool and a tool capable of identifying dents.

ii. In each of the first two years, Plains shall run the second ILI tool as soon as practicable after running the first ILI tool, but no later than 90 days after completion of the first ILI tool run. If one of the two tool runs is unsuccessful, Plains shall re-run the tool that was unsuccessful (but need not re-run the tool that was successful) even if the re-run of the unsuccessful tool run would occur more than 90 days from the successful tool run.

b. Subsequent ILI Runs. After the first two years, Plains shall run at least one MFL or one UT tool every year, using a different ILI tool type (MFL or UT) in each alternating year. Alternatively, Plains may run a UT tool each year. If, however, any UT tool run is unsuccessful, Plains shall document the reasons why the UT tool was unsuccessful, consider changes to increase the likelihood of a successful UT tool run, and may use MFL technology to complete that year's ILI, but must run a UT tool the following year.

c. All ILI Runs. Plains shall provide ILI results and reports to the OSFM within 30 days from its availability to Plains.

5. **Valves**

A. Within one year after entry of the CD for any operating segments of Lines 901, 903, and 2000, and for any new pipeline segments replacing those lines, Plains shall conduct EFRD analyses, which shall include consideration of:

1. Swiftness of leak detection and pipeline shutdown capabilities, type of commodity carried, rate of potential leakage, volume that can be released, topography or pipeline profile, potential for ignition (for spilled commodity), proximity to power sources, location of nearest response personnel, specific terrain between the pipeline and the HCA, and benefits expected by reducing the spill size.

2. Valve placement and method of valve actuation for all valves (not including valves used for instrumentation purposes, such as on tubing on transmitter calibration manifolds).

B. Plains shall submit the EFRD analyses to OSFM within one year of entry of the CD.

C. Where practical, Plains shall confirm that check valves that are necessary for the safe operation of the pipeline are in good working order at intervals required by other valve maintenance activities and associated procedures.

6. **Risk Analysis**

A. For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines):

1. Plains shall submit a risk analysis under proposed regulation 19 CCR § 2111(c) to OSFM (dated January 17, 2019 and publicly noticed in the California Regulatory Notice Register on February 15, 2019), or the final version of such regulation as it may be made effective in the future, regardless of whether or not those lines would otherwise be subject to the proposed regulations.

a. The information in the risk analysis shall be limited to the information listed in proposed regulation 19 CCR § 2111(c).

b. Plains' responsibility under this subsection is limited to providing the risk analysis to OSFM; Plains will maintain discretion over whether and how to implement the results of the analysis. The OSFM may review and comment on the risk analysis submitted by Plains consistent with provisions found in the proposed regulations, 19 CCR 2100 et seq.

c. The risk analysis shall be due within one year from entry of the CD.

7. **Leak Detection**

A. For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines), Plains shall confirm in writing to the OSFM within 30 days of entry of the CD that it has installed a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) that is compliant with API 1130.

B. Within 12 months after initiating operation of any replacement lines for Lines 901 or 903, Plains shall verify and certify to the OSFM that all Pipeline and Instrumentation Drawings (P&IDs) reflect correct "as-built" information.

8. **Non-waiver**

A. Nothing in this CD shall excuse Plains from otherwise complying with the AB 864 regulations when they are promulgated.

**ARTICLE II – COMPANY-WIDE PROVISIONS ON REGULATED PIPELINES**

9. **Integrity Management**

A. New Procedures for Interim Reviews and Assessments

1. Plains shall modify Section 9.5 of its Integrity Management Plan ("Continual Evaluation and Assessment of Pipeline Integrity") to provide for an annual, but not to exceed 15 months, Interim Review of each pipeline segment it operates to determine whether, since the last assessment (whether it was an Interim Assessment or a full periodic assessment under Section 6), conditions have changed or new information has been obtained that could significantly impact already-identified threats or create new threats for that segment. If so, Plains shall evaluate whether it should implement any P&M measure(s) to address that threat prior to the next regularly-scheduled assessment. Section 9.5 shall list all the categories of potential threats to be considered as part of the Interim Review and the types of conditions, information and data that will be included in the information analysis conducted under 49 CFR § 195.452(g).

2. Plains shall modify Section 9.5 of its IMP to provide new forms for P&M measures or actions to be taken as a result of an Interim Review. Section 9.5 shall provide that Plains' Integrity Engineer may recommend any P&M measures that may be appropriate, including any P&M measures that could be recommended following a full assessment performed under Section 6 of its IMP.

3. Plains shall submit its proposed modifications of Section 9.5 to PHMSA no later than 60 days after entry of the CD. If PHMSA does not object or request any modification within 60 days, Plains shall proceed to implement the revised procedures in Section 9.5, which shall be completed within 18 months from entry of the CD.

B. Documentation for P&M Recommendations

1. Within 90 days from entry of the CD, Plains shall revise Part B of its P&M Recommendation form (F11-2), to expand the scope and content of comments in the "Basis of Recommendation" field to provide a narrative explanation that reflects, at a minimum:

   a. What drew the engineer's attention and caused him or her to make the recommendation (such as an anomaly, pattern, trend or potential correlation observed in the data, a particular event or occurrence, a particular change in the operation or configuration of the line or in its surrounding environment, "lessons learned" from another event or occurrence, a corporate goal or initiative, etc.);

   b. The specific risk (likelihood or consequence of failure, or both) or concern that the recommended measure is intended to investigate or address; and

c. The goal or intended outcome that the recommended P&M measure is intended to achieve with regard to that specific risk or concern.

2. In the new forms for the Interim Review procedure described in Paragraph A above, Plains shall likewise provide a narrative explanation of the bases for any recommended P&M measures.

3. In Part B of its Preventive and Mitigative Evaluation Recommendation Form (F11-2), Plains shall continue to identify the anticipated completion date for the P&M measure in the column titled "Deadline Date."

C. Tracking of P&M Measures

Plains shall document P&M measures recommended but not implemented. Plains shall document implemented P&M measures through to completion, whether undertaken pursuant to an Interim Review under Section 9.5 or a full assessment under Section 6, such that these actions will be properly documented under 49 CFR § 195.452(l).

10. **Valves and O&M**

A. Within two years after entry of the CD, Plains shall conduct EFRD analyses for all Regulated Pipelines for which it has not previously completed an EFRD analysis.

B. Within two years of entry of the CD, Plains shall develop and implement procedures to:

1. If a valve fails to respond properly on first actuation command, document the failure and review historical records for that valve to identify any systemic issues.

2. Adjust Plains' surge analyses and Emergency Response Plans, if necessary, to account for identified systemic issues associated with valve closure times.

3. Timely communicate to the Control Room the status of valve maintenance activity for those valves on Regulated Pipelines that are capable of being operated by the Control Room.

4. Verify that personnel assigned to operator-qualification tasks for valve maintenance are qualified to perform those tasks.

C. Plains shall make all repairs necessary to keep valves in good working order within one year of discovery that the valve is not operating as intended, or, if not possible, Plains shall provide timely notification (including justification) to PHMSA or OSFM as applicable.

Case: 26-4629, 11/09/2026, DktEntry: 48.1, (269 of 293)

D. For all field personnel who perform maintenance on facilities, equipment, or devices, Plains shall provide training:

1. Within two years of entry of the CD, that addresses the importance of complying with Plains' policy requiring notification of Control Room personnel before beginning maintenance activities on any such facility, equipment, or device that could change the status of any pump, valve, CPM device, SCADA device, pressure or flow metering or rate that is monitored by the Control Room. Plains shall include in the training a requirement that employees shall notify the Control Room before entering a facility to perform maintenance, or, if not possible, immediately after entering.

E. Plains shall improve existing valve maintenance recordkeeping to include confirmation whether the valve has been actually operated during maintenance.

11. **<u>Leak Detection</u>**

A. Within 90 days after entry of the CD, Plains shall create and maintain a list of its regulated mainline pipelines, excluding gathering lines and Delivery Lines, to indicate which of the following three rupture-detection methods, if any, are used on each line: (1) Rate of Change Combination alarm; (2) low discharge pressure alarm; or (3) 5-minute computational pipeline monitoring (CPM) alarm.

1. Within one year after entry of the CD, for any regulated mainline pipeline identified in the list created pursuant to this paragraph that does not utilize at least one of the three rupture detection methods, Plains shall implement at least one.

B. For the term of the CD, Plains shall conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change.

C. Within 18 months of entry of the CD, for its CPM systems, Plains shall analyze and evaluate the use of accumulated deviation rolling time periods longer than 24 hours.

1. Plains shall document its analysis and provide it to PHMSA for comment, but Plains shall maintain discretion over what actions to take, if any, and how to implement the results of its analysis.

D. Within six months of entry of the CD, Plains shall have in place a written procedure for Selection of Leak Detection Method for its Regulated Pipelines.

1. Plains shall provide the Selection of Leak Detection Method procedure to PHMSA for comment, but Plains shall maintain discretion over and be

responsible for the final content and implementation of the Selection of Leak Detection Method procedure.

E. Plains will hold periodic (at least annual) meetings to solicit feedback from Control Room and operations maintenance personnel regarding potential improvements to leak detection. The results of the meetings will be documented and shared with appropriate personnel. The recommendations will be evaluated and documented.

F. Instrumentation and Display

1. To minimize and prevent false operating conditions from being displayed, Plains shall, per API 1175 (Pipeline Leak Detection – Program Management (1st Edition, December 2015)), within three years from entry of the CD or such earlier time as required by regulations:

a. Provide a procedure by which operations maintenance personnel and/or Control Room personnel identify and record when instrumentation has been impeded on an unplanned basis and is no longer providing accurate and updated values on pressure, flow, or temperature due to scheduled or planned maintenance activities.

b. Track these conditions through to resolution, including instrumentation relocation when necessary.

12. **Control Room Management**

A. For Lines 901 and 903, prior to resuming operations on segments currently not in service or commencing operations on any replacement for those lines, Plains shall:

1. Complete point-to-point verification reviews for all components of its SCADA system, including displays, alarm setpoint values, and alarm log descriptors;

2. Update its piping and instrumentation diagrams, software, manuals, and operating procedures to accurately reflect the existing field configuration;

3. Confirm that all Lo-Lo and Hi-Hi SCADA alarms are configured and programmed as critical safety related alarms for pressures and flows, and that alert notifications are correct and accurate; and

4. Update the names of all facilities, equipment, devices, measurement points and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions (updating or removing out-of-date names).

B. For Line 2000, within six months after entry of the CD, Plains shall confirm to the OSFM that all Alarm Descriptors on the control console are accurate.

C. Plains shall implement the Control Room Management Plan measures and Control Center General Procedures measures referenced in paragraph 23(a) of the CD.

13. **Emergency Response and Oil Spill Response Plans**

A. California-Specific Provisions:

1. Plains shall review and update its Bakersfield District Response Zone Plan periodically, as required by applicable regulations, including 14 CCR 816.05. Plains' review shall include the portions of its Response Plan that address identification of culverts along the pipelines' rights-of-way, potential receptors, access to potential spill sites, and procedures to assure protection of the environment from oil spills. To the extent that Plains has a Tactical Response Plan, Plains shall make it available to the Governments upon reasonable request and as needed in connection with a drill or response to a spill.

B. Company-Wide Provisions

1. Plains shall, at least once before two years from the date of entry of the CD, and at least one additional time prior to termination of the CD, survey its rights-of-way for all regulated mainline pipelines of at least 24" diameter, by foot or air patrol, to identify all culverts and shall ensure the emergency response plans covering those pipelines (a) reflect the locations of all culverts identified, and (b) address potential containment and recovery techniques for spills that may occur near identified culverts.

2. Within 180 days of entry of the CD (or within 180 days of a new employee being hired, or an existing employee being assigned to relevant duties) Plains shall provide or confirm that it has provided all employees who may reasonably be involved in spill response with NIMS ICS training at the 100 and 200 levels. Within 180 days of entry of the CD, Plains shall also provide or confirm that it has provided ICS training at the 300 and 400 level to any employee who may reasonably be expected to coordinate with the Incident Management Team during a spill response. Plains shall provide refresher training to employees within two years after initial training and shall maintain certification of such training and make such documents available to Plaintiffs upon request.

3. Going forward from the date of the CD, Plains shall include in its contracts with all Oil Spill Response Organizations (OSROs) a requirement that the OSROs' employees and contract employees receive training at the same level specified for Plains employees, based on their responsibilities, prior to participating in any incident response on behalf of

Plains. Plains shall require its OSRO contractors and subcontractors to register with a third-party online compliance verification system and shall use that online verification system to spot-check the NIMS ICS Training histories for randomly-selected OSRO personnel who participate in Plains' table-top drills. Plains' spot-check shall include a reasonable number of OSRO personnel participating in the drills to help ensure that all OSRO personnel participating in incident response are trained at the ICS levels specified herein.

4. Within 180 days of entry of the CD, Plains shall provide or confirm that it has provided all Control Room supervisors with training regarding the Control Room's emergency response responsibilities and procedures. Plains shall provide this training annually thereafter. Plains shall maintain auditable documentation that supervisors have received such training and shall make such documentation available to PHMSA upon request.

5. Plains shall notify PHMSA (and, for California Lines, California OSPR and OSFM) of company-sponsored and organized drills in accordance with applicable regulations, including table tops (either with or without equipment deployment). Plains shall provide PHMSA (and, for California Lines, California OSPR and OSFM) with after-action reports for each table-top drill involving equipment deployment within 90 days of completion of the drill. Plains shall include lessons learned in such after-action reports and shall consider such lessons learned for incorporation into future drills or exercises.

6. For the term of the CD, a representative of Plains' Control Room management team shall participate in any after-action or "hot wash" activity designed to identify areas of improvement following a release, and shall share, in documented form, the information obtained with relevant Control Room personnel.

14. **<u>Safety Management System (SMS)</u>**

A. Plains shall continue to implement its SMS, which is based on recommended practices in American Petroleum Institute (API) RP 1173 (Pipeline Safety Management Systems (1st Edition, July 2015)).

1. Prior to the termination of the CD, Plains shall hire a third party to assess the conformance of its SMS to API RP 1173. Plains shall direct the third party to transmit a copy of the final report to PHMSA. Plains' responsibility under this paragraph shall be limited to engaging the third party to prepare the report and providing the report to PHMSA. Any nonconformance identified by the third party shall not be a violation of the CD.

B. Plains shall participate in the API Pipeline SMS Group to exchange ideas, information, and lessons learned about implementation of API RP 1173.

15. **Drug and Alcohol Program**

A. Within one year of entry of the CD, Plains shall review and revise its drug and alcohol misuse plans to comply with post-accident and random drug and alcohol testing required by 49 C.F.R. §§ 199.105(b), (c), and 49 C.F.R. § 199.225(a). This shall include a review of all covered positions among Control Room personnel and field personnel for inclusion in the plans for post-accident testing. Covered positions shall include any person with authority to shut down a pipeline, including Control Room shift supervisors. Plains shall ensure adequate implementation and documentation for all post-accident drug/alcohol tests as required by 49 C.F.R. § 199.117(a)(5) and 49 C.F.R. §§ 199.227(b)(4), (c)(1)(v) and in accordance with its procedures. Should Plains determine that it is not possible to administer a post-accident drug/alcohol test on a covered employee whose performance of a covered function either contributed to the accident or could not be completely discounted as a contributing factor within the time specified in the regulations, Plains shall document why the test was not administered within such time.

# APPENDIX C

## (*Intentionally left blank*)

# APPENDIX D

# *(Remaining Corrective Actions from the PHMSA CAO)*

# APPENDIX D

1. All outstanding corrective actions in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into this Consent Decree, as outlined below, and subject to the sole regulatory oversight of the OSFM.

   a. **Line 901 Shutdown.** Plains shall not operate Line 901 until authorized to do so by the OSFM.

   b. **Restart Plan for Line 901.** If Plains seeks to restart Line 901, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for Line 901 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. The Restart Plan shall include:

      1) Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual;

      2) Provisions for adequate patrolling of Line 901 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two hours;

      3) Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes;

      4) A specific day-light restart that includes advance communications with local emergency response officials;

      5) Master Control Room enhancements, including:

         a) Implementation of advanced leak-detection

Case: 26-4629, 11/09/2026, DktEntry: 48.1, (277 of 293)

capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:

1. Revised alarm threshold adjustments;
2. Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;

b) Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running.  Dynamic alarm limits based on pipeline status shall be used if hydraulically required;

c) Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;

d) Implementation of emergency shutdown programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;

e) Development and implementation of training associated with the emergency shutdown programming described above; and

f) Provision of additional controller training that

incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident.

6) Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes;

7) Installation of additional safety valves as a result of Plains' EFRD evaluation;

8) Installation of additional pressure sensors as a result of Plains' surge study;

9) Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM. The tool run shall be initiated during daylight hours. If the tool run does not collect a complete data set, the UT tool shall be promptly re-run. A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report. Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and

10) **Corrosion Prevention.** Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan. Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c).

c. **Return to Service of Line 901.** After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015.

d. **Removal of Pressure Restriction of Line 901.** The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary removal or modification of the pressure restriction.

e. **Line 903 Shutdown.** After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM.

f. **Restart Plan for Line 903.** If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line

Case: 26-4629, 11/09/2026, DktEntry: 48.1, (280 of 293)

903 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:

1) Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two hours;

2) Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and

3) Provisions for a daylight restart and advance communications with local emergency response officials.

g. **Line 903 Return to Service.** After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments).

h. **Removal of Pressure Restriction for Line 903.** After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903.

1) The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable

engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline.

2) The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction. Requests for removal of the pressure restriction may be submitted by pipeline segment.

i. **Notifications.** Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates.

j. **Reporting Requirements for Lines 901 and 903.** If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval.

1) The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety.

2) Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree.

3) The Appendix D Documentation Report shall include but not be limited to:

A. Table of Contents;

B. [*intentionally left blank.*]

C. [*intentionally left blank.*]

D. Summary of all tests, inspections, assessments, evaluations, and analysis to the extent required under this Appendix D;

E. [*intentionally left blank.*]

F. [*intentionally left blank.*]

G. Lessons learned while fulfilling the requirements of this Appendix D.

# Part 195 - Liquid Pipeline Interstate/Intrastate Delineation

EXAMPLE 1




*(OPS yields jurisdiction to State because it's not conected to any other pipeline facility)

Appendix A.cdr
10/18/01 Page 1 of 12

# Part 195 - Liquid Pipeline Interstate/Intrastate Delineation

EXAMPLE 2




*(OPS yields jurisdiction to State because it's not conected to any other pipeline facility)

Appendix A.cdr
10/18/01 Page 2 of 12

# Part 195 - Liquid Pipeline Interstate/Intrastate Delineation

EXAMPLE 3




Appendix A.cdr
10/18/01 Page 3 of 12

# Part 195 - Liquid Pipeline Interstate/Intrastate Delineation

EXAMPLE 4A




Appendix A.cdr
10/18/01 Page 4 of 12

# Part 195 - Liquid Pipeline Interstate/Intrastate Delineation

EXAMPLE 4B






# Part 195 - Liquid Pipeline Interstate/Intrastate Delineation

EXAMPLE 5A



# Part 195 - Liquid Pipeline Interstate/Intrastate Delineation

Example 5b




*(OPS yields jurisdiction to State because it's not conected to any other pipeline facility)

Appendix A.cdr
10/18/01 Page 7 of 12

# Part 195 - Liquid Pipeline Interstate/Intrastate Delineation

Example 6




*OPS yields jurisdiction to the state because it's not conected to any other pipeline facility. If there is no state enforcement authority or their authority is challenge by the pipeline, then OPS assumes jurisdictional authority.

Appendix A.cdr
10/18/01 Page 8 of 12

# Part 195 - Liquid Pipeline Interstate/Intrastate Delineation




Appendix A.cdr
10/18/01 Page 9 of 12

# Part 195 - Liquid Pipeline Interstate/Intrastate Delineation




Appendix A.cdr
10/18/01 Page 10 of 12

# Part 195 - Liquid Pipeline Interstate/Intrastate Delineation

EXAMPLE 9




Appendix A.cdr
10/18/01 Page 11 of 12

# Part 195 - Liquid Pipeline Interstate/Intrastate Delineation

EXAMPLE 10




Appendix A.cdr
10/18/01 Page 12 of 12

CONFIDENTIAL - NOT FOR PUBLIC RELEASE


TABLE OF CONTENTS

| SECTION | TITLE |
|---|---|
| 1.0 | INTRODUCTION |
| 2.0 | OIL TREATING PLANT (OTP) |
| 3.0 | TRANSPORTATION TERMINAL (TT) |
| 4.0 | STRIPPING GAS TREATING PLANT (SGTP) |
| 5.0 | COGENERATION POWER PLANT (CPP) |
| 6.0 | POWER DISTRIBUTION (PD) |
| 7.0 | UTILITIES & FACILITIES INTERFACE |

CONFIDENTIAL


CONFIDENTIAL - NOT FOR PUBLIC RELEASE

CONFIDENTIAL - NOT FOR PUBLIC RELEASE


## 1.0 INTRODUCTION

The Santa Ynez Unit onshore facilities are located in Las Flores Canyon, west of Santa Barbara, California. These facilities receive produced oil/water emulsion and gas from the Santa Ynez Unit offshore platforms and treat the oil, gas, water and other by-products to acceptable product quality specifications prior to shipment by pipeline or truck to their destinations. In addition, electric power is generated and provided to the offshore platforms.

The onshore facilities have been subdivided into the following areas:

- Oil Treating Plant (OTP)
- Transportation Terminal (TT)
- Stripping Gas Treating Plant (SGTP)
- Cogeneration Power Plant (CPP)
- Power Distribution System (PDS)

The design and operation of the SYU onshore facility is based on compliance with applicable Federal, State, and Local codes, ordinances and regulations plus permit conditions and associated compliance plans submitted by Exxon. Section 10.0 covers these requirements in greater detail.

The relative location of the different areas along with a simplified block flow diagram is shown on Figures 1.2A and 1.2B. A brief discussion of the areas follows:

## 2.0 OIL TREATING PLANT (OTP)

The Oil Treating Plant receives approximately [redacted] KBPD oil and up to [redacted] KBPD water in the form of an emulsion from the offshore platforms. The OTP dehydrates, stabilizes, and sweetens the crude oil i.e. reduces the hydrogen sulfide content to <10PPMW and the vapor pressure to <11PSIA to meet $H_2S$ and vapor pressure product specifications. The separated produced water is filtered, degassed and biologically treated with anaerobic bacteria to reduce dissolved oil and grease so that it is suitable for ocean disposal.

[redacted]

## 3.0 TRANSPORTATION TERMINAL (TT)

The Transportation Terminal located southeast of the OTP consists of two 270 KB storage tanks, 3 pipeline booster pumps, a tank vapor compression and blanket gas system and utility and support facilities necessary to store oil received from the OTP and ship through the All American Pipeline. The booster pumps are designed to batch ship at a [redacted] KBPD rate. The TT plot layout and utilities have been designed to provide for the future addition of a marine terminal with tanker loading facilities.

Also located in the Transportation Terminal are the water outfall pipeline pig launcher and the emulsion pipeline pig receiver.

Oil from the storage tanks is periodically transferred by booster pumps to the All-American Pipeline pump station. As the crude oil level drops in the tanks during transfers, the displaced volume is made up with blanket gas from the Fuel Gas System. Conversely, as treated crude fills the tanks, displaced blanket gas is compressed and routed to the OTP vapor recovery system. Any condensate recovered in the compressor scrubbers flows to the Closed Drain Sump from which it is pumped to the OTP Rerun Tanks for recovery. Drain water from the pump pad area drains and tank farm area drainage contained in the Emergency Containment Basin is treated in the Area Drain Oil/Water Separator before discharging to Corral Creek. Any oily skim-water from this separator is returned to the OTP for processing.

## 4.0 STRIPPING GAS TREATING PLANT (SGTP)

The Stripping Gas Treating Plant processes approximately [redacted] MSCFD stripping gas and other vapors from the Oil Treating Plant and Hondo and Harmony Platforms, to produce a sweet gas for use in the Oil Treating Plant, the Cogeneration Power Plant, and the Transportation Terminal. The SGTP separates the condensate stabilizer



CONFIDENTIAL - NOT FOR PUBLIC RELEASE

CONFIDENTIAL - NOT FOR PUBLIC RELEASE


overhead gas from the OTP into a sour deethanizer gas and a propane and heavier liquid. Makeup gas from the offshore platforms is separated into a sour flash gas and a condensate. The sour gas from the deethanizer overhead and from the offshore makeup gas separation is treated to remove $H_2S$ and $CO_2$.

The propane and heavier liquid is sweetened and fractionated to produce up to [redacted] BPD propane and [redacted] BPD butane products that meet sales quality specifications. Acid gas from the above treating processes and from the OTP is treated to produce up to [redacted] specification sulfur product, plus a tail gas which is cleaned up prior to incineration.

**5.0 COGENERATION POWER PLANT (CPP)**

The 49 MW Cogeneration Power Plant consisting of a natural gas fueled GE Frame 6 Gas Turbine Generator with a rated output of 39.5 MW and a 9.8 MW non-condensing steam turbine is located on the east side of the Oil Treating Plant. The CPP generates electric power for the onshore facilities and the offshore platforms, which is described more fully in paragraph 6.0.

Heat from the gas turbine exhaust is recovered in a supplementary fired waste Heat Recovery Steam Generator which has a total design duty of [redacted] MBtu/h and provides [redacted] steam at 725 psig.

Emissions of nitrogen oxide ($NO_x$) from the gas turbine are controlled by steam injection and a platinum based Selective Catalytic Reduction Unit (SCR).

The power plant operates in parallel with Southern California Edison. SCE provides emergency backup, start-up, and balance power. This tie-in also provides the flexibility to sell power to SCE when the plant generating capacity exceeds the SYU power demand.

**6.0 POWER DISTRIBUTION**

Electrical power for the SYU Onshore and Offshore facilities is provided by the Cogeneration Power Plant with emergency back-up, start-up and balance power provided by SCE at the SCE substation located near the Offshore Substation (OSS) south of the Transportation Terminal. Approximately [redacted] of the power generated by the CPP is used to operate the onshore plants, and the remaining 80% is used for the Offshore Platforms.

[redacted]

SCE power will be supplied initially, from an existing power line which runs from Gaviota to Goleta along the Pacific Coast highway, south of Las Flores Canyon. SCE will augment this with a new transmission line which will be tied into the SCE substation resulting in two separate sources of [redacted]

**7.0 UTILITIES & FACILITIES INTERFACE**

Utilities such as steam, air, power distribution, flare, and vapor recovery were designed to maximize the sharing of systems between the different onshore facilities. In most cases, the utility systems were sized for the ultimate facilities requirements. The pipe rack design also allows for future expansion. This sharing of utilities creates an interdependency between plants which makes it essential that all onshore facilities run concurrently.

CONFIDENTIAL


CONFIDENTIAL - NOT FOR PUBLIC RELEASE

CONFIDENTIAL - NOT FOR PUBLIC RELEASE


[redacted]

ONSHORE AND NEARSHORE PLANT PLOT PLAN FIGURE 1.2A

7-2-91


CONFIDENTIAL - NOT FOR PUBLIC RELEASE

CONFIDENTIAL - NOT FOR PUBLIC RELEASE

89156 :\I_ZUN\I-2B
7-2-91




ONSHORE FACILITIES FUNCTIONAL BLOCK DIAGRAM FIGURE 1.2B

Case: 26-4629, 11/09/2026, DktEntry: 48.1, (293 of 293)

CONFIDENTIAL


CONFIDENTIAL - NOT FOR PUBLIC RELEASE